IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAROL SMITH,<br>    Individually on her own Behalf<br>    and as Personal Representative of the<br>    the Estate of Erika Smith,<br>    4450 South Park Avenue, #415<br>    Chevy Chase, MD 20815<br><br>          Plaintiff,<br><br>          v.<br><br>UNITED STATES OF AMERICA,<br>    Washington, D.C.<br><br>          Defendant. | Civil Action No. _____ |

**COMPLAINT FOR DAMAGES**

Plaintiff Carol Smith, individually on her own behalf and as Personal Representative of the Estate of Erika Smith (deceased), by and through her attorneys, brings this action seeking damages arising from the wrongful death of her nine-year-old daughter, Erika Smith. As set forth more fully below, the acts underlying this Complaint arise from the brutal murder of Erika Smith by Anthony Kelly, a convicted felon, who was negligently and wantonly released from federal custody, five years prior to the completion of his sentence, and who, at the time of the murder five months later, had slipped through the cracks of Defendant's community supervision program through the careless, haphazard and woefully negligent acts and omissions of Defendant's officers, agents and employees. Both Kelly's release and his community

supervision – which failed to result in his reincarceration – were carried out by Defendant in a manner that violated Defendant's rules, policies and procedures.

## Nature of the Action

1.  This is an action for damages against the United States, which, by virtue of the negligent acts and/or omissions of its agents, directly and proximately caused the premature and wrongful death of Erika Smith.

2.  As alleged in greater detail below, Defendant (acting through its federal agencies: the United States Parole Commission, the Federal Bureau of Prisons, and the Court Services and Offender Supervision Agency) prematurely and negligently released from federal custody Anthony Quintin Kelly, a convicted felon, who, shortly after his release to Defendant's community supervision program, viciously and deliberately murdered nine-year-old Erika Smith in Silver Spring, Maryland.

## Jurisdiction and Venue

3.  The Court's personal jurisdiction over the United States of America is manifest. The United States has waived its sovereign immunity under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq.* (2005). This court has original jurisdiction over this action pursuant to 28 U.S.C. § 1346(b)(1) (2005) (claims against the United States).

4.  Plaintiff has exhausted her administrative remedies with respect to the tort claims presented herein as required by 28 U.S.C. § 2675 (2005). These claims were presented to the United States Parole Commission, the Federal Bureau of Prisons, and the Court Services and Offender Supervision Agency on March 29, 2005. The claims were denied on October 7, 2005. *See* Letter from Barbara Matthews-Beck to Stuart H. Newberger dated October 7, 2005 (attached as Exhibit 1).

5.Venue is proper in this Court under 28 U.S.C. §§ 1391(e) and 1402(b) (2005). The estate of Erika Smith is administered by the Superior Court of the District of Columbia and the acts and omissions complained of occurred in the District of Columbia.

### Parties

6.Plaintiff Carol Smith is a resident of Maryland and currently resides at 4450 South Park Avenue, Apartment #415, Chevy Chase, Maryland 20815. She brings this action individually on her own behalf and as Personal Representative of the Estate of Erika Smith. Carol Smith initiated appointment of herself as Personal Representative to the Estate of Erika Smith in the Superior Court for the District of Columbia and was appointed by that Court as Personal Representative of Erika Smith's Estate on March 23, 2005.

7.At the time of her death, Erika Smith was a resident of the District of Columbia and resided with Carol Smith at 3540 39th Street, N.W., Apartment B644, Washington, D.C. 20016.

8.Defendant United States of America is a proper defendant in a claim brought pursuant to 28 U.S.C. § 1346(b) and the Federal Torts Claims Act, 28 U.S.C. §§ 2671 et seq. The United States acts by and through its officers, agents, and employees, including the United States Parole Commission, the Federal Bureau of Prisons, and the Court Services and Offender Supervision Agency, and their officers, agents and employees. The United States Parole Commission, the Federal Bureau of Prisons, and Court Services and Offender Supervision Agency derive their authority from the United States Government and are "federal agencies" within the meaning of 28 U.S.C. § 2671.

9.The United States Parole Commission (hereafter "Parole Commission") is an agency within the United States Department of Justice. The Parole Commission is responsible

for the evaluation, release and supervision of offenders under its jurisdiction. In particular, the Parole Commission is responsible for making determinations of the initial conditions of release; the modification of those conditions; early discharge from active supervision; the issuance of warrants for violations of the conditions of release; and revocation of parole for such offenders.

10. The Federal Bureau of Prisons (hereafter "BOP") is an agency within the United States Department of Justice. BOP is responsible for the management and regulation of all federal penal facilities, including private correctional centers with which it contracts to provide community-based services for offenders under BOP supervision and custody, such as Hope Village halfway house in the District of Columbia, where Kelly resided from December 12, 2001, until his release from federal custody on March 7, 2002.

11. The Court Services and Offender Supervision Agency (hereafter "CSOSA") is an independent agency responsible for supervising the activities and monitoring the compliance of District of Columbia offenders on probation, parole, and supervised release, including Anthony Kelly, who was under the CSOSA's supervision in August 2002, when he traveled to Silver Spring, Maryland and murdered Erika Smith.

**Factual Allegations**

The following facts are alleged upon information and belief:

12. On April 16, 1996, after pleading guilty to car theft and assaulting (and threatening to kill) two individuals with a dangerous weapon, Anthony Kelly was sentenced to 10 years and six months in prison. Prior to this sentence, Kelly had accrued a lengthy record of criminal activity – including violent crimes – dating back to 1982.

**Administrative Failures**

13. More than five years before his sentence would have been completed, Kelly was released from federal prison in Pennsylvania to Hope Village, a BOP halfway house in Southeast D.C., based on representations which Defendant knew or should have known were fraudulent. Kelly was released to Hope Village in December 2001, with a parole date set for three months later. On March 7, 2002, despite numerous violations of the conditions of his release, Kelly was paroled by Defendant from BOP custody to the D.C. community, under the supervision of the CSOSA. Five months later, on August 6, 2002, Kelly broke into Erika Smith's father's home in Silver Spring, Maryland, and brutally and viciously murdered the nine-year-old girl, lacerating the right side of her face, and shooting her once at point-blank range. Kelly then shot Erika's father eight times in the leg and chest before killing him. Kelly escaped the scene of the murders ultimately with the family Bible and three dollars stolen from the house. Had Defendant complied with its mandatory regulations, policies and other requirements governing the parole and supervision of federal offenders, Kelly would not have been free in August 2002, when he murdered Erika Smith.

14. On information and belief, in 2001, Kelly applied to the United States Parole Commission for early release. In his application, Kelly claimed to have earned the requisite General Educational Development ("GED") high school equivalency diploma in March 2000. In truth, Kelly had never received any educational diploma or degree, equivalency or otherwise. Defendant negligently failed to verify or otherwise investigate the validity of Kelly's representation, when, as late as March 2001, it knew, or should have known, that Kelly had not earned a GED. Instead, Defendant proceeded to process his application, and imposed a requirement one year after Kelly purportedly earned his GED, that Kelly participate in a GED

program as a condition of release. Moreover, there was no attempt by any officer, agent, or employee of the Parole Commission, the BOP, or the CSOSA to verify receipt of a GED prior to releasing Kelly from custody. On information and belief, Defendant's policies prohibit release of offenders who defraud the government or fail to satisfy conditions of release, such as completion of a GED program.

    15. On December 12, 2001, five years before his scheduled release, Defendant released Anthony Kelly from federal prison into the temporary custody of a BOP halfway house owned and operated by Hope Village, Inc., in Southeast Washington, D.C.

    16. Anthony Kelly resided at Hope Village for less than three months, until he was released from federal custody into the community, under the CSOSA's supervision, on March 7, 2002. However, because he violated numerous conditions imposed by BOP during his stay at the halfway house, Kelly should not have been released in March 2002 and instead should have been returned to prison. On information and belief, under Defendant's policies, the Parole Commission, the BOP, and/or the CSOSA must verify that an offender is employed prior to being paroled into the community. In fact, Kelly was never employed at any point after his December 12, 2001 transfer to the halfway house, including during his community supervision by the CSOSA and, contrary to Defendant's requirements, not one officer, agent, or employee of the Parole Commission, the BOP, or the CSOSA verified that Kelly was employed prior to his release from the halfway house. Additionally, in violation of Defendant's polices, Defendant's officers, agents, and employees failed to investigate the circumstances of Kelly's alleged "employment." Had they done so, they would have discovered that Kelly's sham "employment" arrangement was with his stepfather, in violation of BOP regulations forbidding employment by a relative. There was no attempt by any officer, agent, or employee of the Parole Commission,

the BOP, or the CSOSA to ensure that the identity of Kelly's supposed employer was verified, despite a requirement that Defendant verify the employment circumstances of offenders in its custody or supervision. Had Defendant's officers, employees and agents taken due care to ensure that Kelly's claims were properly investigated, they would have discovered that he was in violation of the conditions of his release and Kelly would have been returned to prison.

17. On information and belief, Kelly, while still in BOP custody at the halfway house, continued to violate the law and the requirements of his release by driving stolen vehicles. BOP policies require that prisoners who engage in such conduct while on release to halfway houses be returned to prison.

18. Each of the above factors on its own was sufficient, under internal policies, practices and procedures, to require Kelly's return to prison, but especially so when considered in the aggregate. Nonetheless, Kelly was released from confined custody and into the D.C. community on March 7, 2002.

19. On information and belief, upon his release from the halfway house in March 2002, Kelly was placed in the custody and care of the CSOSA, a federal agency that is responsible for, among other things, supervising and monitoring inmates who have been released on parole. The CSOSA works closely with the Parole Commission to ensure the safety of the community while facilitating the transition of offenders to life outside of prison.

20. On information and belief, Kelly was initially placed under one of the strictest levels of supervision, "maximum supervision." According to CSOSA policy, "maximum supervision" required a minimum of four face-to-face contacts per month between Kelly and his Community Supervision Officer ("CSO"), two of which were required to occur outside of the

CSOSA office, in the "field." On information and belief, field visits to verify, at a minimum, Kelly's employment and residence did not occur.

21. That same spring, Defendant, through its officers, agents and employees at the CSOSA negligently, recklessly, and in violation of Defendant's requirements, reduced Kelly's level of supervision to "medium supervision," one level below maximum. This reduction was contrary to CSOSA policy, which requires that, before a reduction be effected, *inter alia*, the offender: 1) serve a minimum of three months in the original status before reduction; 2) have complied with his individualized case plan; 3) have an address and employment which have been verified by the CSOSA through field visits; 4) notify the CSOSA before traveling outside the jurisdiction; and 5) have undergone a criminal check. Defendant reduced Kelly's level of supervision in violation of these requirements. Had Kelly's CSO performed the field visits as required by CSOSA policy, on information and belief, the CSO would have discovered that Kelly was not employed and that, also contrary to Defendant's policy, the person for whom Kelly purported to be working was a relative, not a legitimate employer under Defendant's policies. Defendant also would have discovered additional violations by Kelly, had Defendant's officers, agents and employees supervised his parole with reasonable care, including, on information and belief: 1) his change of residence to his girlfriend's apartment; 2) domestic violence charges filed against him; and 3) his arrest in Prince George's County for driving a stolen vehicle and assaulting a police officer. Kelly also was indicted in Montgomery County subsequently for two rapes which took place in March and June 2002 in Takoma Park and Wheaton, Maryland.

22. On June 10, 2002, while driving a stolen vehicle from a liquor store in Prince George's County, Maryland, Kelly was arrested for assaulting a police officer. On information

and belief, the CSOSA did not learn about Kelly's arrest until advised by Kelly, ten days later. On June 20, 2002, Kelly's CSO, sought revocation of Kelly's parole, but failed to mark the memo to the Parole Commission "urgent" or send it by facsimile, as required by Defendant's policies. The Parole Commission did not take action on the CSO's request until July 9, almost one month after Kelly's arrest – when it declined to revoke Kelly's parole. Had the Parole Commission been properly apprised of Kelly's actions, he would have been reincarcerated.

23. On information and belief, Kelly was returned to maximum supervision during this period but, on information and belief, seen by his CSO fewer times than required and never seen in the field before the August 6 murder of Erika Smith, in violation of Defendant's policies and procedures.

24. Despite the aforementioned requirement that, under maximum supervision, Defendant hold four monthly face-to-face meetings with Kelly, including two in the field, the last time that Kelly saw his assigned CSO was in the CSOSA office on July 10, 2002. During July, the CSOSA fell short of the requisite number of both field visits and face-to-face meetings with Kelly.

25. Defendant, also in violation of its policies, failed to take any action following Kelly's July 30, 2002 failure to appear in court in Prince George's County on the car theft and assault charges from the preceding month, for which a warrant for Kelly's arrest had been issued. The following day, according to a subsequent indictment, Kelly smashed a window in a gun store in Kensington, Maryland, and stole five weapons, including the weapon that would be used to murder Erika Smith on August 6, 2002.

26. On information and belief, Defendant, through its CSO assigned to supervise Kelly, had no contact with Kelly between July 10, 2002 and August 16, 2002, when Kelly called

the CSO to state that he had missed the July 30 court hearing in Prince George's County. The CSO failed to report Kelly's action or the issuance of an arrest warrant for him. Indeed, Defendant took no action with regard to Kelly's flagrant violations of his parole conditions until August 21, when, prompted by a D.C. police officer's call seeking Kelly's whereabouts, the CSO called Kelly, and several days later mailed – by regular mail, again in violation of Defendant's policies – an arrest warrant request to the Parole Commission. The Parole Commission received the request six days later and issued a warrant for Kelly's arrest the following day. On information and belief, at no time between July 10 and September 5 were there field visits between Kelly and his CSO despite having been returned to "maximum supervision" during that period.

27. Anthony Kelly was finally captured by authorities on September 5, 2002. On May 15, 2003, Kelly was indicted for the murders of Gregory Russell and Erika Smith.

28. Had Defendant acted with due care and in compliance with its mandatory rules and procedures governing the release and community supervision of Anthony Kelly, he would have not have been free on parole on the night of August 6, 2002.

**The Murder of Erika Smith**

29. Erika Smith turned nine years old on June 4, 2002. On August 6, 2002, she was just about to enter fourth grade at Potomac School in McLean, Virginia. Erika's mother, Carol Smith, and father, Gregory Russell, were friends who shared custody of Erika. The two agreed that Erika would live with Carol and visit with her father weekly at his home at 9337 Columbia Boulevard in Silver Spring, Maryland 20910.

30. On Tuesday, August 6, 2002, Erika and her dad spent their last hours together. Erika was on break from summer camp and she and her dad had spent their day together running

errands and later playing together in the park. That night, as Erika and Greg were getting ready for bed, a stranger broke into Gregory Russell's home. The intruder, carrying a .32 caliber handgun, came upon Erika first. She ran upstairs, crying for her father, Greg, who was talking on the telephone with a friend when the intruder broke into his home. Greg screamed Erika's name as he heard the shot fired at his daughter. The assailant turned his weapon on Greg, shot him eight times, and killed him. The murderer was Anthony Kelly.

### Count I

*Carol Smith, as Personal Representative of the Estate of Erika Smith*

#### Action for Survival Damages

Paragraphs 1 through 30 are incorporated herein as if fully set forth.

As a direct and proximate result of the negligent and reckless acts of the United States, its officers, and/or agents, Erika Smith suffered extreme physical and mental pain and suffering before her death, entitling her Estate to compensatory damages.

WHEREFORE, Plaintiff Carol Smith, as Personal Representative of the Estate of Erika Smith, demands that judgment be entered against the Defendant United States, for compensatory damages.

### Count II

*Carol Smith, as Personal Representative of the Estate of Erika Smith*

#### Action for Wrongful Death

Paragraphs 1 through 30 are incorporated herein as if fully set forth.

As a direct and proximate result of the negligent and reckless acts of the United States, its officers and/or agents, Erika Smith sustained injuries at the hands of Anthony Kelly, resulting in her death. Due to her premature death, Erika Smith will never be able to earn an income or reap the benefits of a productive life.

WHEREFORE, Plaintiff Carol Smith, as Personal Representative of the Estate of Erika Smith, demands that judgment be entered against the Defendant United States, for compensatory damages, including loss of Erika's income.

## Count III

### Carol Smith, Individually on Her Own Behalf

### Loss of Solatium, Severe Emotional Distress and Funeral Expenses

Paragraphs 1 through 30 are incorporated herein as if fully set forth.

As a direct and proximate result of the negligent and reckless acts of the United States, its officers and/or agents, Plaintiff, Carol Smith, has been forced to mourn the loss of society and companionship of her only child, Erika Smith. This she does continuously. Because of the negligent acts or omissions of Defendant and the sudden, unexpected, and extremely violent death of her only child caused by Defendant's negligent acts and/or omissions, Carol Smith has suffered severe mental anguish and sorrow. Carol Smith was also forced to bury her only child and incur the expenses related to the burial and funeral.

WHEREFORE, Plaintiff Carol Smith demands that judgment be entered against Defendant United States, for compensatory damages.

## PRAYER FOR RELIEF

Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 1 through 30 of this Complaint as if set forth fully herein.

WHEREFORE, Plaintiff Carol Smith, individually on her own behalf and as Personal Representative of the Estate of Erika Smith, prays that this Court grant Plaintiff judgment in her favor against Defendant on Counts I through III and grant Plaintiff:

A. Damages in the amount of TWENTY FIVE MILLION DOLLARS ($25,000,000);

B. Reasonable costs and expenses, including attorneys' fees;

C. Such other and further relief that the Court may deem just and appropriate under the circumstances.

Respectfully submitted,

_____
Stuart H. Newberger (D.C. Bar No. 294793)
Laurel Pyke Malson (D.C. Bar No. 317776)
Aryeh S. Portnoy (D.C. Bar No. 464507 )
Alyssa Gsell (D.C. Bar No. 490395)
CROWELL & MORING, LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
Phone: (202) 624-2500
Fax: (202) 628-5113

Attorneys for Plaintiff Carol Smith, Individually on Her Own Behalf and as Personal Representative of the Estate of Erika Smith

DATED: April 6, 2006