## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAROL SMITH,<br>        Individually on her own Behalf<br>    and as Personal Representative of the<br>    the Estate of Erika Smith,<br>    4450 South Park Avenue, #415<br>    Chevy Chase, MD 20815<br><br>                    Plaintiff,<br><br>                    v.<br><br>UNITED STATES OF AMERICA,<br>    Washington, D.C.<br><br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 1:06-CV-00633 (RBW) |

### AMENDED COMPLAINT FOR DAMAGES

Plaintiff Carol Smith, individually on her own behalf and as Personal Representative of

the Estate of Erika Smith (deceased), by and through her attorneys, brings this action seeking

damages arising from the wrongful death of her nine-year-old daughter, Erika Smith.  As set

forth more fully below, the acts underlying this Complaint arise from the brutal murder of Erika

Smith by Anthony Kelly ("Kelly"), a convicted felon, who was negligently, recklessly, and

wantonly released from federal custody and supervised in the community by Defendant, five

years prior to the completion of his sentence.  Following his premature release, in the months

leading up to the murder of Erika Smith, Kelly embarked on a violent crime spree that included

brutal rapes and assaults, including the assault of a police officer, multiple automobile thefts, and

burglary of a gun shop, all facilitated by the gross negligence and reckless acts and omissions of

Defendant's officers, agents and employees. Despite these acts, Kelly was permitted to roam

freely around the community, wreaking havoc and destroying lives. In August 2002, five

months after his release from custody and while under Defendant's supervision, Kelly broke into

the Silver Spring, Maryland home of Erika's father, Greg Russell, and murdered Erika and her

father.

Both Kelly's release to a privately-owned and poorly run halfway house, and his

subsequent community supervision – marked by acts that should have resulted, but failed to

result, in his reincarceration and/or revocation or retardation of parole – were carried out by

Defendant in a manner that was grossly negligent and exhibited wanton indifference to the safety

of members of the community, including Erika Smith, and in violation of the policies, practices,

procedures, rules, requirements, guidelines, regulations and standards applicable to the release

and supervision of offenders within community corrections facilities and in the community.

<u>**Nature of the Action**</u>

1.      This is an action for damages against the United States which, by virtue of the

negligent, reckless, and wanton acts and/or omissions of its agents, officers, and employees,

directly and proximately caused the premature and wrongful death of Erika Smith.

2.      As alleged in greater detail below, Defendant (acting through its federal agencies:

the United States Parole Commission, the Federal Bureau of Prisons, and the Court Services and

Offender Supervision Agency, and their agents, officers and employees) prematurely,

negligently, recklessly, and with wanton indifference released, or facilitated the release, from

federal custody of, and supervised in the community, Anthony Quintin Kelly, a convicted felon.

Shortly after his release to Defendant's community supervision program, Kelly embarked on a

ruthless crime spree in the community, during which he viciously and deliberately murdered nine-year-old Erika Smith in Silver Spring, Maryland.

## Jurisdiction and Venue

3.    The Court's personal jurisdiction over the United States of America is manifest. The United States has waived its sovereign immunity under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq.* (2005). This court has original jurisdiction over this action pursuant to 28 U.S.C. § 1346(b)(1) (2005) (claims against the United States).

4.    Plaintiff has exhausted her administrative remedies with respect to the tort claims presented herein, as required by 28 U.S.C. § 2675 (2005). These claims were presented to the United States Parole Commission, the Federal Bureau of Prisons, and the Court Services and Offender Supervision Agency on March 29, 2005, and denied on October 7, 2005. *See* Letter of Oct. 7, 2005 from Barbara Matthews-Beck to Stuart H. Newberger (attached as Exhibit 1).

5.    Venue is proper in this Court under 28 U.S.C. §§ 1391(e) and 1402(b) (2005).

## Parties

6.    Plaintiff Carol Smith is a resident of Maryland and currently resides at 4450 South Park Avenue, Apartment #415, Chevy Chase, Maryland 20815. She brings this action individually on her own behalf and as Personal Representative of the Estate of Erika Smith. Carol Smith was appointed Personal Representative of the Estate of Erika Smith in the Superior Court for the District of Columbia on March 23, 2005, and the Estate of Erika Smith is administered by the Superior Court.

7.    At the time of her death, Erika Smith split her time residing with her mother in the District of Columbia (540 39th Street, N.W., Apartment B644, Washington, D.C. 20016), and her father in Silver Spring, Maryland (9337 Columbia Boulevard, Silver Spring, Maryland, 20910).

8.      Defendant United States of America is a proper defendant in a claim brought pursuant to 28 U.S.C. § 1346(b) and the Federal Torts Claims Act, 28 U.S.C. §§ 2671 *et seq*. The United States acts by and through its officers, agents, and employees, including the United States Parole Commission, the Federal Bureau of Prisons, and the Court Services and Offender Supervision Agency, and their officers, agents and employees.  The United States Parole Commission, the Federal Bureau of Prisons, and the Court Services and Offender Supervision Agency derive their authority from the United States Government and are "federal agencies" within the meaning of 28 U.S.C. § 2671.  Each of these federal agencies is bound by mandatory policies, practices, procedures, rules, requirements, guidelines, regulations or standards governing the parole and supervision of federal offenders and/or the supervision of community-based halfway houses.

9.      The United States Parole Commission (hereafter "Parole Commission") is an agency within the United States Department of Justice.  The Parole Commission is responsible for the evaluation, release and supervision of offenders under its jurisdiction.  In particular, the Parole Commission is responsible for making determinations regarding the initial conditions of release; the modification of those conditions; early discharge from active supervision; the issuance of warrants for violations of the conditions of release; and revocation and retardation of parole for such offenders.  It is the duty of the Parole Commission to reincarcerate, and/or revoke or retard the parole date of, paroled convicts under certain conditions, including those set forth herein regarding Anthony Kelly.

10.      The Federal Bureau of Prisons ("BOP") is an agency within the United States Department of Justice.  BOP is responsible for the management, regulation, and supervision of federal penal facilities, including private correctional centers with which it contracts to provide

community-based services for offenders under BOP supervision and custody, such as Anthony
Kelly.  The Hope Village halfway house in the District of Columbia, where Kelly resided from
December 12, 2001 until his release on March 7, 2002, is one such BOP-supervised private
correctional center.  It was the duty of BOP to ensure that Hope Village was following its
requirements as a community-based facility, including those requirements related to the
monitoring and supervision of federal inmates residing at such facilities pending parole into the
community.

11.    The Court Services and Offender Supervision Agency (hereafter "CSOSA") is an
independent federal agency responsible for supervising the activities, and monitoring the
compliance with applicable rules and requirements, of District of Columbia offenders on
probation, parole, and supervised release.  CSOSA also is responsible for coordinating with other
federal agencies regarding the monitoring and supervision of such offenders, including by
making recommendations for reincarceration and/or revocation or retardation of parole.  The
ability of Defendant to make proper decisions regarding reincarceration and/or revocation or
retardation of parole is dependent on CSOSA fulfilling its obligations regarding paroled
offenders.  Anthony Kelly was under, *inter alia*, CSOSA's supervision in the Summer of 2002
when he committed multiple rapes, assaults, car robberies, burglaries, and murders, including,
ultimately, the murder of 9-year old Erika Smith in Silver Spring, Maryland.

## Factual Allegations

The following facts are alleged upon information and belief:

12.    On April 16, 1996, after pleading guilty to car theft and assaulting (with a threat
to kill) two individuals with a loaded gun, Anthony Kelly was sentenced to 10 years and six

months in prison. By this time, Kelly had accrued a lengthy record of escalating criminal activity – including, *inter alia*, violent crimes, burglary, automobile thefts, alleged possession of a prohibited weapon, and an alleged prison breach – dating back to 1982.

## Administrative Failures

13.    More than five years before his sentence would have been completed, Kelly was given a parole date by the Parole Commission and furloughed by BOP from federal prison in Pennsylvania to Hope Village, a halfway house in Southeast Washington, D.C. under contract with BOP, based on certain representations that Defendant knew or should have known were inaccurate. Kelly was transferred to Hope Village in December 2001 with a release date set for three months later.

14.    On March 7, 2002, despite numerous violations of the conditions of his release, which, pursuant to applicable policies, practices, procedures, rules, requirements, guidelines, regulations or standards, should have resulted in Kelly's reincarceration by Defendant and/or revocation or retardation of his parole date beyond the date of Erika Smith's murder, Kelly was paroled by Defendant from BOP custody at Hope Village to the D.C. community, under the supervision of CSOSA.

15.    BOP was required to supervise and monitor Hope Village's oversight of prisoners living at the halfway house; had it done so in accordance with applicable policies, practices, procedures, rules, requirements, guidelines, regulations or standards, it would have determined that Hope Village was operated in a grossly negligent and reckless manner, which allowed residents like Anthony Kelly to openly and flagrantly violate even the minimum conditions of their confinement. As a result of Defendant's failures to meet its own requirements regarding the supervision of Hope Village and Kelly, Kelly was not reincarcerated, his parole date was not

retarded, and he was simply released into the community. During the first several months after

his release and during his parole under CSOSA's supervision, Kelly brutally raped and beat a 60-

year-old woman, raped another woman, assaulted a police officer, and stole five cars and five

guns.

16.    On August 6, 2002, five months after his release and while still under CSOSA's

supervision, Kelly broke into Greg Russell's Silver Spring, Maryland home. He viciously

attacked Russell's daughter, nine-year-old Erika Smith, striking her multiple times in the face

with a gun or other solid object and shooting her in the back, leaving her to bleed to death in a

closet. He also killed Greg Russell by shooting him eight times in the leg and chest. Kelly left

the murder scene with cash and property from the residence, including the family Bible.

17.    Just two days later, Kelly killed again. Kelly shot Katie Hill, a tourist leaving the

Takoma Metro station in Northwest Washington, in the torso, wrist, arm and head. He stole her

wallet, camera and other possessions and left her on the ground to die.

18.    Had Defendant's agents, officers and employees complied with mandatory

policies, practices, procedures, rules, requirements, guidelines, regulations or standards

governing the parole and supervision of federal offenders and/or the supervision of community-

based halfway houses, and executed their duties with appropriate and due care, Kelly would not

have been free in August 2002 when he committed these brutal crimes, including the murder of

Erika Smith.

19.    Kelly's corrections record contained multiple references to his propensity to lie

and to be dishonest in order to "manipulate the system" and to promote his personal interests

while in custody. In one record, Kelly was identified as a "pathological liar." Despite Kelly's

history, of which Defendant was aware, Defendant failed to take the necessary and reasonable steps to verify information provided by Kelly to obtain early release into the community.

20.    For example, on information and belief, Kelly applied to the United States Parole Commission for early release in 2001, based, in part, on his purportedly having earned a General Educational Development ("GED") high school equivalency diploma in March 2000 from the Ohio Department of Education.  It was a readily ascertainable fact, however, that Kelly never actually earned the GED certificate.  Despite Kelly's obvious and readily apparent use of false information, Defendant furloughed him to Hope Village, ultimately authorizing his release to the community in March 2002.

21.    Kelly never should have been released in March 2002 because he also had violated numerous conditions of his release during his stay at the halfway house which, based on the policies, practices, procedures, rules, requirements, guidelines, regulations or standards of BOP and the Parole Commission at that time, should have resulted in his reincarceration and/or revocation or retardation of his parole date.  If not for Defendant's gross negligence and recklessness in its supervision and monitoring both of Kelly and Hope Village, it would have known of these violations, and Kelly would not have been released in March 2002.

22.    On information and belief, for example, Defendant's policies, practices, procedures, rules, requirements, guidelines, regulations and standards required verification that an offender was employed prior to being paroled into the community.  In fact, however, Kelly was never employed at any point after his December 12, 2001 transfer to Hope Village, including during the period of his community supervision by CSOSA.  Indeed, the pay stub and subsistence information provided by Hope Village to Defendant regarding Anthony Kelly was

sufficient to put Defendant on notice that Kelly was not employed as he had represented and that he was lying about his supposed compliance with the conditions of his furlough.

23.     In violation of their policies, practices, procedures, rules, requirements, guidelines, regulations and standards, and despite the Government's knowledge of Kelly's propensity to lie, no officer, agent, or employee of the Parole Commission, the BOP, or CSOSA investigated, or investigated with due care, the circumstances and nature of Kelly's alleged "employment" to verify that Kelly was employed prior to his release into the community. Had they done so, they immediately would have discovered that Kelly was not working at all, and that his supposed "employment" was a sham arrangement with his stepfather, in violation of rules forbidding employment by a relative. This sham employment enabled Kelly daily to roam the streets freely and to commit criminal and other systematic violations of the conditions of his confinement and supervised release. These included, *inter alia*, Kelly's theft and use of at least one automobile while still at Hope Village – a violation for which Kelly would have been returned to prison and for which Defendant would have revoked or retarded his parole date.

24.     Each of the above factors on its own was sufficient, under applicable policies, practices, procedures, rules, requirements, guidelines, regulations and standards, to require Kelly's return to prison and the retardation or revocation of his parole date until after the date of Erika Smith's murder, but especially so when considered in the aggregate. Nonetheless, Kelly was released from confined custody and into the D.C. community on March 7, 2002.

25.     On information and belief, upon his release from the halfway house in March 2002, Kelly was placed in the custody and care of CSOSA, a federal agency that was responsible for, among other things, supervising and monitoring inmates who have been released on parole.

Among CSOSA's duties was, in conjunction with the Parole Commission, to ensure the safety of the community while facilitating the transition of offenders to life outside of prison.

26.     On information and belief, when Kelly was paroled, he was initially placed under one of the strictest levels of supervision, "maximum supervision." According to CSOSA policy "maximum supervision" required a minimum of four face-to-face contacts per month between Kelly and his Community Supervision Officer ("CSO"), two of which were required to occur outside of the CSOSA office, in the "field." Defendant failed to meet the requirements of "maximum supervision," including, *inter alia*, the requisite number of face-to-face meetings and field visits between Kelly and his CSO.

27.     CSOSA further negligently, recklessly, and in violation of its policies, practices, procedures, rules, requirements, guidelines, regulations and standards, reduced Kelly's level of supervision to "medium supervision." This reduction was contrary to, and in violation of, CSOSA policies, practices, procedures, rules, requirements, guidelines, regulations and standards, which require, *inter alia*, that, before a reduction be effected, the offender must: 1) have served a minimum of three months in the original status; 2) have complied with his individualized case plan; 3) have an address and employment which have been verified by CSOSA through field visits; 4) notify CSOSA before traveling outside the jurisdiction; and 5) have undergone a criminal check. These conditions were not met. Had CSOSA fulfilled its duties, it would easily have discovered Kelly's repeat violations and lies to Defendant regarding his purported compliance with the conditions of his release, and his level of supervision would not have been reduced.

28.     Upon information and belief, Defendant's CSO met Kelly's stepfather, William Barker during a home visit to Kelly's residence. Had the CSO fully and appropriately supervised

Kelly, as required by CSOSA policies, practices, procedures, rules, requirements, guidelines, regulations and standards, the CSO would have discovered that Kelly was not employed, as his purported "employer" was his stepfather William Barker, not a legitimate employer as required by Defendant's policies. This discovery would have required, at a minimum, further inquiry by Defendant which would have uncovered Kelly's sham employment, and the fact that Kelly was traveling around the community in stolen vehicles and committing crimes rather than going to work, all of which would have resulted in Kelly's return to prison and/or the revocation or retardation of his parole and would have prevented Kelly from murdering Erika Smith in August 2002.

29.     Had Defendant's officers, agents and employees supervised Kelly's parole as required, they would have discovered additional violations and misconduct by Kelly, including, on information and belief, Kelly's 1) change of residence to his girlfriend's apartment without the requisite notice to Defendant; 2) conduct resulting in the issuance of a temporary restraining order against Kelly ordering him not to contact his first wife, Tiray Edwards; and 3) arrest while driving a stolen vehicle and assault on a police officer in Prince George's County, Maryland, all of which occurred while Kelly was on parole and under Defendant's supervision but prior to his murdering Erika Smith. As a result of the car theft and assault on an officer, Kelly was arrested on June 10, 2002, and ordered to appear in court on July 30, 2002. Despite these and other violations, CSOSA sat idly by while Kelly remained free in the community and continued his crime spree, including raping women in Takoma Park and Wheaton, Maryland.

30.     On information and belief, CSOSA took no steps to monitor Kelly's behavior as required or to learn of any criminal conduct by Kelly while on parole, and learned about Kelly's arrest for assaulting a police officer only when Kelly himself volunteered the information some

ten days later. In a June 20, 2002 memo to the Parole Commission, Kelly's CSO recommend revocation of Kelly's parole. Despite its knowledge that Kelly had been charged with automobile theft and assaulting a police officer, the Parole Commission inexplicably failed to revoke Kelly's parole; instead, it merely returned him to maximum supervision – which he should have been under all along. Still, CSOSA's failures continued. Even after Kelly was returned to maximum supervision, and despite the pending charges against him, Kelly's CSO failed to conduct the requisite field and office visits. In fact, in violation of Defendant's policies, practices, procedures, rules, requirements, guidelines, regulations and standards, no CSOSA representative *ever again* saw Kelly in the field before he murdered Erika Smith on August 6. Had any of these field visits been conducted, Defendant would have learned, at the very least, that Kelly was not working as he had represented, was not living where he said he was, and was out in the community committing crimes.

31.     Kelly was scheduled to appear in court in Prince George's County on July 30, 2002 on the car theft and assault charges from the proceeding month. He failed to appear, however, which resulted in a warrant being issued for his arrest. Even after the issuance of the arrest warrant, however, Defendant negligently, and with reckless and wanton indifference, failed to take any action to detain Kelly or revoke his parole. The following day, Kelly smashed a window in a gun store in Kensington, Maryland, and stole five weapons, including the weapon that would be used to murder Erika Smith on August 6, 2002.

32.     On information and belief, on August 16, 2002, when Kelly called the CSO to state that he had missed the July 30, 2002 court hearing in Prince George's County, the CSO failed to report Kelly's action or the issuance of an arrest warrant for him. Indeed, Defendant took no action with regard to Kelly's flagrant violations of his parole conditions until August 21,

when, prompted by a D.C. police officer's call seeking Kelly's whereabouts, the CSO called

Kelly, and several days later mailed an arrest warrant request to the Parole Commission. The

warrant was mailed by regular mail, and the Parole Commission did not receive the request until

six days later, upon which it issued a warrant for Kelly's arrest the following day. All of this

was in direct violation of Defendant's policies, practices, procedures, rules, requirements,

guidelines, regulations and standards, and reflected a continuation of the negligent, reckless, and

wanton conduct by Defendant that allowed Anthony Kelly to be free to murder Erika Smith.

33.    Anthony Kelly was finally captured by authorities on September 5, 2002. On

May 15, 2003, Kelly was indicted for the murders of Gregory Russell and Erika Smith.

34.    Had Defendant acted with due care and in compliance with its mandatory

policies, practices, procedures, rules, requirements, guidelines, regulations and standards

governing the release and supervision of Anthony Kelly, Kelly would have not been free on

parole on the night of August 6, 2002, and he could not have murdered Erika Smith.

**The Murder of Erika Smith**

35.    Erika Smith turned nine years old on June 4, 2002. On August 6, 2002, she was

just about to enter fourth grade at Potomac School in McLean, Virginia. Erika's mother, Carol

Smith, and father, Gregory Russell, were friends who shared custody of Erika. On Tuesday,

August 6, 2002, Erika and her dad spent their last hours together. Erika was on break from

summer camp, and she and her dad had spent their day together running errands and later playing

together in the park. That night, as Erika and Greg were getting ready for bed, a stranger broke

into Gregory Russell's home. The intruder, carrying a .32 caliber handgun, came upon Erika

first. She ran upstairs, crying for her father, who was talking on the telephone with a friend

when the intruder broke into his home. In the ensuing minutes, the intruder attacked Erika by

striking her multiple times in the face with a gun or other hard object, shot Erika's father eight

times in the leg and chest, murdering him, and shot Erika in the back, perhaps while she was

trying to escape, leaving her to bleed to death in a closet.

36.    In May 2003, Plaintiff Carol Smith learned that the murderer was Anthony Kelly.


## Count I

### *Carol Smith, as Personal Representative of the Estate of Erika Smith*

### Action for Survival Damages

Paragraphs 1 through 36 are incorporated herein as if fully set forth.

As a direct and proximate result of the negligent, wanton, and reckless acts of the United

States, its officers, employees, and/or agents, Erika Smith endured extreme physical and mental

pain and suffering before her death and will never be able to earn an income or reap the benefits

of a productive life, entitling her Estate to compensatory and punitive damages.

WHEREFORE, Plaintiff Carol Smith, as Personal Representative of the Estate of Erika

Smith, demands that judgment be entered against the Defendant United States, for compensatory

and punitive damages, including loss of Erika's income and funeral expenses.


## Count II

### *Carol Smith, Individually on Her Own Behalf*

### Action for Wrongful Death
### (Md. Courts & Jud. Proc. Code Ann. § 3-904)

Paragraphs 1 through 36 are incorporated herein as if fully set forth.

As a direct and proximate result of the negligent, wanton, and reckless acts of the United

States, its officers, employees and/or agents, Erika Smith sustained injuries at the hands of

Anthony Kelly, resulting in her death.  As a result of Erika Smith's premature death, Carol Smith

suffers from mental anguish, emotional pain and suffering, loss of society, companionship,

comfort, protection, filial care, attention, advice, counsel, training, guidance, and education, and

will never reap the benefits of Erika's productive life, including loss of future income.

WHEREFORE, Plaintiff Carol Smith demands that judgment be entered against

Defendant United States, for compensatory damages, including loss of future income.


## Count III

### *Carol Smith, Individually on Her Own Behalf*

### Loss of Solatium and Severe Emotional Distress

Paragraphs 1 through 36 are incorporated herein as if fully set forth.

As a direct and proximate result of the negligent, wanton, and reckless acts of the United

States, its officers, employees and/or agents, Plaintiff Carol Smith has been forced to mourn the

loss of society and companionship of her only child, Erika Smith.  This she does continuously.

Because of the negligent and reckless acts or omissions of Defendant and the sudden,

unexpected, and extremely violent death of her only child caused by Defendant's negligent,

wanton, and reckless acts and/or omissions, Carol Smith has suffered severe mental anguish and

sorrow.

WHEREFORE, Plaintiff Carol Smith demands that judgment be entered against

Defendant United States, for compensatory and punitive damages.

## **PRAYER FOR RELIEF**

Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 1 through 36 of this Complaint as if set forth fully herein.

WHEREFORE, Plaintiff Carol Smith, individually on her own behalf and as Personal Representative of the Estate of Erika Smith, prays that this Court grant Plaintiff judgment in her favor against Defendant on Counts I through III and grant Plaintiff:

A.  Damages in the amount of TWENTY FIVE MILLION DOLLARS ($25,000,000);

B.  Reasonable costs and expenses, including attorneys' fees;

C.  Such other and further relief that the Court may deem just and appropriate under the circumstances.

Respectfully submitted,

Stuart H. Newberger (D.C. Bar No. 294793)
Laurel Pyke Malson (D.C. Bar No. 317776)
Aryeh S. Portnoy (D.C. Bar No. 464507)
CROWELL & MORING, LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
Phone: (202) 624-2500
Fax: (202) 628-5116

Attorneys for Plaintiff Carol Smith,
Individually on Her Own Behalf and as
Personal Representative of the Estate of
Erika Smith

DATED:  October 4, 2006

EXHIBIT 1



**Court Services and Offender Supervision Agency**
**for the District of Columbia**

*Office of the General Counsel*

October 7, 2005

<u>VIA CERTIFIED MAIL</u>

Stuart H. Newberger, Esquire
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Re:    **FTCA-05-001**

Dear Mr. Newberger:

    I am writing to advise you of the Agency's determination of the administrative claim you filed on behalf of your client, Carol Smith, pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671 *et seq.*, against the Court Services and Offender Supervision Agency for the District of Columbia (CSOSA), the Federal Bureau of Prisons (BOP), and the United States Parole Commission (USPC). Upon careful consideration of your claim against CSOSA, the various supporting documents you have provided the Agency, review of the facts and the prevailing law, we have determined that your client's claim is denied because it fails to state a claim upon which relief can be granted under District of Columbia law.

    Having been designated as the lead agency in this claim by the United States Department of Justice (DOJ), CSOSA adopts DOJ's recommendation as to your client's claims against the DOJ employees at BOP and USPC, and also denies those claims.

    Since the Agency has denied your claim, you have the right to file a lawsuit in the appropriate United States District Court. You must do so no later than six (6) months after the date of mailing of this notification. You may also seek reconsideration of the Agency's decision any time prior to the end of the six-month period during which you may file an action in court. If you seek reconsideration from the Agency, you have six (6) months from the date of filing to file an action in court.

Sincerely,

Barbara Matthews-Beck
Acting General Counsel

## Certificate of Service

**I HEREBY CERTIFY** that a true and correct copy of the foregoing Amended Complaint was sent on this 4th day of October via electronic mail and certified U.S. Mail to the following:

Darrell Valdez, Esq. (attorney of record)
Assistant United States Attorney
Office of the United States Attorney for the District of Columbia
501 3rd Street, NW
Washington, DC 20001


and via certified U.S. Mail to:

Alberto Gonzales, Attorney General
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530

Jeffrey A. Taylor
US Attorney for District of Columbia
555 4th Street, NW
Washington, DC 20530


I understand a copy of the foregoing will be available to all attorneys of record via the Court's electronic filing system, once it is has been accepted by the Clerk of Court.


Alyssa Gsell