## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAROL SMITH,              ) | |
|                       ) | |
|       Plaintiff,      ) | |
|                       ) | |
|       v.                 ) | Civil Action No. 06cv00633 (RBW) |
|                       ) | |
| UNITED STATES OF AMERICA,  ) | |
|                       ) | |
|       Defendant.     ) | |
| | |

## MOTION TO DISMISS

Defendant United States of America, by and through undersigned counsel, hereby moves for dismissal of all claims pursuant to 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. Specifically, this Court lacks subject matter jurisdiction because Plaintiff filed her claims against the Federal Defendant well-outside the statutory time period mandated by the Federal Tort Claims Act ("FTCA"). The Court further lacks subject matter jurisdiction regarding Plaintiff's claims against the Federal Defendant arising out of (1) the alleged acts or omissions of the United States Parole Commission which are subject to absolute immunity; (2) the alleged acts or omissions of the United States Parole Commission and the Federal Bureau of Prisons which are barred by the discretionary function exception of the FTCA; and (3) the alleged acts or omissions of the Federal Bureau of Prisons which are barred by the government contractor exception to the FTCA.

Finally, the claims against the Federal Defendant arising out of the alleged acts or omissions of any Federal agency, including the United States Parole Commission, the Federal

Bureau of Prisons, and the Court Services and Offender Supervision Agency, are barred by the

Public Duty Doctrine and further fail to state a claim as the Federal Defendant owed no

actionable duty of care to the Plaintiff or the decedent.

In support of this Motion, the Court is referred to the accompanying Memorandum

of Points and Authorities, and the proposed Order attached hereto.

Respectfully submitted,

  /s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


  /s/ Rudolph Contreras
RUDOLPH  CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


  /s/ Darrell C. Valdez
DARRELL C. VALDEZ, D.C. BAR # 420232
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W., Civil Division
Washington, D.C.  20530
(202) 307-2843

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————    )
                                        )
CAROL SMITH,                            )
                                        )
    Plaintiff,                  )
                                        )
    v.                          )    Civil Action No. 06cv00633 (RBW)
                                        )
UNITED STATES OF AMERICA,               )
                                        )
    Defendant.                  )
———————————————————    )

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
### OF DEFENDANT'S MOTION TO DISMISS

Plaintiff Carol Smith, on behalf of herself and her daughter Erika Smith, filed this wrongful death and survival action on April 6, 2006 against the Defendant United States of America.  See Complaint for Damages, Smith v. United States, Case No. 1:06-cv-00633 ("Compl.").  Plaintiff seeks to recover damages resulting from the August 6, 2002 murder of her daughter, Erika Smith, allegedly at the hands of Anthony Kelly, a parolee allegedly released due to the negligent acts or omissions of the Bureau of Prisons (the "BOP"), the United States Parole Commission (the "USPC"), and the Court Services and Offender Supervision Agency ("CSOSA"), agencies of the United States.  See id. at ¶¶ 1, 29.  As a result, Plaintiff requests twenty-five million dollars in actual damages, as well as costs and further relief.

This Court, however, lacks subject matter jurisdiction to adjudicate Plaintiff's claims. Furthermore, Plaintiff has failed to allege facts sufficient to state a claim upon which relief can be granted.  Accordingly, the matter should be dismissed.

## STATEMENT OF FACTS

### A.    Factual Background.

On April 16, 1996, Anthony Kelly was sentenced to ten years and six months in prison after pleading guilty to assault with a dangerous weapon and unauthorized use of a motor vehicle. See Compl. at ¶ 12. Kelly was incarcerated at a federal prison in Pennsylvania. See id. at ¶ 13. In preparation for his upcoming parole, on December 12, 2001, Kelly was transferred from the federal prison to Hope Village, Inc. ("Hope Village"), a private halfway house contracting with the BOP and located in Southeast Washington, DC. See id. at ¶ 15. See also Declaration of Renee Brinker Fornshill, attached as Exh. 1 (Fornshill Declaration) at 4-6.

Plaintiff alleges that while Kelly was at Hope Village, Kelly drove a stolen car in violation of the conditions of his half-way house placement. See Compl. at ¶ 17. Plaintiff has not alleged, however, that any defendant was ever made aware of these violations.

Upon his release from the halfway house on March 7, 2002, Kelly was placed on parole under the supervision of a Community Supervision Officer (the "CSO") at CSOSA. See Compl. at ¶¶ 16, 19-20. Kelly was initially placed on "maximum" supervision by CSOSA, a status requiring four visits per month between Kelly and his CSO, two of which were to be conducted "in the field," or outside of the CSOSA office. See id. at ¶ 20. Plaintiff alleges that the CSO failed to conduct the required "field" visits. Id. Subsequently, CSOSA reduced Kelly's supervision level to "medium," a designation requiring fewer visits between Kelly and the CSO. See id. at ¶ 21.

At the time of Kelly's parole, The CSO believed Kelly to be employed. See Compl. at ¶ 16. However, Plaintiff alleges that Kelly's purported employment arrangement was a "sham" arranged with the help of Kelly's stepfather, and that Kelly was not actually working after his

2

transfer to Hope Village or during his parole. See id. It is not alleged that Defendant was ever made aware of Kelly's deception.

Plaintiff alleges that in the spring and summer of 2002, Kelly moved out of his mother's apartment and committed multiple crimes in Maryland. See Compl. at ¶ 21, 25. Plaintiff does not allege that Defendant was ever made aware of these facts.

On June 10, 2002, Kelly was arrested in Prince George's County, Maryland, for driving a stolen vehicle and assaulting a police officer. See id. at ¶ 22. Upon learning of Kelly's arrest, the CSO sent a request for issuance of a parole warrant to the USPC. See id. The USPC denied the request on July 9, 2002, pending the outcome of the Maryland charges. See id. Accordingly, Kelly was allowed to remain on parole. See id at ¶ 22, 23.

After his release from Prince George's County, Kelly met with his CSO on July 10, 2002. See Compl. at ¶ 24. Thereafter, Kelly failed to report to his CSO, see id. at ¶¶ 23, 24, and further failed to attend a July 30, 2002 hearing in Prince George's County. See id. at ¶ 25. Authorities in Prince George's County immediately issued a warrant for Kelly's arrest. See id. On August 16, 2002, Kelly called his CSO and agreed to turn himself into the police. See id. at ¶ 26. After learning that Kelly failed to turn himself into the police, the CSO requested that the USPC issue a warrant for Kelly's arrest. See id. The USPC approved the CSO's request and issued a parole warrant. See id.

Plaintiff alleges that on August 6, 2002, Kelly broke into the home of Erika Smith and her father, Gregory Russell, in Silver Spring, Maryland. See Compl. ¶ 27. During the break-in, Kelly shot and killed Erika Smith and Mr. Russell. See id.

On August 30, 2002, Takoma Park police spotted Kelly driving a stolen car. See Exh. 9 (Phuong Ly and David A. Fahrenthold, *D.C. Parolee Questioned in Slayings, Suspect Accused of*

*Rape After Release in March*, Wash. Post, Sept. 7, 2002) at B1.  After a brief chase, Kelly

crashed the car and fled on foot.  See id.  In a search of the car and of Kelly's apartment, officers

found evidence, including a handgun, linking Kelly to the murder of Gregory Russell and Erika

Smith.  See id.  See also Exh. 8 (David A. Farenthold and Allan Lengel, *Ballistic Tests Link*

*Slayings in Silver Spring, Takoma*, Wash. Post, Sept. 5, 2002) at B2.

It was standard practice of the Montgomery County, Maryland, homicide detectives to

keep a victim's family abreast of substantial developments in the investigation of the murder,

including the development of a suspect.  See Declaration of Cpl. Joan Buchan, attached as Ex. 3

(Buchan Decl.) at ¶ 5.  Prior to September 5, 2002, Plaintiff was informed that evidence linking

Kelly to the murder had been found.  See id. at ¶ 6.  Plaintiff was further informed by the

homicide detectives that Kelly was on parole at the time of the murders.  Id. at ¶ 7.

Kelly was eventually arrested on September 5, 2002, and formally indicted for the

murder of Erika Smith on May 13, 2003.  See Compl. at ¶ 27.

**B.    The Media Coverage.**

The killings of Erika Smith, Gregory Russell, and Katie Lynn Hill generated a great deal

of attention in Silver Spring, Montgomery County, and surrounding areas.  See Exh. 5 (Greg

Simmons, *Police Provide Details of Double Murder Response*, Gazette (Maryland), Aug. 28,

2002); Exh. 6 (Greg Simmons, *Surge in Neighborhood Crime Worries Area Residents*, Gazette

(Maryland), Aug. 21, 2002).  Progress in the investigation was widely and regularly reported in

local and national media outlets in the days, weeks and months following the murders.  See, e.g.,

Exh. 7 (Greg Simmons, *Killings Plagued Silver Spring Area*, Gazette (Maryland), Dec. 25,

2002); Exh. 8 (David A. Farenthold and Allan Lengel, *Ballistic Tests Link Slayings in Silver*

*Spring, Takoma*, Wash. Post, Sept. 5, 2002) at B2.

4

On September 5, 2002, the Washington Post Metro Section reported that police ballistics tests linked Kelly's gun to the murder of Erika Smith and Gregory Russell. See Exh. 8 (David A. Farenthold and Allan Lengel, *Ballistic Tests Link Slayings in Silver Spring, Takoma*, Wash. Post, Sept. 5, 2002) at B2. The article stated that Mr. Kelly was sought in connection with the murders. See id. News of the killings and of Kelly's involvement was reported on area television stations on September 3, 2002. See id.

On Saturday, September 7, 2002, the front page of the Metro Section of the Washington Post reported that Kelly had been arrested and was being questioned in connection with the murder of Erika Smith and Gregory Russell. See Exh. 9 (Phuong Ly and David A. Fahrenthold, *D.C. Parolee Questioned in Slayings, Suspect Accused of Rape After Release in March*, Wash. Post, Sept. 7, 2002) at B1. The article further detailed the history of Mr. Kelly's parole and subsequent alleged crimes. See id. The next week also saw reports in the Washington Post and the local media regarding Kelly's arrest, parole history, and that Kelly had violated the conditions of his parole prior to the killings. See Exh. 10 (*Crime & Justice, The Region*, Wash. Post, Sept. 10, 2002) at B2; Exh. 4 (Meredith Hooker, *Man Charged with Rape, Questioned in Washington, D.C. Killing*, Gazette (Maryland), Sept. 11, 2002). The Gazette again printed Kelly's name in conjunction with the murder of Erika Smith on December 25, 2002. See Exh. 7 (*Killings Plagued Silver Spring Area*, Gazette (Maryland), Dec. 25, 2002).

## C.    Procedural History.

Plaintiff filed an administrative FTCA claim with the Parole Commission, the BOP and CSOSA on March 29, 2005 – two years and 8 months after the murder of Erika Smith and Gregory Russell. Compl. at ¶ 4. On October 7, 2005, Plaintiff's administrative FTCA claims were denied by the agencies. Id. Plaintiff filed the present action on April 6, 2006.

# ARGUMENT

Plaintiff alleges that the United States committed negligence through the acts of three federal agencies, as follows:

1.    That the United States Parole Commission (the "USPC") paroled Anthony Kelly based on representations that Kelly had received a GED which the USPC should have known were false, and that the USPC should have revoked Kelly's parole prior to the murder.

2.    That the Federal Bureau of Prisons (the "BOP"), through its contractor Hope Village, Inc., failed to verify Kelly's receipt of a GED, as well as his employment status and residence, and further failed to return Kelly to prison.

3.    That the Court Services and Offender Supervision Agency ("CSOSA") failed to meet with Kelly as often as required by CSOSA policies, and failed to timely request revocation of Kelly's parole.

## I.    STANDARD OF REVIEW.

The United States moves for dismissal of Plaintiff's Complaint pursuant to Federal Civil Rules 12(b)(1), 12(b)(2) and 12(b)(6) for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim upon which relief can be granted.

In making determinations on a motion to dismiss under Federal Civil Rule 12(b)(6), the Court must view facts alleged in the complaint in the light most favorable to the plaintiff. Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Nix v. Hoke, 139 F. Supp. 2d 125, 131 (D.D.C. April 2001) (citing Weyrich v. The New Republic, Inc., 235 F.3d 617, 623 (D.C. Cir. 2001)); see also Slaby v. Fairbridge, 3 F. Supp. 2d 22, 27 (D.D.C. 1998). A complaint should be dismissed

if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley, 355 U.S. at 46. In this case, Plaintiff fails to establish a right to relief even when the facts as she alleges them are accepted as true.[1]

Plaintiff also fails to establish that this Court has subject matter jurisdiction over the matter. Plaintiff clearly bears the burden of establishing subject matter jurisdiction. See Miller v. United States, 710 F.2d 656, 662 (10th Cir.), cert. denied, 464 U.S. 939 (1983); Baird v. United States, 653 F.2d 437, 440 (10th Cir. 1981), cert. denied, 454 U.S. 1144 (1982). Requests for dismissal for lack of subject matter jurisdiction pursuant to 12(b)(1) require a similar standard of review as those for failure to state a claim. A court may resolve a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) in two ways. First, the court may determine the motion based solely on the complaint. Herbert v. National Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992). Alternatively, to determine the existence of jurisdiction, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence. See id.[2] Applying these standards here demonstrates that Plaintiff's complaint should be dismissed with prejudice.

## II. THE COURT LACKS SUBJECT MATTER JURISDICTION OVER PLAINTIFF'S CLAIMS.

---

[1]      The United States, of course, does not concede that the factual allegations in the Complaint are true.

[2]      It is well-established that when a defendant challenges the substance of jurisdictional allegations, it may use extraneous evidence to test those allegations without converting the motion into one for summary judgment. See Land v. Dollar, 330 U.S. 731, 735 n.4 (1947); Herbert v. National Academy of Sciences, 974 F.2d 192, 197-98 (D.C. Cir. 1992); Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987); Bonterra America, Inc. v. Bestmann, 907 F. Supp. 4, 5 n.1 (D.D.C. 1995); Kuffel v. United States Bureau of Prisons, 882 F. Supp. 1116, 1120 (D.D.C. 1995); see also 11 Moore's Federal Practice, § 56.30[6] (Matthew Bender 3d ed.).

The United States, as a sovereign, is immune to all suits, except in accordance with the explicit terms of the statutory waiver of such immunity. Hercules v. United States, 516 U.S. 417, 422-23 (1996); Cox v. Sec'y of Labor, 739 F. Supp. 28, 30 (D.D.C. 1990); see also, United States v. Testan, 424 U.S. 392, 399 (1976); United States v. Mitchell, 445 U.S. 535, 538 (1980); Kline v. Republic of El Salvador, 603 F. Supp. 1313, 1316 (D.D.C. 1985). Because a waiver of sovereign immunity must be strictly construed in favor of the sovereign, such waiver "is to be read no more broadly than its terms require." Masonry Masters, Inc. v. Nelson, 105 F.3d 708, 712 (D.C. Cir. 1997). Additionally, "any ambiguities in the statutory text must be resolved in favor of immunity." United States v. Williams, 514 U.S. 527, 531 (1995). For example, to sustain a claim for monetary damages against the United States, the waiver of sovereign immunity "must extend unambiguously to such monetary claims." Flatow v. Islamic Republic of Iran, 74 F. Supp. 2d 18, 20-21 (D.D.C. 1999) (quoting United States v. Nordic Village, Inc., 503 U.S. 30, 34 (1992)); see also, Bienvenuti v. Dep't of Defense, 587 F. Supp. 348, 351-52 (1984). In short, sovereign immunity operates as a jurisdictional bar to suit without an otherwise explicit waiver of such immunity. See, Flatow, 74 F. Supp. 2d at 21.

A.    **Because the Plaintiff Failed to File Her Administrative Claim Within the Statutory Period, This Court Lacks Subject Matter Jurisdiction to Hear Her Claims.**

The Federal Tort Claims Act ("FTCA") waives sovereign immunity in a limited number of tort actions, allowing in limited circumstances for the United States to be sued for torts "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674; see also, Eagle-Picher Industries, Inc. v. United States, 937 F.2d 625, 627-28 (D.C. Cir. 1991). However, the limited waiver of sovereign immunity under the FTCA requires full compliance with the conditions placed upon waiver of that immunity, and absent such

compliance, the Court lacks jurisdiction to entertain tort claims against the United States.  GAF

Corp. v. United States, 818 F.2d 901, 905, 916 n.86 (D.C. Cir. 1987).  One such condition is

contained in 28 U.S.C. § 2401, which provides that:

> A tort claim against the United States shall be forever barred unless it is presented
> in writing to the appropriate Federal agency within two years after such claim
> accrues or unless action is begun within six months after the date of mailing, by
> certified or registered mail, of notice of final denial of the claim by the agency to
> which it was presented.

28 U.S.C. § 2401(b); see also Schuler v. United States, 628 F.2d 199, 201 (D.C. Cir. 1980) (the

FTCA "requires the claimant both to file the claim with the agency within two years after

accrual of the claim and then to file a complaint in the District Court within six months after the

agency denies the claim").  "A claim not so presented and filed is 'forever barred.'"  Mittleman

v. United States, 104 F.3d 410, 413 (D.C. Cir. 1997).

   In this case, this Court is without jurisdiction to hear Plaintiff's claims because Plaintiff

failed to file her initial administrative claim within two years of the accrual of her claim.  Absent

strict compliance with the waiver requirements of the FTCA, this Court lacks jurisdiction to hear

Plaintiff's suit against the United States, and her Complaint should be dismissed.  See United

States v. Kubrick, 444 U.S. 111, 117 (1979); see also Stokes v. U.S. Postal Serv., 937 F.Supp.

11, 14 (D.D.C.1996) (presentment to the appropriate agency within two years is "a mandatory

jurisdictional prerequisite to filing a lawsuit against the United States").

   With respect to the critical issue of **when** Plaintiff's claim accrued, "[i]t is well

established that for purposes of the FTCA, a claim usually accrues at the time of the plaintiff's

injury."  Cronauer v. United States, 394 F.Supp.2d 93, 102 (D.D.C. 2005); accord Garza v. U.S.

Bureau of Prisons, 284 F.3d 930, 934 (8th Cir. 2002) (finding knowledge of relationship between

halfway house and BOP sufficient to require inquiry into accountability of the United States and

to notify Plaintiff of her claim, even where Plaintiff did not know specific employee worked for BOP); Dyniewicz v. United States, 742 F.2d 484, 486 (9th Cir. 1984) (finding knowledge that decedents died in highway flood sufficient to notify plaintiffs of their claim against the United States, even when plaintiffs were ignorant of the government role in creating the flood). Even if subsequent discovery of possible government involvement causes mental anguish, it is the decedent's death, not a plaintiff's mental anguish, that is the cognizable injury. See Sexton v. United States, 832 F.2d 629, 637 (D.C. Cir. 1987).

The opinion of the United States Court of Appeals for the Third Circuit in Zeleznick v. United States, 770 F.2d 20 (3rd Cir. 1985), is especially on point in this matter. In Zeleznick, the parents of a murdered victim brought an FTCA action alleging that the Immigration and Naturalization Service ("INS") negligently failed to detain an illegal immigrant, who attempted to surrender himself to the INS and then subsequently killed the Zeleznicks' son shortly after the INS turned him away. 770 F.2d at 21. The parents did not learn of the murderer's visit to the INS until 8 years later when the Massachusetts legislature launched an investigation into practices of state psychiatric hospitals. Id. The parents filed an FTCA administrative claim within two years of the discovery. Id. Rejecting the parent's claim that the statute of limitation was tolled until they learned of the INS's involvement in the matter, the Third Circuit Court held that the statute of limitations is not intended to postpone the accrual date until the injured party knows every fact necessary to bring his case. Id. at 23. Rather, the limitations period is intended to provide the plaintiff a reasonable time "to determine within the limitations period whether any party may be liable to him." Id. Thus, the injured party with knowledge of an injury and its immediate cause must use that time to "determine whom to sue in a obscure factual context." Id. Thus, a cause of action under the FTCA accrues at the time of the last event necessary to

complete the tort, and the person is then on notice that there has been an invasion of his legal rights.  Id. at 22.  See also Kubrick, 444 U.S. at 123 and n.10; Sexton, 832 F.2d at 634, 636.  In the case of a murder, the starting event is the actual murder itself, and it does not matter that the complainant is unaware of the government agency's negligence or involvement.  See Zelznick, 770 F.2d at 22.  See also Norman v. United States, --- F.3d ---, 2006 WL 3069125, at * 2 (D.C. Cir. Oct 31, 2006) (dismissal of complaint upheld although pedestrian filed suit against federal employee in District of Columbia Superior Court within District of Columbia's three-year statute of limitations for personal injury actions, pedestrian made no effort prior to expiration of FTCA's statute of limitations to discover whether employee was employed by United States).

Here, Plaintiff's injury occurred on August 6, 2002, when Erika Smith was murdered – more than 31 months before Plaintiff filed her agency claim.  Compl. at ¶ 14.  At the time of the murder, Plaintiff was well-aware that there had been an invasion of her's and Erika's legal rights, and it was incumbent upon Plaintiff to use the FTCA's two year time period to "find and make a claim against a possibly responsible governmental agency."  Zeleznick, 770 F.2d at 24.[3/] Indeed, this was not an impossible task, as Plaintiff was informed of the killer's identity and his status as a parolee by the homicide detective in just over one month from the murder, see Exh. 3 (Buchan Decl.) at ¶¶ 6-7, and the local media was able to gather and make public detailed information regarding Anthony Kelly's parole history within a matter of weeks. See Exh. 8 (David A. Farenthold and Allan Lengel, *Ballistic Tests Link Slayings in Silver Spring, Takoma,*

---

[3/]    The statute of limitations "may be tolled only on a showing of 'fraudulent concealment' of the existence of a cause of action."  Smith v. Hope Village, Inc., 05cv00633, slip op. at 5 (D.D.C. July 26, 2006) (citing Flemmings v. District of Columbia, 719 A.2d 963, 964 (D.C. 1998)).  In the present case, Plaintiff does not, nor can she allege that Defendant fraudulently concealed its involvement, and accordingly Plaintiff's complaint is "properly dismissed as barred."  See Smith, 05cv00633, slip op. at 5.

Wash. Post, Sept. 5, 2002) at B2; Exh. 9 (Phuong Ly and David A. Farenthold, *D.C. Parolee Questioned in Slayings; Suspect Accused of Rape After Release in March*, Wash. Post, Sept. 7, 2002) at B1; Exh. 10 (*Crime & Justice, The Region*, Wash. Post, Sept. 10, 2002) at B2; Exh. 4 (Meredith Hooker, *Man Charged with Rape, Questioned in Washington, D.C. Killing*, Gazette (Maryland), Sept. 11, 2002).[4/]

Accordingly, Plaintiff failed to file her administrative claim within two years as required by the FTCA, sovereign immunity has not been waived, and this Court lacks subject matter jurisdiction. Plaintiff's complaint should be dismissed in its entirety.[5/]

**B.      Because the United States Parole Commission and the Court Services and Offender Supervision Agency Are Absolutely Immune From Suit with Respect to Their Adjudicative Functions, the Federal Government Cannot be Held Liable for Their Alleged Acts or Omissions.**

By its terms, the FTCA reserves to the United States certain defenses available to agents of the United States whose acts or omissions give rise to a cause of action. 28 U.S.C. § 2674. Specifically, the United States retains the ability to assert defenses based on judicial immunity, as well as "other defenses," which would have been available to the employee of the United States whose act or omission gave rise to the claim. 28 U.S.C. § 2674. See, e.g., Tinsley v.

---

[4/]      Publicly available information suggesting the existence of an injury and its cause is sufficient to put a plaintiff on inquiry notice even where an injury or its cause may not be obvious. See Kenneda v. United States, 880 F.2d 1439, 1443 (D.C. Cir. 1989); accord Sprint Communications Co. L.P. v. FCC, 76 F.3d 1221, 1226-27 (D.C. Cir. 1996) (finding that plaintiff long distance telephone carrier was on notice of Federal Communications Act claim against defendant for charging unlawfully high rates, because a third company had previously filed a publicly available complaint with the FCC alleging defendant charged unlawfully high rates).

[5/]      A dismissal of this Complaint does not leave Plaintiff without a possible remedy. Indeed, Plaintiff has a pending lawsuit against Hope Village, Inc. for damages resulting from the murder of Erika Smith. See Smith v. Hope Village, Inc., No. 05cv0633 (RBW) (D.D.C. filed Mar. 28, 2005).

Widener, 150 F.Supp.2d 7, 11, 12 (D.D.C. 2001) (holding that the United States was immune from claims under the FTCA based on underlying acts of Federal district court judges who were absolutely immune from suit).  This reservation is not solely limited to defenses of traditional judicial immunity.  In its report accompanying the Federal Employees Liability Reform and Tort Compensation Act of 1988, the House Judiciary Committee specifically explained that Section 2674 enabled the United States to assert "other functional immunities . . . recognized in judicial decisions," such as quasi-judicial immunity, which would otherwise have been available to federal employees.  See H.R. Rep. No. 100-700, at 5 (1988), reprinted in 1988 U.S.C.C.A.N. 5945, 5948.

The Supreme Court has observed that "[f]ew doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction."  Pierson v. Ray, 386 U.S. 547, 553-54 (1967).  The common law doctrine of judicial immunity has been endorsed by the Supreme Court for well over a century, and has been deemed necessary to preserve the independence and integrity of the judicial process.  See Bradley v. Fisher, 13 Wall. 335 (1872) (holding that a federal judge may not be assessed damages for a judicial act taken within his jurisdiction "however erroneous the act may have been, and however injurious"); see also Stump v. Sparkman, 435 U.S. 349, 363 (1978) (holding that judicial immunity applies regardless of a judge's procedural "informality" and despite any ex parte feature of the proceeding).

Courts have extended judicial immunity in the form of absolute "quasi-judicial" immunity for other federal officials close to the judicial process who play a role "'functionally comparable' to that of a judge," such as federal hearing examiners and administrative law judges.  See Butz v. Economou, 438 U.S. 478, 513 (1978).  Courts have also extended absolute

quasi-judicial immunity to a wide range of persons playing a role in the judicial process –

including parole and probation officers.  See Briscoe v. LaHue, 460 U.S. 325, 335 (1983)

(witnesses who testify in judicial proceedings); Imbler v. Pachtman, 424 U.S. 409, 424-26

(1976) (federal and state prosecutors, as well as grand jurors); Sindram v. Suda, 986 F.2d 1459,

1460 (D.C. Cir. 1993) (law clerks); Turner v. Barry, 856 F.2d 1539, 1541 (D.C. Cir. 1988)

(probation officers); Simons v. Bellinger, 643 F.2d 774, 779-82 (D.C. Cir. 1980) (a court-

appointed committee monitoring the unauthorized practice of law); Schinner v. Strathmann, 711

F.Supp. 1143 (D.D.C. 1989) (a psychiatrist who interviewed a criminal defendant to assist a trial

judge); Austern v. Chicago Bd. Optionc Exch., Inc., 898 F.2d 882, 886 (2nd Cir. 1990) (persons

performing binding arbitration); Sellars v. Procunier, 641 F.2d 1295, 1303-04 (9th Cir. 1981)

(holding that parole board members are entitled to absolute immunity); Howard v. Drapkin, 222

Cal. App. 3d 843 (Cal. App. 1990) (a psychologist performing dispute resolution services in

connection with a lawsuit over custody and visitation rights).

     In deciding whether particular functions of federal officers fit within the tradition of

quasi-judicial immunity, courts must take a "functional approach" and look to "the nature of the

function performed, not to the identity of the actor who performed it."  Forrester v. White, 484

U.S. 219, 229 (1988); Gray v. Poole, 275 F.3d 1113, 1116 (D.C. Cir. 2002); accord Butz, 438

U.S. at 511 ("Judges have absolute immunity not because of their particular location within the

Government but because of the special nature of their responsibilities").  Relevant factors

include the degree to which the official function resembles judicial decisions made by judges,

and the probable effect that exposure to liability would have on the appropriate and faithful

exercise of those functions.  See Forrester, 484 U.S. at 224; Wagshal v. Foster, 28 F.3d 1249,

1252-53 (D.C. Cir. 1994).

To the extent that Plaintiff's claims arise out of any decisions of the USPC regarding Anthony Kelly's parole, the Federal Government is absolutely immune from liability.  Although neither the United States Supreme Court nor the U.S. Court of Appeals for the District of Columbia have directly ruled on the question of whether parole board officials are accorded quasi-judicial immunity, both Courts have approvingly noted that most other federal courts have identified and upheld absolute quasi-judicial immunity for parole board officials.  See Cleavinger v. Saxner, 474 U.S. 193, 204 (1985) (noting that a parole board – as distinct from a prison institutional discipline committee, which is entitled only to qualified immunity – is a "neutral and detached" hearing body consisting of "impartial professional[s] serving essentially 'as an arm of the sentencing judge,'" and required to provide due process protection) (internal citations omitted); Martinez v. California, 444 U.S. 277, 284 (1980) (upholding California law immunizing parole board officials in a civil rights action by survivors of a 15 year-old girl murdered by a parolee); Briggs v. Goodwin, 569 F.2d 10, 21 (D.C. Cir. 1977) ("The [absolute] immunity of 'quasi-judicial' officers such as . . . parole board members derives . . . from the fact that they exercise discretion similar to that exercised by judges.") (citing with approval McCray v. Maryland, 456 F.2d 1, 3 (4th Cir. 1972)).

The United States District Court for the District of Columbia has consistently held that parole board officials are absolutely immune, noting that most federal courts have held that parole board members are absolutely immune, and anticipating that the United States Court of Appeals for the District of Columbia will join sister circuits in so holding.  See Pate v. United States, 277 F. Supp. 2d 1, 10-11 (D.D.C. 2003); Reynolds El v. Husk, 273 F. Supp. 2d 11, 13 (D.D.C. 2002).  In Pate, the complainant brought a civil rights action against, inter alia, the entity responsible for the now-defunct D.C. Parole Board, as well as the former chairman and

15

members of the D.C. Parole Board, after being held for 65 days without a parole hearing.  277 F. Supp. 2d at 6.  The Court, examining the nature of the functions of the Parole Board, determined that members of the Parole Board perform duties analogous to those of a judge, see id. at 8, and "that the function of scheduling a [parole] revocation hearing is integral to the judicial process, and thus entitled to absolute immunity."  Id. at 9 (internal citations omitted).  Similarly, in Reynolds El, a prison inmate sued a Parole Commission examiner for denying him parole.  The Court stated that "most federal courts . . . have consistently held that parole board members are absolutely immune from suit for their decisions to grant, deny, or revoke parole because the board's functions are closely analogous to the adjudicated functions of a judge, or [ ] intimately associated with the judicial process itself."  273 F. Supp. 2d at 13 (internal citations and quotation marks omitted).  "The Court discern[ed] no reason to depart from the holdings of every circuit that has addressed the issue and therefore conclude[d] that [defendant USPC examiner was] entitled to absolute immunity."  Id.

Further, the D.C. Circuit has accorded quasi-judicial immunity to probation officers utilizing a similar line of reasoning.  See Turner, 856 F.2d at 1540-41.  In Turner, the complainant asserted in his complaint that a probation officer of the Superior Court filed a presentence report containing false information, resulting in a longer sentence for the complainant.  Id. at 1540.  The Court noted that quasi-judicial immunity has been extended to quasi-judicial officials other than judges when (1) their activities are integrally related to the judicial process, and (2) they must exercise discretion comparable to that exercised by a judge. Id. (citing Imbler, 424 U.S. 409 (criminal prosecutors); Simons, 643 F.2d 774 (members of committee appointed by court of appeals to monitor unauthorized practice of law)).  The Court reasoned that probation officers exercise similar discretion, and thus held that District of

16

Columbia probation officers are absolutely immune from liability.  Turner, 856 F.2d at 1540-41.

Other federal courts have concluded that parole boards and parole officers are entitled to quasi-judicial immunity with respect to their adjudicative functions.  For example, in Sellars, a prisoner sued a state parole board under the Civil Rights Act, 42 U.S.C. § 1983 alleging the parole board conspired to deprive him of his civil rights by giving him an excessively late parole date.  641 F.2d at 1303-04.  The U.S. Court of Appeals for the Ninth Circuit found that parole board officials performed "functionally comparable tasks to judges when they decided to grant, deny, or revoke parole" because they "render[ed] impartial decisions in cases and controversies that excite strong feelings" and "face the [ ] risk of constant unfounded suits by those disappointed in the parole board's decisions," and as such the court held that they required quasi-judicial immunity.  See id. at 1302-03.  Thus the court held "the adjudicatory system simply could not work" without absolute immunity because the parole board's "already difficult task of balancing the risk involved in releasing a prisoner whose rehabilitation is uncertain against the public's right to safety would become almost impossible," and "[f]urthermore, time spent in depositions and on the witness stand defending their actions would leave these overburdened public servants with even less time to perform their crucial tasks."  Id. at 1303.  See also Montero v. Travis, 171 F.3d 757, 761 (2nd Cir. 1999) (finding member of New York State Board of Parole was entitled to absolute immunity with respect to the quasi-adjudicative function of revoking plaintiff's parole); Anton v. Getty, 78 F.3d 393, 396 (8th Cir. 1996) (finding that the Parole Commissioner and USPC officers were entitled to absolute immunity with respect to the quasi-judicial function of determining that complainant failed to prepare an adequate release plan); Bermudez v. Duenas, 936 F.2d 1064, 1066 (9th Cir. 1991) (finding members of the Guam Territorial Parole Board were entitled to absolute immunity for actions taken when processing

17

parole applications); <u>Walter v. Torres</u>, 917 F.2d 1379, 1383-84 (5th Cir. 1990) (finding the Texas Board of Pardons and Paroles entitled to absolute immunity in its application of rules to a particular case in the context of parole revocation procedure); <u>Thompson v. Duke</u>, 882 F.2d 1180, 1182-85 (7th Cir. 1989) (finding that members of the Prisoner Review Board and the Illinois Department of Corrections were subject to absolute immunity in the scheduling and conduct of a parole violation hearing, which is an integral judicial or quasi-judicial function), <u>cert</u>. <u>denied</u>, 495 U.S. 929 (1990); <u>Johnson v. Rhode Island Parole Bd. Members</u>, 815 F.2d 5, 6-8 (1st Cir. 1987) (holding that Rhode Island parole board members were shielded by absolute immunity in the performance of their official duties because they faced the risk of constant unfounded suits by those disappointed by their decisions, and without immunity there was danger that parole board members might not impartially adjudicate difficult cases); <u>Pope v. Chew</u>, 521 F.2d 400, 405-06 (4th Cir. 1975) (holding that the Chairman and members of the Virginia Parole and Probation Board performed a quasi-judicial function entitled to absolute immunity in writing to the governor and requesting revocation of plaintiff's pardon).

Here, Plaintiff alleges that the United States is liable for acts of the USPC and the CSO in the very performances of their quasi-judicial duties. Plaintiff's claims against the United States should be dismissed because the Federal Government retains the functional immunity defenses available to the USPC and CSOSA. Thus, this Court lacks subject matter jurisdiction over Plaintiff's claims.

**C.    The Court Lacks Subject-Matter Jurisdiction Over the Plaintiff's Tort Claims Regarding the Conduct of the Parole Commission Under the Discretionary Function Exception of the FTCA.**

The discretionary function exception is also an exception to the limited waiver of sovereign immunity under the FTCA. Under this exception, the United States cannot be held

18

liable for:

> [a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). The "discretionary function" exception has two basic elements. First, the exception applies to acts that involve an element of judgment or choice. See Sloan v. U.S. Dep't of Hous. and Urban Dev., 236 F.3d 756, 759 (D.C. Cir. 2001) (quoting United States v. Gaubert, 499 U.S. 315, 322 (1991)). In other words, the conduct does not involve mandatory compliance with a particular federal statute, regulation or policy. Id. Second, assuming that an element of judgment is involved, it then must be determined whether the judgment is of a kind that the discretionary function exception is designed to protect, namely a government action based upon considerations of public policy. See United States v. Varig Airlines, 467 U.S. 797, 813 (1984); Berkovitz v. United States, 486 U.S. 531, 536 (1988); Sloan, 236 F.3d at 760. When established government policy, as expressed or implied by statute, allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy. Gaubert, 499 U.S. at 323. Such acts are encompassed by the discretionary function exception even where such discretion has been abused. See 28 U.S.C. § 2680(b). The discretionary function exception operates to protect the Government from liability that would "seriously handicap efficient government operations." Varig Airlines, 467 U.S. at 814 (quoting United States v. Muniz, 374 U.S. 150, 163 (1963)). In short, where the Government may establish that an act involved a judgment that the exception is designed to protect, the discretionary function exception applies, and the district court lacks subject matter jurisdiction. See 28 U.S.C. § 2680(a); Sloan, 236 F.3d at 759.

Decisions how to investigate or prosecute a matter by law enforcement officials are an

example of discretionary functions that fall within the exception.  See Gray v. Bell, 712 F.2d

490, 514 (D.C. Cir. 1983), cert. denied, 465 U.S. 1100 (1984); Kelly v. United States, 924 F.2d

355, 362 (1st Cir. 1992).  In Bell, the former acting director of the FBI sought damages arising

out of a federal grand jury investigation which resulted in his indictment for conspiracy to

violate rights of certain citizens.  Bell, 712 F.2d at 492-93.  The Circuit Court rejected the

complainant's claim, holding that "the federal government's decisions concerning enforcement

of its criminal statutes comprise a part of its pursuit of national policy."  Id. at 514 (*quoting*

Smith v. United States, 375 F.2d 243, 246-47 (5th Cir.), cert. denied, 389 U.S. 841 (1967).

Thus, "[p]rosecutorial decisions as to whether, when and against whom to initiate prosecution

are quintessential examples of governmental discretion in enforcing the criminal law," and are

immune under the discretionary function exception.  Id. 513.  Nor is the discretionary function

limited solely to the formulation of policy by agency heads.  In Piechowicz v. United States, the

Fourth Circuit recognized that lower level agency operatives such as "agents supervising a case,"

including FBI agents, are granted "considerable latitude to decide whether and how to protect

witnesses."  885 F.2d at 1212.  Thus, the court held that "the decision whether to offer the

[witness] federal protection was left to [the agents'] discretion" and any claim with respect to

that decision was barred by the discretionary function exception.  Id. at 1213.

 Like prosecutorial decisions, decisions by the BOP regarding place of imprisonment,

transfer, temporary release for employment purposes, and pre-release custody of federal

prisoners involve elements of discretion in accordance with statutory mandates.  See, e.g., 18

U.S.C. § 3621(b) (listing factors to be considered by the BOP when choosing a place of

imprisonment); 18 U.S.C. § 3622 (permitting the BOP to temporarily release prisoners to

reestablish community ties or work, "if such release otherwise appears to be consistent with the

public interest and if there is reasonable cause to believe that a prisoner will honor the trust to be

imposed in him); 18 U.S.C. § 3624.  Such BOP decisions are inherently susceptible to policy

analysis.  Indeed, the Seventh Circuit has held that a decision by the BOP to transfer a violent

career felon from prison to a halfway house was discretionary and "entwined with social policy

considerations of integrating prisoners into society," and accordingly liability under the FTCA

was barred by the discretionary function exception.  Bailor v. Salvation Army, 51 F.3d 678, 685

(7th Cir. 1995).  Accordingly, the decision to place Kelly at Hope Village and to permit Kelly to

work during the day involved policy analysis, and Plaintiff's claims arising out of the decisions

of the BOP are barred.

Similarly, the Parole Commission is granted discretion by statute and regulation in the

exercise of its duties with respect to granting or revoking parole.  See, e.g., D.C. Code § 24-131;

28 CFR § 2.73(a)(1)-(3) (the USPC may parole D.C. Code offenders – "in its discretion" –

where it determines a prisoner has a "reasonable probability" of living safely in the community,

and such release is "in the opinion of the Commission . . . not incompatible with the welfare of

society").  Numerous courts have found that decisions of the USPC to release prisoners on parole

are discretionary within the meaning of 28 U.S.C. § 2680(a), and thus cannot form the basis of

an FTCA claim.  See, e.g., Taitt v. United States, 770 F.2d 890, 894 (10th Cir. 1985) (holding

that USPC decision to release a convicted armed robber into the Witness Protection Program

was discretionary); Burger v. United States, 748 F.Supp. 1265, 1270, 1274 (S.D. Ohio 1990)

(holding that USPC decisions to parole a convicted armed robber and not to revoke his parole of

for post-release drug offense was discretionary because the USPC weighed "a host of intangible

factors," and balanced policy considerations of prisoner rehabilitation and social welfare) (*citing*

Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 13 (1979);

21

Morrissey v. Brewer, 408 U.S. 471, 477, 479-80 (1972)); *accord* United States v. Addonizio, 442 U.S. 178, 188-89 (1979) ("The [United States Parole] Commission has substantial discretion to determine whether a prisoner should be released on parole."). Accordingly, the decisions of the USPC fell within the discretionary function exception.

Nor can Plaintiff's claims regarding alleged negligence of the BOP and the USPC circumvent the discretionary function exception of the FTCA by identifying acts or omissions that were, in themselves, components of the agencies' discretionary decisions. A plaintiff may not evade the jurisdictional limitations of the discretionary function exception merely by pleading in a "disaggregative fashion" in order to isolate allegedly non-discretionary "ministerial" actions or decisions taken in the process of or leading up to a discretionary decision. See Bell, 712 F.2d at 516 (*citing* Payton v. United States, 679 F.2d 475, 482 (5th Cir. 1982)). Rather, to survive a motion to dismiss, "plaintiffs must allege conduct that is sufficiently separable from the decision-making function." Orkilow v. United States, 682 F.Supp. 77, 82 (D.D.C. 1988). In Payton, the United States Board of Parole paroled a man convicted of assault with intent to murder and with a history of violence toward women. Payton, 679 F.2d at 475. The parolee went on to murder three women, including the appellants' decedent. Id. On appeal, the Fifth Circuit analyzed the appellants' claims in light of the statutory and regulatory mandates of the parole board, and held that decisions to grant or deny parole, as well as decisions regarding the terms of parole, were within the "complete discretion" of the Parole Board, and were susceptible to policy analysis in that they required determination that an individual was capable of safely living in society without violating laws. Id. at 480-81. The court also found that claims that the Board negligently failed to acquire, read, or consider records indicating that the parolee should not have been released because he was a homicidal psychopath "implicate[d]

22

the discretionary function of the Board" because "the manner and degree of consideration with which the Board examines these materials is inextricably tied to its ultimate decision" whether or not to parole.  Id. at 481-82.  Therefore, those claims were also barred by the discretionary function exception.  Id.

Plaintiff's claims regarding negligence by federal agencies fall within the types of actions contemplated by the discretionary function exception.  Plaintiff's conclusory allegations do not allege conduct sufficiently separable from the agencies' discretionary functions to survive a motion to dismiss because they implicate the discretionary functions of the BOP and the USPC. Plaintiff has not identified, nor can she identify, any specific mandatory statutory or administrative duties with which the BOP or the USPC failed to comply.  Accordingly Plaintiff's Complaint should be dismissed for lack of subject-matter jurisdiction.

### D.    The United States Is Not Liable For Any Acts of Negligence of An Independent Contractor.

Plaintiff alleges that the BOP was negligent through the actions of its contractor, Hope Village, Inc.  However, because Hope Village was not operated or managed by the BOP, but was instead an entirely independent private contractor, the FTCA does not provide for Federal Government liability.  By its terms, the FTCA creates liability for certain torts committed by agencies of the United States or their employees.  See 28 U.S.C. § 1346(b)(1).  For purposes of the FTCA, the BOP is a "federal agency" subject to the same protections and responsibilities as any other government agency under the Act.  Cannon v. United States, 645 F.2d 1128, 1139-40 (D.C. Cir. 1981); Phillips v. Fed. Bureau of Prisons, 271 F.Supp.2d 97, 101 (D.D.C. 2003). Plaintiff acknowledges this fact in her complaint.  See Compl. at ¶ 10.  However, under the statute, federal agency "does not include any contractor with the United States."  28 U.S.C. §

23

2671.  This provision of the FTCA is referred to as "the independent contractor exception," and
it prevents the United States from being found liable under the FTCA for the actions of its
contractors.

There are two significant Supreme Court decisions interpreting the FTCA's independent
contractor exception, and these remain controlling law today.  In Logue v. United States, the
Court heard an FTCA claim by parents of a federal prisoner who hanged himself while in prison.
412 U.S. 521 (1973).  At the time, the prisoner was being held in a county jail pursuant to a
contract between the jail and the BOP.  Id. at 525.  The contract provided, *inter alia*, that the
local jail undertook the responsibility for keeping the inmate safe.  Id. at 529.  The lower court
nevertheless found that the BOP had been negligent in its supervision of the local jail.  Id. at 525.
In rejecting the finding of liability, the Supreme Court focused on the level of control that the
Bureau of Prisons retained over the local jail, pursuant to the contract.  The Court found that in
the FTCA independent contractor exception, Congress meant to establish a federal standard for
control, independent of the common law of principal liability for acts of contractors.  See id. at
528.  The Court then found that:

> Congress not only authorized the Government to make contracts such as the one
> here in question, but rather clearly contemplated that the day-to-day operations of
> the contractor's facilities were to be in the hands of the contractor, with the
> Government's role limited to the payment of sufficiently high rates to induce the
> contractor to do a good job.  The contract entered into between the Government
> and Nueces County reflects a similar division of responsibility.  The county
> undertakes to provide custody in accordance with the Bureau of Prisons' rules and
> regulations governing the care and custody of persons committed under the
> contract.  These rules in turn specify standards of treatment for federal prisoners,
> including methods of discipline, rules for communicating with attorneys,
> visitation privileges, mail, medical services, and employment.  But the agreement
> gives the United States no authority to physically supervise the conduct of the
> jail's employees; it reserves to the United States only the right to enter the
> institution . . . at reasonable hours for the purpose of inspecting the same and
> determining the conditions under which federal offenders are housed.

Id. at 529-30 (emphasis added, internal quotes omitted). Thus, the United States is not liable for the actions of its contractors when the contract does not empower the federal government agency "to physically supervise the conduct of the [contractor's] employees." Id. at 530.

The Supreme Court re-affirmed the Logue standard in United States v. Orleans, 425 U.S. 807 (1976). Orleans involved a child injured when the van he was riding in struck a parked vehicle. Orleans, 425 U.S. at 810. The van was operated by a non-profit corporation that received all of its funding from grants through a federal agency, the Office of Economic Opportunity ("OEO"). Id. at 809-10. The Court of Appeals below found that the OEO did not control or supervise the physical performance of the work of the non-profit, nor its day-to-day operations, id. at 812, but rejected application of the FTCA's independent contractor exception because it found that OEO had required the non-profit, by threatening to cancel its funding, to name a new chairman of the board and to re-organize, and that this level of control was inconsistent with a principal's relationship with "an independent contractor." See id. The Supreme Court overturned the appellate court's decision and specifically held that the independent contractor exception **did** apply. Id. at 819 (emphasis added). The Court found that the government routinely imposes standards upon contractors, and controls their compliance with those standards through funding and contracting. Id. at 817-818. Such standards and the oversight of those standards did not transform the government's actions into a day-to-day supervision of operations. Id. at 816. Thus, both Logue and Orleans require courts to look exclusively at the level of control the federal government retains over the day-to-day operations of the contractor and its employees. When the government hires a contractor, the FTCA's independent contractor exclusion applies unless the government's control over the contractor's operations is on par with that of a direct manager or supervisor who gives day-to-day directions

to the employees in physically carrying out their tasks.[6/]

Courts in this Circuit have consistently applied the standard from <u>Logue</u> and <u>Orleans</u> to bar recovery from the United States for claims arising out of the acts or omissions of independent contractors.  See, e.g., <u>Macharia v. United States</u>, 334 F.3d 61, 68-69 (D.C. Cir. 2003) (finding a security contractor was an independent contractor within the meaning of the FTCA exception when the contract provided "detailed guidelines and regulations that the contractor was required to conform with," but the Department of State did not supervise day-to-day operations); <u>Cannon</u>, 645 F.2d 1128, 1134 (finding the Lorton Reformatory was an independent contractor within the meaning of the FTCA exception because the contract "did not give the United States the authority to physically supervise the conduct of the jail's employees," but only allowed the United States authority to inspect the prison); <u>Phillips</u>, 271 F. Supp. 2d 97, 101 (finding that Hope Village was an independent contractor within the meaning of the FTCA exception where, under the governing contract, the BOP did not supervise day-to-day operations); <u>Cooper v. United States</u>, 225 F. Supp. 2d 1, 4 (D.D.C. 2002) (finding that the United States was not liable in an FTCA action for the alleged negligence of a private contractor when the Government Services Agency delegated complete responsibility for maintenance of government equipment to the contractor); <u>Hockman v. United States</u>, 741 F. Supp. 5 (D.D.C. 1990) (dismissing for lack of subject-matter jurisdiction an FTCA action in which plaintiff was

---

[6/]    The applicability of the independent contractor exception is properly decided at the motion to dismiss stage.  See, e.g., <u>Macharia v. United States</u>, 334 F.3d 61 (D.C. Cir. 2003) (affirming district court's dismissal following limited jurisdictional discovery); <u>Cannon</u>, 645 F.2d at 1130 (reversing district court's denial of government's pre-discovery motion to dismiss); <u>Phillips</u>, 271 F. Supp. 2d 97 (granting government's motion to dismiss); <u>Banuwal v. United States</u>, No. 91-1455, 1992 WL 29968 (D.D.C. Jan. 30, 1992) (granting government's motion to dismiss); <u>Hockman v. United States</u>, 741 F. Supp. 5 (D.D.C. 1990) (same); <u>Jennings v. United States</u>, 530 F. Supp. 40 (D.D.C. 1981) (same).

employed by a private construction contractor to the FBI, not by the FBI itself, and in which the contract provided that the contractor retained control over construction operations); Jennings v. United States, 530 F. Supp. 40 (D.D.C. 1981) (dismissing FTCA claim in which plaintiff was employed by construction contractor to the National Park Service, and Park Service retained only the right to inspect construction operations).  Other Circuits are similarly consistent.  See, e.g., Savic v. United States, 918 F.2d 696 (7th Cir. 1990); Leone v. United States, 910 F.2d 46 (2d Cir. 1990); Letnes v. United States, 820 F.2d 1517 (9th Cir. 1987); Larsen v. Empresas El Yunque, Inc., 812 F.2d 14 (1st Cir. 1986); Merklin v. United States, 788 F.2d 172 (3rd Cir. 1986); Cavazos v. United States, 776 F.2d 1263 (5th Cir. 1985); Wood v. Standard Products Co., 671 F.2d 825 (4th Cir. 1982).

In Phillips v. Federal Bureau of Prisons, a case involving the very contract at issue here between the BOP and Hope Village, Inc., this Court (J. Collyer) held that the contract and contracting parties are governed by the independent contractor exception.  271 F. Supp. 2d at 101.  In that case, the mother of a federal inmate who was shot and killed while housed at Hope Village brought suit against the BOP under the FTCA, claiming, *inter alia*, negligence and wrongful death.  Id. at 98.  The Court granted the BOP's motion to dismiss, finding as a matter of law that Hope Village was an independent contractor, and the BOP did not involve itself in the day-to-day physical operations of the facility.  Id. at 101.

In the present case, the very same parties operated together under the same contract that, in Phillips, was held to be governed by the independent contractor exception within the meaning of the FTCA.  Under the contract, "the contractor shall furnish the necessary facilities, equipment, and personnel to provide for the safekeeping, care, and program needs of persons residing in centers . . . .  The contractor has affirmative responsibility to ensure proper

27

management and oversight of their program . . . .  The contractor shall develop operational

policies and procedures that adhere . . . to generally accepted correctional practice as defined by

the [Contracting Officer's Technical Representative]."  See Phillips, 271 F. Supp. 2d at 101 and

Statement of Work, pp. 1, 4-5, portions attached as Ex. 2.[2/]  Furthermore, the BOP "does not

manage or supervise Hope Village employees" and "does not provide BOP staff for Hope

Village, Inc."  See Phillips, 271 F. Supp. 2d at 101 and Exh. 1 (Fornshill Declaration) at 4-6.

Hope Village, Inc., is, accordingly, an "independent contractor" for purposes of the FTCA, and

Plaintiff's claims regarding any acts or omissions of the BOP are barred.

Granting this Motion will not foreclose Plaintiff's avenue to possible recovery, but will

permit Plaintiff to proceed against the party committing the acts complained of, Hope Village,

Inc.  There is no basis under the FTCA upon which to find the United States was negligent

through the acts of Hope Village, Inc., and any claims in reference to the BOP should be

dismissed.

## III.    THE AGENCIES OF THE UNITED STATES NEITHER OWED NOR BREACHED ANY SPECIFIC DUTY TO ERIKA SMITH.

The FTCA specifies that claims must be determined in accordance with the substantive

tort law **of the place where the act or omission occurred**.  28 U.S.C. § 1346(b) (emphasis

added); Raflo v. United States, 157 F.Supp. 2d 1, 8 (D.D.C. 2001).  In this case, although

Plaintiff has amended her complaint in an attempt to raise Maryland law, the FTCA requires that

Plaintiff's claims be determined in accordance with the substantive tort law of the District of

Columbia, because Plaintiff's claims arise out of the alleged acts or the failures to act by federal

---

[2/]    Due to the large number of pages, only relevant portions of the Statement of Work are attached as Exh. 2.  Plaintiff has obtained a copy of the Statement of Work, and, should the Court wish to obtain a full copy, one will be provided.

28

agencies either located in the District of Columbia or acting on matters occurring within the District of Columbia.  See generally Amended Complaint.[8/]

Under District of Columbia law, the existence of tort duty is a question of law to be determined by the Court.  In re Sealed Case, 67 F.3d 965, 968 (D.C. Cir. 1995).  A plaintiff bears the burden of proof on each element of negligence, including the applicable standard of care, the deviation from or breach of that standard, and the causal relationship between the breach and the plaintiff's injury.  Varner v. District of Columbia, 891 A.2d 260, 265 (D.C. 2006); Butera v. District of Columbia, 235 F.3d 637, 659 (D.C. Cir. 2001).  In the absence of a cognizable duty of care, there can be no breach, and a defendant cannot be liable in tort to a plaintiff.  See N.O.L. v. District of Columbia, 674 A.2d 498, 499 n.2 (D.C. 1995) ("The foundation of modern negligence law is the existence of a duty owed by the defendant to the plaintiff.") (citing Palsgraf v. Long Island R.R., 248 N.Y. 339, 162 N.E. 99 (1928)).[9/]

---

[8/]     Plaintiff has taken great pains in her Amended Complaint to remove any facts demonstrating Plaintiff's and Erika Smith's District of Columbia residency in order to create the impression that Maryland has the substantial interest in the matter and that Maryland law should apply.  However, in addition to the specific provisions of the FTCA that require that the law of the place where the negligent acts occurred, and not the injury, Plaintiff admitted in her initial Complaint that both she and Erika Smith resided in the District of Columbia at the time of the incident, Complaint at ¶ 7, that Plaintiff was appointed as the Personal Representative of the Estate of Erika Smith pursuant to District of Columbia law, Complaint at ¶ 6, and that Anthony Kelly was released and supervised in the District of Columbia.  Complaint at ¶¶ 10-11.  Consequently, the District of Columbia is not only the jurisdiction where the acts of the Defendant occurred, but the jurisdiction with a substantial interest in the matter, and the law of the District of Columbia governs.

[9/]     The determination of the absence of an applicable standard or duty of care may be made at the motion to dismiss stage.  See Slaby v. Fairbridge, 3 F.Supp.2d 22, 29 (D.D.C. 1998) ("It is well settled tort law that a failure to establish a duty owed to the plaintiff is fatal to claims of negligence.") (citing Woolridge Mfg. Co. v. United States, 235 F.2d 513, 514 (D.C. Cir. 1956)).

**A.**   **Plaintiff's Claims Are Barred by the Public Duty Doctrine.**

By its terms, the FTCA reserves to the United States defenses available to agents of the

United States whose acts or omissions give rise to a cause of action.  28 U.S.C. § 2674.

Specifically, the United States retains the ability to assert functional immunity and "other

defenses" which would have been available to the employee of the United States whose act or

omission gave rise to the claim.  28 U.S.C. § 2674.  See also, Tinsley, 150 F.Supp.2d at 11, 12.

The reservation is not limited to defenses of traditional judicial immunity.  See H.R. Rep. No.

100-700, at 5 (1988), reprinted in 1988 U.S.C.C.A.N. 5945, 5948.

To the extent that the United States, through any of it agencies, had a duty to protect

Erika Smith, that duty did not differ in kind or degree from the general duty to protect the public

at large, and as such it provided no basis for a private tort cause of action.  Under the "public

duty doctrine," courts in the District of Columbia have adhered to "the fundamental principle

that a government and its agents are under no general duty to provide public services, such as

police protection, to any particular individual citizen."  Klahr v. District of Columbia, 576 A.2d

718, 720 (D.C. 1990) (quoting Warren v. District of Columbia, 444 A.2d 1, 4 (D.C. 1981)).  In

order to convert a general public duty into a specific and actionable duty of care owed an

individual, a plaintiff must allege and prove a "special relationship" between the government and

the individual by proving: (1) direct and continuing affirmative contact between the injured party

and the governmental agency, and (2) a justifiable reliance on the part of the injured party.

Klahr, 576 A.2d at 719-20.  Otherwise, potential liability stemming from ordinary exercise of

state police powers could be so "staggering" that government would cease to function.  Warren,

444 A.2d at 25-6; see also Wanzer v. District of Columbia, 580 A.2d 127, 132 (D.C. 1990).

Thus, in order to protect government allocation of scarce manpower and resources, the courts

developed the public duty doctrine, "a major exception to [the] generally salutary principle" that "liability follows tortious wrongdoing."  See Varner, 891 A.2d at 274, 276.

    The D.C. Court of Appeals decision is Klahr is especially instructive here, as it involved claims very similar to those raised by Plaintiff in this action.  In Klahr, appellants' decedents were robbed and murdered in their apartment by an escapee from a District of Columbia halfway house.  576 A.2d at 718.  Appellants charged that the District of Columbia was negligent in its supervision and confinement of the killer.  Id.  The D.C. Court of Appeals held that appellants' claims were barred by the public duty doctrine, because the duty owed decedents was not different from or greater than the general duty owed the entire city to confine the inmate.  See id. at 719; see also Cunningham v. District of Columbia, 584 A.2d 573, 575 (D.C. 1990) (holding psychiatrist employed by District of Columbia Parole Board to evaluate mental condition of parolee owed no specific, non-public duty of care to seven women subsequently injured or killed by parolee); Warren, 444 A.2d 1, 3 (holding that police had no specific, non-public duty to protect three women abducted and sexually assaulted after police failed to respond to their requests for assistance).

    As in Klahr, the United States, acting through the BOP, the USPC and CSOSA, owed only a general public duty to safely parole and supervise Kelly.  Plaintiff has neither alleged nor can she present evidence to support the existence of a special relationship between Erika Smith and any of these agencies of the United States.  Neither the tragedy of Erika Smith's death nor the nature of the relationship between agents of the United States and Anthony Kelly relieves Plaintiff of her burden of proving a special relationship.  See Klahr, 576 A.2d at 720 ("Notwithstanding the great misfortune that befell the [decedents], it is evident that they were the victims of a random criminal attack.  The District of Columbia had not agreed to provide specific

31

protection . . . nor had it any reason" to foresee a danger to the decedents "any greater in degree than, or different in kind from, the danger . . . to anyone else."); Warren, 444 A.2d at 8-9 ("It is easy to condemn the failings of the police. However, the desire for condemnation cannot satisfy the need for a special relationship out of which a duty to specific persons arises.").[10/]

In this case, Plaintiff's claims are barred by the public duty doctrine. Accordingly, the United States had no duty of care which might form a basis for liability in a private negligence action, and Plaintiff's claims should be dismissed.[11/]

---

[10/]    One case has found a special relationship between a parole officer and subsequent victims of a parolee in a factually different matter. In Rieser v. District of Columbia, the Circuit Court found that a special relationship existed where a parole officer with detailed knowledge of a parolee's criminal and sexually abusive history assisted the parolee in obtaining employment at an apartment building. 563 F.2d 462, 478-79 (D.C. Cir. 1977), modified in part, 580 F.2d 647 (D.C. Cir. 1978). Several women living in the apartment building were subsequently raped and murdered by the parolee. Rieser, 563 F.2d at 464. The Court held that a special relationship existed because the actions of the parole officer made the killer "a virtual member of the victim's household," thus "present[ing] a specific and unreasonable risk of harm to the [victims], therefore giving rise to a special duty toward them." Id. at 479. Unlike the parole officer in Rieser, the Federal agencies in this case did not knowingly make Kelly a "virtual member" of Erika Smith's household, nor did Kelly pose a "specific or unreasonable risk" to Erika Smith in particular. In any event, the District of Columbia Court of Appeals has since rejected the holding in Rieser, stating that Rieser is not binding on the District of Columbia courts. Cunningham, 584 A.2d at 575 n.3. Accordingly, Rieser is not a reflection of the tort law in the District of Columbia, and is of questionable authority.

[11/]    Nor do Plaintiff's general allegations that the BOP, the USPC, and CSOSA violated various policies and procedures in paroling and supervising Anthony Kelly create a "special relationship" from which an actionable duty of care might arise. In order for statutes or regulations to create a duty of care overcoming the public duty doctrine, a plaintiff must affirmatively set forth "mandatory acts clearly for the protection of a particular class of persons rather than the general public as a whole." Morgan v. District of Columbia, 468 A.2d 1306, 1314 (D.C. 1983). Thus, even if Plaintiff had pointed to a specific statute or regulation mandating duties of the BOP, the USPC, or CSOSA, Plaintiff has certainly not alleged that any such statute or regulation set Erika Smith apart from the public. Further, it is relevant to note that internal agency protocols or procedures "cannot create a special duty to a protected class." Wanzer, 580 A.2d at 133.

**B.**    **The Federal Government Owed No Duty of Care to Erika Smith.**

Even if Plaintiff's claims were not barred by the public duty doctrine, Plaintiff has failed

to set forth any standard or duty of care to Erika Smith which the United States breached.  Under

District of Columbia law, the existence of a tort duty is basically an issue of the foreseeability of

the plaintiff's injury.  District of Columbia v. Beretta, 872 A.2d 633, 642 (D.C. 2005); Rieser,

563 F.2d at 479.[12]  Because of the extraordinary nature of criminal conduct, however, there is no

duty to protect another from a criminal attack by a third person.  Cebula v. Bush, 778 F. Supp.

567, 569 (D.D.C. 1991) (citing Kline v. 1500 Massachusetts Avenue Apartment Corp., 439 F.2d

477, 481 (D.C. Cir. 1970)); see also Skeen v. Federative Rep. of Brazil, 566 F. Supp. 1414, 1419

(D.D.C. 1983).[13]  Only under "exceptional circumstances" will a duty to protect a plaintiff from

---

[12]        In the District of Columbia, the issue of foreseeability is relevant to determinations of the existence of duty as well as to proximate cause.  See Workman v. United Methodist Committee on Relief of the General Board of Global Ministries of the United Methodist Church, 320 F.3d 259, 265 (D.C. Cir. 2003).  The District of Columbia Court of Appeals has declined to reconsider "the theoretically somewhat anomalous blending of duty and foreseeability" in District of Columbia tort law.  Beretta, 872 A.2d at 642 n.4.
    In this case, Plaintiff has failed to plead facts sufficient to establish an actionable duty of care, because Erika Smith was not a foreseeable victim of Kelly.  See discussion infra.  Nor has Plaintiff established a causal connection between an alleged act or omission of any federal agency, because any duty the federal defendants may have had was discharged when the CSO requested a parole violator warrant (which request was denied by the USPC), see Compl. at ¶ 26, and because the issuance of an outstanding warrant for Kelly's arrest in Prince George's County prior to the murder of Erika Smith attenuated the relationship between the alleged acts or omissions of the federal defendants and the murder.  See Compl. at ¶¶ 22; Morgan v. District of Columbia, 468 A.2d 1306, 1318 (D.C. 1983) (finding no liability where defendant police supervisor's role in plaintiff's injury at the hands of her husband, a police officer, was too attenuated, and where defendant had already told the husband not to hurt the plaintiff).
[13]        Plaintiff cannot establish that the Federal Defendants owed an actionable duty of care under either Tarasoff v. Regents of the University of California, 551 P.2d 334, 345 (Cal. 1976) (finding defendant psychotherapist owed duty to protect plaintiff's decedent where defendant's patient articulated to defendant a specific intention to kill plaintiff's decedent), or Section 319 of the Restatement (Second) of Torts (1965) ("Duty of Those in Charge of Person Having Dangerous Propensities").  Although Courts in the D.C. Circuit have occasionally discussed and applied such theories of third party liability, see, e.g., White v. United States, 780

(continued...)

the criminal acts of a third person be found.  See Rieser, 563 F.2d at 479-80.  Even under such

exceptional circumstances, however, in order to hold a defendant liable for the intervening

criminal acts of a third party, a plaintiff must meet a demanding "heightened showing of

foreseeability," and bears the burden of showing foreseeability by "precise" proof.  Beretta, 872

A.2d at 642 (citing Potts v. District of Columbia, 697 A.2d 1249, 1252 (D.C. 1997) (finding that,

in the absence of "specific evidence bearing directly on the foreseeability of the shooting

---

[13]/(...continued)
F.2d 97, 101, 103 (D.C. Cir. 1986) (citing Tarasoff and Restatement (Second) of Torts § 319
(1965)), neither Tarasoff nor the related Section 319 have ever actually been adopted by the
District of Columbia Court of Appeals.  See Klahr, 576 A.2d at 720-21 (declining to adopt
Section 319 as an exception to the public duty doctrine, noting that theories of negligence
liability for the criminal actions of third parties – such as that enunciated in White, 780 F.2d 97 –
are not binding on the District of Columbia Court of Appeals); see also Cunningham, 584 A.2d
at 575 n.3 (rejecting theory of third party liability enunciated in Rieser to the extent that it is
inconsistent with Klahr).
        Even if Tarasoff applied in this case, Plaintiff fails to state a claim because Erika Smith
was not a foreseeable victim of Anthony Kelly.  See White, 780 F.2d at 101 (stating that a
Tarasoff duty to protect or warn a potential victim of a third party exists "only if the victim is
identifiable"); see also Hoehn, 217 F. Supp. 2d at 47 n.7 (declining to extend Tarasoff duty to
cover a hospital whose heavily medicated patient crashed into plaintiffs while driving, stating
that Tarasoff presented a "much stronger basis" for liability because the patient "expressly
informed his therapist of his intention to kill a particular person"); accord Simpson v. Braider,
104 F.R.D. 512, 521 n.13 (D.D.C. 1985) ("liability of psychiatrists should be predicated on a
rule of 'specific threats to specific victims,' such a rule being a workable, reasonable, and fair
boundary") (internal citations and quotation marks omitted); Thompson v. County of Alameda,
27 Cal.3d 741, 753-54 (Cal. 1980) (clarifying and limiting Tarasoff liability to specific threats to
specific victims).
        Similarly, even if Section 319 applied here, Plaintiff fails to state a claim.  "[O]nly
custodial circumstances give rise to a duty to control under Section 319."  Hoehn, 217 F. Supp.
2d at 47.  Upon his release into the community – and upon his transfer to Hope Village, where
Kelly and other inmates checked out daily for work purposes – the United States did not "take
charge" of Kelly within the meaning of Section 319, because supervision of Kelly was not
constant.  See Thomas v. City Lights School, Inc., 124 F. Supp. 2d 707, 712 (D.D.C. 2000)
(citing Abraham v. Wayside Cross Rescue Mission, 682 N.E.2d 1240, 1244-45 (Ill. App. 1997)
(holding halfway house did not "take charge" of an inmate within the meaning of Section 319
where, inter alia, the inmate was permitted to leave for work each day, and thus halfway house
owed no duty to protect wife who was stabbed by the inmate)).

incident at issue," the District of Columbia owed no duty of care to protect plaintiffs who were

shot while leaving the Washington Convention Center); <u>Bailey v. District of Columbia</u>, 668 A.2d

817, 820 n.6 (D.C. 1995) (rejecting "generic information" about shootings in the vicinity of a

school as insufficient to create a duty of care by the City to protect the plaintiff from firearms

while at school); <u>Clement v. Peoples Drug Store</u>, 634 A.2d 425 (D.C. 1993) (finding drug store

owed no duty to plaintiff, a store manager murdered in the store parking lot, absent specific

evidence showing the specific crime was foreseeable)).<u>14/</u> <u>See also</u> <u>Cebula</u>, 778 F. Supp. at 569-

70 ("The foreseeability of harm must be more precisely shown where there is intervening

criminal conduct than in the typical negligence situation.") (<i>quoting</i> <u>District of Columbia v. Doe</u>,

524 A.2d 30, 32-33 (D.C. App. 1987)). "[U]nder ordinary circumstances it may reasonably be

assumed that no one will violate the criminal law." <u>Boykin v. District of Columbia</u>, 484 A.2d

560, 565 (D.C. 1984).

 In addition to foreseeability, the existence of a tort duty is also a matter of fairness and

public policy. <u>See</u> <u>Hoehn v. United States</u>, 217 F. Supp. 2d 39, 45, 47 (D.D.C. 2002) (declining

to find a hospital owed a duty to plaintiffs injured by a hospital patient, noting that "the

imposition of a duty . . . could be extremely burdensome to hospitals generally, as they might be

driven to extend hospital stays beyond what is medically necessary, or attempt to develop

rigorous controls . . . ."); <u>Thomas v. City Lights School, Inc.</u>, 124 F. Supp. 2d 707, 709 (D.D.C.

---

  <u>14/</u>  The D.C. Court of Appeals has adopted an increasingly demanding interpretation
of the "heightened showing" or "precise proof" requirement in recent years. In one earlier
decision, <u>Doe v. District of Columbia</u>, the Court of Appeals found that the District of Columbia
owed a duty to protect plaintiff, a child at a District elementary school, from being raped by an
intruder, because evidence specific to that school and surrounding area "could be viewed by
reasonable factfinders as enhancing the foreseeability of danger from intruders." 524 A.2d 30,
34 n.5 (D.C. 1987). "[B]y contrast," in subsequent cases, the D.C. Court of Appeals has
"rejected liability as a matter of law where foreseeability (hence duty) was not limited by any
evidentiary reference to a precise location or class of persons." <u>Beretta</u>, 872 A.2d at 642.

2000) ("[W]hether a duty exists is not simply a question of foreseeability. [It] is ultimately a question of fairness. . . . [and] involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.") (*quoting* Knippen v. Ford Motor Co., 546 F.2d 993, 1000 (D.C. Cir. 1976)).

In Beretta, the District of Columbia and victims and survivors of gun violence brought a common law negligence suit against a gun manufacturer. 872 A.2d 633. The District of Columbia Court of Appeals affirmed the Superior Court's dismissal of common-law negligence claims against a gun manufacturer. Id. at 643. The Court found no applicable standard of care where plaintiffs failed to meet the "heightened showing of foreseeability" through their failure to proffer any specific evidence of foreseeability of specific shootings, and because "the sheer number of causal links" between the manufacture of guns and the use of guns to injure people cautioned against finding a "potentially unlimited" duty of care. Id. at 643. Similarly, in Workman v. United Methodist Committee on Relief of the General Board of Global Ministries of the United Methodist Church, the Court of Appeals for the D.C. Circuit noted that a "heightened showing" is required, the requirement is a "demanding" one, and the proof must be "precise." 320 F.3d 259, 262 (D.C. Cir. 2003). Thus, "the Court of Appeals has been reluctant to see a defendant held liable for harm caused by the criminal act of a third party," which is "not surprising, because the heightened foreseeability test provides a limited exception to the general rule of nonliability for such claims." Id. at 262-63 (internal citations and quotation marks omitted). In Workman, the Circuit Court declined to find that the defendant owed any duty of care to the plaintiff, an aid worker working on behalf of defendant in Kenya, despite defendant's awareness of danger in that country and plaintiff's specific warning that she might be in danger. 320 F.3d at 264. In reaching this conclusion, the Circuit Court distinguished cases where courts

applying District of Columbia law have found a duty of care to protect against the criminal actions of a third party, specifically noting that "[i]n these cases a good deal of evidence suggested the defendant was on notice there was a substantial risk of harm to the plaintiff," and "the relationship between the plaintiff and the defendant suggested the defendant should be held liable as a matter of policy."  Id. (citing Doe, 524 A.2d at 33-34; Doe v. Dominion Bank of Washington, 963 F.2d 1552, 1555-56 (1992)).

Applying these principles in this case, Plaintiff has failed to establish an applicable standard or duty of care upon which she might base a claim of common law negligence. Plaintiff has made no specific factual allegation to show that it was foreseeable to the United States that Anthony Kelly would commit a murder, least of all that he would murder Erika Smith in particular.  Plaintiff's conclusory allegations and speculative assertions regarding Kelly's criminal history and conclusions that the Federal defendants should have drawn simply do not meet Plaintiff's considerable burden of proof.  Furthermore, public policy cautions against the imposition of a duty in any case:  The agencies at issue in this case could be extremely burdened by potentially unlimited liability for the actions of parolees, and could, in turn, be driven to extend incarceration beyond what is necessary or desirable.  Accordingly, the general rule of nonliability for the criminal actions of third parties applies here.  Plaintiff's lawsuit against the federal defendants for the intervening criminal actions of Anthony Kelly should be dismissed for failure to state a claim.

## CONCLUSION

Wherefore, for all the foregoing reasons, Plaintiff's Complaint should be dismissed with prejudice.

Respectfully submitted,


  /s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


  /s/ Rudolph Contreras
RUDOLPH  CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


  /s/ Darrell C. Valdez
DARRELL C. VALDEZ, D.C. BAR # 420232
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W., Civil Division
Washington, D.C.  20530
(202) 307-2843