**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                               )
CAROL SMITH,                                   )
   Individually and as Personal Representative )
   of the Estate of Erika Smith,                )
                                               )
       Plaintiff,                           )   CASE NO:  1:06-CV-00633-RBW
                                               )
       v.                                   )
                                               )
UNITED STATES OF AMERICA,                      )
                                               )
       Defendant.                           )
_____)


**PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

ARGUMENT ..............................................................................................................5

I.    THE FTCA'S STATUTE OF LIMITATIONS DOES NOT CREATE A
      JURISDICTIONAL BAR TO THIS COURT'S CONSIDERATION OF
      PLAINTIFF'S CLAIMS. ..............................................................................5

      A.    The FTCA Statute of Limitations Did Not Start Running Until the Cause
            of Injury Became Known to Plaintiff in May 2003. ...........................................5

      B.    Ms. Smith Was Incapable of "Knowing" the Cause of Erika's Death Until
            May 2003. .................................................................................................10

II.   THE UNITED STATES IS NOT ENTITLED TO ABSOLUTE IMMUNITY.............13

III.  THE "DISCRETIONARY FUNCTION" EXCEPTION TO THE FTCA DOES
      NOT BAR PLAINTIFF'S CLAIMS. .........................................................................15

      A.    The Discretionary Function Exception to the FTCA Shields From Liability
            Only Those Governmental Actions Grounded in Considerations of Public
            Policy. .........................................................................................................16

      B.    The Discretionary Function Exception Does Not Protect the Government
            from Liability for CSOSA's Failure to Comply With Mandatory
            Requirements Regarding the Supervision of Anthony Kelly. ...........................17

      C.    Any "Discretion" Exercised By the Government in Supervising Anthony
            Kelly Was Not Grounded in Policy Considerations..........................................20

IV.   PLAINTIFF HAS STATED A CLAIM AGAINST THE UNITED STATES
      UNDER THE FTCA. ...............................................................................................22

      A.    The "Public Duty Doctrine" Does Not Bar Ms. Smith's Claims. ......................22

      B.    The Government Owed a Duty of Reasonable Care Under District of
            Columbia Law to Carol and Erika Smith. ......................................................28

            1.    It was reasonably foreseeable that Anthony Kelly would commit
                  the acts which resulted in Erika Smith's murder.................................29
            2.    Ms. Smith has alleged sufficient facts to esetablish the
                  Government's duty in this case. ........................................................33
            3.    Public policy considerations support denial of the Government's
                  motion to dismiss. ............................................................................36

CONCLUSION ...............................................................................................................38

Defendant United States of America ("United States" or "Government") has moved to dismiss Plaintiff Carol Smith's ("Plaintiff" or "Ms. Smith") Amended Complaint for Damages ("Complaint" or "Compl.") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et seq.*, for the wrongful death of her daughter, Erika Smith, and for Erika's pain and suffering prior to her death. The Government seeks dismissal pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), asserting that: (1) this Court lacks subject matter jurisdiction to consider Ms. Smith's claims; and (2) her claims fail "to allege facts sufficient to state a claim upon which relief can be granted." *See* Motion to Dismiss at 1-2.

Specifically, the Government argues that Ms. Smith's claims are barred because they (1) were brought outside the FTCA's statutory limitations period; (2) allege acts or omissions that are "subject to absolute [judicial] immunity;" (3) fall within the discretionary function exception to the FTCA; (4) allege acts or omissions of an independent government contractor;[1] (5) are barred by the "public duty doctrine;" and (6) are not based on an actionable duty of care owed by the Government to Ms. Smith or to Erika. *Id.*

The Government's assertions on each of these points are unavailing for several reasons. *First*, the FTCA's two-year statute of limitations does not bar this Court from considering Ms. Smith's claims. The law is clear that the FTCA limitations period does not start to run until a plaintiff has knowledge of the cause of her injury – which did not occur in this case until approximately May 2003. Ms. Smith has alleged and presented evidence that she was unaware – and, in any event, *unable* to know – of the cause of Erika's murder until that time, rendering her

---

[1]    The Government asserts the government contractor defense *only* with respect to claims arising from the actions of Hope Village – an independent contractor of the Bureau of Prisons. Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss ("Def. Memo.") at 23-28. Plaintiff does not challenge the Government's assertion of this defense with respect to such claims. However, the Government also had independent duties of care, which Ms. Smith alleges were breached, and which form the basis of her Complaint.

claims against the Government comfortably within the limitations period. Aside from ambiguous statements by one of the Montgomery County detectives investigating the crime, and a series of equivocal statements in the press (primarily from online publications), the Government has presented no evidence to the contrary.[2]

*Second*, although Plaintiff does not dispute that *some* of the actions underlying her claims may be "adjudicative" in nature, and therefore subject to absolute immunity, the Government's attempt here to so characterize *all* of the negligent acts alleged in Ms. Smith's Complaint – including those involving the Court Services and Offender Supervision Agency's ("CSOSA") compliance (or lack thereof) with *mandatory* requirements – as "judicial" in nature is unsupportable as a matter of law. The law is clear that absolute judicial or quasi-judicial immunity of the type claimed by the Government here is limited to "judicial" or "functionally comparable" roles within the Government – not to the supervisory and administrative acts and omissions by CSOSA employees at issue in this case.

*Third*, while some of the acts giving rise to Plaintiff's claims likewise may, in fact, constitute "discretionary function[s] or duties" on the part of Government actors, CSOSA's acts with respect to Anthony Kelly fall well outside the discretionary function exception to the FTCA. The Government does not contend otherwise, and with good reason. CSOSA's officers were bound by certain mandatory and specific requirements and had no discretion to substitute their judgment in lieu of complying with those requirements. Neither is there any evidence that the challenged actions of CSOSA in this case are "of the nature and quality that Congress

---

[2]     Ms. Smith's affidavit, Affidavit of Carol Smith ("Smith Aff.) at Exh. 1, reflects her memory as to what she knew about Anthony Kelly and when, and is not inconsistent with the testimony contained in Detective Joan Buchan's declaration as to what the detective may have told Ms. Smith regarding Kelly. Declaration of Det. Cpl. Joan Buchan (Ret.), Def. Memo. at Exh. 3. Nevertheless, should this court read Detective Buchan's declaration differently, jurisdictional discovery or an evidentiary hearing regarding this matter would be appropriate at this stage, rather than dismissal.

intended to shield from tort liability." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense* ("*Varig Airlines*"), 467 U.S. 797, 813 (1984); *Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995). Accordingly, the discretionary function exception does not preclude liability under the FTCA for tort claims arising from the negligent supervision of Anthony Kelly by CSOSA officers.

*Fourth*, the "public duty doctrine" defense as articulated by the Government in its Motion fails to account for the knowledge – reasonably and properly attributable to the Government – of Anthony Kelly's dangerousness prior to the murder. Indeed, the very authority cited by the Government expressly left open the possibility that claims such as Ms. Smith's – alleging a failure to supervise known dangerous offenders – are not barred by the public duty doctrine.

*Finally*, Ms. Smith has alleged sufficient facts to state a claim against the Government for wrongful death and survival damages arising from the foreseeable criminal acts by Anthony Kelly which resulted in the death of her daughter on August 6, 2002. Her claims are supported by substantial authority finding a duty of care on the part of both public and private entities in circumstances such as those presented here and holding them liable for the acts of dangerous criminal offenders under their supervision.

For these reasons, and applying the standards to which Ms. Smith is entitled under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), the Government's Motion to Dismiss should be denied and Ms. Smith afforded the opportunity to present her case on the merits.[3]

---

[3]    Alternatively, should the Court determine that underlying questions of fact remain before its jurisdiction can be ascertained, Ms. Smith requests limited jurisdictional discovery to establish the facts necessary to resolve such questions.

## STANDARD OF REVIEW

When considering a Rule 12(b)(1) motion, the Court must consider as true all of the non-movant's factual allegations. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). Furthermore, the Court may consider, in addition to the allegations in the Complaint, affidavits and other evidence addressing the plaintiff's threshold pleading requirements. *OFAC v. Voices in the Wilderness*, 329 F. Supp. 2d 71, 76 (D.D.C. 2004) (citations omitted). Of course, given the defendant's opportunity to present material outside the four corners of the complaint to support dismissal, this Circuit "require[s] that plaintiffs be given an opportunity for discovery of facts necessary to establish jurisdiction prior to a decision of a 12(b)(1) motion." *Ignatiev v. United States,* 238 F.3d 464, 467 (D.C. Cir. 2001) (citing *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996)); *Crane v. Carr*, 814 F.2d 758, 764 (D.C. Cir. 1987).

Likewise, under Rule 12(b)(6), the Court must construe the factual allegations contained within the Complaint in a light most favorable to the non-movant. *OFAC*, 329 F. Supp. 2d at 76. These allegations, in turn, do not have to be pled with exacting specificity. Rather, all that is required is that the Complaint contain "'a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Given these standards, a complaint should not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of [her]claim which would entitle [her] to relief." *Id*. at 45-46. Ms. Smith comfortably meets these threshold requirements in this case.

**ARGUMENT**

I.    **THE FTCA'S STATUTE OF LIMITATIONS DOES NOT CREATE A
       JURISDICTIONAL BAR TO THIS COURT'S CONSIDERATION OF
       PLAINTIFF'S CLAIMS.**

The FTCA requires tort claims against the United States, such as Ms. Smith's here, to be
filed with the appropriate federal agency within two years of the accrual of the claim, and with
the district court within six months of the agency's denial of the claim.  28 U.S.C. § 2401(b).
Ms. Smith filed her administrative claim on March 29, 2005, and filed this action on April 6,
2006 – well within the statutory six month limitations period following the October 2005 denial
of Ms. Smith's claim by CSOSA.  *See* October 7, 2005 letter from CSOSA to Stuart H.
Newberger, at Exh. 2.

Ms. Smith alleges in her Complaint that she first learned that Anthony Kelly had caused
Erika's death in May 2003, Compl. ¶ 36, and thus, as set forth below, her claim did not accrue
until then.  The Government argues, in contrast, that Ms. Smith's claim accrued on August 6,
2002 – the date of Erika's murder – because the murder itself was "the last event necessary to
complete the tort."  Def. Memo. at 10-11.  On that basis, the Government argues that Ms.
Smith's claims for relief are forever barred, as her March 29, 2005 administrative claim fell
outside the two-year limitations period under the FTCA.  The Government's argument fails for
several reasons.

A.    **The FTCA Statute of Limitations Did Not Start Running Until the
       Cause of Erika's Murder Became Known to Ms. Smith in May 2003.**

The Government misstates the standard for accrual of a wrongful death claim under the
FTCA in this jurisdiction.  Such a claim does not automatically accrue – nor does the clock begin
to run – at the time of the "actual murder itself," as the Government suggests.  Def. Memo. at 11.
Instead, it is well-established in this Circuit, and in Supreme Court jurisprudence, that "the

5

statute starts to run (*i.e.*, the claim 'accrues') by the time a plaintiff 'has *discovered both his injury and its cause*,' even though he is unaware that the harm was 'negligently inflicted.'" *Sexton v. United States*, 832 F.2d 629, 633 (D.C. Cir. 1987) (quoting *United States v. Kubrick*, 444 U.S. 111, 120 (1979)) (emphasis added).

The authority – including *Sexton* – upon which the Government relies is not to the contrary. Even in *Zeleznick v. United States*, 770 F.2d 20 (3d Cir. 1985), the Third Circuit case upon which the Government relies most heavily, the statute of limitations did not begin to run until the plaintiffs were aware of *both* the murder *and* its cause – *i.e.*, not only the fact of the murder, but the *identity* of the murderer as well. 770 F.2d at 23; *see also Kubrick*, 444 U.S. at 123 (claim accrued when plaintiffs came into possession "of *all* the facts about the cause of his injury") (as quoted in *Sexton*, 832 F.2d at 633) (emphasis added). In *Zeleznick*, the court concluded that "[a]n injured party . . . cannot make a claim until he has or should have had notice that he had an action to bring." *Id.* at 22. Ms. Smith, in this case, could not have known that she "had an action to bring" on August 6, 2002 when Erika and her father were found shot to death. Rather, as in *Zeleznick*, her claim could not accrue until she was in possession of sufficient facts to know that Anthony Kelly had murdered her child. As alleged in the Complaint and in her affidavit which accompanies this Opposition, Ms. Smith was unaware that Anthony Kelly had caused Erika's murder until shortly before Kelly's indictment in May 2003. Compl. ¶ 36; *see also* Affidavit of Carol Smith ("Smith Aff."), Exh. 1 at ¶¶ 5, 7.

The Government has failed to counter this allegation; indeed, its reliance on a stricter standard is unsurprising when one considers the paucity of evidence it has set forth to suggest that Ms. Smith knew facts in the weeks immediately following the murders that were sufficient, as a matter of law, to commence the FTCA limitations period. For example, the Government

alleges in conclusory fashion that Ms. Smith "was informed of the killer's identity and his status as a parolee by the homicide detective in just over one month from the murder." Def. Memo. at 11. But any purported factual "support" for this assertion is far less conclusive, boiling down to a vague (and highly equivocal) affidavit of a Montgomery County detective, and a series of articles (mostly from online publications), which there is no evidence that Ms. Smith ever saw, or reasonably should have seen under the circumstances. In fact, there is evidence that she *never* saw them. Smith Aff. ¶ 9. None of the Government's "evidence" is sufficient to support its argument that Ms. Smith's claims accrued in August 2002, at the time of the murder.

The declaration of Detective Joan Buchan demonstrates the speculative and inconclusive nature of the Government's argument. Far from presenting evidence that Ms. Smith was informed in August or September 2002 "of the killer's identity and his status as a parolee," Def. Memo. at 11, Detective Buchan's declaration can be characterized as little more than the detective's recollection of her general practices, and a "best guess" of what Ms. Smith *may* have been told *by someone* during the course of the investigation. In fact, Detective Buchan *never* declares *what* she told Ms. Smith. Rather, she states expressly that she "do[es] not remember when" she first spoke with Ms. Smith, though she recalls having spoken with her on "multiple occasions." Declaration of Det. Cpl. Joan Buchan (Ret.) ("Buchan Aff.") at ¶ 5.

Nor are the specific statements on which the Government relies to support its limitations defense any more concrete. Instead, Detective Buchan observes only that she has notes suggesting that Anthony Kelly was identified by the police as *a* suspect on August 29, 2002, and that the "development" of Anthony Kelly was first "reported" on September 5, 2002. *Id.* ¶ 6. "Accordingly," Detective Buchan declares, without more, that "Carol Smith *was informed* that Anthony Kelly was identified as a suspect prior to September 5, 2002." *Id.* (emphasis added).

Such surmising is far from specific enough to permit this court to conclude that the state of Ms. Smith's knowledge at that time would start the statutory limitations period running.

The Government offers no authority to suggest that the mere identification of one suspect during the early stages of the murder investigation was sufficient for Ms. Smith's FTCA claim to accrue, even assuming that Detective Buchan were able to testify competently that this information was provided to Ms. Smith at the time. Of course, the declaration contains no such testimony. Indeed, Detective Buchan's statements fail to establish what she thinks Ms. Smith knew, and when. *What* is the "development" of Anthony Kelly that was reported in September? *Where* was it reported? *Who* told Ms. Smith that Anthony Kelly was a suspect? And, if it was Detective Buchan, why did she not say so? If someone else, why is *that* person not identified? Why is *that person's* declaration not attached to the Government's motion? Certainly Detective Buchan's statements raise more questions than they resolve – a circumstance that compels, *at the very least*, an opportunity for jurisdictional discovery before Ms. Smith is deprived forever of the right to seek relief from the Government for her claims.[4] These tenuous statements constitute *all* the evidence the Government has been able to muster to counter the allegations in Ms. Smith's complaint. But this simply is not enough. The allegations in the Complaint, as well as Ms. Smith's testimony in her affidavit – and the absence of any evidence to the contrary – demonstrate sufficiently that Ms. Smith was unaware of the cause of Erika's murder until May 2003. Compl. ¶ 36; Smith Aff. ¶¶ 4-9.

---

[4]    The next paragraph – upon which the Government also relies – fares no better. Detective Buchan again states simply that she reviewed Anthony Kelly's criminal history once he was identified as a suspect and obtained a Certificate of Parole in September 2002. "That information," she declares, "was passed on to Carol Smith before it became public in the media." *Id.* ¶ 7. What information? That the detective reviewed Kelly's history? That Detective Buchan reviewed a certificate? That Kelly was on parole? And, how does Detective Buchan know that any such information was "passed on"? These ambiguous statements by a witness who obviously does not remember many details of the events in question are insufficient to overcome Ms. Smith's allegations at this stage of the proceedings.

Neither is the "local media" coverage cited by the Government sufficient to support its conclusion that Ms. Smith knew of the killer's identity and of his status as a parolee back in August 2002. The articles cited – primarily from an online suburban Maryland newspaper called "Gazette.Net" – report in varying degrees of detail the nature of the police investigation "that left a father and daughter dead with few clues." Def. Memo., Exh. 6. The most that can be said for these articles is that they identify Kelly as a person of possibly substantial interest to the police in the early stages of the investigation based on certain evidentiary links; but that, as late as Christmas 2002 – the date of the *last* article the Government cites – police still were "actively investigat[ing]" the case, "the investigation [was] not complete," and the police still were tracking down "a few leads" in their attempts to solve the crime, even though Anthony Kelly was a "strong suspect." Def. Memo., Exh. 7. Even so, there is no evidence that Ms. Smith ever read, or even saw, these articles. Indeed, the only evidence in this case is to the contrary. Smith Aff. ¶ 9.

In short, the Government has failed to overcome Ms. Smith's showing that she was unaware of the cause of Erika's death prior to May 2003, and has failed, therefore, to carry its "burden to show that [the plaintiff] could have discovered [the facts necessary to state a claim] if [she] had exercised due diligence." *Orlikow v. United States*, 682 F. Supp. 77, 84 (D.D.C. 1988). Indeed, in *Orlikow*, the Government identified a panoply of news articles and television programs which disclosed specifically not only the cause of the plaintiffs' injuries, but the link to the government as well. 682 F. Supp. at 83, n.7 (referencing published book, multiple television programs, and "at least 25 articles" on the subject). Still, even without evidence to the contrary submitted by the plaintiffs, the question of whether they had notice of, or exercised due diligence in pursuing, their claims was a question of fact which the district court held improper for

resolution on a motion to dismiss:  "Newspaper articles containing allegations do not necessarily place citizens on notice when there is no evidence that these articles were read . . . . The extent of the articles' reach, the popularity of the paper, the ability of the plaintiffs to follow daily public events, especially under the circumstances of this case, are all issues difficult to discern at this posture."  *Id.* at 85.[5]

Ms. Smith alleges that she was unaware until May 2003 that Anthony Kelly was the "cause" of her daughter's murder.  The Government has offered no evidence, save an ambiguous affidavit and general news stories that Ms. Smith never read, to contradict this allegation. Accordingly, Ms. Smith submits that her claim is timely and that the Government's Motion to Dismiss on that basis should be denied.

**B.    Ms. Smith Was Incapable of "Knowing" the Cause of Erika's Death Until May 2003.**

Even were the court to find that Ms. Smith was in actual or constructive *possession* of sufficient information that Anthony Kelly was the cause of Erika's death, it should conclude that Ms. Smith, nevertheless, lacked "knowledge" sufficient to trigger the statute of limitations until May 2003, because of her mental state during that time.  While mental impairment does not "toll," *per se*, the FTCA statute of limitations, a plaintiff's mental condition properly is considered "when evaluating whether [she] exercised due diligence."  *Orlikow*, 682 F. Supp. at 84 (discussing "diligence-discovery rule" in FTCA case pursuant to which "time does not begin

---

[5]      Authority from other jurisdictions is in accord.  *See, e.g.*, *In re Swine Flu Prods. Liab. Litig.*, 764 F.2d 637 (9th Cir. 1985) (reports in medical literature and widespread attention in the press, including two articles in Plaintiffs' community, insufficient to show that community knowledge of cause of plaintiff's injury was so pervasive that plaintiff was reasonably put on notice); *Allen v. A.H. Robins Co., Inc.*, 752 F.2d 1365 (9th Cir. 1985) (series of press releases, accompanied by "'Dear Doctor' letters to over 200,000 physicians," insufficient to prove plaintiff had notice of cause of injury for purposes of discovery rule); *Heinrich v. Sweet*, 44 F. Supp. 2d 408 (D.Mass. 1999) (articles and reports written about possible link between patients' treatment and deaths held insufficient to provide notice to decedents' families).

to run until plaintiff discovers, or by reasonable diligence *could have* discovered, the basis of the lawsuit").[6]  Stated otherwise, "[a]lthough insanity cannot toll the statute of limitations, the question is did [Ms. Smith] actually 'know' in the true sense of the word [that Anthony Kelly was the cause of Erika's death]."  *Id*. at 86.  In this case, the sudden and horrific murder of her only child and dear friend (Erika's father) left Ms. Smith so substantially impaired during the first several months following the murder, that she was incapable of processing information sufficient to enable her to be "fully aware" even if those facts reasonably available to her at the time.  *Id*.; *see also* Smith Aff. ¶¶ 10-15; Declaration of Dr. Larry Pastor ("Pastor Decl."), Exh. 3 ¶ 4.[7]

In *Orlikow*, one of the plaintiffs presented witness testimony that he suffered from "a deficit in information processing that inhibits his ability to understand facts and make decisions." *Id*. at 85.  The witness further testified that when he tried to communicate information regarding the injury to the plaintiff, the plaintiff "became very upset and was *unable* to discuss it.  Not until

---

[6]     The Government cites this Court's opinion in *Smith v. Hope Village*, 1:05-CV-00633, to argue that a statute of limitations "may be tolled only on a showing of 'fraudulent concealment' of the existence of a cause of action." Def. Memo. at 11, n.3.  That decision, which is the subject of a pending motion for reconsideration, involved a common law wrongful death claim.  At least in the FTCA context, it is clear that the "diligence-discovery rule applies not only to concealment cases but also 'where a plaintiff demonstrates that his injury was inherently unknowable at the time he was injured.'"  *Orlikow*, 682 F. Supp. at 83 (quoting *Barrett v. United States*, 689 F.2d 324, 327 (2d Cir. 1982)).

[7]     Courts in this district have held open the possibility that the equitable tolling doctrine may apply to an FTCA case in appropriate circumstances.  *Norman v. United States*, 377 F. Supp. 2d 96 (D.D.C. 2005).  Plaintiff is not asking this Court to apply "equitable tolling" in this case.  Rather, Plaintiff asserts simply that her claim did not begin to accrue until she had "knowledge" of the "cause" of her injury, *i.e.*, Anthony Kelly, and further, that her mental impairment rendered her temporarily incapable of procuring and acting upon that knowledge.  Nevertheless, equitable tolling cases outside the FTCA context lend further support to the theory that, as a matter of equity, plaintiffs should not be barred from pursuing their rights when, as a result of mental impairment and through no fault of their own, they are delayed in their ability to bring suit.  *See, e.g.*, *Miller v. Runyon*, 77 F.3d 189, 191 (7th Cir. 1996) ("[e]ven when the defendant is faultless, if the plaintiff because of disability, irremediable lack of information, or other circumstances beyond his control just cannot reasonably be expected to sue in time, the statute of limitations will be tolled until he is able through the exercise of proper diligence to file his suit."); *Elchediak v. Heckler*, 750 F.2d 892 (11th Cir. 1985) (recognizing equitable tolling where mental illness prevented SSI claimant from pursuing legal rights); *Canales v. Sullivan*, 936 F.2d 755 (2d Cir. 1991) (recognizing availability of equitable tolling where mental impairment prevents plaintiff from timely pursuing right to judicial review).

11

some time later did [the witness] begin to broach the subject again gently and ultimately supported [the plaintiff] in joining the ongoing lawsuit." *Id.* (emphasis in original). The plaintiff filed his claim two years and six months after the date he claimed to have been in possession of information confirming the Government's involvement in his injury. *Id.* at 86.

The court rejected the Government's motion to dismiss under the FTCA on timeliness grounds. Despite the availability to the plaintiff, more than two years before he filed his claim, of information regarding the Government's involvement in his injury, the court found compelling the existence of "evidence which suggests that [the plaintiff] suffers a psychological impairment which significantly interferes with his ability to comprehend and process in a manner of a normal functioning individual." *Id.* at 86. The Court held that questions of fact existed regarding how significantly the disorder – allegedly caused by a third-party as a result of Government's negligence – "interfered with [the plaintiff's] ability to be fully aware of the facts. The question of whether [the plaintiff] had knowledge sufficient to trigger the statute of limitations prior to February 1981 is a factual issue and it must be resolved at trial." *Id.*

Ms. Smith's mental state during the first few months following Erika's tragic death is discussed more fully in her affidavit and the declaration of Dr. Larry Pastor, a licensed physician who has evaluated Ms. Smith and reviewed her medical records. Smith Aff.; Pastor Decl. According to Dr. Pastor, Ms. Smith's testimony that she could not have "known" (even assuming the information were available) before May 2003 the cause of Erika's death is consistent with the "debilitating mental trauma" that she suffered as a result of the shocking discovery that her only child had been murdered. Pastor Decl. ¶ 4.

This is not a case where Ms. Smith sat on her hands allowing her claims to lapse. Ms. Smith lost her daughter in August 2002 in what can only be characterized as the most tragic

event possible to befall a parent. Upon learning the news that her only child was murdered –

along with her dear friend, Erika's father – Ms. Smith was understandably, if not expectedly,

rendered incapable of processing information as would a "normal functioning individual."

Pastor Decl. ¶ 4; *Orlikow*, 682 F. Supp. at 84. It is impossible to fathom completely the

catastrophic impact of this event on Ms. Smith. Dr. Pastor's testimony provides a small window

into the effects of the murder on Ms. Smith, and, along with Ms. Smith's own affidavit, is the

only evidence in the record regarding Ms. Smith's mental state in the months immediately

following the tragedy. Pastor Decl. ¶¶ 1-5; Smith Aff. ¶¶ 6-15.

In the cases relied upon most heavily by the Government – *Sexton* and *Zeleznick* – the

plaintiffs waited *nine and fifteen years*, respectively, to bring suit. Ms. Smith did not. Her case

is more akin to *Orlikow* where the plaintiff, even in the face of obvious and documented mental

infirmities, brought his claims within months of the date the Government argues the statute of

limitations had expired. The question in this case is whether, prior to March 2003 – assuming

sufficient facts even were *available* to Ms. Smith by that time, a conclusion the Government has

failed to support – Ms. Smith was able to be "fully aware" of the facts surrounding Erika's

murder sufficient to trigger the statute of limitations under the FTCA. Ms. Smith submits that

she was not; at most, this question raises a disputed factual issue that cannot be resolved at this

stage.

## II.    THE UNITED STATES IS NOT ENTITLED TO ABSOLUTE IMMUNITY.

The Government argues that the acts and omissions underlying Ms. Smith's claims

against it are essentially "adjudicative" in nature, and therefore it is absolutely immune from

liability for claims based on those acts or omissions. *See, e.g.*, Def. Memo. at 17. This

contention can be disposed of easily. As the Government well recognizes, "judicial" and "quasi-

judicial" immunity are limited to those functions – *e.g.*, decision-making by prosecutors, grand

jurors, and parole board members – close to the judicial process, and which are "functionally comparable to [those performed] by a judge." *Butz v. Economou*, 438 U.S. 478, 513 (1978).  It is cases involving those functions upon which the Government relies here.  *See* Def. Memo. at 14-15 (citing, *e.g.*, *Imbler v. Pachtman*, 424 U.S. 409 (1976) (prosecutors and grand jurors); *Briggs v. Goodwin*, 569 F.2d 10 (D.C. Cir. 1977) (parole board members)).  Indeed, all of the cases cited by the Government relate to actions indisputably intertwined with adjudicative and judicial processes.  *Id.*

Absolute immunity does *not* apply, however, to the United States based on the daily functions of parole officers in supervising offenders in the community; there is nothing "judicial" or even "quasi-judicial" about these functions.  Nor is there any relationship at all between the mandatory requirements and other policies governing Community Supervision Officers' ("CSO") everyday duties and the judicial process.  Moreover, although probation officers may exercise certain discretion regarding such administrative matters as the time or place to meet with offenders, they certainly do not "exercise discretion comparable to that exercised by  a judge," sufficient to entitle the United States to an absolute immunity defense to claims based on their negligent actions.  *Turner v. Barry*, 856 F.2d 1539, 1540 (D.C. Cir. 1988).

The Government's broad assertion that "the D.C. Circuit has accorded quasi-judicial immunity to probation officers" is unfounded.  Def. Memo. at 16.  Although the D.C. Circuit in *Turner* extended absolute immunity to probation officers in that case, it expressly limited its holding to cases alleging "errors in the investigation and preparation of *presentence reports*" for the court.  856 F.2d at 1541 (emphasis added).  A number of circuits similarly have extended absolute immunity to probation officers in this limited circumstance on the ground that "[t]he presentence report is an integral part of the judicial function of sentencing" and that in preparing

such reports, probation officers "serve as an 'arm of the sentencing judge.'" *Id.* at 1540 (citations omitted).

No such judicially-related functions are at issue here with respect to the actions of CSOSA employees. Ms. Smith alleges that CSOSA employees failed to comply with *mandatory* requirements governing the day-to-day supervision of Anthony Kelly. This includes, *inter alia*, CSOSA's failure to conduct required office and field visits with Kelly, and its failure to follow mandatory procedures before reducing Kelly's supervision level. Compl. ¶¶ 26-30. These required duties and functions simply do not involve the sort of "adjudicative" functions that are "a key feature of the tasks sheltered by judicial immunity." *See Wagshal v. Foster*, 28 F.3d 1249, 1252 (D.C. Cir. 1994) (extending absolute immunity to mediator whose "tasks appear precisely the same as those judges perform going about the business of adjudication and case management"). Ms. Smith is aware of no authority – nor has the Government pointed to any – that supports extending absolute immunity to the negligent actions of CSOSA employees in this case.

## III.     THE "DISCRETIONARY FUNCTION" EXCEPTION TO THE FTCA DOES NOT BAR PLAINTIFF'S CLAIMS.

The Government next argues that claims arising from its decisions to place Anthony Kelly in a halfway house and to release him are barred by the discretionary function exception to the FTCA, 26 U.S.C. § 2680(a); Def. Memo. at 18-23. It makes no such contention with respect to Plaintiff's claims arising from the actions of CSOSA officers. This is not surprising, as Ms. Smith's claims regarding the acts and omissions of CSOSA in failing to follow *mandatory* requirements regarding Anthony Kelly's supervision fall well outside the scope of any "discretionary functions" that otherwise might protect the Government from liability for such acts and omissions. The Government is not entitled to dismissal on this ground.

A.   **The Discretionary Function Exception to the FTCA Shields From Liability Only Those Governmental Actions Grounded in Considerations of Public Policy.**

The Supreme Court has characterized the discretionary function exception as "mark[ing] the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Varig Airlines*, 467 U.S. at 808.  The Court has articulated a two-part test to determine whether Government action falls within the discretionary function exception to the FTCA.

First, the court must determine if there exists any statute, regulation, directive or policy that *requires* a particular course of action.  *See United Sates v. Gaubert*, 499 U.S. 315, 322 (1991); *see also Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995); *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 197 (D.D.C. 2002).  If so, the inquiry ends there "because the employee has no rightful option but to adhere to the [requirement]."  *Gaubert*, 499 U.S. at 322.  Second, even where some degree of judgment or discretion is permitted, the Court still must determine whether the challenged conduct was of the type intended by Congress to be shielded, as a matter of public policy, from liability under the FTCA.  *See Gaubert*, 499 U.S. at 322-23 ("the exception 'protects only governmental actions and decisions based on considerations of public policy'") (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)); *see also Cope*, 45 F.3d at 448.[8]

---

[8]   If the relevant decisions do not themselves involve the balancing of public policy factors, the exception does not apply.  *See Appleton v. United States*, 69 F. Supp. 2d 83, 92 (D.D.C. 1999).  "This exception was designed to prevent the courts from 'second-guessing,' through decisions in tort actions, the way that government officials choose to balance economic, social, and political factors as they carry out their official duties."  *Cope*, 45 F.3d at 448-49 (citing *Varig Airlines*, 467 U.S. at 814, 820) ("the question is not whether there is any discretion at all, but whether the discretion is 'grounded in the policy of the regulatory regime;' [t]he mere presence of choice . . . does not trigger the exception") (quoting *Gaubert*, 499 U.S. at 325)).

**B.    The Discretionary Function Exception Does Not Protect the Government from Liability for CSOSA's Failure to Comply With Mandatory Requirements Regarding the Supervision of Anthony Kelly.**

The Government in this case cannot survive even the first prong of the FTCA's discretionary function test.  Under this prong, the court looks to an agency's regulations, procedures, guidelines, manuals, handbooks, and any other indicia of policies and directives to determine whether the alleged conduct is the subject of specific requirements, or lies within the discretion of the government actor.  *See, e.g.*, *Ignatiev v. United States,* 238 F.3d 464, 467 (D.C. Cir. 2001) ("internal guidelines can be an actionable source of a mandatory obligation under the FTCA"); *Blakey v. U.S.S. Iowa*, 991 F.2d 148, 152-53 (4th Cir. 1993) (looking to JAG manual guidelines to determine whether challenged conduct involved discretion).  Put another way, if any "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," then the resulting course of action, by definition, lacks the element of judgment or choice and falls outside the discretionary function exception to the FTCA.  *Gaubert*, 499 U.S. at 322; *see also Dickerson, Inc. v. United States,* 875 F.2d 1577, 1581 (11th Cir. 1989) (declining to apply discretionary function exception when agency's internal policy mandated course of action).  That is precisely the case here.

Ms. Smith alleges in her Complaint that the United States, through its agencies, is bound by mandatory rules and requirements governing the supervision of federal offenders in the community.  *See, e.g.*, Compl. ¶ 8.  With respect to CSOSA, in particular, Ms. Smith alleges that the Government consistently failed to meet these mandatory requirements with respect to its

supervision of Anthony Kelly. *Id*. ¶¶ 26-32.[9]  The Government neither disputes that these requirements exist, nor does it dispute Ms. Smith's allegations that these requirements were not met.  Indeed, the Government fails even to *argue* in its Motion to Dismiss that the discretionary function exception shields it at all from liability for Ms. Smith's claims arising from CSOSA's acts and omissions.  *See generally* Def. Memo. at 18-23.

The Government cannot escape this conclusion in any event.  CSOSA – an independent federal agency responsible for supervising offenders' activities and monitoring their compliance with applicable rules and requirements, Compl. ¶ 11 – is subject to a number of mandatory requirements, set forth in various rules, regulations, statutes, and internal policies including, *inter alia*, the D.C. Code.  For example, CSOSA is required to establish for each offender under its supervision a "supervision level" and to follow a "minimum contact requirement" – defined as the minimum frequency for face-to-face interactions between the offender and his CSO.  D.C. Code 24-1233(b)(2)(b) § 810.1.  The Code further requires CSOSA to verify certain factors before reducing the offender's level of supervision, *see, e.g.*, 810.2(b).  Pursuant to the Code, CSOSA also has promulgated binding Policy Statements directing CSOSA personnel to effectuate the agency's supervision requirements in certain ways.  *See, e.g.*, CSOSA Policy Statements at Exh. 4.[10]

---

[9]     Ms. Smith has alleged in her related case against Hope Village, *supra* at n.6, that the Government's negligence was a direct and foreseeable result of Hope Village's actions, including its provision to the Government of false and misleading information relating to Anthony Kelly.  As a result of Hope Village's actions, the Government may have a right to indemnity from Hope Village pursuant to the Statement of Work between the two entities, but Hope Village's causative role in the Government's misconduct does not provide the Government a defense in this case.

[10]     Some of the policy statements attached hereto are from 2003 or later.  Plaintiff believes that the policies in effect at the time the Government was required to supervise Anthony Kelly were materially the same.  To the extent the Government takes a different view, Ms. Smith should be permitted to take limited jurisdictional discovery on this point.

Ms. Smith alleges in her Complaint that CSOSA consistently failed to meet these requirements with respect to Anthony Kelly.  For example, Ms. Smith alleges that CSOSA failed to conduct the required number of in-person contacts with Kelly after he initially was paroled into the community under so-called "maximum supervision."  Compl. ¶ 26; *see also Policy Statement: Guidelines on Supervision Contact Standards, Collateral Contacts, and Field Contacts* at Exh. 4.  Ms. Smith further alleges that CSOSA failed to comply with mandatory and specific requirements before reducing Kelly's level of supervision from "maximum" to "medium" supervision.  Compl. ¶ 27.[11]  Even after Kelly voluntarily revealed to CSOSA in June 2002 that he had been arrested for assaulting a police officer and was returned to "maximum supervision," CSOSA *still* failed to conduct the mandatory field and office visits required by the D.C. Code.  Compl. ¶ 30; D.C. Code 24-1233(b)(2)(b) § 810.2.  In fact, in violation of its requirements, no CSOSA representative *ever again* saw Kelly in the field before he murdered Erika Smith in August 2002.

None of these requirements is discretionary on the part of CSOSA; nor do they afford CSOSA the benefit of judgment or "choice" that can give rise to discretionary function immunity under the FTCA.  In short, CSOSA, through its agents, was required to take certain specific steps to supervise Anthony Kelly in the community.  Plaintiff alleges that it failed to do so.  Thus, "the only issue is whether the [agents] followed the [requirements] and [are] thus exempt . . . or whether [they] did not follow the [requirements], thus opening the government to suit."  *Cope*,

---

[11]    Specifically, before such a reduction can be effected, CSOSA must ensure that the offender has:  1) served a minimum of three months in the original status; 2) complied with his individualized case plan; 3) secured a residence and employment, which have been verified by CSOSA through field visits; 4) notified CSOSA before traveling outside the jurisdiction; and 5) undergone a criminal check.  Compl. ¶ 27; *see also CSOSA Policy Statement: CSOSA Screener: Administrative Supervision Level Adjustment* at Exh. 4;" D.C. Code 24-1233(b)(2)(b) § 810.1 (requiring CSOSA to monitor each offender's compliance with the conditions of his supervision).  Ms Smith alleges that CSOSA failed to ensure these minimum requirements were met.  Compl. ¶¶ 26-32.

45 F.3d at 448; *see also Tri-State Hosp. Supply Corp. v. United States,* 142 F. Supp. 2d 93

(D.D.C. 2001), *rev'd on other grounds*, 341 F.3d 571 (D.C. Cir. 2003) (violation of mandatory

customs regulations unprotected by discretionary function exception); *Appleton v. United States*,

69 F. Supp. 2d 83, 92 (D.D.C. 1999) ("discretionary function exception does not apply if an

employee violates mandatory regulations"); *Phillips v. United States,* 956 F.2d 1071, 1076-77

(11th Cir. 1992) (discretionary function exception inapplicable where Army Corps personnel

failed to perform mandatory daily inspection of scaffolding at construction site); *McMichael v.*

*United* States, 856 F.2d 1026 (8th Cir. 1988) (federal inspector lacked discretion to forgo

requirements of detailed safety checklist); *Aslakson v. United States,* 790 F.2d 688 (8th Cir.

1986) (discretionary function exception did not apply to decision by officials charged with

responsibility of implementing already established policy contained in safety code).[12]

## C.    Any "Discretion" Exercised By the Government in Supervising Anthony Kelly Was Not Grounded in Policy Considerations.

Having failed to satisfy even the first prong of the discretionary function analysis, the

inquiry is over.  However, even if there were no specific requirements governing CSOSA's

conduct – which, of course, there are – any discretion exercised by CSOSA employees in

supervising Anthony Kelly was of the "garden-variety" type which is not protected under the

FTCA.  *See, e.g.*, *Cope*, 45 F.3d at 448 ("only discretionary actions of greater significance –

those grounded in 'social, economic, or political goals' – fall within the protection of the

---

[12]    Ms. Smith has identified sufficient mandatory policies and requirements to compel the conclusion that the discretionary function bar raised by the Government does not apply to this case.  Ms. Smith believes there are more. If the Court is not satisfied that Ms. Smith has raised sufficient questions regarding the non-discretionary character of the acts and omissions alleged to withstand a motion to dismiss, Ms. Smith should be afforded the opportunity to pursue limited jurisdictional discovery to enable her to identify additional policies known only to the Government that demonstrate the non-discretionary nature of the challenged conduct alleged in this case.  *See, e.g.*, *Ignatiev*, 238 F.3d 466-67 (district court "erred in not allowing discovery, limited perhaps to the issue of whether such guidelines exist, prior to dismissing for lack of subject matter jurisdiction;" "an agency cannot shield itself from liability simply by denying the allegations of a complaint").

statute") (quoting *Gaubert*, 499 U.S. at 323).[13]  The functions carried out by CSOSA employees

in supervising Anthony Kelly are not "of the nature and quality that Congress intended to shield

from tort liability," *Varig Airlines*, 467 U.S. at 325, nor are they otherwise grounded in

"considerations of public policy."  *Berkovitz*, 486 U.S. at 537.  To the extent that CSOSA

employees exercise any discretion at all, it is limited to such administrative decisions as, *e.g*, the

specific time and place to conduct required meetings with offenders, not whether to conduct

those meetings at all.  The "policy" choices in this regard already have been made.  CSOSA is

required to effectuate those choices.

There is no basis to conclude in this case that Congress intended to protect acts or

omissions by CSOSA's agents charged with supervising offenders in the community through the

discretionary function exception.  Nor does the Government provide any authority to the

contrary.  For this reason as well, the Government's motion should be denied.[14]

---

[13]     The D. C. Circuit distinguished Government employees' exercise of poor discretion, *e.g.*, in operating an automobile and causing an accident or posting road warning signs ("garden variety") from those decisions that are "susceptible to policy judgment and involve an exercise of 'political, social, [or] economic judgment.'"  *Cope*, 45 F.3d at 488 (quoting *Gaubert*, 499 U.S. at 325 and *Varig Airlines*, 467 U.S. at 820).

[14]     Although construing common law "discretionary immunity" concepts rather than the discretionary function exception to the FTCA, the Washington Supreme Court's decision in *Taggart v. Sandau*, 118 Wash.2d 195 (Wash. 1992) (en banc) nevertheless is instructive in its analysis of the "non-discretionary" nature of the type of parole supervision duties at issue in this case.  In *Taggart*, an offender who violated numerous conditions of his parole – by, *inter alia*, quitting his job, changing his address without notifying his parole officer, and failing to report to his parole officer as required – raped a young woman, who subsequently brought suit against the parole officer.  The victim alleged that the officer had neglected to make the requisite contact with the offender, the offender's employer, and others with whom he was in contact, and failed to ensure that the offender met the requirements of his parole.  *See id.* at 213.  The Court held that the discretionary function did not bar the plaintiff's claim:

> We recognize that parole officers' supervisory decisions require the exercise of discretion. The crucial point, however, is that the discretionary immunity exception applies only to basic policy decisions. Parole officers' supervisory decisions, however much discretion they may require, are not basic policy decisions. Such decisions are ministerial in nature. Therefore, even if the discretionary immunity exception applies to the Board's release decisions, an issue we have found it unnecessary to resolve, the exception does not shield parole supervision decisions.

*Id*. at 216.

IV.    **PLAINTIFF HAS STATED A CLAIM AGAINST THE UNITED STATES
UNDER THE FTCA.**

The Government finally argues that Ms. Smith's Complaint should be dismissed because
the "public duty doctrine" bars her claim as a matter of law or, in the alternative, because she has
failed to state a claim upon which relief can be granted.   The Government offers no authority for
the conclusion that the "public duty doctrine" bars liability in a case like this, involving the
Government's negligent supervision of a known dangerous offender.   Moreover, Plaintiff has
alleged specific facts sufficient to state a claim against the United States for wrongful death and
survival damages arising from Anthony Kelly's murder of Erika Smith while under the
Government's supervision.   Substantial authority compels the conclusion that the Government
may be liable on the facts of this case, and Ms. Smith is entitled to have her case decided on the
merits.

A.    **The "Public Duty Doctrine" Does Not Bar Ms. Smith's Claims.**

Relying almost exclusively on the D.C. Court of Appeals' decision in *Klahr v. District of
Columbia*, 576 A.2d 718 (D.C. 1990), the United States argues that Ms. Smith's claims should
be barred by the so-called "public duty doctrine" recognized by D.C. courts.[15]   The Government
misreads *Klahr* and overstates the law in the District on the scope of this doctrine.   The public
duty doctrine has not been interpreted to bar claims alleging the Government's negligent
supervision of criminal offenders known to be dangerous *before* the acts in question.   *Compare
Klahr*, 576 A.2d at 720-21 with *White v. United States*, 780 F.2d 97, 103-06 (D.C. Cir. 1986) and
*Reiser v. District of Columbia*, 563 F.2d 462, 478-79 (D.C. Cir. 1977).   The doctrine, therefore,

---

[15]    Contrary to the Government's assertion, Def. Memo. at 29, n.8, Ms. Smith does not dispute that District of
Columbia law applies to her substantive tort claims here.

does not bar Plaintiffs' claims in this case, and Ms. Smith's Complaint should not be dismissed on this basis.

As the Government points out, the plaintiffs in *Klahr* alleged that the Government negligently supervised an offender who escaped from a halfway house and subsequently robbed and murdered a couple in their apartment.  The D.C. Court of Appeals held that, under the public duty doctrine, government agents "are under no general duty to provide public services, such as police protection, to any particular individual citizen."  *Klahr*, 576 A.2d at 720.  Because the attack was completely random, and because the government had no reason to anticipate that the particular offender would engage in violence, the court held that the doctrine barred the plaintiffs' claims.

The Government omits, however, a critical part of the court's analysis in *Klahr*.  In its decision, the *Klahr* court expressly distinguished the facts of the case from circumstances where the government was responsible for supervising individuals who *previously* had been determined to be dangerous.  Specifically, the Court distinguished its holding from the decision in *White*, in which the D.C. Circuit found the government liable for criminal acts committed by an inmate under a public hospital's supervision.  As recognized in *Klahr*, the *White* court held that public entities responsible for supervising "*dangerous persons*" do owe a "duty to members of the public to exercise reasonable care to control" those under their supervision, and may be held liable for injuries caused by those dangerous individuals.  576 A.2d at 720 (quoting *White*, 780 F.2d at 103) (emphasis in original).  Unlike with the offender in *White*, the government in *Klahr* had no reason to believe that the offender was dangerous – he "had been convicted of only a misdemeanor, had been sentenced to a work-release program, and *had not exhibited any*

*propensity to commit violent crimes.*"  *Id.* at 721 (emphasis added).[16]  Acknowledging this fundamental distinction, the court expressly left open the question whether an exception to the public duty doctrine exists for cases such as this – where the government has specific responsibility over an offender which it *already* knows to be dangerous.[17]  *Id.*  On the specific facts of *Klahr*, the court dismissed the claim, observing: "[*Klahr*] is not a *White*-type case."  *Id.*

Subsequent cases in this district are consistent.  In *Johnson v. District of Columbia*, No. 03-2548, 2006 WL 2521241 (D.D.C. Aug. 30, 2006),[18] the court dismissed claims against the District arising from a violent act committed by an escapee from a group home, citing the public duty doctrine.  Critical to the court's analysis was the fact that the escapee, under D.C. law, was not known to be dangerous.  Indeed, had he been so adjudicated, he *could not have been* placed in the group home at issue.  *Id.* at *10, n.9.  The Court noted specifically the distinction drawn in *Klahr* for cases involving dangerous persons:  "The *Klahr* Court suggested that a different outcome might be proper if the murderer's conviction had given 'rise to a presumption that he was dangerous.'  In that case, it explained, the District would have had a 'duty to members of the general public to exercise reasonable care to control him.'"  2006 WL 2521241 at *10, n.9

---

[16]     Although *White* involved the public institution's negligence regarding a dangerous person who had escaped from confinement, we read the D.C. Circuit's to focus on the known dangerous propensities of the offender, rather than his confinement by the government.

[17]     The D.C. Court of Appeals has yet to consider whether an exception to the public duty doctrine exists for the negligent supervision of dangerous criminal offenders by parole and probation officers.  This issue has been addressed squarely in the State of Washington, where the Washington Supreme Court recognized such an exception based on the "special relationship between the offender and the State."  *Joyce v. State Dept. of Corrections*, 119 P.3d 825, 827 (Wash. 2005).  That Court previously had held that when a "parolee is likely to cause bodily harm to others if not controlled, the parole officer is under a duty to exercise reasonable care to control the parolee and to prevent him or her from doing such harm."  *Taggart*, 822 P.2d at 255.  For these reasons, and consistent with cases such as *White v. United States*, 780 F.2d 97 (D.C. Cir. 1986) and *Reiser v. District of Columbia*, 563 F.2d 462 (D.C. Cir. 1977), which have extended liability to public defendants for the violent acts of individuals under their supervision, Plaintiff submits that the Washington Supreme Court takes the most reasoned view, and that the same view would be adopted by the D.C. Court of Appeals.  The policies underlying the public duty doctrine do not support immunizing the government from liability when individuals that they *already* knew to be dangerous injure people in the immediate community as a result of the government's failure to supervise them with so much as *reasonable* care.

[18]     An appendix of unreported decisions is attached hereto at Exh. 5.

(citing *Klahr*, 576 A.2d at 721 and *White*, 780 F.2d at 97).  In *Johnson*, the court found no evidence that the victim had faced any greater or lesser degree of danger *from the offender* than any other member of the public.  Because there was no reason to extend liability to the District for acts committed by any random juvenile runaway, the public duty doctrine barred the claims.

    *Klahr* and *Johnson* may not be "*White*-type case[s]."  This is.  Like the public hospital in *White*, each of the Government agencies in this case knew *all* of the details of Anthony Kelly's violent and other criminal history, and should be charged with the knowledge of his continuing violence in the community that would have been in their possession absent their own negligence. Ms. Smith alleges that by the time Anthony Kelly was convicted in 1996 of car theft and assault with a deadly weapon – for which he was sentenced to more than 10 years in prison – Kelly had accrued a lengthy record, dating back almost *fifteen years*, of escalating criminal activity, including violent crimes, burglary, alleged possession of a prohibited weapon, and an alleged prison breach.  Compl. ¶ 12.  Kelly's corrections record further contained multiple references to his propensity to lie, and otherwise to engage in conduct in order to "manipulate the system" and to promote his personal interests.  *Id.* ¶ 19.  The Government, and CSOSA in particular, should be charged with knowledge that Kelly was both dangerous and could not be trusted.  *Id.* ¶¶ 12, 19.

    Having ample reason – indeed specific mandates – to pay particular attention to Kelly, a violent offender under its supervision, the Government should not be permitted now to escape liability by simply ignoring its mandatory duties and permitting him to wreak havoc on the community without recourse.  The public duty doctrine is not designed to protect government

officials from their own negligence under such circumstances.[19]  Nor would the policy

underlying this doctrine – *i.e.*, preventing "staggering" liability of public officials, Def. Memo. at

30 – be undermined by a finding that the Government owed Ms. Smith and Erika a duty of care

in a case such as this.  To the contrary, "[u]nless persons injured by [a public entity's] failure to

properly perform its functions can recover for their injury, society's ability to insure that the

[entity] conscientiously performs its duties is rendered haphazard at best."  *See, e.g.*, *White*, 780

F.2d at 103 (quoting *Hicks v. United States*, 511 F.2d 407, 422 (D.C. Cir. 1975) (Tamm, J. and

Mcgowan, J., concurring)).

        *Reiser*, likewise, supports this result.  In *Reiser*, the District of Columbia appealed a

verdict holding it liable for the rape and murder of a woman by a parolee with a history of

violence.  The court found that the District had a duty to reveal to the parolee's employer the

offender's violent history, and to ensure that appropriate safeguards were implemented to protect

local residents in the residential community in Northwest D.C. in which the offender worked.

563 F.2d at 479.  As in this case, there was no prior relationship in *Reiser* between the offender

and his ultimate victim.  Nevertheless, given the proximity of the offender to the ultimate

victims,[20] and the parole officer's "*detailed knowledge of [the offender's] criminal and sexually*

---

[19]        The other cases upon which the Government relies – *Cunningham v. District of Columbia*, 584 A.2d 573
(D.C. 1990) and *Warren v. District of Columbia*, 444 A.2d 1 (D.C. 1981) – provide no greater support for its
argument.  The offender in *Cunningham* was on parole for a gun-permit violation; there is nothing to suggest the
offenders in *Warren* were under government supervision, or had engaged in any prior violent acts, at all.

[20]        In *Reiser*, the court found that the offender became "a virtual member of the victim's household" due to his
proximity to the victims.  563 F.2d at 479.  In this case, if given the chance to present her case on the merits, Ms.
Smith will be able to show that the Government should have been aware *before* Erika's murder that Anthony Kelly
had been committing crime in an area just across the street from Gregory Russell's home.  *See infra* at n. 22.  That
would place Erika Smith squarely within the foreseeable "zone of danger" created by the Government's negligence
regarding Anthony Kelly.  *Cf. Meeks v. Broschinksi*, 2003 WL 22415285 (Va. Cir. Ct. Sept. 5, 2003) (plaintiff may
distinguish herself from the general public if she was a member of a class consisting of persons 'within a given zone
of danger'); *Prindel v. Ravalli County*, 133 P.3d 165, 180 (Mont. 2006) (victim was foreseeable plaintiff where
proximity to jail brought him well within foreseeable zone of danger created by jail staff's negligence which resulted
in offender's release).  At this stage, it is sufficient that Ms. Smith has alleged that the Government was, or

(continued…)

*abusive history*," Def. Memo. at 32 (emphasis added), the court affirmed the verdict against the

District. Specifically, the court found that the government's actions (and omissions) "present[ed]

a specific and unreasonable risk of harm to the [victims], therefore giving rise to a special duty

toward them." 563 F.2d at 479.[21]

Consistent with *White* and *Reiser*, federal and state courts from other jurisdictions have

rejected the argument the Government raises here that public institutions who supervise

dangerous persons have no duty to protect members of the public from those individuals. *See,*

*e.g., Torres v. State*, 912 A.2d 1132 (Conn. Super. 2006) (special relationship imposed duty on

state to protect innocent child murdered in Florida two months after offender escaped from

Connecticut prison); *Joyce v. State Dept. of Corrections*, 119 P.3d 825 (Wash. 2005) (citing

*Taggart v. State*, 822 P.2d 243 (Wash. 1992) for proposition that that parole officers have duty to

protect others from reasonably foreseeable dangers engendered by parolees' dangerous

propensities); *Natrona County v. Blake*, 81 P.3d 948, 956-58 (Wyo. 2003) (county owed duty to

innocent citizen murdered by escaped prisoner, 280 miles away from the prison; proximate

causation and foreseeability were questions for the jury) (citing cases); *see also infra* at Section

IV.B (citing cases imposing duty on public entities for acts by dangerous persons under their

supervision). As the *Reiser* court observed: "[t]o uphold such a liability [of public entities] does

---

(continued)

reasonably should have been, aware of Kelly's violent history in the surrounding community and failed to take the required steps to protect innocent citizens in his path.

[21]     Contrary to the Government's suggestion that *Reiser* no longer reflects the law in the District of Columbia, *see* Def. Memo. at 32, n.10, *Reiser*, in fact, is consistent with the law in the District of Columbia and elsewhere regarding the duty of government and private entities to protect members of the public from dangerous individuals under their supervision. *See infra* at IV.B. The reference in *Cunningham*, 584 A.2d at 575, n.3, to *Reiser* cited by the Government in its Memorandum noted merely the unremarkable proposition that the case was not binding on local D.C. courts and "to the extent, if any" that it was inconsistent with binding D.C. authority, the D.C. Court of Appeals "*would* be bound" to reject it on that basis. *Id.* (emphasis added).

not mean that municipalities are called upon to answer for every loss caused by outlaws . . . ."
*Reiser*, 563 F.2d at 479 (citation omitted).  However, the Government can – and should be – held
accountable for its failure to monitor reasonably those known dangerous offenders that are under
its direct supervision.

The public duty doctrine has not been extended to cases such as this, and for good reason.
Accordingly, this doctrine provides no basis for dismissing Plaintiff's case.

B.      **The Government Owed a Duty of Reasonable Care Under District of
         Columbia Law to Carol and Erika Smith.**

Ms. Smith alleges in her Complaint that the Government was responsible for supervising
Anthony Kelly and ensuring his compliance with the conditions of his release, including by
providing necessary information to the appropriate agencies to determine whether Kelly's
actions required reincarceration and/or revocation or retardation of his parole.  Compl. ¶¶ 8-11,
24.  It was the Government's duty to ensure the safety of the local community in which Kelly
was residing and acting.  Compl. ¶ 25.  Indeed, the Government concedes that it had a "general
public duty to safely parole and supervise Kelly."  Def. Memo. at 31.

The Government's requirements regarding Kelly's supervision were heightened as a
result of Kelly's lengthy record of escalating criminal activity, including violent crimes,
burglary, and auto theft, as well as his documented propensity for dishonesty and attempts to
"manipulate the system" to promote his personal interests.  Compl. ¶¶ 12, 19-20; *see also infra* at
IV.B.1.  Ms. Smith alleges that, despite these requirements, the Government failed to supervise
Kelly reasonably.  *See, e.g.*, Compl. ¶ 11, 23, 26-32.  These and other facts alleged in the
Complaint support a finding that Anthony Kelly's violent actions in the surrounding community
were foreseeable.  As a result, while under the Government's apparent – and required –
supervision, Kelly committed multiple rapes, assaults, car robberies, burglaries, and murders,

including the murder of Ms. Smith's daughter, Erika. Compl. ¶ 11. According to the Complaint,

had the Government complied with mandatory rules, requirements, guidelines, regulations and

standards, it would have discovered sufficient facts that would have resulted in Kelly's

reincarceration and prevented Erika's murder. *See, e.g.*, Compl. ¶ 18. These allegations are

sufficient to state a claim under District of Columbia tort law arising from the Government's

failure reasonably to supervise Anthony Kelly or to take reasonable measures to ensure that

Kelly, a known dangerous offender under its direct supervision, did not commit additional crime

in his surrounding community.[22]

> **1.    It was reasonably foreseeable that Anthony Kelly would**
> **commit the acts which resulted in Erika Smith's murder.**

As the Government correctly asserts, the components of a legal duty sufficient to state a

claim merge into the question of "the foreseeability of the plaintiff's injury" under District of

Columbia tort law. Def. Memo. at 33-34 (citing *District of Columbia v. Beretta*, 872 A.2d 633

(D.C. 2005) and *Reiser*, 503 F.2d at 479). In *Beretta*, the D.C. Court of Appeals observed that

"the requisite duty of care required for negligence is a function of foreseeability, arising only

when foreseeability is alleged commensurate with 'the extraordinary nature of [intervening]

criminal conduct,'" and found "no need to reconsider" the "theoretically somewhat anomalous

blending of duty and foreseeability in [the D.C. Court of Appeal's] decisions"). 872 A.2d at

641-42 (citations omitted). Likewise, in *Reiser*, the court held that "[a]n actionable duty is

generally owed to reasonably foreseeable plaintiffs subjected to an unreasonable risk of harm by

the actor's negligent conduct." 563 F.2d at 462.

---

[22]    In an affidavit submitted by Detective Michael Brent (one of the detectives who investigated Erika's murder) in the related case against Hope Village, *see supra* at n. 6, Detective Brent provides further evidence regarding Anthony Kelly's criminal activity in the immediate vicinity, indeed within a few feet, of the home where Erika and her father regularly resided together and were murdered. *See* Second Affidavit of Detective Michael Brent (Retired), Exh. 6 (at Exhibit A, p.11).

The Government also is correct that this standard of foreseeability is heightened where the injury is caused by the criminal acts of a third party. *See, e.g.*, *Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 912 (D.C. Cir. 2006) (remanding case for jury to determine issue of foreseeability where club patrons were attacked by strangers after leaving the establishment). However, even in such circumstances, where the relationship between the defendant and the victim "strongly suggests a duty of protection, specific evidence of foreseeability is less important, whereas if the relationship is not of a type that entails a duty of protection, then the evidentiary hurdle is higher." *Id.* at 912 (citation omitted).[23]

The Government's contention that Anthony Kelly's murder of Erika Smith was not sufficiently foreseeable under these standards to impose a duty of care fails because it ignores the facts the Government knew, or reasonably should have known, about Kelly, Kelly's whereabouts, and Kelly's propensity to commit violent crime in the immediate community.[24] Had the Government done what it should have done in these circumstances – *i.e.*, taken reasonable measures, consistent with its duties and functions, to ensure proper supervision and accountability of Anthony Kelly – Ms. Smith alleges that Anthony Kelly would have been unable to commit the atrocities which form the basis of her Complaint. Compl. ¶ 32. Indeed,

---

[23]    The court in *Reiser* recognized the existence of a special relationship between a parole officer and the victim (of a stranger's violent attack) in circumstances similar to those here, where the relationship between parole officers, known dangerous parolees, and the local community "strongly suggests a duty of protection." The Government concedes the existence of such a duty in this case. Def. Memo. at 31.

[24]    Defendant's further assertion that Plaintiff has not "established a causal connection . . . because any duty the federal defendants may have had was discharged when the CSO requested a parole violator warrant," Def. Memo. at 33, n.12, is inaccurate. Although Kelly's CSO did recommend revocation of Kelly's parole, the CSO's failure to properly supervise Kelly meant that Kelly was improperly on a less restrictive level of supervision than was appropriate and, further, that the CSO failed to convey to the USPC the full scope of Kelly's parole violations. Plaintiff asserts – and should be permitted to prove – that had the USPC received all of the information required on Kelly, it would have revoked his parole and sent him back to prison before he could have had the opportunity to murder Erika Smith. In any event, proximate causation is a question of fact that should not be resolved on a motion to dismiss. *See, e.g.*, *Grant v. District of Columbia*, 597 A.2d 366, 370 (D.C. 1991).

Ms. Smith has raised a sufficient question of fact whether, had the Government acted reasonably, Erika Smith would be alive today.

The D.C. Circuit's recent decision in *Novak* – a case noticeably omitted from the Government's Memorandum – squarely addresses the issue of foreseeability and liability under D.C. law where a plaintiff seeks to hold a party liable for third-party criminal acts. Although the "heightened showing" requirement in such cases requires more than "generic information such as crime rates or evidence that the defendant's employees worked in a 'criminally active environment,'" the court did not adopt the prohibitive standard for which the Government appears to advocate here. Def. Memo. at 33 (arguing that "there is no duty to protect another from a criminal attack by a third person"); *see also Novak*, 452 F.3d at 912 (internal citations omitted).

Rather, under D.C. law, foreseeability is a highly factual inquiry that may be shown "by a combination of factors which give [the] defendant [ ] an increased awareness of the danger of a particular criminal act." *Id.* (quoting *Workman v. United Methodist Comm. Of Relief of Gen. Bd. of Global Ministries of United Methodist Church*, 320 F.3d 259, 262 (D.C. Cir. 2003) and *District of Columbia v. Doe*, 524 A.2d 30, 33 (D.C. 1987)).[25] In *Briggs v. WMATA*, 293 F. Supp. 2d 8 (D.D.C. 2003), for example, Judge Leon distinguished *Bailey v. District of Columbia*, 668 A.2d 817 (D.C. 1995) and *Clement v. Peoples Drug Store, Inc.*, 634 A.2d 425 (D.C. 1993) – upon which the Government relies here – to find that the plaintiff "must be given an opportunity to demonstrate the necessary foreseeability" at trial. *Briggs*, 293 F. Supp. 2d at 15. In *Briggs*,

---

[25] The Government tries to avoid the effect on this case of the D.C. Court of Appeals' decision in *District of Columbia v. Doe* by suggesting that it is "one earlier decision" from which the courts have retreated. Def. Memo. at 14. That assertion is belied completely by the ongoing and consistent reliance on *Doe* as an authoritative statement of the District of Columbia law by courts in this Circuit. *See, e.g.*, *Novak*, 452 F.3d at 912-13; *Briggs v. WMATA*, 293 F. Supp. 2d 8, 14-15 (D.D.C. 2003).

the plaintiff alleged that the inadequate lighting and security around a Metro stop and the amount of crime in the area should have enabled the District to foresee that someone *might* be murdered by an unknown assailant at the station.  The court held that the plaintiff need only be able to show that the District meet the "increased awareness" standard established in *Doe*, and that "the plaintiff need merely to *allege* such foreseeability to satisfy the motion-to-dismiss requirements." *Id.* (emphasis added).

Thus, to raise a fact question sufficient to withstand a motion to dismiss under D.C. law, the plaintiff need not show that the third-party attacker previously had committed the same sort of attack as that alleged in the complaint.  452 F.2d at 912 (a showing of "previous occurrences of the particular type of harm" is not required to establish foreseeability sufficient to state a claim); *see also Doe v. Dominion Bank of Washington, N.A.*, 963 F.2d 1552, 1561 (D.C. Cir. 1992) ("th[e] insistence that [the plaintiff] had to show the previous occurrence of a particular type of crime, *i.e.*, a crime against a person, seems to us at odds with D.C.'s multi-factored, anti-talismanic approach to foreseeability").[26]  Nor must the defendant have been able to anticipate the *precise degree* of harm inflicted in the case, so long as some harm was reasonably foreseeable: "We respectfully do not see a basis for such a distinction and do not believe the District of Columbia Court of Appeals would endorse the dissent's suggestion that a [defendant] need only protect against an extremely precise level of fighting."  *Novak*, 452 F.3d at 914 n.11 (refusing to distinguish between evidence of prior fights involving "fisticuffs" and instant case

---

[26]    For example, even where specific evidence of prior violent crimes is not apparent – as it is here – the court may consider other factors as well, including a special relationship between the parties (as was found in *Reiser*) and evidence of prior *non*violent crimes.  *Novak*, 452 F.3d at 913 (citations omitted).

involving severe beating which resulted in a coma and permanent loss of brain and motor functions).[27]

This case is unlike those upon which Defendant relies, where the claims were based on random and completely unforeseeable crimes committed by perpetrators completely unknown – and unknowable – to *either* the plaintiff or the defendant.  Def. Memo. at 33-37.  Here, Anthony Kelly was *far* from unknown to the Government.  The Government knew, or should have known, where he worked, where he lived and acted (including that he had stolen an automobile from a gas station just a few feet from where he murdered Erika Smith, Brent Aff., Exh. A at 11), with whom he was living, and, of course, his lengthy criminal history.  The Government also knew that Kelly had spent years in prison for his long history of committing burglaries and car thefts and for assaulting and threatening to kill two individuals with a loaded gun.  Indeed, the *very reason* that Kelly was under CSOSA's supervision was that he was a known, dangerous felon.  It would be difficult for the Government to have been more "aware[ ] of the danger" posed by Anthony Kelly to members of Erika's community.  *District of Columbia v. Doe*, 524 A.2d at 33.

> ### 2.    Ms. Smith has alleged sufficient facts to establish the Government's duty in this case.

Ms. Smith certainly has alleged enough facts to provide a basis on which the court can conclude that Kelly's acts were foreseeable.  *See, e.g.*, Compl. ¶¶ 12, 19-20; *see also Briggs*, 293 F. Supp. 2d at 15.  In support of her allegations, Ms. Smith should be permitted to submit evidence on the highly fact-based question of whether it was foreseeable that a dangerous

---

[27]    *See also Doe v. Dominion Bank*, 963 F.2d at 1561 (evidence of previous sexual attacks not essential to determination that rape was foreseeable); *Bailey v. District of Columbia*, 668 A.2d 817, 820 (D.C. 1995) (plaintiff is not required to show the exact same crime had happened before to establish the defendant's increased awareness of a particular act); *District of Columbia v. Doe*, 524 A.2d at 33 (rejecting argument that defendant must have "specifically foreseen a sexual assault by an intruder at the school"); *Graham v. M & J Corp.*, 424 A.2d 103, 105 (D.C. 1980) (rejecting defendant's argument that prior "minor acts of trespass and vandalism" were "so different in scope" as to render arson unforeseeable).

criminal like Anthony Kelly – with a history of burglary and gun use – would burglarize a nearby home with a gun and would used that gun to commit murder during the crime. Even in *Bailey*, upon which the Government relies, the D.C. Court of Appeals found that a plaintiff can establish sufficient foreseeability – *i.e.*, "the [Government's] increased awareness of the probable danger of a particular criminal act" – by demonstrating that the Government "should have anticipated *the prospect* of violent criminal conduct." 668 A.2d at 820, 821 (emphasis added). Based on the facts alleged, the Government *absolutely* should have anticipated at least the *prospect* that Anthony Kelly, if inadequately supervised, would commit violent crimes again.

Ms. Smith also has pled enough to support the inference that members of the local community where Erika Smith regularly resided with her father foreseeably would be harmed by an inadequately monitored and supervised violent parolee in their midst like Anthony Kelly. Indeed, Gregory Russell's home where he and Erika were murdered was just a few miles from where Kelly lived, and only a few feet from where Kelly already had committed crime while under the Government's supervision. *See supra* at n.22. That the Government should have anticipated violent criminal activity by Anthony Kelly in this neighborhood is, at the very least, a factual question that should not be decided against Ms. Smith on a motion to dismiss.

The case of *Torres v. State* is illustrative. In that case, the offender had "never murdered anyone before, had never attempted to escape, had never been incarcerated before, had no history of violent behavior for approximately two and a half years and had won an award for breaking up a prison fight." 912 A.2d at 1144. Nevertheless, the court refused to dismiss the case where the offender escaped from prison in Connecticut, traveled to Florida, and kidnapped, raped, and murdered an infant child. Evidence that the offender had committed violent acts in the past, had received disciplinary reports prior to sentencing, had been denied a furlough during the period of

his confinement, and had taken steps which suggested the possibility of escape was sufficient to require the issue of foreseeability to be presented to the jury. *Id.*; *see also Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 37 (Tex. 2002) (evidence that offender previously had burglarized apartment, trespassed on private property, committed assault with a gun, and stole two cars was sufficient to send to jury question of foreseeability that offender would murder innocent victim at convenience store and steal her car); *Estate of Jones v. State*, 15 P.3d 180, 187, 188 (Wash. App. 2000) (escape and subsequent rape and murder of innocent victim was not unforeseeable where offender had multiple prior burglary convictions and had committed the rape and murder in the course of another burglary).

Dismissal only is warranted when "it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Because Ms. Smith has pled facts upon which the foreseeability of Anthony Kelly's actions reasonably can be found by the fact finder in this case, the Government's motion should be denied. *See, e.g.*, *Thomas*, 124 F. Supp. 2d at 713 (declining to dismiss complaint on duty grounds where court found that plaintiff "may be able to prove a set of facts" that demonstrates foreseeability of random violence by one of defendant's students); *Doe*, 524 A.2d at 34 (finding that "the probative evidence presented by appellees of a criminally active environment raised a factual issue of foreseeability of intervening criminal conduct [*i.e.*, the abduction and rape of a student by a total stranger] sufficient for submission to the jury").[28]

---

[28]     In *Williams v. United States*, 450 F. Supp. 1040 (D.S.D. 1978), the district court held the United States liable where a parolee was released from a VA hospital, approached a random individual on the street, and shot and killed him. The court, citing *Hicks v. United States*, 511 F.2d 407 (D.C. Cir. 1975), concluded that, in light of the assailant's past history of hostile behavior and chronic alcoholism, it was reasonably foreseeable that if he were released without supervision he would become intoxicated and initiate an argument with a stranger. Once that happened, it similarly was foreseeable that the stranger might resist the assailant's aggression, causing the assailant to respond with violence. 450 F. Supp. at 1046. So, too, the chain of events alleged here, which began with

(continued…)

**3.     Public policy considerations support denial of the Government's motion to dismiss.**

Finally, the Government's assertion that "public policy cautions against the imposition of a duty in this case [because] [t]he agencies at issue in this case could be extremely burdened by potentially *unlimited liability* for the actions of parolees," Def. Memo. at 37 (emphasis added), is a red herring. To be sure, Ms. Smith never has argued – nor need this court find – that the Government should be liable for every crime committed by a parolee; Ms. Smith argues only that liability may be predicated on crimes committed by parolees the Government *knew, or had reason to know*, could be dangerous but who they failed to supervise *reasonably*.

When analyzing the question of duty in cases involving liability for criminal acts of third parties, courts in the District have considered the public policy implications of holding liable entities responsible for supervising dangerous persons and on the community. *See, e.g., District of Columbia v. Doe*, 524 A.2d at 33 ("whether a duty exists is ultimately a question of fairness") (emphasis in original); *Thomas*, 124 F. Supp. 2d at 709 ("whether a duty exists is not simply a question of foreseeability. [It] is ultimately a question of fairness . . . [and] involves a weighing of the relationship of the parties; the nature of the risk, and the public interest in the proposed solution"). Factors to be considered include: "the known character, past conduct, and tendencies of the [criminal], the temptation or opportunity which the situation may afford him for such misconduct, the gravity of the harm which may result, and the possibility that some other person will assume the responsibility for preventing the harm, together with the burden of the

---

(continued)

CSOSA's negligence and ended with Kelly gunning down Erika Smith, was reasonably foreseeable given Kelly's history and his geographic proximity to Erika and her father.

precautions which the actor would be required to take." *D.C. v. Doe*, 524 A.2d at 34, n.3

(quoting RESTATEMENT (SECOND) TORTS § 302B, cmt. f (1997)).

Courts have resolved this question in favor of imposing a duty of *reasonable* care on

entities responsible for supervising *dangerous* individuals for the protection of members of the

surrounding community. *See, e.g., White*, 780 F.2d at 103 (quoting *Hicks v. United States*, 511

F.2d 407, 422 (D.C. Cir. 1975) (Tamm, J. and Mcgowan, J., concurring)) ("[u]nless persons

injured by the [public entity's] failure to properly perform its functions can recover for their

injury, society's ability to insure that the [public entity's] conscientiously performs its duties is

rendered haphazard at best"); *Thomas*, 124 F. Supp. 2d at 713 (discussing court's mindfulness of

important role played by facility and the potentially discouraging effect of liability, but refusing

to find, as a matter of law, that no duty existed).

Indeed, while Defendant argues that if it faced liability for acts of parolees, it "may be

driven to extend incarceration beyond what is necessary or desirable," Def. Memo. at 37,  the

words of one Delaware court addressing similar circumstances come to mind:  "it is difficult to

imagine that an organization [much less the United States Government] would be discouraged

from providing [services relating to dangerous individuals] simply because the law expects that

this function will be discharged without negligence." *Shively v. Ken Crest Centers for*

*Exceptional Persons*, No. Civ.A. 96C-05-316, 2001 WL 209910 (Del. Super. Jan. 26, 2001) at

*8.[29]  Indeed, Defendant would not need to extend incarceration "beyond what is necessary or

---

[29]    Similarly, as the Florida Supreme Court held in *Nova Univ. v. Wagner*, it is not "too onerous a burden" to require entities with supervisory responsibility to "exercise reasonable care in carrying out its efforts[;] the alternative, the exercise of no care or unreasonable lack of care, subjects the [defendant] to liability."  491 So.2d 1116, 1118 (Fla. 1986).

desirable" to avoid liability – it simply would need to properly monitor and supervise dangerous offenders; in other words, to do its job.

The Government was charged with protecting members of the community by monitoring and supervising parolees released into the community. The Government concedes this much. It specifically was entrusted with these tasks and with coordinating with other federal agencies to prevent the exact situation that ultimately occurred here – a dangerous felon violating, over and over again, conditions of his parole, yet grossly inadequate monitoring and supervision leaving him free to endanger – and ultimately murder – innocent citizens living in his community including a nine-year-old girl. While Anthony Kelly was under its direct supervision, the Government was the party "best equipped to guard against the predictable risk of [harm]," and "in the best position to take the necessary protective measures." *Kline v. 1500 Mass. Ave. Apt. Corp.*, 439 F.2d 477, 484 (D.C. Cir. 1970). Therefore, public policy as well weighs in favor of imposing a duty of care on the Government, and Ms. Smith should be permitted to make her case on the merits.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Government's motion be denied.

Respectfully submitted,

_____/s/_____

Stuart H. Newberger (D.C. Bar No. 294793)
Laurel Pyke Malson (D.C. Bar No. 317776)
Aryeh S. Portnoy (D.C. Bar No. 464507 )
CROWELL & MORING, LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 624-2500
Fax: (202) 628-5116