# Exhibit 4



**Court Services and Offender Supervision Agency
for the District of Columbia**

# POLICY STATEMENT

Policy Statement 1000
Policy Area: OGC
Effective Date: NOV 2 5 2003
Approved: _Paul Quander_

Paul A. Quander, Jr., Director

## POLICY AND PROCEDURE MANAGEMENT

### I. COVERAGE

This Policy Statement and its appended procedures apply to all Court Services and Offender Supervision Agency ("CSOSA" or "Agency") policy and procedure issuances, including those Policy Statements prepared for the joint signatures of the Director of CSOSA and the Director of the District of Columbia Pretrial Services Agency ("PSA"). Agency staff with specific responsibilities under these procedures include the Director, Associate Directors or delegatees, the Agency's Records Manager, and staff designated as policy coordinators.

### II. BACKGROUND

As a new agency formed from previously separate components, CSOSA recognizes the importance of establishing uniform standards for developing, issuing, and maintaining Agency policy and procedures. Uniform standards ensure that: (1) Agency staff will know where to find current and related information on policy and procedures; (2) policy and procedures will be presented in a readily understandable and consistent format; (3) issuance of duplicative or conflicting policy and procedures will be precluded; and (4) future Agency decision-makers will have adequate information regarding the basis for previous policy and procedure determinations.

Policy and procedures necessarily work together. This Policy Statement is intended to clarify this working relationship by addressing how policy and procedures are to be developed, reviewed, and issued. Policy establishes objectives and expectations. When appropriate, policy also assigns broad responsibilities, delegations of authority, and reporting requirements. Some procedures are so closely tied to the achievement of objectives and expectations that they need to be presented together with the statement of policy. Procedures which provide direction or instruction in the general implementation of policy, which require coordination within the Agency, or which establish deadlines must be appended to Policy Statements. Procedures which have been specifically delegated by policy for issuance by a particular office or staff position or which address the routine staff actions within an Agency unit or office are to be developed at the unit or office level for issuance in a unit or office manual or as an Operational Instruction.

Court Services and Offender Supervision Agency for the District of Columbia
Policy Statement 1000
Effective date: 11/25/2003
Page 2

## III. POLICY

Agency senior staff and managers shall issue policy and procedures and disseminate other information pertaining to policy and procedures in accordance with the procedures appended to this Policy Statement.

More specifically, these procedures:

- Require that Agency policy must be issued in the form of Policy Statements;
- Require that Agency procedures be appended to Policy Statements or issued in the form of a unit or office manual or Operational Instructions;
- Establish standards for the development and clearance of policy and procedures;
- Standardize the format for the various types of policy and procedures;
- Establish requirements for maintaining the administrative record documenting the development and issuance of policy and procedures;
- Require annual reviews of existing policy and procedures to determine any need for revision; and
- Provide for the waiver of policy by the Director in specific instances.

## IV. AUTHORITIES, SUPERSEDURES, REFERENCES, AND ATTACHMENTS

A. Authorities.

5 U.S.C. § 301; Section 11233(b)(2) of the National Capital Revitalization and Self-Government Improvement Act of 1997, Pub. Law 105-33, 111 Stat. 712; D.C. Code § 24-1233(b)(2), D.C. Code § 24-103.

B. Policy Supersedures.

None

C. Procedural or Other References.

PSA Policy Management

D. Attachments.

Appendix A. General Procedures

Appendix B. Policy Statement Format

Appendix C. Sample Union Notification

Court Services and Offender Supervision Agency for the District of Columbia
Policy Statement 1000
Effective date: 11/25/2003
Page 3

Appendix D. Sample CSOSA Director's Approval Routing

Appendix E. Sample CSOSA/PSA Directors' Approval Routing

Appendix F. Policy/Procedure Checklist

Court Services and Offender Supervision Agency for the District of Columbia
Policy Statement 1000
Effective date: 11/25/2003
Page 4

**APPENDIX A**
**GENERAL PROCEDURES**

A. Policy and Procedures Issuances.

    (1) Agency policy is to be issued as a Policy Statement.

        (a) A Policy Statement is prepared by an Agency component for issuance under the Director's signature (or under the signatures of the CSOSA Director and the PSA Director if the policy is also to be applicable to PSA);

        (b) A Policy Statement remains in effect until it is rescinded, modified or superceded by another Policy Statement.

    (2) Procedures may be appended to a Policy Statement, or may be issued in a unit or office manual or as an Operational Instruction.

        (a) Procedures which pertain to *what* must be done to implement policy should be appended to a Policy Statement. These procedures provide a functional explanation of policy, and typically are general in nature, require coordination between Divisions within the Agency, or establish deadlines. In cases where additional implementing procedures are anticipated, the Policy Statement needs to identify the office or position title responsible for issuing the additional implementing procedures as an Operational Instruction.

        (b) Procedures which have been specifically delegated by policy for issuance by a particular office or staff position or which pertain to *how* staff routinely implement policy are to be issued in an Operational Manual or as an Operational Instruction.

        (c) An Operational Manual or an Operational Instruction is prepared by an Agency component for issuance under an Associate Director's signature (or as delegated by a Policy Statement or by the Associate Director).

        (d) Procedures appended to a Policy Statement or in an Operational Manual or Management Instruction remain effective until they are rescinded or superseded by another Policy Statement, Operational Manual, or Operational Instruction.

B. Development.

    (1) Policy may be required in response to new legislation, regulations, decisions of the Agency's Director and senior staff, annual review, or in response to operational needs. Procedures need to be developed or adjusted in accordance with new or revised policy. The Associate Director for each Agency component must designate a policy coordinator who is responsible for monitoring the component's progress in developing and reviewing

policy and procedures. The name of the policy coordinator must be provided to the Director's Chief of Staff.

(2) Once the determination is made to develop or revise policy or procedures, the Agency component responsible for the policy must determine the type of issuance to be used, document the start date, and estimate a target date for completing the issuance.

(a) Policy is to be issued as a Policy Statement. It is important to append to the Policy Statement the general procedures necessary for implementing the policy. By appending the procedures to the Policy Statement, the component is ensuring that the general procedures will receive maximum review by the other Agency components. In cases where additional implementing procedures are anticipated, the Policy Statement needs to identify the office and/or position title responsible for issuing the procedures as an Operating Instruction.

(b) Unit or office manuals and Operational Instructions are intended to address procedures specifically delegated by policy for issuance by a particular office or staff position and or routine staff work procedures. Unit or office manuals and Operational Instructions should be organized in such a way as to make revisions of specific procedures a simple process.

(3) The Agency component shall then prepare draft policy and/or procedures (using Microsoft Word electronic files whenever practicable) for Agency or Division review as appropriate. Appendix F of Policy Statement 1000 contains a policy/procedure checklist recommended for use in the development and maintenance of policy and/or procedures. Where an existing policy/procedure is being revised, revisions shall be indicated by use of the 'Tracking Changes' tool provided in Word.

(4) The Agency component shall request assistance from appropriate PSA components for the development of any policy and/or procedure which is to be prepared for the joint signatures of the Director of CSOSA and the Director of PSA.

(5) The Agency component is responsible for evaluating the impact of proposed policies and procedures on the resources and various offices of the Agency. Accordingly, the component needs to coordinate early with any component for which a substantive impact is anticipated (for example, training, budget, facilities, security, and information technology).

C. Format.

(1) Policy Statements.

(a) Policy Statements are to be issued in a consistent format (see Appendix B of Policy Statement 1000). Each Policy Statement will be identified by a unique number.

Court Services and Offender Supervision Agency for the District of Columbia
Policy Statement 1000
Effective date: 11/25/2003
Page 6

Policy Statements prepared by the Office of Human Resources, which tracks the part numbers of Office of Personnel Management (OPM) regulations, may include a decimal in the number (for example, PS 650.1 and 650.2) because OPM regulations may require more than one policy issuance for any particular part number. Revisions of existing Policy Statements will be identified by the effective date for the new Policy Statement. Each Policy Statement must use a keyword (or keywords) to identify the issuing component for the policy. For example, this first issuance of CSOSA's Policy Statement on Policy and Procedure Management is identified as PS 1000, effective mm/dd/yyyy, and the Policy Area is identified in the headings on the first page as Office of the General Counsel. The next revision of this PS would have a later effective date. For consistency, the range of numbers is assigned as follows:

| | |
|---|---|
| 0000-0999 | Office of Human Resources |
| 1000-1999 | Director's Office, Office of Legislative, Intergovernmental and Public Affairs, Office of Equal Opportunity, and the Office of the General Counsel |
| 2000-2999 | Information Technology |
| 3000-3999 | Community Justice Programs |
| 4000-4999 | Community Supervision Services |
| 5000-5999 | Management and Administration |

An Agency component may choose to organize its assigned range to reflect the subject matter of the policies it prepares. For example, Management and Administration may assign 5000 through 5099 to General Administrative, 5100 through 5199 to Financial Management, 5200 through 5299 to Procurement, and so forth.

(b) Policy Statements are to contain the following major headings: (1) Coverage; (2) Background; (3) Policy; and (4) Authorities, Supersedures, References and Attachments.

(i)   The Coverage section should describe Agency components or employees affected by the policy. For example, this section may specify that the policy applies both to CSOSA staff and to PSA staff, or the section may indicate that the policy applies only to CSOSA staff involved in the referral and placement of offenders with mentors in the community. This section should identify the position titles of agency staff with specific responsibilities under the Policy Statement. Further details as to assignments of responsibilities, delegations, or reporting could be presented in a separate appendix to the Policy Statement. This heading may also address the scope of the policy (for example, this heading may be used to emphasize that the policy on the internet and electronic mail use applies to personal use of the Agency's e-mail system). The intent is that staff will be able to determine easily whether or how the policy impacts their duties and responsibilities.

Court Services and Offender Supervision Agency for the District of Columbia
Policy Statement 1000
Effective date: 11/25/2003
Page 7

(ii)  The Background section should contain a brief discussion on why the policy is necessary.  For example, this section may describe the nature of the problem addressed by the policy, the definition of an essential concept, or the anticipated results of implementing the policy.  A lengthy listing of definitions, however, is better presented in a separate appendix to the Policy Statement.

(iii)  The Policy section should contain a comprehensive summary statement of the policy.  Staff should be able to read this section and know in general terms what the policy requires.

(iv)  The Authorities, Supersedures, References, and Attachments section should contain citations to authorizing laws, regulations, Critical Success Factors, superseded policies, associated policies, procedures, other pertinent reference documents, and appended material which needs to be presented in full.  For example, general procedures needed to implement the policy and CSOSA regulations on the topic covered by the Policy Statement are to be carried in appendixes to the Policy Statement.

(2) Unit or Office Manuals and Operational Instructions.

(a) For consistency, unit or office manuals and Operational Instructions need to identify themselves as policy documents by using a format similar to the one used for Policy Statements.  For example, an Operational Instruction will have "Operational Instruction" instead of "Policy Statement" in the headers.  Unit or office manuals and Operational Instructions must be numbered to ensure ease of reference.

(b) Agency components, however, may structure the unit or office manual or the Operational Instruction in accordance with their needs.  Each component shall develop formats suitable for its use.

D. Clearance.

Policy and procedures must undergo formal review before issuance.  When formal review includes other Agency components, the components are responsible for completing their review within the deadline given for the review.  An Agency component which is not able to complete its review within the deadline must contact the issuing component to determine if an extension to the deadline is possible.

The responding component's Associate Director is responsible for ensuring that the component's substantive comments are consolidated into a single response.  This response must be transmitted electronically to include one of the following replies:

Court Services and Offender Supervision Agency for the District of Columbia
Policy Statement 1000
Effective date: 11/25/2003
Page 8

- Concur
- Do not concur

If the responding component does not concur, the responding component must clearly identify the basis for non-concurrence and, if possible, present an acceptable alternative.

(1) Policy Statements

(a) Because Policy Statements are prepared for the Director's signature, the formal review must include all Agency components. If the policy is being prepared for the signatures of both the CSOSA Director and the PSA Director, the formal review shall also include PSA.

(b) Clearance will be done electronically. This will enable Agency components to review the policy simultaneously. Agency components ordinarily will be given two weeks to complete their review of a draft issuance. The date of the draft Policy Statement should be clearly identified in the document. The draft issuance is to be sent to the Associate Directors, the General Counsel, the EEO Director with a cc copy to the Director's Chief of Staff. Other staff may be cc'd at the discretion of the issuing component.

(c) Any substantive comment must be returned electronically (for example, as part of the message or as an attached file). Editorial or stylistic comments also should be submitted electronically in the same response, but may be submitted separately on paper if the electronic response so notes. If a reviewing component is unable to return comment by the given deadline, the reviewing component's policy coordinator must contact the issuing component in order to minimize delay in processing comments.

(d) The issuing Agency component shall attempt to resolve all comments from the various reviewing components. The component shall ordinarily be given one week to resolve comments.

(e) If the response to comments results in a significant change to the draft policy, the issuing Agency component must recirculate the revised draft so that the reviewing components will be able to comment on the changes. The comment period for recirculated drafts ordinarily should be one week. This version must also indicate changes from the version originally circulated using the 'Track Changes' tool in Word.

(f) When the issuing Agency component is ready to move the policy forward for the Director's approval, the component must prepare a folder for this routing and include documentation for all concurrences. See Appendix D for a sample routing slip for the Director of CSOSA. See Appendix E for a sample routing slip for the Directors of

Court Services and Offender Supervision Agency for the District of Columbia
Policy Statement 1000
Effective date: 11/25/2003
Page 9

CSOSA and PSA. If the component is unable to resolve a non-concurrence comment, the component must include a statement in the documentation as to the reasons for rejecting the comment. This folder shall also include a cover sheet to be used for documenting union notification (see Appendix C).

(2) Unit or Office Manuals and Operational Instructions.

    (a) Unit or office manuals and Operational Instructions are to undergo formal review within the Agency component.

    (b) The Associate Director is responsible for determining appropriate review procedures and signatory authority within the component for these unit or office manuals and Operational Instructions.

    (c) If the procedures in the manuals or Operational Instructions affect the rsponsibilities and/or procedures of other Agency components, then the issuing office must provide the offices affected and the Office of the General Counsel with an opportunity for review and comment. Any review required outside the component should be done electronically, if practicable. The Agency component may provide outside components with a paper copy at the discretion of the Associate Director.

    (d) The Agency component must keep the General Counsel and the Director's Chief of Staff apprised of procedures under development. If the General Counsel and/or the Chief of Staff so request, the Agency component shall provide the General Counsel and/or the Chief of Staff with a copy of the draft procedures for review and comment.

E. Union Notification, Promulgation, and Distribution.

    (1) Union Notification.

        (a) The adoption of or changes to policies and procedures may be subject to bargaining over impact and implementation issues. The Office of Human Resources (OHR) is responsible for determining whether the policy must be reviewed by the union and serves as the point of contact for providing necessary notice to the union on policy issuance. See Appendix C for a sample union notification form.

        (b) The Agency component preparing the policy issuance must contact OHR to ensure that any necessary union notifications are made and that there are no labor-management issues left unresolved before routing the policy to the Director or Associate Director (or any other CSOSA official with signatory authority) for signature.

Court Services and Offender Supervision Agency for the District of Columbia
Policy Statement 1000
Effective date: 11/25/2003
Page 10

(c) Editorial changes to policy or procedural issuances (for example, updates to material listed in Authorities, Supersedures, References) do not require formal union notification.

(2) Promulgation and Distribution.

(a) Once the policy or procedure issuance has been signed, the Director's Office (or the Associate Director when appropriate) shall determine the effective date for the issuance. In most cases, the effective date will be the date the issuance was signed. In certain instances (for example, when notice must be given to the public through regulations), the effective date may be a different date.

(b) After being signed, the issuance must be submitted in both paper and electronic form to the Office of Information Technology for posting on CSOSA's intranet and/or internet. A broadcast message will then be sent informing Agency staff of the posting. Posting policy and procedure issuances on the intranet serves as official notice to Agency staff of the issuance's applicability. Further distribution to staff may be made electronically or by paper copy, as deemed appropriate by the Director or by the Associate Directors. Any issuance which has been signed by the Director of CSOSA and the Director of PSA shall also be submitted to PSA's Information Technology Division.

F. Maintenance and Review.

(1) Agency components are responsible for maintaining the administrative record for the policies and procedures which they have in development.

(a) The component responsible for issuing the policy or procedure must maintain a folder containing documentation on the need for issuance, all significant working drafts, comments and documentation on the resolution of or response to comment from Agency review, and any background information pertinent to the component's decision to issue the policy or procedure. A copy of supporting statutes and regulations relied upon should also be maintained.

(b) Each Agency component's policy coordinator must have access to any electronic or paper file for policies or procedures being prepared by the component.

(c) The Associate Director is responsible for verifying that policies and procedures prepared by the component are current. Each policy or procedure should be reviewed once a year (by the anniversary date of the issuance). The component's policy coordinator must submit an annual report on the results of these reviews to the Director's Office. This report must include target dates for the revision of any policy or procedure which is not certified as current.

Court Services and Offender Supervision Agency for the District of Columbia
Policy Statement 1000
Effective date: 11/25/2003
Page 11

       (d) Any Agency policy or procedure issued before the effective date of this Policy Statement must be scheduled for reissuance in the new approved format in accordance with the clearance procedures of this Policy Statement.

    (2) Once the policy or procedure has been signed, the Agency's Records Manager is responsible for maintenance of the administrative record for the policy or procedure (including the signed original). Accordingly the issuing component shall forward the administrative record to the Records Manager.

G. Policy Waiver.

The Director may waive policy in specific instances. For example, it may be necessary to issue or update a policy or a procedure more rapidly than is possible within the formal policy management procedures presented in this Policy Statement. The Director may determine to set aside application of one or more of the procedures for good cause. Any waiver must be documented in writing.

## APPENDIX B. POLICY STATEMENT FORMAT



**Court Services and Offender Supervision Agency
for the District of Columbia**

# POLICY STATEMENT

Policy Statement xxxx
Policy Area: Component
Effective Date: mm/dd/yyyy
Approved: _____

Paul A. Quander, Jr., Director

## SUBJECT

**I. COVERAGE**

**II. BACKGROUND**

**III. POLICY**

**IV. AUTHORITIES, SUPERSEDURES, REFERENCES, AND ATTACHMENTS**

A. Authorities.

B. Policy Supersedures.

C. Procedural and Other References.

D. Attachments.

Appendix A. General Procedures

Appendix B.  ...

**APPENDIX B. POLICY STATEMENT FORMAT**

Court Services and Offender Supervision Agency for the District of Columbia
Policy Statement xxxx
Effective date: xx/xx/2003
Page 2

**APPENDIX A**
**GENERAL PROCEDURES**

A. Heading

    (1) Subordinate heading

        (a) ...

            (i) ...

B. ...



**Court Services and Offender Supervision Agency
for the District of Columbia**

# Workplace Violence Program

AFGE Local 727 has been given advance notice and the opportunity to bargain over the impact and implementation of the attached procedures.  All bargaining requirements have been concluded.

_____
Frank Jacquette
Assistant Director for
Employee & Labor Relations

_____
Date

# For the Director's Approval

**Policy Statement**

| Concurrence | Date |
|---|---|
| 1. Thomas H. Williams | |
| 2. Barbara Matthews-Beck | |
| 3. George E. Pruden, II | |
| 4. Debra Fulton | |
| 5. Adrienne Poteat | |
| 6. Beverly Hill | |
| 7. Paul A. Quander, Jr. | |

### Drug Testing Protocol

This Policy Statement was prepared by Community Supervision Services. The Policy Statement establishes procedures for using drug tests to monitor offender compliance with conditions of parole, probation, and/or community supervision.

The Policy Statement was circulated within CSOSA for review. All comments were resolved. Documentation for the review is attached. If approved by the Director, the Policy Statement will then be submitted to the union in order to give the union the opportunity to bargain over the impact and implementation of the procedures in the Policy Statement.

# For the Directors' Signature

**Policy Statement**

| Concurrence | Date |
|---|---|
| 1. Jim Williams | |
| 2. Barbara Matthews-Beck | |
| 3. George E. Pruden, II | |
| 4. Debra Fulton | |
| 5. Adrienne Poteat | |
| 6. Linda Christian | |
| 7. Peter Krauthamer | |
| 8. Susan W. Shaffer | |
| 9. Beverly Hill | |
| 10. Paul A. Quander, Jr. | |

### Federal Tort Claims Act Procedure

This Policy Statement was prepared by the Office of the General Counsel. The Policy Statement establishes tort claim procedures and advises staff on the extent to which the Agency could be held liable for employee acts or omissions.

The Policy Statement was previously issued under the signature of CSOSA's Director only. The Policy Statement has been reformatted and will now carry the signatures of the Directors for CSOSA and PSA. The Policy Statement has also been amended to reflect the role of PSA's Deputy Director in the approval process for claims filed against PSA and to use the current name for PSA's Office of Finance and Administration.

Because these changes do not have an impact on the conditions of employment, the reformatted Policy Statement does not need to be submitted to the union.

**APPENDIX F**
**POLICY/PROCEDURE CHECKLIST**

DEVELOPMENT STAGE

❑ Prepare folder for policy/procedure administrative record
❑ Document the reason for policy (law, regulation, judicial order, senior staff decision, other).
❑ Determine appropriate issuance
    ❑ Procedures suitable for inclusion with Policy Statement.
    ❑ Procedures suitable for unit or office manual or Operational Instruction.
❑ Establish deadline for completion.
❑ Obtain number for issuance.
❑ Identify other policy/procedures affected or suitable for reference.
❑ Request PSA assistance (if appropriate).
❑ Assess training needs.

REVIEW STAGE

❑ Division or office clearance.
❑ CSOSA clearance (electronic)
    ❑ PSA review (if appropriate).
    ❑ Document comments.
    ❑ Resolve comments.
    ❑ Recirculation completed (if appropriate).

UNION NOTIFICATION

❑ Route through Director to OHR (use routing slip in Appendix D or Appendix E)
❑ Be available to assist OHR with negotiations

PROMULGATION AND DISSEMINATION

❑ Route for Director's signature (through Director's Chief of Staff)
❑ Include clearance documentation
❑ Submit electronic file and paper copy of signed document (via Records Manager) to IT

MAINTENANCE AND REVIEW

❑ Paper copies of background information, drafts, comments, etc. on file.
❑ Electronic copy of final signed document and prior working drafts clearly identified and ready for transfer to IT and the Records Manager.
❑ Schedule review by Division policy coordinator before anniversary date of issuance.

PART 800--ORGANIZATION AND FUNCTIONS

Sec.
800.1   Statutory authorization.
800.2   Mission.
800.3   Functions and responsibilities.
800.4   Director.
800.5   Agency components.
Appendix A to Part 800: Agency Addresses.

   Authority: 5 U.S.C. 301; Pub. L. 105-33, 111 Stat. 251, 712
(D.C. Code 24-1232, 24-1233).


Sec. 800.1  Statutory authorization.

   The National Capital Revitalization and Self-Government Improvement
Act of 1997 (``Revitalization Act'') established the Court Services and
Offender Supervision Agency for the District of Columbia (``CSOSA'')
within the federal government as an independent executive branch agency
and placed the District of Columbia Pretrial Services Agency as an
independent entity within CSOSA. In addition, the District of Columbia
Public Defender Service, an independent District of Columbia agency,
receives its appropriated federal funds through a transfer from CSOSA.


Sec. 800.2  Mission.

   CSOSA's mission is to increase public safety, prevent crime, reduce
recidivism, and support the fair administration of justice in close
collaboration with the community.


Sec. 800.3  Functions and responsibilities.

   (a) Community Supervision Services. (1) The Revitalization Act
requires CSOSA to provide supervision, through qualified supervision
officers, to offenders on probation, parole, and supervised release for
violation of District of Columbia Code offenses. The Agency carries out
its responsibilities on behalf of the court or agency having
jurisdiction over the person being supervised. Accordingly, CSOSA
supervises all offenders placed on probation by the Superior Court of
the District of Columbia, and all individuals on parole pursuant to the
District of Columbia Code. CSOSA supervises offenders from other
jurisdictions in accordance with the provisions of the Interstate
Parole and Probation Compact.
   (2) CSOSA is also required to determine uniform supervision and
reporting practices, develop and operate intermediate sanctions
programs for sentenced offenders, and arrange for the supervision of
District of Columbia Code offenders in jurisdictions outside the
District of Columbia.
   (3) In accordance with its supervisory functions and as authorized
by the Sex Offender Registration Act of 1999 (D.C. Law 13-137, D.C.
Code 24-1101 et seq.), CSOSA operates and maintains the sex offender
registry for the District of Columbia.
   (b) Pretrial Services. (1) The District of Columbia Pretrial
Services Agency (``PSA'') assists the trial and appellate levels of
both the federal and local courts in determining eligibility for
pretrial release by providing verified background information and

criminal histories on all arrestees and recommendations about available release options.

(2) PSA is further responsible for supervising defendants released from custody during the pretrial period by monitoring compliance with conditions of release and by ensuring that they appear for scheduled court hearings.

(3) PSA also provides defendants with the opportunity to participate in a variety of social intervention programs that decrease the likelihood of future criminal behavior.

Sec. 800.4  Director.

(a) CSOSA is headed by a Director appointed by the President, by and with the advice and consent of the Senate, for a term of six years.

(b) PSA is headed by a Director appointed by the Chief Judge of the United States Court of Appeals for the District of Columbia Circuit and the Chief Judge of the United States District Court for the District of Columbia in consultation with an Executive Committee. The Executive Committee includes the four chief judges of the local and Federal trial and appellate courts, the United States Attorney for the District of Columbia, the Director of the District of Columbia Public Defender Service, and the Director of CSOSA.

Sec. 800.5  Agency components.

(a) CSOSA.
(1) Office of the Director (including the Deputy Director).
(2) Office of the General Counsel.
(3) Community Supervision Services.
(4) Office of Community Justice Programs.
(5) Special Criminal Justice Projects.
(6) Office of Planning and Evaluation.
(7) Office of Professional Responsibility.
(8) Equal Employment Opportunity, Diversity, and Special Programs.
(9) Office of Legislative, Intergovernmental, and Public Affairs.
(10) Information Technology Services.
(11) Office of Management and Administration.
(12) Office of Human Resources.
(b) PSA.
(1) Office of the Director (including the Deputy Director).
(2) Planning, Analysis and Evaluation.
(3) Community Justice Programs.
(4) Office of Operations (including Information Technology and Forensic Toxicology and Drug Testing Laboratory).
(5) Human Resources Management.
(6) Finance and Administration.

Appendix A to Part 800--Agency Addresses

I. Central Offices

Court Services and Offender Supervision Agency for the District of Columbia, 633 Indiana Avenue, NW., Washington, DC 20004
CSOSA Community Supervision Services, 300 Indiana Avenue, NW., Washington, DC 20001
District of Columbia Pretrial Services Agency, 633 Indiana Avenue, NW., Washington, DC 20004

II. Field Offices

Court Services and Offender Supervision Agency for the District of
Columbia/Community Supervision Services

CSS Field Office, 409 E. Street, NW., Washington, DC 20001
CSS Field Office, 401 New York Avenue, NE., Washington, DC 20002
CSS Field Office, 1707 Kalorama Road, NW., Washington, DC 20009
CSS Field Office, 1418 Good Hope Road, SE., Washington, DC 20020
CSS Field Office, 3850 S. Capitol Street, SE., Washington, DC 20032
CSS Field Office, 1230 Taylor Street, NW., Washington, DC 20011

District of Columbia Pretrial Services Agency

Office of Operations Branch, 300 Indiana Avenue, NW., Washington, DC
20001
Office of Operations Branch, 500 Indiana Avenue, NW., Washington, DC
20001
Office of Operations Branch, 333 Constitution Avenue, NW.,
Washington, DC 20001
Office of Operations Branch, 601 Indiana Avenue, NW., Washington, DC
20004

IV. FOIA/PA Requests (CSOSA and PSA)

Office of the General Counsel (FOIA), Court Services and Offender
Supervision Agency for the District of Columbia, 633 Indiana Avenue,
NW., Washington, DC 20004

IV. Service of Process (CSOSA and PSA, except for PSA subpoenas)

Office of the General Counsel, Court Services and Offender
Supervision Agency for the District of Columbia, 633 Indiana Avenue,
NW., Washington, DC 20004

V. Tort Claims (CSOSA and PSA)

Office of the General Counsel, Court Services and Offender
Supervision Agency for the District of Columbia, 633 Indiana Avenue,
NW., Washington, DC 20004

Number: TBD
EFFECTIVE DATE: October 10, 2000

**POLICY STATEMENT**

**Policy Area:** Supervision
**Issue:** Supervision Contact Standards
**Action/Guidance:** <u>Guidelines on Supervision Contact Standards, Collateral Contacts, and Field Contacts</u>

**Context:** CSOSA utilizes an assessment-driven case management system. Risk and needs assessments serve as the basis for case classification and case plans applied to all offenders including those in specialized programs, who may have additional case management requirements. The assessment tools define case management requirements by developing case plans and establishing contact standards.

I.   **Definitions**

   A.  **Categories of Cases**

      1.  **Community Supervised:** Offenders residing in the community within the geographic boundaries of the District of Columbia and other jurisdictions while under the authority of the Court Services and Offender Supervision Agency.

         **Examples:**
         - Probation and parole cases (general and special supervision)
         - All interstate cases (transferred out and received in)
         - Unsupervised probation cases (unsupervised YRA or 541e)
         - Civil Protection Orders
         - Deferred sentencing cases
         - Diversion matters
         - Monitored cases
         - Inactive supervision cases

      2.  **Confined:** Offenders held in custody under obligation to the Court Services and Offender Supervision Agency pending release to community supervision.

         **Examples:**
         - Split sentence cases
         - Administrative parole matters
           – Paroled to detainer
           – Paroled to consecutive sentence

      3.  **Warrants:** Offenders who are in a state of noncompliance where the sentencing/releasing authority has issued an arrest order.

         **Examples:**
         - Probation and parole arrest warrants
         - Detainer warrants
         - Executed warrants
         - Pending trial or sentenced in other jurisdictions

1

**B. Categories of Contacts**

1. **Face-to-Face Positive Contact with Offenders:** Interaction that occurs between an offender and a CSO or SCSO (on or off CSOSA premises) in which that official can document in writing the offender's progress or adjustment in relation to the offender's individual performance goals or other aspects of his or her reintegration into the community. A CSO or SCSO may count as purposeful any face-to-face contact with an offender that is consistent with the case plan. In addition, a CSO or SCSO may count as purposeful any face-to-face contact with an offender that resulted from a verified interaction between the offender and one of the Agency's staff or partners, e.g. educational specialist, employment and training specialist, in-house treatment specialists and law enforcement partners, etc.

   ▪ Types of face-to-face positive contact with offenders:

      a. residence verification;

      b. employment, training, treatment, or education verification;

      c. office contacts;

      d. accountability tours;

      e. unscheduled face-to-face contacts (office or field);

      f. other community contacts (e.g., community service verification, institutional visits, etc.)

   ▪ Rationale for face-to-face positive contact with offenders:

      a. to address allegations of parole or probation violations;

      b. to assess compliance with general or special conditions of release; or

      c. to collect and verify other information relevant for case management or other issues necessary to enable the offender to reintegrate into the community.

2. **Treatment Contacts:** Treatment contacts count as collateral contacts when the interaction involves a CSO or SCSO and treatment staff or documented in writing by the treatment program.

3. **Telephone Positive Contacts:** Telephone positive contacts do not substitute for the required minimum number of face-to-face positive contacts per supervision level. CSO's must record the time, date, and content of all telephone conversations with offenders.

4. **Collateral Contact:** Contact between a CSO or SCSO with an individual other than an offender who can provide relevant information on the offender's adjustment in the community or provide potential services or resources that will contribute to the offender's reintegration. Collateral contacts occur frequently between CSOs or SCSOs and offenders' family members, significant others, friends, police, and other community stakeholders.

5. **Telephone Collateral Contacts:** Contact between a CSO or SCSO with an individual other than an offender via the telephone.

2

**C.  Field Contact Screen Entries and Contact Codes:**

CSO/SCSO notes of contacts with the offender are to be written using the following codes and format:

1. **FFOC (Face-to-Face Office Contact):** Interaction that occurs between an offender and a CSO, SCSO, or Agency staff or partners on CSOSA premises.

2. **TC (Treatment Contact):** Interaction between a CSO or SCSO and treatment staff or documented in writing by the treatment program.

3. **TPC (Telephone Positive Contact):** Telephone contact with an offender by CSO or SCSO.

4. **CC (Community/Collateral Contact):** Face-to-face contact by the CSO or SCSO with anyone other than the offender with knowledge of the offender and his/her community adjustment.

5. **TCC (Telephone Community/Collateral Contact):** Telephone call to anyone other than offender or treatment provider to assess the offender's adjustment.

6. **TTC (Treatment Telephone Contact):** Telephone contact with a treatment provider by CSO or SCSO to address offender participation and adjustment.

7. **AT (Accountability Tour):** Face-to-face field contacts with offenders conducted jointly by a CSO and an MPD officer.

8. **PEC (Personal Employment Contact):** Personal on the job contact with the offender by a CSO or SCSO.

9. **PHV (Personal Home Visit):** Personal home visit with the offender by CSO or SCSO.

10. **PHEV (Personal Home Employment Visit):** Personal home employment visit with the offender by CSO or SCSO when the offender works out of their home (additional verification would be required in this case, such as a review of the offender's quarterly tax statements).

11. **EV (Employment Verification):** Verification of employment by any means other than directly from the employer (e.g., pay stub, tax statement).

12. **HV (Home Visit):** Contact with someone at the home or immediate residence vicinity other than the offender that can verify residence.

13. **ME (Misplaced Entry):** In those instances when an entry is mistakenly made in the log notes.

14. **CA (Court /Commission Action):** Action taken by the court or United States Parole Commission (revocation, show cause, early termination, time extension, etc.).

15. **MISC (Miscellaneous):** Case activity requiring log entries not reflected above.

16. **CR (Case Review):** Supervisory entry whenever a case is reviewed.

17. **SE (Special Entry):** Supervisory entry that indicates specific activity not previously addressed, i.e., case assignment, case closing, case transfer, etc.

18. **CONF (Case Conference):** Denotes case conference conducted by SCSO.

19. **US (Urine Screen):** Entries of urine test(s) compliance and result(s).

20. **DI (Disseminated Information):** Entry made whenever confidential information is provided to someone outside of the Agency.

21. **FTR (Failure to Report):** An instance where an offender does not report for a scheduled supervision contact.

22. **APHV (Attempted Personal Home Visit):** Attempted (unsuccessful) contact entries would be noted with an "A" in front of the abbreviation.

   **FIELD CONTACT SCREEN ENTRY EXAMPLES: (utilize the appropriate code above in the "comments" box on the Field Contact Screen.). Sample entries are below:**

   - 9/5/00 FFOC met with offender this date in office. Discussed compliance with treatment attendance and his need to obtain employment. Offender understands urgency for employment and will provide CSO with job inquiries. Next appt scheduled on 10/9/00.

   - 9/6/00 TPC from offender who states that he has obtained employment. Works 7am to 4pm. Address 14 Van Ness Street, NW. CSO will visit on 9/8/00.

   - 9/8/00 PEC/CC visited offender on his job. Met with his supervisor (Mr. Holmes) who reports that the offender is at work on time and performance is satisfactory. Offender was reminded about 9/11/00 PHV.

   - 9/11/00 PHV went to offender's home. Door not answered. Offender left note in door indicating change in work hours this date. CSO to contact offender to reschedule appointment.

## II. Policy:

### A. Supervision Levels: Community Supervision Officer-Offender Contact Standards

1. The CSO is responsible for meeting with offenders in accordance with the offender's individualized case plan. Guidance as to the **minimum number** of face-to-face contacts required by the offender's supervision level is provided in the matrix below. An offender's supervision level is established in accordance with his/her CSOSA Screener score except in the instance of an administrative adjustment where the CSO in consultation with his/her supervisor, departs from the Screener score due to factors or information available to the CSO at the time of the administration of the Screener instrument.

| Supervision Level | Minimum Number of Face-to-Face Contacts | Frequency of Field Contacts* |
|---|---|---|
| Intensive | 8 times per month | 4 per month |
| Maximum | 4 times per month | 2 per month |
| Medium | 2 times per month | 1 per month |
| Minimum | 1 time per month | 1 per every 2 months |

**\*Frequency of Field Contacts**

<u>**Important Note**</u>: at least 50% of the minimum number of face-to-face contacts for each classification level must take place in the field (i.e., outside of the office setting). In this context, face-to-face contacts are broadly construed to include purposeful contact between the offender and CSO/SCSO that is scheduled or unscheduled or between the offender and a CSO and other Agency staff and law enforcement partners not directly charged with the offender's supervision.

**Examples:**

1. A positive face-to-face contact will be recorded for an offender who attends a sanctions group, educational or other Agency sponsored program so long as the supervising CSO receives confirmation from the Agency staff that the offender attended the meeting in accordance with the case plan requirements.

2. A positive face-to-face contact will be recorded if the law enforcement partner for the supervising CSO's team in making his/her community policing rounds meets with the offender to address compliance issues with the conditions of supervision.

2. **Intensive Supervision**

Intensive supervision is the most restrictive level of supervision. The appropriate number of face-to-face contacts will be driven by the offender's individualized case plan. Nevertheless, intensive supervision requires a minimum of eight (8) face-to-face contacts with the offender per month. **Four (4) of the eight (8) contacts must be conducted in the field.** Intensive supervision is reserved for those offenders who score *intensive* on the Screener instrument and those offenders whose supervision levels have been increased from maximum. In addition, intensive supervision requires a high degree of collateral contacts as outlined in the case plan.

3. **Maximum Supervision**

The appropriate number of face-to-face contacts will be driven by the offender's individualized case plan. Nevertheless, maximum supervision requires a minimum of four (4) face-to-face contacts with the offender per month. **Two (2) of the four (4) contacts must be conducted in the field.** Maximum supervision is reserved for those offenders who score *maximum* on the Screener instrument and those offenders whose supervision levels have been increased from medium or decreased from intensive. Maximum supervision also requires a high degree of collateral contacts as outlined in the case plan.

5

4.   **Medium Supervision**

The appropriate number of face-to-face contacts will be driven by the offender's individualized case plan. Nevertheless, medium supervision requires a minimum of two (2) face-to-face contacts with the offender per month and periodic collateral contacts. **One (1) contact per month must be conducted in the field.** Medium supervision is reserved for those offenders scoring *medium* on the Screener instrument and those offenders whose supervision levels have been increased from minimum or decreased from maximum.

5.   **Minimum Supervision**

The appropriate number of face-to-face contacts will be driven by the offender's individualized case plan. Nevertheless, minimum supervision requires a minimum of one (1) face-to-face contact with the offender per month and periodic collateral contacts. **One contact every two (2) months must be conducted in the field.** Minimum supervision is reserved for those offenders scoring *minimum* on the Screener instrument and those offenders whose supervision levels have been reduced from medium supervision.

B.   **Modification of Supervision Levels**

CSOs, in conjunction with their SCSO, shall reduce or increase supervision levels in accordance with the administrative sanctions matrix outlined in "Drug Testing Protocol and Administrative Sanctions" and the guidelines contained in the "Screener Instrument" and "CSOSA Screener: Administrative Supervision Level Adjustment" procedures. However, prior to reducing an offender's supervision level, a CSO must perform a field visit for the purposes of verifying an offender's address and employment as well as assessing the offender's overall compliance with his/her individualized case plan. In addition, the CSO must perform a criminal record check on the offender prior to reducing his/her supervision level.

C.   **Contact Standard Exemptions: Unsupervised Cases, Monitored Cases, Inactive Cases, Diversion Matters, Civil Protection Orders, and Confined Cases**

Unsupervised probation cases, monitored cases, inactive cases, diversion matters, civil protection orders, and cases where the offender is held in confinement are exempt from the minimum contact standards delineated in this policy.

**Definitions:**

1.   **Unsupervised Cases (Probation Only):** These cases include offenders who have been placed on unsupervised probation by the court under D.C. Code §§ 33-54(e) and 24-803, and 18 U.S.C. § 5010 (i.e., 541(e), YRA, and FYCA cases) as well as those under regular supervision in which the probation term has been divided into a supervised period to be followed by an unsupervised period.

**CSO Duties for Unsupervised Cases:**

▪   Monitor cases for new arrests on a monthly basis and report any new arrest to the court within 24 hours of receipt of notice.

▪   YRA/FYCA and 541(e) files are maintained by the CSO until the probation term has been completed. The CSO must submit the appropriate paperwork to the court to ensure that expungement of the criminal record or set-aside of the conviction is granted as long

6

as the offender has not been convicted of a new offender(s).

- In cases where the court has divided the probation term into a supervised period and an unsupervised period, the CSO closes the case once the supervised term is satisfied. The CSO forwards the case file to the Control Center after he/she has made the appropriate update in OASIS.

2. **Monitored Cases (Probation Only):** This supervision level consists of offenders who have met all conditions of probation and have made an exemplary adjustment to active supervision, such that the court has determined that face-to-face and collateral contacts are no longer necessary.

**CSO Duties for Monitored Cases:**

- Monitor cases for new arrests on a monthly basis and report any new arrest to the court within 24 hours of receipt of notice.

3. **Inactive Supervision Cases (Parole Only):** Inactive supervision refers to those parolees who have been relieved by the United States Parole Commission of the previously-imposed conditions of parole, except the requirement that they obey all laws and refrain from behavior that would bring discredit to the parole system.

**CSO Duties for Inactive Supervision Cases:**

- Monitor cases for new arrests on a monthly basis and report any new arrest to the USPC within 24 hours of receipt of notice.

4. **Diversion Matters (Probation Only):** A disposition of a criminal defendant either before or after adjudication of guilt in which the court directs the defendant to participate in a community service, educational, or rehabilitative program as part of the disposition.

**CSO Duties for Diversion Matters:**

- Monitor offender's compliance with community service, educational, or rehabilitative program.

5. **Civil Protection Orders:** A civil order from the court whose purpose is to protect an individual from further harassment or abuse from another individual.

**CSO Duties for Civil Protection Orders:**

- Monitor offender's compliance with court-ordered rehabilitative program.

6. **Confined Cases:** Offenders held in custody under obligation to CSOSA pending release to community supervision.

**CSO Duties for Confined Cases:**

- Monitor the institution for the offender's actual date of release.

### D. Rationale for Fieldwork

Fieldwork is work-related travel outside CSOSA offices (but within the Metropolitan Washington, D.C. area) to make contact with an offender, the offender's family, the employer, a treatment facility, a correctional facility, a potential community resource, or a law enforcement or social services agency. (See Field Safety Policy). An important tool of the CSO is his/her planned use of community resources in all phases of his/her case management practices. Under CSOSA's Patrol Service Area ("PSA") approach to community supervision, it is the responsibility of each CSO to know the resources in the community and to maximize their use (See CSOSA Resource Directory).

Fieldwork is an integral part of the CSO's responsibilities. All CSOs are expected to regularly perform fieldwork (in accordance with the supervision levels of the CSOs caseload), to follow agency procedures with respect to safety and security, and to properly document fieldwork according to agency procedures, as outlined below.

Fieldwork is conducted for the following reasons:

1. To make face-to-face contacts with an offender, as prescribed above.

2. To conduct/participate in accountability tours according to protocol

3. To locate a person whose whereabouts are unknown when efforts to do so by phone and mail have failed ("Loss of Contact" procedure).

4. To investigate complaints or allegations regarding an offender's behavior, or to verify suspicious situations or reports related to the offender's home, employment, or program adjustment;

5. To verify an offender's address, employment, and/or participation in treatment or support groups;

6. To verify an offender's change of address or employment. In the case of a change of address or employment, the CSO must perform the verification fieldwork within ten (10) working days and document both the offender's rationale and collateral party's (e.g. primary homeowner, employer, etc.) rationale for the change in status in the "comments" box on the Field Contact Screen (See Employer Notification Policy);

7. To approach an offender's family in an attempt to gain cooperation and understanding;

8. To gather information available only in the field;

9. To initiate contact in split sentence cases when, in the CSO's judgement, a letter or telecommunications interview is considered less desirable or effective;

10. To support, enhance, or promote compliance with probation/parole conditions, and to enhance communication with teachers, counselors, employers, etc., who are involved with the offender;

11. To ensure compliance with the court order in domestic violence cases in which the victim and the offender reside together (victims may withhold information about continued domestic violence) and;

12. To ensure compliance with supervision conditions in sex offender cases.

**E. Required Activities When Performing Field Visits:**

1. Properly document the travel in the "comments" box on the Field Contact Screen;

2. Sign SCSO's fieldwork logbook prior to embarking on fieldwork which includes the CSO's itinerary with specific reference to the name of offenders to be visited and location and estimated times of home/community contacts;

3. Give advanced notice to those to be visited whenever possible of the time and date of the visit unless there are case management reasons for making an unannounced visit;

4. Follow standard field safety protocols at all times while in the field, as prescribed in the "Field Safety" procedure; and

5. Conduct oneself in a professional manner at all times.

**III.    Statutory Authority:** Section 11232 (b)(1), § 11232(b)(2), § 11233(b)(2)(B) of the National Capital Revitalization and Self-Government Improvement Act of 1997 ("Revitalization Act"), Pub. Law 105-33, 111 Stat. 712, D.C. Code § 24-1232(b)(1), § 24-1232(b)(2), § 24-1233(b)(2)(B) (1996 Repl., 1999 Supp.) (Director's authority); D.C. Code § 24-103 (1996 Repl.) (Probation's authority); D.C. Code § 24-201.2(a)(3) and D.C.M.R. §§ 213.4-2.13.6 (1987) (Parole's Authority).

**IV.    Procedural References/Supercedures:**

- References: Sex Offender Registration Emergency Act of 1999; D.C. Code §§ 33-54(e) and 24-803; and U.S. Code §§ 18-5010 (a); Drug Testing Protocol and Administrative Sanctions; Loss of Contact; Field Safety; Accountability Tours; Screener Instrument; CSOSA Screener: Administrative Supervision Level Adjustment Policy; Employer Notification; and CSOSA Resource Directory.

- Supercedes: Implementing Procedure # SD-93-301, effective date June 30, 1993; Probation Standard Practices Sections 35.6 and 72).

Number: TBD
EFFECTIVE DATE: October 10, 2000

## POLICY STATEMENT

**Policy Area:** Supervision
**Issue:** Classification of Supervised Offenders
**Action/Guidance: <u>CSOSA Screener: Administrative Supervision Level Adjustment</u>**

**Context:**  The CSOSA Screener is designed to assign supervision levels to offenders.  Administrative adjustments may become necessary due to factors or information available to the officer at the time of the administration of the Screener instrument.  CSOSA must cooperate with and accommodate judicial and other systems in order to provide offenders with appropriate supervision and treatment upon release.  It is the aim of the CSOSA to ensure the accurate administration of the Screener to determine the appropriate level for supervision for the offender.

I.    **Policy:**

At the initial classification, administrative supervision level adjustments may be required to increase or decrease supervision levels.  However, if an offender's Screener score places the offender in a higher supervision level than is required by the following administrative guidelines, the supervision level dictated by the Screener will prevail.

**Note: Prior to <u>reducing</u> an offender's supervision level, a CSO must perform a field visit for the purposes of verifying an offender's address and employment as well as assessing the offender's overall compliance with his/her individualized case plan.  In addition, the CSO must perform a criminal record check on the offender prior to reducing his/her supervision level.**

Administrative adjustments shall be used in the following instances.

   A.  Mandatory releasees or parolees released into the community directly from an institution (who have not benefited from a structured, transitional, residential assistance) will begin supervision at a Maximum level.

   B.  Intensive supervision levels will be assigned to probation and parole offenders who are:
      1.  diagnosed with a mental health disorder;
      2.  under HIDTA supervision; or
      3.  sex offenders (as defined in the "Sex Offender Supervision Team" procedures).

   C.  A specific supervision level required by the releasing authority as a specific condition of release.

   D.  Administrative adjustments may only be implemented after an accompanying written justification has been signed by the CSO and approved by the SCSO.  The CSO shall inform the offender of the adjustment and the justification for the adjustment.  The SCSO shall record all adjustments on the case audit form.

II.    **Statutory Authority:** N/A

III.    **Procedural References/Supercedes:**
   • References: Screener Instrument; Guidelines on Supervision Contact Standards, Collateral Contacts, and Field Contacts; Drug Testing and Administrative Sanctions.
   • Supercedes:  None

Number: TBD
EFFECTIVE DATE: November 13, 2000

**PROCEDURE STATEMENT**

**Policy Area:** Safety
**Issue:** Safety Procedures for Conducting Work with Offenders off CSOSA Premises
**Action/Guidance:** <u>Staff Safety – Fieldwork</u>

**Context:** Community Supervision Officer (CSO) safety centers around minimization of risk, by controlling the physical setting of the office, by the establishment of procedures for dealing with emergencies or disruptions, and by staff training in dealing with offenders and the public. Community Supervision Officer field safety is less manageable than office safety, because the field environment cannot be controlled. Nevertheless, CSO training and the establishment of general guidelines can minimize the risk to the CSO in the field.

Risk cannot be eliminated but it can be minimized. Minimization of risk to all CSO's and CSOSA employees is the goal of the agency's safety policies.

I.    **Procedures**

    A.  **Preparation**

        1.  Discuss home visits and other field contacts with offenders during initial office contacts while reviewing the orientation checklist, initial visits upon receiving a transfer case, and subsequent office visits with the offender. During a general discussion of the purpose and procedures for field contacts with offenders, emphasize the following:

            a)  **Rationale for Fieldwork:** Fieldwork is work-related travel outside CSOSA offices to make contact with an offender, the offender's family, the employer, a treatment facility, a correctional facility, a potential community resource, or a law enforcement, social services agency, community member, or organization.

               An important tool of the CSO is his/her planned use of community resources in all phases of his/her work. It is the responsibility of each CSO to know the resources in the community and to maximize their use.

               Fieldwork is an integral part of the CSO's responsibilities. All CSO's are expected to regularly perform fieldwork (in accordance with the supervision levels of the CSOs caseload), to follow agency procedures with respect to safety and security, and to properly document fieldwork according to agency procedures, as outlined below.

               Fieldwork is conducted for the following reasons:

                  (1)  To make face-to-face contacts with an offender, as prescribed above.

                  (2)  To locate a person whose whereabouts are unknown when efforts to do so by phone and mail have failed (see procedure on "Loss of Contact").

1

      (3) To investigate complaints or allegations regarding an offender's behavior, or to verify suspicious situations or reports related to the offender's home, employment, or program adjustment;

      (4) To verify an offender's address, employment, and/or participation in treatment or support groups;

      (5) To meet with an offender's family members or significant others in an attempt to gain their cooperation and understanding;

      (6) To gather information available only in the field;

      (7) To initiate contact in split sentence cases when, in the CSO's judgement, a letter or telecommunications interview is considered less desirable or effective;

      (8) To support, enhance, or promote compliance with probation/parole conditions, and to enhance communication with teachers, counselors, employers, etc., who are involved with the offender; and

      (9) To ensure that in domestic violence cases in which the couple resides together, the victim and any children residing in the home are safe (victims may withhold information about continued domestic violence).

      (10) To provide surveillance of high risk offenders (e.g. – sex offenders).

  b) CSO's may conduct field visits alone, with another CSO, or with a law enforcement officer.

  c) Home visits and field contacts may be scheduled or unannounced.

2. Do some intelligence gathering.

  a) Know the case history of the offender you intend to visit – consult the case file, criminal record, past investigations, and/or speak to other Community Supervision Officers familiar with the case.

      (1) Watch for long histories of mental disorders and evidence of assaultive or abusive behavior, particularly against "authority."

      (2) Be aware of signs of deteriorating behavior or mounting pressure on the offender that could cause a "blow-up."

      (3) If danger signals are present, consult with your supervisor, and consider taking another officer on the home visit or schedule an accountability tour with a law enforcement officer.

  b) Maintain close contact with law enforcement, mental health, and other treatment agencies; they can advise you as to recent activities and possible problem areas.

3.   All staff must complete a travel itinerary and, if appropriate, leave your mobile phone number (names, addresses, and phone numbers of offenders or any other individuals you intend to visit) with your supervisor or supervisor's designee by filling out a field contact sheet before the visits and signing out of the office on the field sheet.

## B. Parking

1.   Selecting your parking spot

    a)   Keep the car moving until you have selected a spot.

    b)   Survey the entire area if you are unfamiliar, even if you have to go around the block.

    c)   If still in doubt about a particular area, consult with police about the area.

    d)   Get as close to your destination as possible.

    e)   If dark or near dark, try to park under a light if possible.

    f)   Leave enough room to easily pull out of the parking spot and to avoid getting blocked in.

    g)   Do not park illegally.  Do not linger in the car after parking.

    h)   Lock your car.  Be sure to hide or remove any loose items, valuable or invaluable, from plain view.

## C. Approaching the Residence

1.   Familiarize yourself with the neighborhood.  If you are unfamiliar with the neighborhood, pass through the neighborhood once before parking to survey the situation.

2.   Get the "big picture" of the area.  If you see danger, make arrangements to return for a home visit at a later time with another officer or schedule an accountability tour with a law enforcement officer.

3.   If your knock is not answered use your mobile phone to call the offender inside the residence, identify yourself, and indicate that you will be knocking on the door in a matter of minutes.

## D. At the Doorway

1.   Use the "off-the-side" approach (do not stand directly in front of the door as you knock/ring the bell).

2.   Allow about 20 seconds for your eyes to adjust to possible changes in light; extreme changes can be blinding.

3.   Stop, look, and listen.

3

a) Stop outside.

b) Look inside. (Are lights on? Can you see anyone? How many people? Can you see their locations? Do you recall the general layout of the dwelling from your past visits? Do you spot any unusual activities?)

c) Listen. (Any conversations? What tone? Any factors such as dogs, music, etc.?)

d) Be wary of any indications of alcohol or drug abuse – these can lead to problems.

e) Develop a mental picture of what's going on inside.

4. Knock in a normal fashion. Remember the "off-the-side" approach.

5. When your knock is answered:

a) Identify yourself by name, title, and organization.

b) Do not enter if any invitation is called out. Wait for the door to be opened to you.

6. As the door is opened, look through the opening for the number of occupants, their location, and any signs of danger.

7. Be courteous and thank the person for letting you into their home.

**E. Once You Have Made Entry**

1. Continue to stay off to the side of the door.

2. Quickly survey the entire area for other residents, any signs of trouble, dogs (or other loose pets), and potential weapons.

3. Be aware of alternate escape routes.

4. Be wary of hidden weapons (e.g., in sofa or bed), particularly if a crisis is developing.

5. Position yourself so that exits are readily accessible. Do not stand in open doorways.

6. If there are any animals loose in the home, ask the resident to have them restrained.

7. If a physical confrontation between residents is in progress, leave the residence and use your mobile phone immediately to contact police.

**F. General Safety Tips for Fieldwork**

1. Walk briskly, with an air of self-confidence and purpose. Stand up to your full measure, keeping your center of gravity low and your head level.

2. Look as if you know where you are heading even if you are a bit lost. If you must venture into an unfamiliar neighborhood, get detailed directions beforehand. If you

4

are lost and need directions, seek help from a police officer or someone familiar with the area.

3.   When necessary, travel with another officer(s) or law enforcement officer(s). Surveys indicate that you can reduce your chances of being attacked by nearly 70 percent if you are with another person and by 90 percent if you are with two others.

4.   Walk purposefully. Look as if you have somewhere to go and are determined to get there soon. This is particularly important in a neighborhood with numbers of people loitering on the street. You may not escape notice, but you should look like you mean business.

5.   At night, walk in open places that are well lighted. If you are making field visits at night, do so with another CSO and/or a law enforcement officer.

6.   Carry a good flashlight in your car. This will be helpful if you are ever stranded on a darkened street at night.

7.   Avoid shortcuts through parks, tunnels, parking lots, and alleys. In fact, it's best to stick to main thoroughfares whenever possible. It might take you a bit longer to get to your destination, but it is worth the effort.

8.   Always carry your mobile phone with you and be sure the batteries are charged.

9.   Avoid carrying a purse, shoulder bag, or briefcase. If you must carry a bag or package, hold the object closely to your body.

10.  Be extra alert in boundary zones. For our purposes, a boundary zone is the area you must traverse between any two places – between, say, your house and your car, the elevator of your office building and the street, or your neighborhood and the one next to it. Many crimes occur in these zones, so be especially alert when you are in them. Always have your keys in your hand when you approach your house or car and be alert for strangers. At the same time, don't be in such a hurry that you fail to check whether it is safe to enter. Make sure that the door has not already been forced and that no one is hiding under or in your car.

11.  Consider carrying a shriek alarm or a police whistle. If somebody bothers you on the street, the noise you make will attract attention and frighten your attacker. A shriek alarm is preferable to a whistle, because it creates a piercing sound and does not require you to take deep breaths. Attach either of these objects to your key ring and have it at hand when needed. It is important to understand the shock value of a loud sound at close range. A sudden burst of official-sounding shrieks will turn just about anybody around in their tracks.

12.  Keep in mind that your voice is a tool of self-protection. If attacked, let out the most piercing, glass shattering scream you can muster, aiming it right between your attacker's eyes. Don't stop until he has fled or help has arrived. If your assailant flees, change your scream from sheer sound to specific words: "Help! Police! Murder!" or "Stop, thief!" This alerts people to the specific nature of the crime and may prompt reports to the police. Even if you think your cries may not be heard, scream anyway – and speak loudly to your assailant. The volume communicates personal strength and the seriousness of your intention. Avoid questions such as

5

"What do you think you're doing?" or "Who do you think you are?"  They are weaker than direct orders:  "Stop!" "Get out of here!" or "Leave me alone!"  In this way you reinforce your authority.

II.    **Statutory Authority:** Section 11233(b)(2)(B) of the National Capital Revitalization and Self-Government Improvement Act of 1997 ("Revitalization Act"), Pub. Law 105-33, 111 Stat. 712, D.C. Code § 24-1233(b)(2)(B) (1996 Repl., 1999 Supp.) (Director's authority); D.C. Code § 24-103 (1996 Repl.) (Probation's authority).

III.    **Procedural References/Supercedures:**

- **References:**

Federal Judicial Center. (unknown).  *Staff Safety:  Workbook for Participants.*  Washington, DC:  Federal Judicial Center.

Maggio, Mark J.  (1997).  *Applied Officer Safety:  In-District Facilitator's Guide for Probation and Pretrial Services.*  Washington, DC:  Federal Judicial Center.

Kipp, Richard A.  (1995).  *Safety Awareness Workbook: Anticipating, Identifying, and Resolving the Potential Victimization of Probation and Parole Officers.*  Washington, DC:  United States Department of Justice, National Institute of Corrections.

Thorton, Robert L. and Shireman, John H.  (1993).  *New Approaches to Staff Safety.*  Washington, DC: United States Department of Justice, National Institute of Corrections.

Virginia Department of Corrections.  Division of Operations.  Community Corrections.  (1999).  *Strategies, Training, Equipment, & Policy for Staff Safety.*  Richmond, VA:  Virginia Department of Corrections.

United States District Court.  Northern District of Ohio.  (unknown).  *Safety Policy.*

- **Supercedes:** N/A

6