Exhibit 5

Appendix of Unreported Cases

| No. | Case Information |
|-----|------------------|
| 1 | *Johnson v. District of Columbia*, No. 03-2548, 2006 WL 2521241 (D.D.C. Aug. 30, 2006) |
| 2 | *Meeks v. Broschinski,* 2003 WL 22415285 (Va. Cir. Ct. Sep. 25, 2003) |
| 3 | *Shively v. Ken Crest Centers for Exceptional Persons*, No. Civ.A. 96C-05-316, 2001 WL 209910 (Del. Super. Jan. 26, 2001) |

1



Slip Copy
Slip Copy, 2006 WL 2521241 (D.D.C.)
**(Cite as: Slip Copy)**

Page 1

Briefs and Other Related Documents
Johnson v. District of ColumbiaD.D.C.,2006.Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
Christi JOHNSON, et al., Plaintiffs,
v.
DISTRICT OF COLUMBIA, et al., Defendants.
**Civil Action No. 03-2548 (GK).**

Aug. 30, 2006.

Wayne R. Cohen, Adam R. Leighton, Kim D. Brooks-Rodney, Cohen & Cohen, PC, Washington, DC, for Plaintiffs.
Monique Daniel Pressley, D.C. Officeof Corporation Counsel, Nicola N. Grey, DC Attorney General's Office, Holly Michelle Johnson, District of Columbia Attorney General, Shana Lyn Frost, Office of the Attorney General for the District of Columbia, Washington, DC, Edward J. Lopata, Tydings & Rosenberg LLP, Baltimore, MD, for Defendants.

***MEMORANDUM OPINION***
GLADYS KESSLER, District Judge.
**\*1** Plaintiff, Christi Johnson, brings this action in her individual capacity and on behalf of the estate of her son, Tyrone David Christian. Defendants are the District of Columbia ("the District" or "D.C."), Gayle Turner, the Administrator of the D.C. Youth Services Administration ("YSA"), [FN1] and Dytrad Management Services, Incorporated ("Dytrad"). Pursuant to 42 U.S.C. § 1983, Plaintiff seeks damages for violations of her late son's constitutional rights. Plaintiff also seeks damages under the common law of the District of Columbia for Defendants' alleged negligence.

> FN1. Hereinafter, the Court will refer to the District of Columbia and Turner collectively as the "District Defendants."

**\*1** This matter is currently before the Court on the District Defendants' Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment [Dkt. No. 73] and Dytrad' s Motion for Judgment on the Pleadings [Dkt. No. 81]. Upon consideration of the Motions, Oppositions, and Replies, and the entire record herein, and for the

reasons set forth below, the District Defendants' Motion is hereby **granted** and Dytrad's Motion is hereby **granted**.

### I. BACKGROUND

#### A. Facts

**\*1** The tragic facts of this case are for the most part undisputed.[FN2] On October 18, 2001, Tyrone David Christian, sixteen years old, was shot outside his home on Martin Luther King Avenue in the District of Columbia by Paul Andre Coleman, a juvenile whose precise age is not given.[FN3] Am. Compl. ¶ 9. Within minutes of the shooting, he died in the arms of his mother, the Plaintiff. Id. ¶ 11.

> FN2. In the current procedural posture, the Court must accept Plaintiff's factual allegations as true and construe any inferences that may be drawn therefrom in the light most favorable to her. *See Peters v. Nat'l R.R. Passenger Corp., 966 F.2d 1483, 1485 (D.C.Cir.1992).*

> FN3. Since both Tyrone and Paul are juveniles, they will be referred to by their first names.

**\*1** Approximately sixty days before the shooting, Paul had escaped from the Gateway IV Group Home, a residential facility for troubled youth in the District of Columbia. Id. ¶ 12. The Gateway IV Group Home is controlled by the YSA, an agency of the District of Columbia, and operated by Dytrad, with which YSA contracted for that purpose. Id. ¶¶ 12-13. Plaintiff claims that Defendants knew that Paul had absconded on two prior occasions and negligently failed to supervise him accordingly, a failure that she argues caused her young son's untimely death. Id. ¶ 12.

**\*1** At the time of Tyrone's death, Plaintiff was unaware that Paul was a ward of the District and had escaped from its custody. Id. ¶ 15. She learned that fact from a *Washington Post* reporter who contacted her in January 2003. Id. According to Plaintiff, she also learned that juveniles within the District's custody escaped 782 times during the ten-month

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 2
Slip Copy, 2006 WL 2521241 (D.D.C.)
(Cite as: Slip Copy)

period in which her son was killed, *id.* ¶ 16, and that twenty teenagers committed serious crimes in the District after absconding from group homes or jails between 1998 and 2002. *Id.* ¶ 17. Furthermore, she alleges, "only two police officers [are] assigned to locate approximately 600 runaways a year." *Id.* ¶ 19.

**B. Procedural History**

**\*1** Plaintiff filed her Complaint in the District of Columbia Superior Court on July 16, 2003. Invoking this Court's jurisdiction pursuant to 28 U.S.C. § 1331, Defendants filed a Notice of Removal on December 16, 2003. With leave of the Court, Plaintiff amended her Complaint on May 27, 2004, adding Dytrad as a Defendant. *See* Dkt. No. 9. On June 21, 2005, the District filed a counterclaim against Dytrad seeking, *inter alia,* indemnification or contribution for any liability it might incur in this litigation. *See* Dkt. No. 67.

**\*2** On July 7, 2005, the District Defendants filed the instant Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment [Dkt. No. 73]. Plaintiff opposed that Motion on July 29, 2005 [Dkt. No. 79] and the District Defendants filed their Reply on August 12, 2005 [Dkt. No. 84].

**\*2** Dytrad filed its Motion for Judgment on the Pleadings [Dkt. No. 81] on August 4, 2005. Plaintiff's Opposition [Dkt. No. 85] and Dytrad's Reply [Dkt. No. 86] were filed August 15, 2005 and August 22, 2005, respectively.

**II. STANDARD OF REVIEW**

**\*2** Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed but within such time frame as not to delay the trial, any party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). A motion for judgment on the pleadings will be granted if the movant shows, at the close of the pleadings, that no issue of material fact remains to be resolved, and that he or she is entitled to judgment as a matter of law. See *Terry v. Reno,* 101 F.3d 1412, 1423 (D.C.Cir.1996); *Haynesworth v. Miller,* 820 F.2d 1245, 1249 n. 11 (D.C.Cir.1987); *Summers v. Howard University,* 127 F.Supp.2d 27, 29 (D.D.C.2000).

**\*2** The standard of review for a Rule 12(c) motion is "virtually identical" to that which governs motions to dismiss pursuant to Rule 12(b)(6). *Haynesworth,* 820

F.2d at 1254; *Robinson v. District of Columbia,* 403 F.Supp.2d 39, 47 (D.D.C.2005). Accordingly, a motion for judgment on the pleadings may be granted only if it appears, based on the allegations set forth in the complaint, that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Hishon v. King & Spaulding,* 467 U.S. 69, 73 (1984). Because such motions "summarily extinguish litigation at the threshold and foreclose the opportunity for discovery and factual presentation, [they] should be treated with the greatest of care." *Haynesworth,* 820 F.2d at 1254. The factual allegations of the complaint must be presumed true and liberally construed in favor of the plaintiff. *Shear v. Nat'l Rifle Ass'n of Am.,* 606 F.2d 1251, 1253 (D.C.Cir.1979).

**\*2** A court may not consider matters outside the pleadings and is "limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record." *Robinson,* 403 F.Supp.2d at 47 (citing *EEOC v. St. Francis Xavier Parochial School,* 117 F.3d 621, 624 (D.C.Cir.1997)). Although the court must construe the complaint in the light most favorable to the non-moving party, it "need not accept inferences drawn by the plaintiff if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994).

**III. ANALYSIS**

**A. The District Defendants Are Entitled to Judgment on the Pleadings Because Plaintiff Has Failed to State a Valid Substantive Due Process Claim and Her Negligence Claims Are Barred by the Public Duty Doctrine**

**1. Plaintiff's constitutional claim fails as a matter of law**

**\*3** In Count I of her Complaint, Plaintiff contends that by acting "with deliberate indifference" to his safety, the District Defendants "deprived Tyrone David Christian of his interests in life and property under the Fourteenth Amendment of the United States Constitution in violation of 42 U.S.C. § 1983." [FN4] Am. Compl. ¶ 21. Defendants' actions, she argues, not only resulted in her son's death, but

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 3
Slip Copy, 2006 WL 2521241 (D.D.C.)
**(Cite as: Slip Copy)**

also caused her to suffer, *inter alia*, "mental anguish, emotional pain and suffering, [and] loss of society." *Id.* ¶ 24.

> FN4. As the District Defendants point out, Plaintiff's due process claims actually arise under the Fifth Amendment. See District Defs.' Mot. at 5 n. 2. The Fourteenth Amendment applies to states only, and thus not to the District of Columbia. Nevertheless, the full protection of the Fourteenth Amendment has been extended to residents of the District of Columbia through the Fifth Amendment's Due Process Clause. See <u>Bolling v. Sharpe, 347 U.S. 497, 499 (1954)</u>.

**\*3** According to the District Defendants, however, Plaintiff's constitutional claims fail as a matter of law. To establish a substantive violation of the Fifth Amendment's Due Process Clause, they argue, Plaintiff must demonstrate that Tyrone suffered an unlawful deprivation of either a protected property or liberty interest. *See* District Defs.' Mot. for Judgment on the Pleadings at 5 (hereinafter "District Defs.' Mot."). The District Defendants contend that she cannot do so on the facts of this case.

#### a. Tyrone Christian did not have a protectible property interest in the supervision of Paul Coleman

**\*3** Plaintiff argues that by failing to restrain Paul while he was in their custody, and to retrieve him after he escaped, Defendants violated Tyrone's "constitutionally-protected property interest in the supervision of group home residents within the juvenile justice system and the retrieval of absconders from group homes." Opp'n at 5. According to the District Defendants, however, neither Tyrone, nor any member of the public, can claim a cognizable property interest in "state prevention of criminal acts by a third party." District Defs.' Mot. at 5.

**\*3** The Fifth Amendment protects citizens against deprivation of "life, liberty, or property without due process of law." <u>U.S. CONST. amend V</u>. The Supreme Court has explained that "property" in this context encompasses more than real estate or personal chattel and can include certain government benefits, including, *inter alia,* welfare payments, public education, and, in limited cases, employment.

*See <u>Goldberg v. Kelly,</u> 397 U.S. 254 (1970)* (welfare benefits); <u>Goss v. Lopez,</u> 419 U.S. 565 (1975) (public education); <u>Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)</u> (government employment).

**\*3** To have a protectible property interest in a benefit, an individual must "have more than an abstract need or desire ... and more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." <u>Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972)</u>. Such entitlements derive not from the Constitution, but "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." <u>Paul v. Davis, 424 U.S. 693, 711 (1976)</u>. "A benefit is not protected if government officials may grant it or deny it at their discretion." *Town of Castle Rock v. Gonzales,* 124 S.Ct. 2796, 2803 (2005).

**\*4** To succeed on her claim that Tyrone had a constitutionally-protected property interest in Paul's supervision or restraint, Plaintiff must establish that he had a "legitimate claim of entitlement" to such protection, which derives from an "independent source such as state law." *Paul,* 424 U.S. at 711. Plaintiff does not, and cannot, point to any District of Columbia law entitling citizens in general, or her son in particular, to protection from escaped juvenile offenders. Nevertheless, she argues that such an entitlement arose from the 1986 Consent Decree entered in <u>District of Columbia v. Jerry M.. See 571 A.2d 178 (D .C.1990)</u>. That Consent Decree is the only authority on which Plaintiff relies as the basis for her claim that citizens, including her son, had an entitlement to protection from escaped juvenile offenders.

**\*4** In *Jerry M.,* a class of youth offenders in the custody of the District's juvenile justice system challenged that system on the ground that it failed to provide adequate education and rehabilitation opportunities. *Id.* at 180-81. In settling that case, the District agreed to "design ... placement alternatives for youth no longer requiring secure confinement ... [and to] implement a juvenile justice system with a variety of community based services and thereby reduce the time youth were inappropriately housed in secure facilities." *Jerry M.,* 571 A.2d at 180; *see also* <u>Turner v. District of Columbia, 2006 WL 566121 at \*8 (D.D.C. Mar. 7, 2005)</u>. Specifically, the Consent Decree required "increased use of diversion from prosecution, temporary housing for youth whose parents cannot be located, increased use of 'home detention,' short term foster care, alternatives to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4
Slip Copy, 2006 WL 2521241 (D.D.C.)
(Cite as: Slip Copy)

secure detention ... new treatment facilities ... and improved record keeping and monitoring of placements." *Jerry M.,* 571 A.2d at 182.

*4 By entering into this agreement, Plaintiff argues, "Defendants affirmatively assumed control of those juveniles committed to the juvenile justice system who would be housed and cared for in group homes and thus [ ] became liable for the supervision of the juveniles residing in the group homes and absconding therefrom." Opp'n at 6. As a result, "Defendants created an entitlement for Plaintiff and Christian ... [because] the creation of the group homes became an independent source and a legitimate claim to entitlement." *Id.* at 7.

*4 Plaintiff's argument is unconvincing for at least three reasons. First, whether it derives from state law or, as Plaintiff alleges here, a consent decree binding a municipality, the "independent source" underlying a property interest in a particular benefit must be clear enough to provide a citizen with "an objectively reasonable expectation that he is entitled to" that benefit. *Hall v. Ford,* 856 F.2d 255, 266 (D.C.Cir.1988). Notwithstanding Plaintiff's characterization, however, the *Jerry M.* Consent Decree does not impose on the District a duty either to prevent abscondences from juvenile group homes or to arrest any individuals who may escape. *See Turner,* 2006 WL 566121 at *9. As a result, the *Jerry M.* Consent Decree cannot have given Plaintiff, or Tyrone, an "objectively reasonable expectation" of the benefit she now claims. *Hall,* 856 F.2d at 266.

*5 Second, and more importantly, a substantive due process claim alleging deprivation of a protected benefit can succeed only if "government officials may grant or deny [the benefit] in their discretion." *Town of Castle Rock,* 125 S.Ct. at 2803. Unless the Government's provision of a particular benefit is mandatory, therefore, an individual cannot claim a constitutionally-protected interest in it. In language that is directly relevant, and fatal, to Plaintiff's claim, the Supreme Court has recently explained that individuals do not have a property interest in police protection generally, or even in the detention or arrest of a particular individual, because the "well-established tradition of police discretion" allows officers to decide whether and when to make an arrest. *Town of Castle Rock,* 125 S.Ct. at 2805-06.

*5 Town of Castle Rock, a case with facts even more tragic than those contained in Plaintiff's Complaint, illustrates how difficult it is for a citizen to claim a property interest in police protection. In that case, the

plaintiff had obtained a restraining order barring her estranged husband from coming within 100 yards of her or their three daughters. *Id.* at 2801. On its face, the restraining order directed "law enforcement officials" to "use every reasonable means to enforce this restraining order." *Id.* Addressing such law enforcement officials, the order provided that "You shall arrest or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest of the restrained person ..." *Id.* Nevertheless, when the estranged husband appeared at plaintiff's home one afternoon, the police declined to intervene despite her numerous 911 calls asking them to enforce the order. *Id.* at 2801-02. Early the following morning, the estranged husband abducted the young girls, drove to the local police station, and died after initiating a firefight with officers on duty. *Id.* at 2802. When the police searched the truck he was driving, they discovered the bodies of his daughters, whom he had murdered. *Id.*

*5 Notwithstanding the seemingly-mandatory language contained in the restraining order, the Supreme Court held that the plaintiff could claim no property right in its enforcement. "We do not believe," the Court explained, "that ... Colorado law truly made enforcement of the restraining order mandatory. A well established tradition of police discretion has long coexisted with apparently mandatory arrest statutes." *Id.* at 2805. Because police officers retained such discretion, the Court concluded that plaintiff could not claim a legitimate entitlement to protection from her husband, and therefore could not maintain her substantive due process claim. *Id.* at 2803.

*5 Whereas the restraining order in *Town of Castle Rock* was drafted to protect particular individuals and seemed to clearly mandate police action, the consent Decree in *Jerry M.* names no specific beneficiaries and requires no action on the part of the police. Accordingly, if the plaintiff in *Town of Castle Rock* had no property interest in the enforcement of the restraining order against her husband, there can be no question that the *Jerry M.* Consent Decree gave Tyrone no property interest in police protection from escaped juveniles.

*6 Third, and finally, the Supreme Court has made clear that no cognizable property interest arises when the benefit of a particular government function or program inures to the public at large, rather than to a particular individual or class of individuals. *See Town of Castle Rock,* 125 S.Ct. at 2808, 2810. To the extent that the Consent Decree in *Jerry M.* confers

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 5
Slip Copy, 2006 WL 2521241 (D.D.C.)
(Cite as: Slip Copy)

government benefits, they most certainly are indeterminate in nature and designed to improve the welfare of District of Columbia residents as a whole, by creating greater opportunities for juvenile offenders and, thereby, reducing the social costs associated with juvenile delinquency. At most, if the Consent Decree confers benefits to any particular individual or class of individuals, it is to the young people in the juvenile delinquency system who have been placed in the custody of the Youth Services Administration for their "care and rehabilitation." *See* D.C. CODE § 2-1515.04. Plaintiff cannot reasonably claim that either she or her son are members of a discrete class that the Consent Decree was designed to serve.

*6 Accordingly, Plaintiff cannot establish that Tyrone suffered any deprivation of a constitutionally-protected property interest.

**b. Because the District did not affirmatively create the harm that befell Tyrone Christian, his liberty interests under the Due Process Clause were not violated**

*6 Since Plaintiff cannot claim a valid property interest in police protection, she must establish that Defendants violated one of Tyrone's cognizable liberty interests in order to succeed on her substantive due process claims. Plaintiff argues that Tyrone's "right to life is clearly encompassed in the protected right of liberty within the Fifth Amendment." Opp'n at 8. By failing to properly supervise Paul, Plaintiff alleges, Defendants acted "with deliberate indifference" to the safety of Tyrone, "created ... and aggravated" a "dangerous situation" that led to his death, and, in so doing, violated his Fifth Amendment rights.[FN5] *Id.* at 9, 12.

FN5. As the District Defendants note, Plaintiff incorrectly invokes the "deliberate indifference" standard in support of her Fifth Amendment claims. That standard governs liability under the Eighth Amendment, *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976), and is wholly inapplicable in this context.

*6 The District Defendants do not dispute that Tyrone had a protected liberty interest in his life, nor that a due process claim alleging violation of that interest might succeed under a different set of facts. *See* District Defs.' Mot. at 10. This is not such a case in their view, however. For Plaintiff's claim to

succeed, the District Defendants contend, she must present evidence of "affirmative conduct on the part of the government" that directly endangered her son. *Id.* at 11. At most, however, the conduct here amounted only to a "failure to act" rather than "affirmative conduct." *Id.* at 10.

*6 It is well-established that "nothing in the Due Process Clause itself requires the State to protect life, liberty, and property of its citizens." *DeShaney v. Winnebago County Dep't of Social Services*, 479 U.S. 189, 195 (1989). "[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government may not deprive the individual." *Id.* As a result, a "State cannot be held liable under the [Due Process] Clause for injuries that could have been averted ... [and therefore] a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.

*7 Notwithstanding this general principle, however, there are two limited circumstances in which the Due Process Clause imposes liability on government entities for injuries a citizen suffers at the hands of a third party. First, in what has been described as the "custody exception," the Supreme Court has explained that if the state "takes a person into its custody and holds him against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being" and any failure to meet that duty is actionable under the Due Process Clause. *Id.* at 199-200. Second, in this jurisdiction, under the so-called state endangerment theory, "an individual can assert a substantive due process right to protection by the District of Columbia from third-party violence when District of Columbia officials affirmatively act to increase or create the danger that ultimately results in the individual's harm." *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C.Cir.2001).

*7 Our Court of Appeals has cautioned, however, that the state endangerment theory is to be narrowly construed in order to "differentiate substantive due process, which is only to protect against arbitrary government action, from local tort law." *Id.* Accordingly, to make out a state endangerment claim, the plaintiff must show that "the District of Columbia's conduct was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Id.* (internal quotation and citation omitted). Generally, governmental

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 6
Slip Copy, 2006 WL 2521241 (D.D.C.)
**(Cite as: Slip Copy)**

conduct "shocks the conscience" when it involves *"deliberate* decisions of government officials to deprive a person of life, liberty or property." *Fraternal Order of Police Dept. of Corrections Labor Committee v. Williams,* 375 F.3d 1141, 1146 (D.C.Cir.2004) (citing *Daniels v. Williams,* 474 U.S. 327, 331 (1986)) (emphasis in original).

*7 Plaintiff invokes the state endangerment theory here. The District, she argues, created a dangerous situation that led to Tyrone's death by "fail[ing] to properly supervise juveniles who have a known propensity for absconding, thus allowing dangerous juveniles to intermix with the immediate public." Opp'n at 9. She further argues that Defendants failed to adequately supervise the employees charged with monitoring juveniles like Paul, a failure that she characterizes as "deliberate indifference" to the "rights of inhabitants" of the District of Columbia. *Id.* at 11.[FN6]

> FN6. Plaintiff relies chiefly on *Ashford v. District of Columbia,* 306 F.Supp.2d 8 (D.D.C.2004), to support her "deliberate indifference" argument. In that case, the court found that an inmate could state a substantive due process claim against the District after he was violently assaulted while in custody. *Ashford,* 306 F.Supp.2d at 14. The court found that officials at the D.C. jail acted with deliberate indifference, and thereby violated plaintiff's constitutional rights, by ignoring his repeated pleas for protection from a gang of other inmates who had threatened to kill him. *Id.*
> Contrary to Plaintiff's assertions, however, *Ashford* is both legally and factually distinguishable from this case. First, *Ashford* concerned the "custody exception" described in *DeShaney.* Here, by contrast, Plaintiff claims to be grounding her claim in the state endangerment theory. Second, the facts of *Ashford* are wholly inapplicable to this case: in *Ashford,* the court found that the District violated a duty to the plaintiff because it had taken him into custody and thereby assumed a duty to ensure his reasonable safety. Here, however, Tyrone was never in the District's custody. Consequently, Plaintiff's claim that the District owed him a constitutional duty of care, under the reasoning of *Ashford,* cannot be accepted.

*7 Applying the principles outlined in *Butera* to the facts of this case, there can be no question that Plaintiff's claim fails as a matter of law. First, under the state endangerment theory, an individual's due process rights are violated by affirmative action on the part of the government that creates or increases the danger that ultimately befalls him. The Defendants' "actions" on which Plaintiff bases her claim, however, are not actions at all. According to her, Defendants violated Tyrone's liberty interests by failing to keep Paul in their custody, by failing to train and supervise the officials charged with his care, and by failing to find and arrest him after he absconded. However, failure to act is, by definition, not action itself. Moreover, as a matter of constitutional law, the government's failure to act does not give rise to a due process claim. *See Butera,* 235 F.3d at 650 ("No constitutional liability exists where the State actors 'had no hand in creating a danger but [simply] stood by and did nothing when suspicious circumstances dictated a more active role.' ") (quoting *Reed v. Gardner,* 986 F.2d 1122, 1125 (6th Cir.2003); *see also Turner,* 2006 WL 566121 at *6 (noting that "failure to act is not an affirmative act [and] ... does not amount to a constitutional violation").

*8 Second, the Defendants' "actions," which are in effect inaction, cannot be deemed to be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Butera,* 253 F.3d at 651 (internal quotation omitted). The failure to supervise and restrain Paul while in the group home, alleged by Plaintiff, does not satisfy this requirement.

*8 The harms that befell Tyrone, and Plaintiff, are sad beyond words. They are not, however, constitutionally cognizable. Accordingly, judgment on the pleadings must be entered in the District Defendants' favor on Plaintiff's due process claims.[FN7]

> FN7. Because the Court concludes that Plaintiff's constitutional claims fail on the merits, there is no need to discuss the District Defendants' alternative argument that they are barred by qualified immunity. See District Defs.' Mot. at 15-17. However, it would appear that the District of Columbia has a strong likelihood of prevailing on this argument under *Estate of Anthony Sean Phillips, Sr. v. District of Columbia,* 455 F.3d 397 (D.C.Cir.2006).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 7
Slip Copy, 2006 WL 2521241 (D.D.C.)
**(Cite as: Slip Copy)**

**2. Plaintiff cannot prevail on her negligence claims because they are barred by the public duty doctrine**

**\*8** Counts two through five of the Amended Complaint allege various common law negligence claims.[FN8] See Am. Compl. at 5-10. While they differ in some of their particulars, all of the negligence claims center on the following allegations: (1) that Defendants had a duty to protect Tyrone from escaped juvenile offenders; (2) that they breached that duty by failing to monitor and restrain Paul, supervise the employees responsible for doing so, or arrest him after he escaped; (3) that those failures proximately caused Tyrone's death and Plaintiff's injuries; and (4) that Plaintiff is entitled to recover as a result. See id.

> FN8. Specifically, Plaintiff states the following claims: Negligence (Count II), Wrongful Death (Count III), Negligent Hiring and Supervision (Count IV), and Negligent Infliction of Emotional Distress. See Am. Compl.

**\*8** The District Defendants move for judgment on the pleadings as to each of these claims on the ground that they "are barred, in their entirety, by the public duty doctrine." District Defs.' Mot. at 17. Because the Court agrees that the public duty doctrine governs all of Plaintiff's negligence claims against the District Defendants, it will address them together.

**\*8** Under District of Columbia law, which the Court must apply to Plaintiff's common law causes of action, negligence claims proceed according to a familiar three-part analysis. The plaintiff must establish: first, that defendant owed a legal duty of care; second, that defendant breached that duty; and, third, that plaintiff "sustained harm as a proximate result of the defendant's breach." _Souci v. William C. Smith & Co.,_ 763 A.2d 96, 99 (D.C.2000). No negligence claim can lie in cases where the defendant owes no duty of care to the plaintiff.

**\*8** It is well-established in this jurisdiction that the District Government owes no general duty of care to its citizens. Instead, "the District is subject to liability for injuries arising from the negligence of its employees only if the duty owed to the plaintiff was a special duty to that person as an individual or as a member of a class ... [T]he District cannot be sued if the duty it owed was a general duty to the public at

large." _Auto World v. District of Columbia,_ 627 A.2d 11, 13 (D.C.1993) (internal citation and quotation omitted). This "public duty doctrine ... shield[s] the District and its employees from liability associated with providing public services," _Powell v. District of Columbia,_ 602 A.2d 1123, 1125 (D.C.1992), in order to protect the Government from what would be "an overwhelming tide of liability if [it] were liable for mishaps which occur during the provision of public services." _Joy v. Bell Helicopter Textron,_ 1991 Dist. LEXIS 2193 (D.D.C.1991).

**\*9** A narrow exception to the public duty doctrine allows a plaintiff to "convert a general duty owed to the public into a special duty owed to an individual" if she can establish, first, "a direct or continuing contact between the injured party and a governmental agency or official," and, second, "a justifiable reliance on the part of the individual." _Klahr v. District of Columbia,_ 576 A.2d 718, 720 (D.C.1990) (citing _Turner v. District of Columbia,_ 532 A.2d 662, 667 (D.C.1987)). This exception applies only if the plaintiff demonstrates "a direct transaction ... or arm's length relationship in which the city's agent [dealt] directly, in some form, with the person injured" and that "the government ... engage[d] in an affirmative undertaking of protection on which the victim justifiably relies." _Taylor v. District of Columbia,_ 776 A.2d 1208, 1214-15 (D.C.2001).

**\*9** Plaintiff contends that the public duty doctrine does not bar her negligence claims for two reasons. First, she argues that the Consent Decree in _Jerry M._ "sufficiently created a legal duty, or special duty, which requires Defendants to use reasonable care in supervising group home residents and absconding juveniles" and therefore that she has satisfied the standard set forth in _Klahr_ and _Taylor._ Opp'n at 14-15. This argument is without merit.

**\*9** The Court has already held that the benefits of the _Jerry M._ Consent Decree redound to the public at large, and possibly to the juveniles in the care and custody of the District of Columbia. Plaintiff cannot establish that she, or her son, can claim special benefits under the Consent Decree. Nor can Plaintiff demonstrate, as _Klahr_ and _Taylor_ require, a "direct transaction" in which the District, or one of its agents, affirmatively undertook the protection of Tyrone.

**\*9** _Klahr_ is particularly instructive here given the factual similarities between that case and this one. See _Klahr,_ 576 A.2d at 718. In _Klahr,_ the plaintiff sued the District, alleging negligence and wrongful

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 8
Slip Copy, 2006 WL 2521241 (D.D.C.)
(Cite as: Slip Copy)

death, after a man escaped from a halfway house operated by the D.C. Department of Corrections and committed a double murder. *See id.* As Plaintiff does here, Klahr-who was the executor of the victims' estate-argued that the District negligently failed to restrain the murderer, supervise the employees on duty at his halfway house, or find and arrest him after his escape. *See id.* at 719. Recognizing that the public duty doctrine could bar her claims, Klahr argued that because the murderer had been in the District's custody prior to committing the offense, an "actionable duty toward the public at large and the [victims] in particular" had been established, thereby exposing the District to liability. *Id.* at 720.

*9 The D.C. Court of Appeals rejected that logic. "Notwithstanding the great misfortune that befell the [victims]," it explained,
*9 it is evident that they were the victims of a random criminal attack. The District of Columbia had not agreed to provide specific protection for [them], nor had it any reason to believe that Mosby [the murderer] posed a danger to the [victims] that was greater in degree than, or different in kind from, the danger he posed to anyone else ... Even if there were, appellants would still have to show that the District owed a special duty to the [victims] above and beyond that general duty.

*10 *Id.* Here too, there is no evidence that the attack on Tyrone was anything but random, that he faced any greater or lesser degree of danger from Paul than any other member of the public, or that the District had specifically committed to providing him with protection from Paul or any other juvenile runaway.[FN9]

> FN9. The *Klahr* Court suggested that a different outcome might be proper if the murderer's conviction had given "rise to a presumption that he was dangerous." In that case, it explained, the District would have had a "duty to members of the general public to exercise reasonable care to control" him. *See Klahr,* 576 A.2d at 721 (citing *White v. United States,* 780 F.2d 97 (D.C .Cir.1986), for the proposition that prisons and hospitals have a general duty to protect the public from their inmates or patients if they are presumed dangerous). Plaintiff seizes on this language and attempts to make a distinction between halfway houses and group homes. Because group homes provide a higher-security

environment than halfway houses, she argues, the District makes an implicit assumption that an individual is dangerous by placing him in a group home. *See* Opp'n at 17. On that basis, she contends that the District had a greater duty to monitor Paul, who was held in a group home, than it did the murderer in *Klahr,* who lived in a halfway house.
As the District Defendants point out, however, there is no legal or factual basis for Plaintiff's assertion that group-home residents are more dangerous than their counterparts in halfway houses. See Reply at 18. On the contrary, under D.C. law any individual who is adjudicated to constitute a danger to the public cannot qualify for placement in either a group home or a halfway house. *See id.* at 19; D.C. MUN. R. § 29-6274.1. The distinction Plaintiff attempts to draw between group homes and halfway houses, and thus *Klahr* and this case, is simply unconvincing.

*10 In support of her argument that the District can be held liable despite the public duty doctrine, Plaintiff relies chiefly on two cases, both of which are easily distinguishable. *See* Opp'n at 15. In the first, *District of Columbia v. Banks,* 646 A.2d 972 (D.C .1994), an individual was hit and injured by a police car involved in a high-speed chase. The D.C. Court of Appeals allowed his negligence claim to proceed on the ground that the District's "emergency run statute," which waived sovereign immunity for injuries arising out of such accidents, also contained an implicit waiver of the public duty doctrine. *See Banks,* 646 A.2d. at 979-80. The court's reasoning in *Banks* is wholly inapplicable here. Contrary to Plaintiff's assertions, unlike the District's emergency run statute, the Consent Decree in *Jerry M.* does not waive sovereign immunity or create a private cause of action. It cannot, therefore, also waive the public duty doctrine. *See Turner,* 2006 WL 566121 at *12.

*10 Plaintiff's second case, *Liser v. Smith,* 254 F.Supp.2d 89 (D.D.C.2003), is equally unhelpful. In that case, a citizen who had been shot by a member of the Metropolitan Police Department sued for negligence. Although the District raised the public duty doctrine as a defense, the court allowed the plaintiff's negligence claim to proceed. According to the court, the public duty doctrine shields governments from liability for "failure to protect a person" from harm caused by a third party. *Liser,* 254 F.Supp.2d. at 102. When the alleged harm is caused

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 9
Slip Copy, 2006 WL 2521241 (D.D.C.)
**(Cite as: Slip Copy)**

not by a failure to protect against a third party but by District employees themselves, however, the public duty doctrine is "wholly inapposite." *Liser,* 254 F.Supp.2d. at 102. According to the court, "the claim that the government has no general duty to protect particular citizens from injury is simply a non-sequitur where the government itself is solely responsible for that injury." *Id.* Plaintiff does not, and cannot, claim that Paul was acting as an agent of the District at the time he shot Tyrone. As a result, the reasoning of *Liser* is totally inapplicable on the facts of this case.

**\*10** Plaintiff's second argument against the application of the public duty doctrine in this case "invites the court to ignore local law." *Turner,* 2006 WL 566121 at \*13. Noting that a number of courts in other jurisdictions have "abrogated the [public duty] doctrine in favor of statutory enactments or general theories of negligence," she urges this Court as well to find that the doctrine "no longer serves the purposes for which it was conceived" and to allow the negligence claims to proceed. Opp'n at 18-19. As outlined above, the public duty doctrine is well-settled in this jurisdiction. The D.C. Court of Appeals, which the Court is bound to follow on matters of local law, has set forth a robust and detailed body of law applying the public duty doctrine, and has reaffirmed it as recently as six months ago. *See Varner v. District of Columbia,* 891 A.2d 260, 276-77 (D.C.2006) ("[T]he public duty doctrine is well-established in this jurisdiction."). The Court finds no justification for ignoring this well-settled controlling authority.

**\*11** Because the District Defendants did not owe a special duty to Tyrone or to Plaintiff, therefore, the public duty doctrine applies and her negligence claims fail as a matter of law.[FN10]

> FN10. Because the Court finds that Plaintiff's negligence claims cannot succeed on the merits, it will not discuss the District Defendants' alternative arguments that they are barred by the mandatory notice provisions of D.C.Code § 12-309 and the doctrine of discretionary immunity. *See* District Defs.' Mot. at 25-32.

**B. Judgment on the Pleadings Must Be Entered in Dytrad's Favor on the Negligence Claims Because the Company Owed No Legal Duty to Plaintiff and Therefore Cannot Have Committed a Breach**

**\*11** Defendant Dytrad, which at all relevant times operated the Gateway IV Group Home pursuant to its contract with the District, also moves for judgment on the pleadings as to Plaintiff's negligence claims. Plaintiff's negligence claims against Dytrad are identical to those she has stated against the District Defendants.[FN11]

> FN11. Those claims are: Negligence (Count II), Wrongful Death (Count III), Negligent Hiring and Supervision (Count IV), and Negligent Infliction of Emotional Distress. *See* Am. Compl. The negligence claims are Plaintiff's only claims against Dytrad.

**\*11** Dytrad contends that it cannot be held liable for the injuries Paul caused because "no legal duty ran from Dytrad to the Plaintiff or her decedent." [FN12] *See* Dytrad's Mot. to Dismiss at 2. Specifically, it argues that because Paul escaped from its custody sixty days prior to the attack, he was not within its control at the time of Tyrone's murder. *See id.* Dytrad further claims that it had no reason to know that Paul had violent propensities and, on that basis as well, is relieved from liability arising out of his conduct. *See* Reply at 3. Plaintiff maintains that Dytrad "had a duty to properly supervise juveniles as a result of its assumption of their care," and that it can be held liable for breaching that duty in this case. *See* Opp'n at 6.

> FN12. Dytrad also argues that the statute of limitations has run on Plaintiff's Wrongful Death claim and moves the Court to dismiss it summarily on that ground. See Opp'n at 6-7. Because the Court concludes that Plaintiff cannot succeed on the merits on any of her negligence claims against Dytrad, it need not address Dytrad's procedural argument on the Wrongful Death claim.

**\*11** As noted *supra,* to succeed on her negligence claims, Plaintiff must establish: (1) that Dytrad owed a legal duty to her or her son; (2) that it breached that duty; and (3) that Dytrad's breach proximately caused the injuries alleged. *Souci,* 763 A.2d at 99. It is axiomatic in tort law that an individual, or entity, generally has no duty to control the conduct of a third party and cannot be held liable for any injuries caused by another. *See* Restatement (Second) of Torts § 315 (1965); *see also Committee of U.S. Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929, 950 (D.C.Cir.1988). An exception exists,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 10
Slip Copy, 2006 WL 2521241 (D.D.C.)
**(Cite as: Slip Copy)**

however, where one "takes control" of a third party whom he "knows or should know to be likely to cause bodily harm to others if not controlled." *See* Restatement (Second) of Torts § 319 (1965). In such a situation, the custodian has a duty to make reasonable efforts to prevent his ward from causing physical harm to others. *See id.; see also Thomas v. City Lights School,* 124 F.Supp.2d 707, 711 (D.D.C.2000).

**\*11** Applying these principles to the instant facts, there is no question that Dytrad cannot be held responsible for the injuries that befell Tyrone and Plaintiff. First, even assuming that Dytrad had a duty to control Paul while he was in its custody-which may or may not have been the case-that duty cannot have survived Paul's escape, especially given the length of time that elapsed between his abscondence and Tyrone's murder. Plaintiff cites no authority, nor is the Court aware of any, supporting her contention that Dytrad remained liable for Paul's actions despite the sixty-day gap between the two events.

**\*12** The sole case Plaintiff cites, *Thomas v. City Lights School,* actually appears to support Dytrad's position. In *Thomas,* the plaintiff sued, alleging negligence, after he was attacked and injured by students of the defendant's school for at-risk youth while they were participating in a field trip to the National Zoo in Washington. The court permitted the plaintiff to maintain his negligence claim on the ground that the school had a duty to make reasonable efforts to protect members of the public from its students during the field trip. *See Thomas,* 124 F.Supp.2d at 707.

**\*12** In so holding, the *Thomas* court cautioned that the school was subject to third party liability only because of the high degree of control it exercised over the students at the time of the injury, when they were in its direct control, and because it had prior knowledge that the students had dangerous propensities. *Id.* at 711-12. The court explained that a different outcome might be warranted if the school had insufficient "custodial control" over the students, or had no reason to believe that they posed a danger to others. *Id.* at 712 (collecting authority). *City Lights* is clearly distinguishable on its facts. Whereas the students in *City Lights* were under the school's direct control, and were participating in a school-sponsored event at the time they injured the plaintiff, Paul was far beyond Dytrad's "custodial control" at the time he killed Tyrone.[FN13] Taken to its logical conclusion, Plaintiff's theory would hold Dytrad liable in perpetuity for injuries caused by its former

residents. Nothing in the case law or treatises supports that position.

> FN13. The Court notes that even while Paul was under Dytrad's supervision, he remained a ward of the District of Columbia.

**\*12** Second, even assuming that Dytrad did have control over Paul at the time of the murder, it would only face liability if it knew, or should reasonably have known, that he had dangerous propensities. *See* Restatement (Second) of Torts § 319 (1965); *Thomas,* 124 F.Supp.2d at 712. Dytrad argues, convincingly, that it did not have such knowledge. Both Dytrad and the District Defendants explain that juveniles who are determined to pose a public danger are not assigned to group homes like Gateway IV because D.C. law prohibits employees at such facilities from using physical restraint or force against residents. *See* Dytrad's Reply at 3; District Defs.' Reply at 18-19; D.C. MUN. R. § 29-6274.1. Juveniles whom the District believes to be dangerous are instead housed in higher-security facilities. *See* Dytrad's Reply at 2.

**\*12** If the very fact that Paul was placed in Dytrad's care assumes that there had been a determination that he did not pose a danger to the public, Dytrad could not have had reason to believe that he was, in fact, dangerous. *See id.* at 3. Without such knowledge, Dytrad cannot be held liable for the injuries he caused.

**\*12** In sum, because Dytrad did not have sufficient control over Paul at the time he killed Tyrone, and did not have reason to believe that he posed a danger to the public, Plaintiff cannot hold it responsible for the injuries Paul caused. Judgment on the Pleadings must be entered in Dytrad's favor on Plaintiff's negligence claims.

## IV. CONCLUSION

**\*13** Accordingly, for the foregoing reasons, the District Defendants' Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment [Dkt. No. 73] is hereby **granted** and Dytrad's Motion for Judgment on the Pleadings [Dkt. No. 81] is hereby **granted.**

**\*13** An Order will issue with this Opinion.

D.D.C.,2006.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 11
Slip Copy, 2006 WL 2521241 (D.D.C.)
**(Cite as: Slip Copy)**

Johnson v. District of Columbia
Slip Copy, 2006 WL 2521241 (D.D.C.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2453185 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Defendant Dytrad Management Services, Inc.'s Rule 12(c) Motion for Judgment on the Pleadings as to Plaintiff's Amended Complaint (Aug. 14, 2005) Original Image of this Document (PDF)
• 2005 WL 2453184 (Trial Motion, Memorandum and Affidavit) Defendant's, Dytrad Management Services, Inc., Rule 12(c) Motion for Judgment on the Pleadings As to Plaintiff's Amended Complaint (Aug. 4, 2005) Original Image of this Document (PDF)
• 2005 WL 2095913 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Defendants District of Columbia and Gayle Turner's Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment (Jul. 29, 2005) Original Image of this Document with Appendix (PDF)
• 2005 WL 2095912 (Trial Motion, Memorandum and Affidavit) Defendants District of Columbia and Gayle Turner's Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment (Jul. 7, 2005) Original Image of this Document (PDF)
• 2004 WL 2056737 (Trial Pleading) Defendant's, Dytrad Management Services, Inc., Answer to the Amended Complaint (Jul. 6, 2004) Original Image of this Document (PDF)
• 2004 WL 2056728 (Trial Pleading) Amended Complaint (May 27, 2004) Original Image of this Document (PDF)
• 1:03cv02548 (Docket) (Dec. 16, 2003)
• 2003 WL 23780488 (Trial Pleading) Answer (2003) Original Image of this Document (PDF)
• 2003 WL 24166164 (Trial Motion, Memorandum and Affidavit) Defendants District of Columbia and Gayle Turner's Reply to Plaintiff's Opposition to Defendants' Motion for Judgment on the Pleadings (2003) Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2

Westlaw.

Not Reported in S.E.2d                                                                    Page 1
Not Reported in S.E.2d, 63 Va. Cir. 150, 2003 WL 22415285 (Va. Cir. Ct.), 18 VLW 459
(Cite as: Not Reported in S.E.2d)

Meeks v. BroschinskiVa.Cir.Ct.,2003.Wanda D. MEEKS, Administrator of the Estate of Jody Hilton Swisher

v.

Richard G. BROSCHINSKI

Sept. 25, 2003.

Dear Mr. Harris & Ms. Inge:

FRANKLIN, J.

*1 In the case of *Meeks v. Broschinski,* Defendant, (employee of the City of Staunton, Virginia's emergency personnel [FN1]), invokes the public duty doctrine as a defense to Plaintiff's negligence claim against Defendant for his alleged failure to provide emergency medical services to Plaintiff following Defendant's receipt of a 911 call reporting a suspected hit-and-run accident in Staunton, Virginia, on August 25, 2001. Whether the public duty doctrine shields Defendant from liability is a complicated matter that invokes both legal doctrines and public policy concerns.

>      FN1. Va.Code § 18.2-426:
>      "Emergency personnel means any persons, paid or volunteer, who receive calls for dispatch of police, fire, or emergency medical service personnel, and includes law-enforcement officers, firefighters, including special forest wardens designated pursuant to § 10.1-1135, and emergency medical service personnel."

*1 The public duty doctrine asks whether a defendant owes a duty to the citizenry at large or whether a defendant owes a special duty to a specific identifiable person or class or persons. Only a violation of the latter duty will give rise to civil liability of the official. *Marshall v. Winston,* 239 Va. 315, 319 (1990). Thus, to determine whether Defendant can protect himself from liability under the public duty doctrine the Court must analyze two issues: (1) whether Plaintiff is a specific identifiable person or member of a class of persons to whom Defendant owes a special duty of care and (2) whether a special relationship exists between Plaintiff and Defendant that creates a special duty of care.

*Was Plaintiff a Member of a Class of Persons or the Citizenry At Large?*

*1 Because the identity of Plaintiff was unknown on the night in question, to cross the first hurdle of the public duty doctrine he must show that he is a member of a class of persons to whom Defendant owes a special duty of care. To establish oneself as a member of a discernable class of persons, Plaintiff must distinguish himself from the general public. *Mpras v. Community Living Alternatives,* 35 Va. 264, 267 (1994). For instance, in the case of *Dudley v. Offender Aid and Restoration,* the Virginia Supreme Court recognized the victim as a member of a class consisting of those persons "within a given area of danger." 241 Va. at 279. Thus, the class of person need not be defined by race, sex or residency. Rather a class of persons may be somewhat fluid, but still identifiable-had the victim in Dudley not lived near her attacker she would not have been a member of the class of persons within the zone of danger.

*1 On the night in question, Plaintiff was not part of the general public, rather he was a person in need of emergency services and thus a member of such class. Plaintiff had been struck by a moving automobile with such force that the car's windshield had shattered and Plaintiff's blood stained the car. The evidence from the car alone makes evident that Plaintiff required emergency medical assistance and as such was member of a class of persons discernable from the community at large.

*1 Defendant contests this classification and relies on the holdings of neighboring jurisdictions that have held 911 dispatchers to be immune from negligence suits under the public duty doctrine.[FN2] Specifically, Defendant relies heavily on the holding in *Muthukumarana v. Montgomery County,* Maryland, 370 Md. 447 (2002). In *Muthukumarana,* the Court of Appeals of Maryland addressed the liability of 911 dispatchers stemming from two different incidents. In one incident, the dispatcher provided an incorrect address to the emergency response team and in the other situation the dispatcher did not suggest the caller flee the home and call again from a safer location rather than remain on the phone in the presence of her violent husband. *Id.* at 457-469. The Maryland court equated the 911 dispatchers to police officers and held they have a *public duty* to aid rather than a specific duty to aid particular persons or classes of persons. *Id.* at 490. The Maryland court relied heavily on public policy concerns to make its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                                                    Page 2
Not Reported in S.E.2d, 63 Va. Cir. 150, 2003 WL 22415285 (Va. Cir. Ct.), 18 VLW 459
**(Cite as: Not Reported in S.E.2d)**

decision and emphasized that to impose liability on such dispatchers who were executing their duties as they saw fit would cause greater harm than good. The Maryland court foreshadowed vast amounts of litigation against emergency response dispatchers due to disagreements on how best to handle emergency situations and feared that such litigation costs would subtract from the limited funds available to provide such necessary emergency services. *Thus,* the Maryland court found neither defendant 911 dispatcher liable for the wrongful deaths of the victims.

> FN2. Virginia has not addressed the liability of 911 dispatchers specifically. Thus, Defendant relies on the holdings of state courts in Maryland, Washington, D.C., and West Virginia that granted 911 dispatchers immunity from negligence suits in accordance with the public duty doctrine.

**\*2** However, the holding in *Muthukumarana* is distinguishable from the case at hand. In *Muthukumarana,* both defendants dispatched emergency crews to the scenes of the emergencies (or to a nearby location) in response to the calls and each caller followed appropriate protocol in handling the incoming calls. *Muthukumarana,* 370 Md. at 396-98. In the case at hand, Defendant did not follow Call Prioritization procedures;[FN3] he did not dispatch an emergency response team to investigate the situation described by the caller; and at the very least, he did not mention the uncertain call to his supervisor or co-workers to better analyze the validity of the call. Furthermore, given the sensitivity of the responsibilities of 911 dispatchers and the reliance that persons in need place in such workers, it would be arbitrary for this Court, like the Court of Appeals of Maryland, to make a general statement that 911 dispatchers are protected from liability under the public duty doctrine. The principles of justice are far better served on a case by case basis than by a one-size-fits-all analysis.[FN4]

> FN3. Testimony of Police Chief of Staunton City Police Department familiar with emergency procedures, Hearing on Motion to Dismiss, Aug. 21, 2003.

> FN4. "In every case, it is for the court to determine, as a question of law, from all the circumstances, if it is controverted, whether the plaintiff falls within the class of those to whom the defendant owes a duty." *Dudley v. Offender Aid and Restoration of Richmond,* 241 Va. 270, 279 (1991).

**\*2** Still, Defendant may argue that like police officers and firefighters, emergency dispatchers serve the public at large and not solely those in need of emergency services. Defendant's analogy is strong. Emergency dispatchers assist police officers and firefighters in carrying out their duties to protect citizens in general. Dispatchers are the link in the chain of emergency response services and as such some courts afford them the same immunity from suit as provided police officers. However, one fine-line distinction between police officers and emergency dispatchers is that dispatchers work in a responsive capacity while police officers are obligated to work in both affirmative and responsive capacities. Specifically, when on duty, police officers must be alert of their surroundings and must act proactively to prevent crime and reactively to stop or respond to the report of a crime. As such, the primary responsibility of police officers is to actively protect the public at large. On the contrary, the duties of emergency dispatchers are completely reactionary. They await calls from persons in need of prompt assistance. Once such call is received, a dispatcher serves a distinguishable member of a class-persons in need of emergency services. Consequently, emergency dispatchers serve an identifiable class of persons while police officers serve the general public.

**\*2** Thus, as a member of an identifiable class of persons-those in need of emergency medical attention -Plaintiff must now show that Defendant owes a special duty to Plaintiff as a result of the special relationship between the two parties as one who is in need of emergency medical assistance and one who is able to provide emergency medical assistance.

### *Did Defendant Owe Plaintiff a Special Duty?*

**\*2** The method for determining whether a government entity or employee owes its residents a special duty based on the dynamics of the relationship between the two is unsettled in Virginia. The common law of Virginia has not adopted a particular standard by which to resolve negligence claims against government employee or official. This ambivalence toward establishing a specific standard, one would suspect, is due to the difficulty of defining the duties of government employees and conversely, the ramifications of doing so.[FN5] Hence the parties in this case advance two different methodologies for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                    Page 3
Not Reported in S.E.2d, 63 Va. Cir. 150, 2003 WL 22415285 (Va. Cir. Ct.), 18 VLW 459
**(Cite as: Not Reported in S.E.2d)**

determining whether a special relation exists between the Plaintiff and Defendant in this matter.

> FN5. When Virginia first adopted the public duty doctrine it acknowledged that "it would not be in society's best interest to impose liability upon a public official for the violation of his public duty to the citizenry at large, because to do so would expose him to litigation from all his official acts." *Marshall*, 239 Va. at 319.

**\*3** Plaintiff contends that the Court must analyze the totality of the circumstances of the night in question in order to discern the existence of a special relation between the Plaintiff and Defendant. *See* Plaintiff's Brief in Reply to Defendant's Special Plea, at 3 (Aug. 14, 2003), *citing Dudley*, 241 Va. at 279. The Defense, on the other hand, advocates a stricter, more methodical four-part test, first introduced in a New York case, to be the appropriate standard for examining the presence of a special duty. *Cuffy v. City of New York*, 69 N.Y.2d 255, 260 (1987) *as quoted in Linda Lee Corp. v. City of Bedford*, 36 Va. 590 (1993). Pursuant to the New York test, a court must analyze the following criteria to determine whether a special relation exists between the parties to create liability:
**\*3** (1) an assumption by local government entity, through promises or actions, of an affirmative duty to act on behalf of the party who was injured;
**\*3** (2) knowledge on the party of the local government entity's agents that inaction could lead to harm;
**\*3** (3) some form of direct contact between the local government entity's agents and the injured party; and
**\*3** (4) that party's justifiable reliance on the local government entity's affirmative undertaking. *Linda Lee Corp.* 36 Va. at 594.

**\*3** As one would expect, the two test result in two different outcomes of liability and thus the Court must intervene and determine the appropriate special relation standard.

**\*3** After comparing the standards promoted by the Parties the differences between the two seem insignificant. The New York test promoted by the Defendant is simply an explicit list of factors encompassed in the Plaintiff-endorsed totality of the circumstances test. The distinction between the two tests is not in the tests themselves but rather in the manner in which the tests are interpreted and applied. The Plaintiff invokes a broad and sweeping interpretation of the totality of the circumstances standard while the Defendant restricts the New York test to very strict and narrow definitions.

**\*3** The first factor of the New York test asks whether the local government entity assumed an affirmative duty to act on behalf of the injured party through promises or actions. *Linda Lee Corp.* 36 Va. at 594. Such promises or actions include the adoption of local ordinances creating a duty to act, the nature of the acts made by the government entity and whether such acts were advertised throughout the community.

**\*3** In this case, the City of Staunton assumed the responsibility of providing emergency services, including emergency medical, fire and protective services, for the benefit of its residents pursuant to Virginia Code Sections 27-23.1 and 27-6.1. To provide the most thorough and efficient emergency services the City of Staunton implemented an emergency system predicated on the emergency 911 system. The emergency system utilized emergency personnel to receive emergency calls for dispatch of police, fire or emergency medical service personnel. Furthermore, the City of Staunton notified its residents of the emergency response system via its telephone books, banners on police and emergency vehicles and public telephones. Provided this information it is evident that the City of Staunton assumed responsibility for the emergency care of its residents upon which its residents relied. Such reliance between an entity of the local government and its residents satisfies the first prong of the New York test.

**\*4** The second element of the New York test is a knowledge requirement. Specifically, the test asks: to what extent does the local government entity's agent know that his inaction could create harm for the injured party? The knowledge element is directly related to the local government agent's job responsibilities. If the City Manager receives a call from a resident complaining that the trash was not collected on his street, inaction on the part of the City Manager, despite his knowledge of the situation, is an oversight but it will not harm the aggravated resident. Conversely, if a firefighter receives knowledge that a residential house is ablaze, inaction by the firefighter would be irresponsible given his job duties and worse yet, harmful to the residents affected by the fire.

**\*4** Provided the information regarding the call made on the night in question, it is difficult to conclude that Defendant did not know that inaction on his part could lead to harm. Defendant received a call in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                                    Page 4
Not Reported in S.E.2d, 63 Va. Cir. 150, 2003 WL 22415285 (Va. Cir. Ct.), 18 VLW 459
**(Cite as: Not Reported in S.E.2d)**

which the caller, Mr. Clifton, provided Defendant with specific details of the alleged hit and run accident. Mr. Clifton expressed that he was "as serious as a heart attack" and continuously urged Defendant to investigate the scene of the crime. Plaintiff's Motion for Judgment at 2 (Feb. 3, 2003). In deference to the Defendant, the Court must recognize the inconsistent statements of Mr. Clifton-Mr. Clifton reported that there was blood on the *inside* of the car that allegedly hit Plaintiff), as well as the suspicious context of the call (the call was received at approximately 2:00 am on August 25, 2001, and Mr. Clifton refused to provide his name to Defendant). Nevertheless, at the very least, Mr. Clifton made Defendant aware that a *car* accident had occurred at a specific location; that blood had been left on the car thus indicating an injured victim and the need for emergency medical personnel. Given this information, the Defendant knew or should have known that his failure to act could lead to harm. Hence, Defendant meets the second criteria of the New York test.

**\*4** Third, the New York test requires some direct contact between the local government entity's agent and the injured party. *Linda Lee Corp.* 36 Va. at 594. Emergency 911 calls are often made through anonymous third party callers requesting emergency assistance on behalf of someone else. It would be unreasonable for 911 dispatchers to require a man suffering from a heart attack or a baby choking on a spoon to request emergency services directly. Thus, a more reasonable method for examining whether a special relation exists between a local government entity and an injured party is to require some direct contact between the local government entity's agent and the injured party or an agent of the injured party.

**\*4** Under this revised third element of the New York test, Mr. Clifton's call to Defendant constitutes direct contact with the Plaintiff. As mentioned above, Mr. Clifton called Defendant to inform him of a suspected accident involving a car and a pedestrian-that pedestrian was the Plaintiff in this case who eventually died as a consequence of the accident. Mr. Clifton, acting as an anonymous agent of Plaintiff spoke directly with Defendant, provided Defendant with as much information as possible and begged Defendant to investigate the accident further. Given the circumstances of the accident (Plaintiff was most likely unconscious, far from phone access and badly injured), it is unreasonable to require Plaintiff to make direct contact with Defendant. Thus, pursuant to the practical application of the New York test, the Court holds that Defendant had sufficient contact

with the Plaintiff to satisfy the third prong of the special relation test.

**\*5** Finally, the fourth factor of the New York test asks whether the injured party was justified in relying on the local government entity's affirmative undertakings. *Linda Lee Corp.* 36 Va. 594. To determine whether the injured party was justified in relying on the local government entity the Court must ask whether the local government entity held itself out as a provider of particular services. If the inquiry is answered in the affirmative then the injured party is justified in relying on the entity.

**\*5** As mentioned above, the City of Staunton created its emergency response system to benefit those residents in need of emergency assistance. It adopted an emergency system that has been adopted across the country to provide a uniform, well-known and easily understandable emergency system. The City of Staunton also chose to employ emergency dispatchers to facilitate the prompt, accurate and thorough response of emergency service providers. As such, these dispatchers are an integral link in the chain of emergency services. By taking these steps the City of Staunton held itself out as a provider of emergency services. It is reasonable to expect Staunton residents to rely on the City's emergency services when in need of assistance.

**\*5** On the night of August 25, 2001, Plaintiff, a resident of Staunton, needed emergency assistance. He had been struck by a car that failed to render assistance to him. His suspected location was on a dark road with little traffic. It is safe to assume from the blood reported on the car in which Mr. Clifton was a passenger, Plaintiff was injured. It is reasonable to assume that had Plaintiff had the opportunity, he would have called 911 to request emergency assistance because he was aware of the emergency system implemented by Staunton. Furthermore, as Plaintiff's agent, Mr. Clifton relied on Staunton's emergency services to render assistance to Plaintiff. In fact, according to the transcript of Mr. Clifton's phone call to 911, Mr. Clifton stated "Damn. I'm telling you, you better go check it out," to which Defendant replied "Okay. We'll do that ..." Plaintiff's Motion for Judgment, at 2 (Feb. 2, 2003) By this simple acknowledgement that Defendant would investigate the scene of the reported accident further, it is fair to say that Mr. Clifton relied on Defendant to render assistance to Plaintiff.

**\*5** Provided this examination of the totality of the circumstances in a practical manner, it is evident that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d, 63 Va. Cir. 150, 2003 WL 22415285 (Va. Cir. Ct.), 18 VLW 459
**(Cite as: Not Reported in S.E.2d)**

Defendant, though his words and actions, created a special relation with Plaintiff that obligated him to provide emergency services to him. Defendant worked for a local government entity which assumed the duty to provide its residents with emergency response services. Defendant had adequate information to alert him that inaction on his part could create harm to Plaintiff. Mr. Clifton, on behalf of Plaintiff, contacted 911, spoke directly to Defendant and requested assistance from Defendant to aid Plaintiff, who Mr. Clifton (correctly) suspected was injured. In response to Mr. Clifton's request, Defendant stated that he would investigate the incident. Finally, provided the gravity of the situation, it can be reasonably assumed that Plaintiff would have called 911 to request assistance had he been able to do so because like most citizens of Staunton in need of emergency services, Plaintiff relied on Staunton's emergency services.

**\*6** Based on the foregoing analysis, the Court overrules the defendant's Special Plea of the Public Duty Doctrine.

**\*6** I would ask that the plaintiff's attorney prepare an Order in accordance with the Court's letter opinion and circulate the same for entry.

**\*6** I remain,

Va.Cir.Ct.,2003.
Meeks v. Broschinski
Not Reported in S.E.2d, 63 Va. Cir. 150, 2003 WL 22415285 (Va. Cir. Ct.), 18 VLW 459

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3

Westlaw.

Not Reported in A.2d                                                                    Page 1
Not Reported in A.2d, 2001 WL 209910 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

▷
Shively v. Ken Crest Center for Exceptional
PersonsDel.Super.,2001.Only the Westlaw citation is
currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
Daniel SHIVELY and Kurt Shively, Sr., Plaintiffs,
v.
KEN CREST CENTERS FOR EXCEPTIONAL
PERSONS, a Pennsylvania corporation, Ken-Crest
Services, Inc. and Mark Morris, Defendants.
**No. Civ.A.96C-05-316-JRS.**

Submitted Dec. 15, 2000.
Decided Jan. 26, 2001.

Upon Consideration of Defendant Ken-Crest
Services, Inc.'s Motion for Summary Judgment.
Denied.

Lois J. Dawson, Wilmington, Delaware, for Plaintiff.
William J. Cattie, III, Wilmington, Delaware, for
Defendant Ken-Crest Services, Inc.

MEMORANDUM OPINION
SLIGHTS, J.

*INTRODUCTION*

**\*1** In this case, the Court considers whether an entity
which provides residential facilities and various
supportive services to mentally impaired residents
may be held liable in tort to a young boy who lived in
the same apartment complex where one such facility
was located and who, over several months, was
sexually abused by a resident of the facility. The
residential facility, operated by the defendant, Ken-
Crest Services, Inc. ("Ken Crest"), has moved for
summary judgment on the ground that it owed no
duty to protect its neighbors from the acts of its
residents. The plaintiffs, Daniel Shively, a minor,[FN1]
and his father, Kurt Shively, Sr. (collectively,
"plaintiffs"), argue that Ken Crest was in a unique
position to control the behavior of its residents,
including Mark Morris ("Morris"), a resident of Ken
Crest who purportedly had a long history of sexually
deviant behavior. Plaintiffs contend that Ken Crest
maintained a special relationship with Morris which
was both supervisory and therapeutic in nature. On

this basis, plaintiffs contend that Ken Crest owed a
duty to the public generally, or at least the neighbors
of the residential facility, reasonably to control the
behavior of its residents and to warn of any
reasonably foreseeable dangerous propensities of the
residents. Plaintiffs contend further that Ken Crest
breached this duty with respect to them, and as a
proximate cause of this breach, Morris was able to
commit multiple acts of sexual assault against Daniel
Shively.[FN2]

> FN1. The minor's identity has not been
> concealed throughout the litigation.

> FN2. Morris has been convicted for the
> crimes he committed against Daniel Shively
> and is currently incarcerated. The parties do
> not dispute that he sexually assaulted Daniel
> Shively on multiple occasions on the
> property of the apartment complex where
> they both resided.

**\*1** Resolution of this motion for summary judgment
requires the Court to consider: (1) the parameters of
the legal duty a court will impose upon a defendant to
protect the general public from the acts of third
parties and to warn the general public that a third
party might be dangerous; and (2) the extent to which
public policy would be offended by imposing such a
duty upon a State-sanctioned residential facility for
mentally challenged individuals when such
individuals commit acts of violence against others not
resident in the facility. For the reasons that follow,
the Court concludes that a reasonable extension of
existing common law tort principles compels the
conclusion that Ken Crest owed a duty to Daniel
Shively to take reasonable measures to protect him
from Morris and to warn him of Morris' reasonably
foreseeable dangerous propensities. The Court also
finds that public policy will not be offended by the
imposition of this duty on Ken Crest and, indeed,
public policy dictates the result here.

*FACTS*

A. The Ken Crest Centers for Exceptional People

**\*1** Ken Crest is a provider of supportive residential

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 209910 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 2

assistance to mentally challenged individuals. Specifically, Ken Crest operates four types of adult residential facilities: (1) group homes; (2) family living programs; (3) supervised apartments; and (4) semi-independent apartments. Each type of facility operated by Ken Crest offers differing degrees of care and supervision to its residents. A resident's placement in any of these facilities depends upon the assessment of the resident by a team of specialists comprised of employees of both Ken Crest and the referring agency. The only established admission criterion for each facility, aside from age, residency and consent for services, is that the resident must have a primary diagnosis of mental retardation. Otherwise, Ken Crest does not maintain any set policies or procedures with respect to admission to any of its facilities. Rather, Ken Crest conducts an independent evaluation of each candidate for admission and, with the assistance of the referring agency, determines the appropriate placement of the putative resident. Ken Crest reserves the right to decline to admit any referral it believes to be inappropriate for placement in its facilities.

**\*2** As its name suggests, the "semi-independent apartment" operated by Ken Crest was designated as such because it was contemplated that its residents could assume some degree of independence in their activities of daily living. Nevertheless, the record reflects that Ken Crest provided to residents of these apartments hands-on assistance, if needed, with respect to hygiene issues, personal finances, nutritional requirements and employment placement. Ken Crest also arranged appropriate medical care and mental health counseling for its residents.

### B. Ken Crest's Relationship With The State of Delaware

**\*2** Ken Crest contracted with the State of Delaware's Department of Health and Social Services, Division of Mental Retardation ("the Division"), to receive and to place in its facilities residents of Delaware who have been diagnosed with mental retardation. Among the facilities operated by Ken Crest in Delaware is the semi-independent apartment facility at the Fox Run Apartments in Bear, Delaware.[FN3] Ken Crest's contract with the Division provided that Ken Crest, among other services, would provide: (1) "client admission and discharge criteria"; [FN4] (2) an "individual plan of services" for each resident developed by an "interdisciplinary team"; (3) appropriate housing; (4) access to appropriate nutrition; (5) access to appropriate transportation; and

(6) a "compliment of staff" capable of providing for the needs of the residents and supervising them, if necessary. The Division, for its part, agreed, *inter alia,* to "assign a case manager for each client in the home in order to monitor the implementation of the plan in the home ...," and to take financial responsibility for medical, dental, clinical and case management services for the residents.

> FN3. Fox Run Apartments, LP was dismissed from the litigation by stipulation of the parties after a negotiated settlement.

> FN4. According to James McFalls, Ken Crest's Rule 30(b)(6) designee, Ken Crest never did develop these criteria for the Fox Run facility notwithstanding this contractual obligation to do so.

**\*2** Ken Crest was required by the Division to embrace and incorporate in its provision of services a "Proclamation of Beliefs and Guiding Principles" ("the Proclamation") which generally provided that, in Delaware, Ken Crest's residents were to be free to determine their own lifestyle and to interact with and contribute to the community in which they live. Consistent with the Proclamation were the "Standards for Staffed Apartments" ("the Standards") promulgated by the Division which provided at § 6.4 that when interacting with the residents, "the Staffed Apartment Provider shall use [the] least restrictive alternatives that are consistent with the developmental needs of the client...." Both the Proclamation and the Standards embody a principal which is integral to mental health philosophy and, indeed, is embedded in Delaware law: allow as much freedom and normalcy in the life of the patient as the patient is safely able to handle.[FN5] Nevertheless, the Standards recognize that some restriction of the activities of Ken Crest residents may be required and that Ken Crest was authorized to implement such restrictions at its discretion. Of particular note is Section 9.4 which provides:

> FN5. *16 Del. C.* § § 5504, 5507

**\*3** Clients placed by the [Division] with the Staffed Apartment Provider may be changed only as a consequence to the service needs of the client as identified in his/her [individual program plan]. This might include, but is not limited to ... (3)[a][d]etermination that excessive adjustment problems exist that cannot be resolved after all

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                           Page 3
Not Reported in A.2d, 2001 WL 209910 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

attempts have been made to stabilize the placement.

**\*3** The record clearly reveals that Ken Crest possessed the authority to supervise residents of its semi-independent apartments if warranted and that Ken Crest appreciated that this authority existed. For instance, another Ken Crest policy document, entitled "Intake and Orientation Policy," which describes the staff's role in "Apartment Living" situations, states: "[s]taff supervision [of residents] can be flexed according to the needs of the individuals." Moreover, a Ken Crest memorandum, entitled "Residents in Neighborhood Homes with Plans for Unsupervised Time," admonishes: "until further notice, no resident is to be left alone or follow any existing written plans for 'unsupervised time.' " ' Indeed, the record reflects that Ken Crest has moved residents out of certain settings when they were a threat to their neighbors. Specifically, a Ken Crest representative explained at deposition that a resident was making lewd gestures towards children in a residential setting where many children lived nearby and that Ken Crest's staff determined a placement with another provider was appropriate. It is also clear that Ken Crest was compensated by the Division for supervising the residents of the Fox Run facility, including Morris.

**\*3** In addition to supervisory services, Ken Crest also arranged therapeutic services for its residents of semi-independent apartments. These services included mental health and other counseling.

C. Morris' Relationship with Ken Crest

**\*3** Morris has been diagnosed with numerous problems, including moderate to mild mental retardation, Attention Deficit Disorder, Conduct Disorder (socialized aggressive), and perhaps Fetal Alcohol Syndrome.[FN6] By the time he was 20 months old he was a ward of the State.[FN7] He had been in foster homes or institutionalized almost continually at the time he moved in to his Fox Run apartment.[FN8] It appears that he was placed at Ken Crest's Fox Run facility in late 1991.[FN9]

FN6. *State v. Morris,* Del.Super., I.D. No. 9409017630, Silverman, J. (August 10, 1995).

FN7. *Id.*

FN8. *Id.*

FN9. The parties go to great lengths to describe information about Morris' history of sexually deviant behavior which was not known to Ken Crest at the time of or after Morris' placement at Fox Run. Plaintiffs say Ken Crest should have unearthed this information prior to admitting Morris to its facility; Ken Crest says the Division should have provided this information as part of the referral package which accompanied Morris to Fox Run. The resolution of this dispute may impact upon whether a fact-finder concludes that Ken Crest breached its duty, but it does not affect the Court's determination of whether a duty exists in the first instance.

**\*3** The "individual plan of service" for Morris has not been provided to the Court.[FN10] What have been provided, however, are documents labeled "Interdisciplinary/Progress Notes" which appear to recount Morris' progress while a resident at Fox Run. These records reveal several disturbing behavioral problems exhibited by Morris, including: an incident where Morris was rebuked for having "three small children in the apartment"; an incident where he was accompanied home by a police officer who reported that Morris "allegedly told a boy something lewd"; an incident where Morris had "minor boys" in his apartment; yet another incident where a young boy was found drinking beer with Morris in Morris' apartment; an incident where Morris entered another resident's room without knocking and began to touch her genitals; and an incident where Morris was found in another resident's room with his pants down.[FN11] A "Neighborhood Home Monthly Review" of Morris, performed on December 31, 1993, reflects that the Ken Crest staff was concerned about the escalating behavioral problems exhibited by Morris and notes particularly that he had been arrested recently for throwing a brick at a truck while intoxicated and that "[t]he guys [Morris] is hanging out with appear to be young."

FN10. While this document no doubt would be helpful to the Court in understanding the relationship between Morris and Ken Crest, and its absence from the record is troublesome, the Court is satisfied that the record is adequate in its present form to decide this controversy.

FN11. This last incident report is dated June 2, 1994, one day after Morris' sexual abuse

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 4
Not Reported in A.2d, 2001 WL 209910 (Del.Super.)
(Cite as: Not Reported in A.2d)

of Daniel Shively began.

**\*4** Ken Crest's concern for and about Morris prompted it to provide counseling for Morris in 1994. Specifically, Ken Crest arranged for Daniel Thrash to counsel Morris with respect to "sexuality issues" and, to a lesser extent, concerns relating to Morris' excessive use of alcohol. Thrash testified that his counseling of Morris never reached a "therapeutic" level because he was not provided with information regarding the full extent of Morris' behavioral problems. Had he been so informed, Thrash speculated that "we [presumably referring to himself and the other Ken Crest staff members] would have had a team meeting and my first recommendation would be that the level of independence that Mark has would be reviewed...."

### D. Morris Assaults Daniel Shively

**\*4** The parties agree that Morris sexually assaulted Daniel Shively over a period of nearly four months, from June through September of 1994. The parties further agree that these acts occurred on the property of the Fox Run Apartments. Finally, the parties agree that Ken Crest had not taken steps to place Morris in another facility prior to September, 1994, nor had Ken Crest warned the residents of the Fox Run Apartments that Morris may be dangerous, particularly to children. Indeed, James McFalls, Ken Crest's corporate representative for purposes of this litigation, testified that Ken Crest maintained a strict policy of not warning surrounding residents or communities about a potentially dangerous Ken Crest resident out of concern for the resident's "privacy and confidentiality." (D.I. 177, Ex. C at 47-48) [FN12] Morris was 23 years old at the time of the assaults; Daniel Shively was eight years old.[FN13] Not surprisingly, the parties stipulate that Daniel Shively has experienced tremendous emotional and physical trauma as a result of the assaults and that the emotional components of his injuries are permanent.

FN12. To follow is the specific exchange at deposition:
Q: If a resident were arrested for committing an assault or a sexual assault against another resident at the Ken Crest program and there was a public record, you know, a charge is filed, some sort of disposition, would Ken Crest make the neighbors in the community aware of that?
A: No.

Q: Why is that?
A: Privacy and confidentiality.
Q: I'm asking you, sir, at this point about specific acts that would already be a matter of public record if someone went down to the courthouse and chose to look them up. With respect to things like that, would Ken Crest notify the community of incidents of that type?
A: No.
Q: And that would be out of a concern for the privacy of the resident?
A: And confidentiality of information, yes.

FN13. *Id.*

*DISCUSSION*

### A. Summary Judgment Standard

**\*4** When considering a motion for summary judgment, the Court's function is to examine the record to determine whether genuine issues of fact exist.[FN14] If, after viewing the record in a light most favorable to the non-moving party, the Court finds that there are no genuine issues of material fact, and that the party is entitled to judgment as a matter of law, summary judgment will be granted.[FN15] Summary judgment will not be granted, however, if the record indicates that a material fact is in dispute, or if judgment as a matter of law is not appropriate.[FN16]

FN14. *Oliver B. Cannon & Sons, Inc. v. Door-Oliver Inc.,* Del.Super., 312 A.2d 322, 325 (1973).

FN15. *Id.*

FN16. *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467, 470 (1962).

### B. The Parties' Contentions

**\*4** The parties appear to agree that the Court must begin its analysis by assessing the relationship between Ken Crest and Morris. Delaware law recognizes that certain relationships between individuals can give rise to duties which flow from the nature of the relationship and run to third parties not involved in the relationship.[FN17] Ken Crest contends that neither its relationship with Morris, nor its relationship with plaintiffs are such that a duty

Not Reported in A.2d                                                                 Page 5
Not Reported in A.2d, 2001 WL 209910 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

may be created which would require it to control Morris or to protect plaintiffs from Morris. Ken Crest further contends that its business is highly regulated by the State and, consequently, if a cause of action running to third parties should lie for its negligence, the cause of action must be created by the General Assembly, not the courts.[FN18]

> FN17. *See, e.g., Naidu v. Laird,* Del.Supr., 539 A.2d 1064 (1988)(imposing duty upon psychotherapist to protect third parties from the dangerous propensities of his patient); *Furek v. University of Delaware,* Del.Supr., 594 A.2d 506 (1991)(imposing a duty upon a university to protect students from other students in certain situations).

> FN18. *See Moss Rehab v. White,* Del.Supr., 692 A.2d 902 (1997)(cause of action for malpractice against highly regulated driving school rejected); *Wright v. Moffitt,* Del.Supr., 437 A.2d 554 (1981)(dram shop liability rejected because of extensive State regulation of alcohol service industry).

**\*5** Plaintiffs contend that Ken Crest accepted the responsibility of supervising and caring for Morris, an individual known to Ken Crest to be mentally retarded and prone to inappropriate sexual behavior. Having accepted this responsibility, plaintiffs contend that Ken Crest owed to them and to the other residents of Fox Run a duty to discharge its care and supervision of Morris in a reasonably prudent manner. Moreover, plaintiffs contend that the imposition of a duty upon Ken Crest is a logical application of settled Delaware jurisprudence which recognizes that a legal duty can extend to unknown third parties in certain circumstances. Specifically, plaintiffs contend that, like the psychotherapist and patient in *Naidu,* Ken Crest and Morris shared a "special relationship" as evidenced by Ken Crest's ability to supervise and control Morris and its ability and actual efforts to provide counseling to Morris. Accordingly, plaintiffs contend that this "special relationship" created in Ken Crest a duty to protect its Fox Run neighbors from Morris and any other dangerous resident of its facility.[FN19]

> FN19. *Naidu,* 539 A.2d at 1073.

### C. Ken Crest Maintained a "Special Relationship" With Morris

**\*5** Whether Ken Crest owes a duty to plaintiffs is a mixed question of law and fact to be answered by the Court.[FN20] The legal framework with which the Court should analyze Ken Crest's duty to the plaintiffs is readily apparent in Delaware's case law. The application of this framework to the facts presented here, however, requires the Court to venture a little further down the road first constructed in Delaware by *Naidu.*[FN21] The map is clear.

> FN20. *Id.* at 1070. *See also O'Connor v. Diamond State Tel. Co.,* Del.Supr., 503 A.2d 661, 663 (1985)("[t]he question of duty is traditionally an issue for the court"); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 37, at 236 (5 [th] Ed.1984)(whether a duty exists "is entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which make up the law; and it must be determined only by the court").

> FN21. Defendants urge the Court to follow *Marshall v. University of Delaware,* Del.Supr., No. 78, 1993, Moore, J. (September 22, 1993)(ORDER) in which the Court concluded that the University was not liable for the violent acts of its students against non-students. The Court is not persuaded that Marshall has any application here. In that case, the Court addressed liability based on the University's status as landowner and the *Restatement (Second) of Torts* § 323. Neither of these theories provide the basis for liability here.

**\*5** "Generally a party does not have a duty to control the conduct of a third person."[FN22] Delaware courts have recognized exceptions to this general rule, however.[FN23] Of particular relevance in this case is the exception outlined in the *Restatement (Second) of Torts* § 315 (1965) ("Section 315"), which provides:

> FN22. *Harden v. Allstate Ins. Co.,* D. Del., 883 F.Supp. 963, 971 (1995).

> FN23. *See, e.g., Bright v. State,* Del.Supr., 740 A.2d 927, 931 (1999)(court recognized the duty of a psychiatrist to warn a potential victim of his patient who had expressed an intent to harm the victim); *Naidu,* 539 A.2d 1064 (imposing duty upon psychotherapist

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 209910 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 6

to protect third parties from the dangerous propensities of his patient); _Harden, 883 F.Supp. at 971_ (imposing a duty upon a neurologist which extended to the motoring public to take reasonable measures to prevent his epileptic patient from driving).

*5 There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

*5 (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

*5 (b) a special relation exists between the actor and the other which gives the other a right to protection.

*5 Section 315 first was adopted in Delaware in _Naidu,_ where the Court was confronted with a wrongful death action brought by the widow of a man killed in a car accident involving a patient of Dr. Naidu, a psychiatrist with admitting privileges at the Delaware State Hospital. Plaintiff contended that Dr. Naidu prematurely discharged his patient from the hospital and, in so doing, failed properly to control the patient and prevent him from harming the public at large. Applying Section 315(a), the Court concluded that Dr. Naidu maintained a special relationship with his patient such that he owed to plaintiff a duty to control his patient's conduct.[FN24]

FN24. _Naidu,_ 539 A.2d at 1072-73.

*6 In this case, the Court concludes that, for purposes of the analysis contemplated by Section 315(a), there are few, if any, meaningful facts which distinguish the relationship between a psychotherapist and his patient from the relationship Ken Crest maintains with its residents.[FN25] Like Dr. Naidu, Ken Crest was in a unique position to control the conduct of its residents, including Morris, to the extent Ken Crest believed that such control was needed under the circumstances. Ken Crest was able to coordinate mental health treatment, enforce more stringent supervisory measures, and remove Morris from the facility in its discretion.[FN26] Accordingly, Ken Crest owed to plaintiffs a duty to "initiate whatever precautions [were] reasonably necessary to protect potential victims of the [resident]."[FN27] Whether Ken Crest knew or should have known of the dangerous propensities of Morris, and whether Ken Crest took reasonable steps to protect potential victims of Morris, are questions of fact which are proper for the jury's consideration.[FN28]

FN25. This is not a case for analysis under Section 315(b) since there can be no argument that Ken Crest enjoyed a special relationship with the plaintiffs or its other neighbors at Fox Run which would give rise to a duty to the plaintiffs.

FN26. Comment (c) to § 315 provides in part: "The relations between actor and a third person which requires the actor to control the third person's conduct are stated in § § 316-319." Here, the Court finds that the relationship giving rise to Ken Crest's duty under § 315 is defined in _Restatement (Second) of Torts,_ § 319 (1965), entitled "Duty of Those in Charge of Person Having Dangerous Propensities" which provides:
One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

FN27. _Id._ at 1073 (citation omitted). The Court notes that _Naidu_ emphasized that this duty is not only owed by the psychiatrist, it is owed by "other mental health professionals" as well. This reference to "other mental health professionals" would seem to blunt any argument that psychiatrists somehow occupy a unique place in the § 315 analysis based on their training, experience, professional licensure, etc. The Court is satisfied that the duty contemplated by § 315 clearly is owed by other mental health professionals, such as Ken Crest.

FN28. _Id._ at 1073.

*6 The extension of a duty upon a residential facility such as Ken Crest to protect others from its residents is supported by decisions from other jurisdictions which considered facts closely in line with those _sub judice._ [FN29] In each of these cases, the courts have concluded that a special relationship existed between the defendant and residents of the defendant's facility such that the defendant owed a duty to others reasonably to prevent those under their charge from causing injury.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 7
Not Reported in A.2d, 2001 WL 209910 (Del.Super.)
(Cite as: Not Reported in A.2d)

FN29. *See, e.g., Estates of Morgan v. Fairfield Family Counseling Center,* Oh.Supr., 673 N.E.2d 1311 (1997)(recognizing a duty of an outpatient counseling center to protect third parties from the dangerous acts of its patients); *Dudley v. Offender and Restoration of Richmond, Inc.,* Va.Supr., 401 S.E.2d 878 (1991)(recognizing duty of "halfway house" to protect neighbors from its dangerous residents); *Garrison Retirement Home Corp. v. Hancock,* Fla. Dist. Ct.App., 484 So.2d 1257 (1985)(recognizing duty of retirement village to protect third parties from its residents when an elderly resident injured another in an automobile accident).

**\*6** Ken Crest has urged the Court to reject a Section 315 duty in this case because it was obliged by contract and by statute to allow its residents to interact with their communities and to live independently without unnecessary restrictions on their freedom. The Court rejects this argument for two reasons. First, the record clearly reflects that Ken Crest was authorized and, indeed, expected to provide a degree of supervision and control over its residents as was required to protect the residents from themselves and each other. Second, a Section 315 duty is not predicated on the defendant's ability to exercise total control over individuals with whom it maintains a special relationship. Rather, "it is within the contemplation of the Restatement that there will be diverse levels of control which give rise to corresponding degrees of responsibility."[FN30]

FN30. *Fairfield Family Counseling Center,* 673 N.E.2d at 1323.

**\*6** The Court also concludes that Ken Crest owed a duty to the plaintiffs to warn them of Morris' dangerous propensities to the extent it believed, or reasonably should have believed, that such propensities presented an unreasonable risk of harm to others.[FN31] This duty to warn also flows from the relationship between Ken Crest and Morris and finds its roots as well in the *Restatement (Second) of Torts.*[FN32]

FN31. *Bright,* 740 A.2d at 931.

FN32. *Id.* (citing *Naidu,* 539 A.2d at 1072-73).

D. The State's Regulation of Ken Crest Does Not Eliminate Ken Crest's Duty to Plaintiff

**\*6** Ken Crest contends that it is highly regulated by the State of Delaware and, accordingly, the Court should defer to the General Assembly to create a cause of action for failure to control the facility's residents. Ken Crest points to two scenarios where Delaware courts have declined to create a cause of action in deference to regulatory schemes. As discussed below, both are inapposite.

**\*7** In *Wright v. Moffit*[FN33] and *Moss Rehab v. White,*[FN34] the Delaware Supreme Court was asked to create two new causes of action at common law which had not been recognized previously in Delaware-- Dram Shop liability and educational malpractice (involving a driving school), respectively-- both of which involve industries which are highly regulated within the State. The Court concluded in both cases that the General Assembly was in the best position to fit the proffered causes of action into the existing regulatory scheme. This case, however, does not present the need to create a cause of action and fit it within a regulatory scheme. As indicated, the Court's holding today simply extends settled common law jurisprudence in Delaware to a new set of facts. Rather than *create* a new cause of action, as the courts were asked to do in *Wright* and *Moss Rehab,* the Court in this case has simply *recognized* that an *existing* cause of action is implicated by the facts of record.[FN35]

FN33. Del.Supr., 437 A.2d 554 (1981).

FN34. Del.Supr., 692 A.2d 902 (1997).

FN35. The Court takes note of the fact that the care of the mentally ill, directly at issue in *Naidu* (and here), is also highly regulated by statute. *Naidu,* 539 A.2d at 1071-72. The existence of a regulatory scheme, however, did not stop the Court from recognizing the duty enunciated in Section 315. *Id.* at 1072.

E. Public Policy Mandates The Recognition Of Ken Crest's Duty To Control Its Residents

**\*7** The public policy of Delaware appropriately embodies the notion that "[m]entally retarded persons have a right ... to participate in all aspects of community life; and to have access to appropriate leisure time activities."[FN36] Accordingly, it has been recognized in Delaware that "modification or denial

of [the] rights [of mentally retarded individuals] ... must be based on an evaluation of the social capability of the mentally retarded person by qualified experts...." [FN37] Among the rights enjoyed by patients resident in certain institutions including, arguably, residential facilities such as those operated by Ken Crest, is "the right to be free from chemical and physical restraints...." [FN38] Ken Crest argues that the imposition of a duty upon it to control its residents would be repugnant to these public policy considerations and would dissuade mental health professionals from offering residential options such as semi independent apartments to mentally retarded residents.

FN36. 16 *Del. C.* § 5504

FN37. 16 *Del. C.* . 5507

FN38. 16 *Del. C.* § 1121(7)

**\*7** Ken Crest's emphasis of public policy favoring the mentally retarded citizens of Delaware is entirely appropriate. The Court must consider these policy concerns when determining whether the duty urged by the plaintiffs is reasonable. The Court has done so and concludes for several reasons that public policy will not be offended by the Court's holding. First, similar public policy arguments have been considered and rejected by Delaware courts. For instance, in *Harden,* the defendant neurologist argued that to impose a duty upon him to prevent his epileptic patient from driving would fly in the face of the public policy which encourages those with disabilities to be independent. [FN39] The court did not find the defendant's reference to public policy sufficient to overcome the common law duty recognized in *Section 315.* [FN40] Likewise, in *Naidu,* the court, while acknowledging that there is "inherent difficulty" in the treatment of mentally ill patients, ultimately questioned the reliability of the contention that mental health providers would not treat mentally ill patients if saddled with a duty to protect others from the patient. [FN41] Moreover, the court noted that the public policy argument "misinterpret[ed] the nature of the duty imposed on mental health professionals." [FN42] Specifically, the court observed:

FN39. *Harden,* 883 F.Supp. at 967-68.

FN40. *Id.* at 972.

FN41. *Naidu,* 539 A.2d at 1074.

FN42. *Id.*

**\*8** Recognition of an affirmative duty owed persons other than the patient does not mean that the psychiatrist is liable for the negligence of the patient. Rather, the psychiatrist will be liable only when his own negligence is responsible for the injury in question. [FN43]

FN43. *Id.*

**\*8** As in *Naidu,* the Court finds that Ken Crest's public policy argument simply does not comport with the duty which has been recognized here. The Court has concluded that Ken Crest maintained a special relationship with Morris which enabled it to exercise a degree of control over him which was commensurate with Morris' dangerous propensities. This ability to control Morris was recognized by Ken Crest and sanctioned by the Division. Only to the extent that a fact finder determines that Ken Crest failed to act reasonably in its custodial obligations will it be liable to the plaintiffs. It is difficult to imagine that an organization, such as Ken Crest, would be discouraged from providing residential support services to mentally challenged individuals simply because the law expects that this function will be discharged without negligence.

**\*8** Finally, the Court is compelled to observe that public policy actually dictates the result here. Ken Crest operates some of its facilities in the heart of Delaware's residential neighborhoods. This proximity is necessary to allow the Ken Crest residents to interact with their community and to become productive members of society. Nevertheless, many of Ken Crest's residents have special needs and some of Ken Crest's residents have special difficulties which make their integration into the community a more sensitive matter. Ken Crest must recognize these issues and must take reasonable measures to address them for the protection of the communities in which it operates. Public policy requires that it do so.

*CONCLUSION*

**\*8** For the foregoing reasons, Ken Crest's motion for summary judgment must be DENIED. The special relationship that exists between Ken Crest and its residents is the predicate for a duty owed by Ken Crest to individuals other than its residents. Its duty is to take whatever steps are reasonably necessary and

Not Reported in A.2d                                                                 Page 9
Not Reported in A.2d, 2001 WL 209910 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

available to protect potential victims of the residents when the facility determines, or reasonably should determine, that the patient presents an unreasonable risk of harm to such potential victims. The facility further has a duty to warn potential victims when it knows or should know that the resident's dangerous propensities present an unreasonable risk of harm to others. Whether this duty has been breached by Ken Crest will be determined at trial by the jury.

**\*8** IT IS SO ORDERED.

Del.Super.,2001.
Shively v. Ken Crest Center for Exceptional Persons
Not Reported in A.2d, 2001 WL 209910 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.