# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
CAROL SMITH,                            )
                                        )
             Plaintiff           )
                                        )
      v.                            )         Civil Action No. 06-633 (RBW)
                                        )
UNITED STATES OF AMERICA,               )
                                        )
           Defendant.            )
                                        )
_____ )

## MEMORANDUM OPINION

The plaintiff, Carol Smith, brings this action on behalf of herself and as Personal

Representative of the Estate of Erika Smith, the plaintiff's deceased daughter, against the United

States of America (the "government") for alleged "gross negligence and reckless acts and

omissions," Amended Complaint for Damages (the "Amended Complaint" or "Am. Compl.") at

1, by the United States Parole Commission (the "USPC"), the Federal Bureau of Prisons (the

"BOP"), and the Court Services and Offender Supervision Agency (the "CSOSA") that resulted

in the death of the plaintiff's daughter.  Specifically, the plaintiff alleges that Anthony Quintin

Kelly, a convicted felon, Am. Compl. ¶ 2, "was negligently, recklessly, and wantonly released

from federal custody and supervised in the community by" the USPC, BOP, and CSOSA, id. at

1, which afforded Kelly the opportunity to "br[eak] into the Silver Spring, Maryland home of

Erika's father, Greg Russell, and murder[] Erika and her father," id. at 2.  Currently before the

court is the government's motion to dismiss the Amended Complaint pursuant to Federal Rules

1

of Civil Procedure 12(b)(1) and 12(b)(6) (the "Gov't Mot.").  After carefully reviewing the

Amended Complaint, the government's Motion, and all memoranda relating thereto,[1] the Court

concludes that the Motion should be converted to a motion for summary judgment and that

summary judgment should be granted in favor of the government for the reasons that follow.

## I. Background

The plaintiff alleges the following facts in her Amended Complaint.  On April 16, 1996,

Anthony Quintin Kelly was sentenced to ten years and six months in prison after pleading guilty

to car theft and assaulting and threatening two individuals with a dangerous weapon.  Am.

Compl. ¶ 12.  Kelly, who had "accrued a lengthy record of escalating criminal activity . . . dating

back to 1982," id., was transferred to a halfway house in the District of Columbia known as Hope

Village in December of 2001–"[m]ore than five years before his sentence would have been

completed."  Id. ¶ 13.  Just three months later, on March 7, 2002, Kelly was placed on parole

under the supervision of the CSOSA.  Id.  Kelly was initially placed under a relatively stringent

level of supervision known as "maximum supervision," id. ¶ 26, but the CSOSA "reduced

Kelly's level of supervision to 'medium supervision'" soon thereafter.  Id. ¶ 27.

Kelly was arrested in Prince George's County, Maryland, for driving a stolen vehicle and

assault of an officer on June 10, 2002, and ordered to appear in court on July 30, 2002.  Id. ¶ 29.

As a result of his arrest, Kelly's Court Security Officer ("CSO") recommended that Kelly's

parole be revoked on June 20, 2002, but the USPC decided to return Kelly to "maximum

---

[1] In addition to the Amended Complaint and the government's Motion, the Court considered (1) the Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss ("Gov't Mem."), (2) the Plaintiff's Opposition to Defendant's Motion to Dismiss (the "Opposition" or "Pl. Opp'n"), and (3) the Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss (the "Reply" or "Gov't Reply") in preparing this Memorandum Opinion.

supervision" status instead.  Id. ¶ 30.  Kelly then failed to appear in court on July 30, 2002, as required, leading to the issuance of a warrant for his arrest.  Id. ¶ 31.  The next day, Kelly broke into a gun store in Kensington, Maryland, where he stole five weapons, including the weapon used to kill the plaintiff's daughter.  Id.

On August 6, 2002, Kelly broke into the home of Gregory Russell in Silver Spring, Maryland.  Id. ¶ 16.  "He viciously attacked Russell's [and the plaintiff's] daughter, nine-year-old Erika Smith, striking her multiple times in the face with a gun or other solid object and shooting her in the back" before shooting Russell "eight times in the leg and chest."  Id.  Kelly fled the scene "with cash and property from the residence, including the family Bible," leaving Erika Smith "to bleed to death in a closet."  Id.

Ten days after he killed Erika Smith and her father, Kelly contacted his CSO to inform the CSO that he had missed his July 30, 2002 court hearing in Prince George's County.  Id. ¶ 32.  After receiving a call from a District of Columbia police officer seeking any information as to Kelly's whereabouts on August 21, 2002, the CSO called Kelly, then waited "several days" before mailing an arrest warrant request to the USPC by regular mail.  Id. ¶ 32.  The USPC received the request six days later and issued an arrest warrant the following day.  Id.  Kelly was captured on September 5, 2002, and indicted for the murders of Gregory Russell and Erika Smith on May 15, 2003.  Id. ¶ 33.  It was not until May of 2003 when the plaintiff learned that Kelly was the man who murdered her daughter.  Id. ¶ 36.

As set forth in her Amended Complaint, the plaintiff asserts that the United States government should be held liable under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 (2000) (the "FTCA"), for the death of Erika Smith because the manner in which the various agencies of

the government furloughed Kelly to Hope Village, released Kelly on parole, and supervised

Kelly's parole "was grossly negligent and exhibited wanton indifference to the safety of members

of the community, including Erika Smith, and [was] in violation of the policies, practices,

procedures, rules, requirements, guidelines, regulations and standards applicable to the release

and supervision of offenders within community corrections facilities and in the community." Id.

at 2. The plaintiff alleges that at least one of these agencies of the government acted in a

negligent manner at virtually every turn following Kelly's release from prison. For example, she

alleges that the BOP failed to properly "supervise and monitor Hope Village's oversight of

prisoners living at the halfway house," id. ¶ 15, thus allowing Kelly to "violate[] numerous

conditions of his release during his stay at the halfway house which . . . should have resulted in

[Kelly's] reincarceration [or] revocation or retardation of his parole date." Id. ¶ 21.[2]

With respect to the USPC, the plaintiff alleges that the "[d]efendant failed to take the

necessary and reasonable steps to verify information provided by Kelly to obtain early release

into the community." Id. ¶ 19. Specifically, the plaintiff contends that the USPC released Kelly

on parole "in part[] on his purportedly having earned a General Educational Development

('GED') high school equivalency diploma in March 2000 from the Ohio Department of

Education," id. ¶ 20, when "[i]t was a readily ascertainable fact . . . that Kelly never actually

earned the GED certificate," id. The plaintiff further alleges that the USPC's

"policies . . . required verification that an offender was employed prior to being paroled into the

community," id. ¶ 22, but that Kelly was released even though he "was never employed at any

---

[2] The plaintiff also pursued a wrongful death claim against Hope Village before this Court. Smith v. Hope Village, Civil Action No. 05-0633 (RBW) (D.D.C.). That action settled and was voluntarily dismissed on September 11, 2007.

point after his December 21, 2001 transfer to Hope Village," id.  Finally, the plaintiff alleges that

the USPC "inexplicably failed to revoke Kelly's parole" after it learned "that Kelly had been

charged with automobile theft and assaulting a police officer."  Id. ¶ 30.

Although the plaintiff alleges that the CSOSA acted "negligently" and "recklessly" when

it "reduced Kelly's level of supervision to 'medium supervision,'" id. ¶ 27, the bulk of her

allegations against that agency concern the alleged errors made by Kelly's CSO.  According to

the plaintiff, Kelly's CSO "failed to meet the requirement[] of 'maximum supervision'" that the

CSO conduct four "face-to-face meetings" with Kelly, two of which were supposed to be "in the

'field,'" id. ¶ 26, both before the CSOSA reduced Kelly's level of supervision and after the

USPC reinstated its original level of supervision in the wake of Kelly's arrest.  Id. ¶¶ 26, 30.

Further, the plaintiff opines that "[h]ad the CSO fully and appropriately supervised Kelly, . . . the

CSO would have discovered that Kelly was not employed," id. ¶ 28, a requirement of his parole,

and "would have discovered additional violations and misconduct by Kelly, including . . . Kelly's

1) change of residence to his girlfriend's apartment without the requisite notice to [the

d]efendant; 2) conduct resulting in the issuance of a temporary restraining order against Kelly

ordering him not to contact his first wife . . . ;  and 3) arrest while driving a stolen vehicle and

assault on a police officer in Prince George's County, Maryland . . . ," id. ¶ 29.  The plaintiff also

alleges that Kelly's CSO "failed to take any action to detain Kelly or revoke his parole" after

Kelly was arrested for automobile theft and assaulting a police officer, id. ¶ 31, and that when

Kelly informed his CSO that Kelly had missed his court date in Prince George's County, "the

CSO failed to report Kelly's action or the issuance of an arrest warrant for him" to the USPC, id.

¶ 32.

5

On March 29, 2005, the plaintiff presented these allegations through administrative claims to the USPC, BOP, and CSOSA.  Id. ¶ 4.  The claims were rejected on October 7, 2005. Id. & Ex. 1 (Letter from Barbara Matthews-Beck, Acting General Counsel to the Court Services and Offender Supervision Agency for the District of Columbia to Stuart H. Newberger, Esq. dated Oct. 7, 2005).  The plaintiff filed her initial complaint with this Court on April 6, 2006, and filed her amended complaint on October 4, 2006.  The government then filed its dismissal motion on November 15, 2006.

The government seeks to dismiss the Amended Complaint on two grounds.  First, it argues that the court lacks subject-matter jurisdiction to hear this dispute because (1) the suit is time-barred by the statute of limitations set forth in the FTCA, Gov't Mem. at 8-12, Gov't Reply at 3-7, (2) the government is immune from suit for any actions taken by the USPC and the CSOSA under the doctrine of quasi-judicial absolute immunity, Gov't Mem. at 12-18, Gov't Reply at 7-10, and is immune from suit for any actions taken by the USPC and the BOP under the "discretionary function" exception to the FTCA, Gov't Mem. at 18-23, Gov't Reply at 10, and (3) the BOP is immune from suit under the FTCA "because Hope Village was not operated or managed by the BOP, but was instead an entirely independent private contractor."  Gov't Mem. at 23-28.  Second, the government argues that the plaintiff fails to state a claim for which relief can be granted because it owes no duty of care to individual citizens of the District of Columbia under the "public duty doctrine," Gov't Mem. at 30-32, Gov't Reply at 11-12, and would not have owed a duty of care to Erika Smith based on the facts alleged in the Amended Complaint.  Gov't Mem. at 33-37, Gov't Reply at 12-15.

The plaintiff apparently concedes that the USPC has quasi-judicial immunity from suit in this case and that both the USPC and the BOP fall within the discretionary function exception to the FTCA's waiver of sovereign immunity.  See Pl. Opp'n at 13-21 (discussing quasi-judicial immunity and the discretionary function exception to the FTCA only with respect to actions taken by the CSOSA); Gov't Reply at 7-8, 10 ("Just as [the p]laintiff failed to dispute the application of quasi-judicial immunity to the [USPC], [the p]laintiff has, likewise, failed to dispute [the d]efendant's argument that the actions of the [USPC] and the [BOP] are exempt from FTCA liability under the discretionary function exception.").[3]  On the other hand, the plaintiff asserts that (1) the statute of limitations for the FTCA did not begin to run until May of 2003, which makes her claim timely, Pl. Opp'n at 5-13, (2) the allegedly negligent acts committed by Kelly's CSO were not functionally adjudicative in nature and therefore not protected by quasi-judicial immunity, id. at 13-15, (3) the discretionary function exception to the FTCA's waiver of sovereign immunity does not apply to the actions taken by Kelly's CSO because those actions were not discretionary in nature and were not rooted in public policy

---

[3]  "It is understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."  Buggs v. Powell, 293 F. Supp. 2d 135, 141 (D.D.C. 2003) (Walton, J.).  The Court's authority to treat unopposed arguments as conceded derives from Local Civ. R. 7(b), which states as follows:

> Within 11 days of the date of service or at such other time as the court may direct, an opposing party shall serve and file a memorandum of points and authorities in opposition to the motion.  If such a memorandum is not filed within the prescribed time, the court may treat the motion as conceded.

(Emphasis added.)
    "Courts have interpreted this local rule to apply to specific arguments within a memorandum opposing a motion."  United States v. Real Property, 287 F. Supp. 2d 45, 61 (D.D.C. 2003) (Walton, J.).  The D.C. Circuit "'ha[s] yet to find that a district court's enforcement of this rule constituted an abuse of discretion.'"  Buggs, 293 F. Supp. 2d at 141 (quoting FDIC v. Bender, 127 F.3d 58, 67-68 (D.C. Cir. 1997) (internal citations omitted)).  The Court therefore declines "to act as an advocate for [] [the parties] and construct their legal arguments on [their] behalf in order to counter those in the motion to dismiss."  Real Property, 287 F. Supp. 2d at 61 (quotation omitted).

considerations, id. at 15-21, (4) the public duty doctrine does not apply in this instance because Kelly was a "dangerous person," thus creating a duty on the part of his CSO to prevent him from harming others, id. at 22-28, and (5) the government owed a duty of care to Erika Smith and the plaintiff based on the facts alleged in the Amended Complaint. Id. at 28-38. The government agrees in its Reply that the discretionary function exception does not apply to the negligent acts allegedly committed by Kelly's CSO, Gov't Reply at 10, but otherwise disputes the plaintiff's other arguments.

## II. Legal Standard

As the Court previously noted, the government seeks to dismiss the Amended Complaint under both Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.[4] "Rule 12(b)(1) presents a threshold challenge to the [C]ourt's jurisdiction, whereas 12(b)(6) presents a ruling on the merits with res judicata effect." Al-Owhali v. Ashcroft, 279 F. Supp. 2d 13, 20 (D.D.C. 2003). The two sub-parts of the rule are governed by distinct legal standards, which the Court discusses below. In addition, for the reasons set forth below, the government's Motion also requires a discussion of Rule 56(c) of the Federal Rules of Civil Procedure, which governs the Court's consideration of whether summary judgment in favor of one party or the other is appropriate. The Court therefore includes Rule 56(c) in its discussion of the legal standards applicable in this case.

---

[4] The government makes a passing reference to Federal Rule of Civil Procedure 12(b)(2) in its supporting legal memorandum, Gov't Mem. at 6, but it does not discuss the applicable standard for determining the merits of such motions and does not mention that sub-part of Rule 12(b) anywhere else in its memorandum, its Reply, or the Motion itself. Rule 12(b)(2) permits defendants to assert the defense of lack of personal jurisdiction, an issue that is never discussed in the parties' memoranda of law. As best the Court can tell, the government's citation to Rule 12(b)(2) is nothing more than a typographical error. The issue is moot in any event in light of the Court's conclusion that the Amended Complaint must be dismissed with prejudice based on the government's statute of limitations defense.

A.     Motion to Dismiss for Lack of Subject-Matter Jurisdiction under Rule 12(b)(1)

Broadly speaking, there are two types of Rule 12(b)(1) motions.  "A facial challenge attacks 'the factual allegations of the complaint' that are contained on 'the face of the complaint,' while a factual challenge is addressed to the underlying facts contained in the complaint."  Id. (quoting Loughlin v. United States, 230 F. Supp. 2d 26, 35-36 (D.D.C. 2002) (citations omitted)).  Where the government makes a facial challenge, "the [C]ourt must accept as true the allegations in the complaint and consider the factual allegations of the complaint in the light most favorable to the non-moving party," Erby v. United States, 424 F. Supp. 2d 180, 182 (D.D.C. 2006) (citations omitted), just as it would on a motion to dismiss under Rule 12(b)(6), see Price v. Socialist People's Libyan Arab Jamhiriya, 294 F.3d 82, 93 (D.C. Cir. 2002)  (noting that standard for facial challenge to subject-matter jurisdiction "is similar to that of Rule 12(b)(6)").  Where a factual challenge is made, the Court "may consider materials outside the pleadings" to determine whether it has subject-matter jurisdiction over the challenged case or claims, Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citation omitted), and "the plaintiff bears the burden of establishing the factual predicates of jurisdiction by a preponderance of the evidence," Erby, 424 F. Supp. 2d at 182 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)) (other citations omitted).  For this latter type of challenge, plaintiffs must "be given an opportunity for discovery of facts necessary to establish jurisdiction."  Ignatiev v. United States, 238 F.3d 464, 467 (D.C. Cir. 2001) (citations omitted).

B.     Motion to Dismiss for Failure to State a Claim under Rule 12(b)(6)

As with facial challenges to subject-matter jurisdiction under Rule 12(b)(1), the Court "must treat the complaint's factual allegations as true and must grant the plaintiff the benefit of

all inferences that can be derived from the facts alleged" in considering motions to dismiss under Rule 12(b)(6). Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (internal quotations omitted). Unlike motions to dismiss under Rule 12(b)(1), factual challenges are not permitted under Rule 12(b)(6), and the Court may only consider the facts alleged in the complaint, any documents attached as exhibits thereto, and matters subject to judicial notice in weighing the merits of the motion. EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 (D.C. Cir. 1997). The Court's focus is restricted to the facts as alleged by the plaintiff, which must be sufficiently detailed "to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, ___ U.S. ___, 127 S. Ct. 1955, 1959 (2007). It is incumbent upon the plaintiff to provide "more than labels and conclusions," id. at ___, 127 S. Ct. at 1959, "and a formulaic recitation of a cause of action's elements will not do." Id.

C.    Motion for Summary Judgment under Rule 56(c)

Summary judgment under Rule 56 is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a Rule 56(c) motion, the Court must view the evidence in the light most favorable to the non-moving party. Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)). The Court must therefore draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true. Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986). The non-moving party, however, cannot rely on "mere allegations or denials," Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at 248)

(quotation omitted), and "conclusory allegations unsupported by factual data will not create a triable issue of fact," Pub. Citizen Health Research Group v. FDA, 185 F.3d 898, 908 (D.C. Cir. 1999) (Garland, J., concurring) (internal quotation omitted).   If the Court concludes that "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then the moving party is entitled to summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

### III. Legal Analysis

Based on the concessions of the parties, the only issues left for resolution by the Court are (1) whether the court lacks subject-matter jurisdiction over the plaintiff's suit based on the FTCA's statute of limitations and the doctrine of quasi-judicial immunity insofar as the plaintiff alleges harm as a result of negligent acts committed by the CSOSA, and (2) whether the plaintiff states a claim for which relief can be granted for allegedly negligent acts committed by the CSOSA under the public duty doctrine and traditional notions of tort law in the District of Columbia.[5]  Because the Court "has an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority," Abu Ali v. Gonzales, 387 F. Supp. 2d 16, 17 (D.D.C. 2005) (internal quotation marks and citation omitted), the Court must begin its legal analysis with a discussion of the government's jurisdictional defenses.  As set forth more fully below, the Court

---

[5]  This Court has subject-matter jurisdiction to consider tortious conduct allegedly committed by the United States only insofar as "a private person[] would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b) (2000) (emphasis added).  As alleged by the plaintiff, the "place where the act[s] or omission[s]" of the USPC, BOP, and CSOSA were committed was the District of Columbia; therefore, the Court can only exercise subject-matter jurisdiction over the plaintiff's suit to the extent that the government alleges conduct giving rise to liability under District of Columbia law.  See Edmonds v. United States, 436 F. Supp. 2d 28, 37 (D.D.C. 2006) (dismissing claim for against the Federal Bureau of Investigation for "negligent conversion" allegedly committed in the District of Columbia under § 1346(b) because "[t]here is no liability under D.C. law for 'negligent' conversion").

concludes that the government's statute of limitations defense, while improperly designated as a challenge to this Court's subject-matter jurisdiction under Rule 12(b)(1), acts as a complete bar to the plaintiff's suit, and will award summary judgment to the government for that reason. The Court therefore focuses its analysis solely on the statute of limitations issue.

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." Dep't of Army v. Blue Fox, Inc., 525 U.S. 255, 260 (1999) (quotation omitted). One such waiver to the government's sovereign immunity is the FTCA, which provides in pertinent part that "[t]he United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances" for tort claims. 28 U.S.C. § 2674. Section 2401 of the United States Code provides, however, that

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice and of final denial of the claim by the agency to which it was presented.

Id. at § 2401(b).

The government contends that because Erika Smith died on August 6, 2002, Am. Compl. ¶ 16, and because the plaintiff did not file her claim with the USPC, BOP, and CSOSA until March 29, 2005, id. ¶ 4, Ex. 1; i.e., more than two years after the death of Erika Smith, this suit is barred by § 2401(b). Gov't Mem. at 8-12, Gov't Reply at 3-7. The plaintiff responds by citing Sexton v. United States, 832 F.2d 629 (D.C. Cir. 1987), for the proposition that "'the statute [of limitations] starts to run (i.e., the claim 'accrues') by the time a plaintiff has discovered both his injury and its cause, even though he is unaware that the harm was negligently inflicted.'" Pl.

Opp'n at 5-6 (quoting Sexton, 832 F.2d at 633) (internal quotation omitted) (emphasis added by

the plaintiff).  The government argues in reply that "the identity of the actor need not be known

before the statute of limitations begins under the FTCA, and that the [p]laintiff must use the

limitations period to investigate and learn the identity of the actor."  Gov't Reply at 3.  Both sides

have attached numerous exhibits supporting their arguments.

     A.    Jurisdictional Nature of § 2401(b)

Before reaching the merits of the parties' arguments, the Court must rectify an error in the

government's presentation of its statute of limitations defense.  Contrary to the government's

assertions, "[a] statute of limitations defense . . . is not 'jurisdictional'" in nature.  Day v.

McDonough, 547 U.S. 198, 205 (2006); see also Gov't Mem. at 9 ("this Court is without

jurisdiction to hear [the p]laintiff's claim because [the p]laintiff failed to file her initial

administrative claim within two years of the accrual of her claim").  This rule applies with equal

force to the statute of limitations set forth in § 2401 notwithstanding the jurisdictional nature of

sovereign immunity itself, a point this Court recently recognized in P&V Enters. v. U.S. Army

Corps of Eng'rs, 466 F. Supp. 2d 134 (D.D.C. 2006) (Walton, J.).

In P&V Enterprises, the defendants moved to dismiss the plaintiffs' constitutional

challenge to a United States Army Corps of Engineers regulation under Rule 12(b)(1) on the

grounds that, inter alia, the plaintiffs' suit was barred by the six-year statute of limitations set

forth in 28 U.S.C. § 2401(a).  Id. at 141.  The plaintiffs argued in response that the governments'

statute of limitations defense could not be based on Rule 12(b)(1) because the statute of

limitations set forth in § 2401(a) was not jurisdictional in nature.  Id. at 147.  The Court

concluded that the statute of limitations was not jurisdictional in nature in light of the Supreme

Court's decision in <u>Irwin v. Dep't of Veterans Affairs</u>, 498 U.S. 89 (1990).  <u>P&V Enters.</u>, 466 F. Supp. 2d at 147-50.[6]

Irwin was a Title VII employment discrimination case in which the petitioner failed to file her claim within the thirty-day period prescribed by 42 U.S.C. § 2000e-16(c).  The Supreme Court held that even though § 2000e-16(c) was "a condition to the waiver of sovereign immunity," <u>Irwin</u>, 498 U.S. at 94, the "rebuttable presumption of equitable tolling" inherent in all statutes of limitation applied to § 2000e-16(c) as well.  <u>Id.</u> at 95-96.  This holding arguably gives rise to an inference that "strict compliance with the statute of limitations is not a jurisdictional prerequisite to suing the government," <u>Schmidt v. United States</u>, 933 F.2d 639, 640 (8th Cir. 1991), for "[i]f the statute of limitations were jurisdictional, the court would have no power to consider tolling it," <u>id.</u>  Presumably following the same logic, the District of Columbia Circuit has recently interpreted <u>Irwin</u> as holding "that federal statutes of limitations are not jurisdictional."  <u>Norman v. United States</u>, 467 F.3d 773, 775 (D.C. Cir. 2006); <u>cf.</u> <u>Harris v. Fed. Aviation Admin.</u>, 353 F.3d 1006, 1013 n.7 (D.C. Cir. 2004) (noting "recently expressed doubt about the jurisdictional nature" of statutes like § 2401(b) after <u>Irwin</u>); <u>Chung v. U.S. Dep't of Justice</u>, 333 F.2d 273, 276-77 (D.C. Cir. 2003) (contrasting the pre-<u>Irwin</u> practice of labeling time limits in which to sue the Government "jurisdictional;" <u>i.e.</u>, "not subject to judicial malleation," with <u>Irwin</u>'s "general rule establishing a presumption in favor of equitable tolling in

---

[6]  Although <u>P&V Enterprises</u> concerned only § 2401(a), the Court reasoned that "the [Supreme] Court gave no indication" in <u>Irwin</u> "that its holding . . . was intended to be applied narrowly, . . . nor did it distinguish § 2000e-16c from § 2401(a) <u>or other similar statutes of limitations</u>," <u>P&V Enters.</u>, 466 F. Supp. 2d at 149 (emphasis added), to conclude that § 2401(a) was not a restriction on a court's jurisdiction.  <u>Id.</u>  Indeed, the Court cited several decisions from various Circuit Courts of Appeals concluding that § 2401(b) is non-jurisdictional as support for its conclusion that § 2401(a) is non-jurisdictional.  <u>See id.</u> at 147 (collecting cases).

suits against the Government" (internal quotation omitted)).[7]  This reasoning effectively

precludes the assertion of generic statute of limitations defenses under Rule 12(b)(1), including

defenses predicated on § 2401(b).

Instead, the only possible procedural mechanism for considering the government's statute

of limitations argument at this stage of the proceedings is Rule 12(b)(6).  See P&V Enters., 466

---

[7]  The Court notes that the Eighth Circuit recently reversed its position on the specific point of "whether the statute of limitations [set forth in § 2401] is a jurisdictional prerequisite or an affirmative defense."  T.L. ex rel. Ingram v. United States, 443 F.3d 956, 960 (8th Cir. 2006).  Whereas the Eighth Circuit's earlier ruling in Schmidt "was apparently premised on an understanding that Irwin announced an equitable power of the federal courts to toll a statute of limitations in all suits against the government," T.L., 443 F.3d at 961, in T.L. the Eighth Circuit, relying heavily on the Supreme Court's ruling in United States v. Brockamp, 519 U.S. 347 (1997), concluded that "the availability of equitable tolling depends on congressional intent, and is not necessarily available as a matter of general equitable power in all actions against the government."  T.L., 443 F.3d at 961.  The court therefore joined "several other circuits in holding that considerations of equitable tolling simply make up part of the court's determination whether an action falls within the scope of the waiver of sovereign immunity granted by Congress, and thus within the jurisdiction of the federal courts."  Id. (collecting cases).

The Eighth Circuit's point is well-taken.  While the Supreme Court conceded in Irwin that the use of the doctrine of equitable tolling might amount to a "little . . . broadening of the congressional waiver" intended by Congress in adopting the FTCA, Irwin, 498 U.S. at 95, it held that the doctrine should apply against the government in large part because a "general rule . . . making the rule of equitable tolling applicable to suits against the Government . . . is likely to be a realistic assessment of legislative intent as well as a practically useful principle of interpretation," id. at 95.  Similarly, in Brockamp, the Supreme Court distinguished § 6511 of the Internal Revenue Code, 26 U.S.C. §§ 1 (2000), which sets forth time restrictions for tax refund claims against the Internal Revenue Service, 26 U.S.C. § 6511(a), from ordinary statutes of limitations like the one at issue in Irwin on the grounds that ordinary statutes of limitations "use fairly simple language, which one can often plausibly read as containing an implied 'equitable tolling' exception," Brockamp, 519 U.S. at 350, whereas § 6511 "sets forth its limitations in a highly detailed technical manner, that, linguistically speaking, cannot easily be read as containing implicit exceptions," id.  Read collectively, these decisions strongly suggest that a court's ability to toll time restrictions foreclosing relief against the federal government has nothing to do with a court's equitable powers at all, but rather arises as an implicit waiver of the government's sovereign immunity derived from the statute of limitations itself.  See Irwin, 498 U.S. at 95-96 (noting that Congress may abrogate "the rebuttable presumption of equitable tolling . . . if it wishes to do so"); see also Brockamp, 519 U.S. at 354 (concluding that "Congress did not intend the 'equitable tolling' doctrine to apply to § 6511's time limitations").

Nevertheless, a case could be made that a challenge to a plaintiff's suit under § 2401 is an affirmative defense that should be raised by way of a Rule 12(b)(6) motion because such a challenge, while perhaps "'jurisdictional' . . . in the sense that it prevents the [C]ourt from reaching the merits of the complaint," Kenneda v. United States (In re Swine Flu Immunization Prods. Liability Litig.), 880 F.2d 1439, 1442 (D.C. Cir. 1989) (declining to determine whether statute of limitations challenge to claim under the FTCA should be brought under Rule 12(b)(1) or Rule 12(b)(6)), no longer serves as an absolute bar to a plaintiff's suit in light of Irwin and therefore is not "jurisdictional" in the sense intended by Rule 12(b)(1).  See Arbaugh v. Y&H Corp., 546 U.S. 500, 510-16 (2006) ("when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character").  In any event, the Court is bound to construe Irwin in accordance with the District of Columbia Circuit's decision in Norman, and therefore concludes that the statute of limitations set forth in § 2401 is non-jurisdictional in nature.

F. Supp. 2d at 150 (noting that the "consequence of § 2401(a)'s nonjurisdictionality is to change the basis for dismissal from Rule 12(b)(1) to Rule 12(b)(6)" (internal quotation marks and citation omitted)).  There are important differences between motions to dismiss made pursuant to these two Rules.  For example, a motion to dismiss under Rule 12(b)(1) may be raised at any time, whereas a motion to dismiss under Rule 12(b)(6) may not, Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006); dismissals under Rule 12(b)(6), unlike Rule 12(b)(1) dismissals, are usually with prejudice, Kenneda v. United States (In re Swine Flu Immunization Prods. Liability Litig.), 880 F.2d 1439, 1441-42 (D.C. Cir. 1989); and, unlike on a Rule 12(b)(1) motion, a court cannot consider exhibits (other than those attached to the complaint) submitted by the parties or, generally, any other information beyond the four corners of the complaint, on a Rule 12(b)(6) motion unless it converts the motion into a motion for summary judgment under Federal Rule of Civil Procedure 56.  See Marshall County Health Care Auth. v. Shalala, 988 F.2d 1221, 1226 (D.C. Cir. 1993) ("when a district court is not sitting as an appellate court and the district judge looks outside the complaint to factual matters, he or she must convert a motion to dismiss into a motion for summary judgment").

    B.    <u>Claim Accrual</u>

Having established the governing legal standard for resolving the parties' dispute as to the date on which the plaintiff's claim accrued , the Court turns to the merits of the dispute itself.  "It is well-established that for purposes of the FTCA, a claim usually accrues at the time of the plaintiff's injury."  Cronauer v. United States, 394 F. Supp. 2d 93, 102 (D.D.C. 2005) (Walton, J.); accord Miller v. Philadelphia Geriatric Center, 463 F.3d 266, 271 (3d Cir. 2006); McIntyre v. United States, 367 F.3d 38, 51 (1st Cir. 2004); Garza v. U.S. Bureau of Prisons, 284 F.3d 930,

934 (5th Cir. 2002); <u>Kronisch v. United States</u>, 150 F.3d 112, 121 (2d Cir. 1998).  In the context

of a wrongful death suit, the "injury" in question is the wrongful death, not the pain and suffering

arising as a consequence of that death.  <u>See</u> <u>Sexton</u>, 832 F.2d at 637 (declining to consider "the

emotional harm" that the plaintiffs suffered from the death of their son as "an independent

injury").  Thus, the accrual date of the plaintiff's wrongful death claim in this case, absent an

applicable exception to the general rule, was August 6, 2002 – the night Anthony Kelly murdered

Erika Smith.

    In <u>Kubrick v. United States</u>, 444 U.S. 111 (1979), the Supreme Court "carved out a

'discovery rule' exception for FTCA claims involving medical malpractice."  <u>Miller</u>, 463 F.3d at

271 (citing <u>Kubrick</u>, 444 U.S. at 111).  Under this exception, "the statute starts to run (the claim

'accrues')" when a plaintiff discovers or could, through reasonable inquiry, have discovered

"'both his injury and its cause.'"  <u>Sexton</u>, 832 F.2d at 633 (quoting <u>Kubrick</u>, 444 U.S. at 120).

"The rule set forth in [<u>Kubrick</u>] has been applied to other types of cases, such as trespass,

nuisance and occupational safety."  <u>Cronauer</u>, 394 F. Supp. 2d at 102.  At least one court has

applied the rule in the context of a wrongful death suit brought under the FTCA.  <u>See</u> <u>Garza</u>, 284

F.3d at 934-37 (finding use of the discovery rule in wrongful death suit under the FTCA

"appropriate for the situation at hand").

    The government argues that the discovery rule does not apply in this case at all because

the plaintiff knew or should have known of her alleged injury (the wrongful death of her

daughter) as soon as she discovered that her daughter had been killed, even if the plaintiff did not

know the identity of her daughter's killer at that time.  Gov't Mem. at 9-12; Gov't Reply at 3-5.

The plaintiff counters that she could not have known the cause of her daughter's death until she

knew the identity of her daughter's killer, Pl. Opp'n at 5-6, and avers that the plaintiff did not and could not have known this information until May of 2003, id. at 7-10. She further asserts that she engaged in due diligence under the circumstances because she was "so substantially impaired during the first several months following the murder[] that she was incapable of processing information sufficient to enable her to be 'fully aware' even if those facts [were] reasonably available to her at the time." Id. at 11.

1.    Requirements for claim accrual

The government's first argument – that the plaintiff was on notice of the cause of her injury as soon as she knew that her daughter had been killed – is a non-starter. As the Seventh Circuit noted in Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n, 377 F.3d 682 (7th Cir. 2004), "the general rule" is "that accrual occurs when the plaintiff discovers that he has been injured and who caused the injury," id. at 688 (internal quotation and citation omitted) (emphasis in original removed; emphasis added); see also Chappell v. Rich, 340 F.3d 1279, 1283 (11th Cir. 2003) (claims under 42 U.S.C. §§ 1983 and 1985 "will not accrue . . . until the plaintiffs know or should know (1) that they have suffered the injury that forms the basis of their complaint and (2) who has inflicted the injury" (emphasis added)); Gartrell v. Gaylor, 981 F.2d 254, 257 (5th Cir. 1993) (statute of limitations on § 1983 claim "begins to run when the plaintiff is in possession of the critical facts that he has been hurt and who has inflicted the injury" (internal quotation and citation omitted) (emphasis added)); cf. Gould v. U.S. Dep't of Health & Human Servs., 905 F.2d 738, 743 (4th Cir. 1990) (holding that FTCA claim for wrongful death accrued at time of victim's death because the plaintiffs "at this time were aware of the existence of the injury and its cause, including the identity and conduct of attending physicians" (emphasis

18

added)).  This general rule dates back to <u>Kubrick</u>, where the Supreme Court recognized that

knowledge by a plaintiff of "who has inflicted the injury" is one of the "critical facts" that a

plaintiff must know (or should know through the exercise of due diligence) before the plaintiff's

claim can accrue.  <u>Kubrick</u>, 444 U.S. at 122.  As the Supreme Court explained in that case, "facts

about causation may be in the control of the putative defendant, unavailable to the plaintiff or at

least very difficult to obtain," <u>id.</u>, but once the plaintiff knows that he has been injured and

knows the source of his injury, "[h]e is no longer at the mercy of the latter."  <u>Id.</u>

 The cases cited by the government are either distinguishable or unpersuasive.  Contrary to

the government's representations, <u>Zeleznik v. United States</u>, 770 F.2d 20 (3d Cir. 1985), is not

"on point in this matter."  Gov't Mem. at 10.  In that case, the plaintiffs sued the United States

under the FTCA for the wrongful death of their son on December 20, 1974, at the hands of an

illegal alien named Vernal Walford who had "unsuccessfully attempted to surrender to the

Immigration and Naturalization Service ('INS') in Springfield, Massachusetts."  <u>Zeleznick</u>, 770

F.2d at 21.  Although the plaintiffs knew that Walford was the man who killed their son, they did

not learn until 1982 that the INS had allowed Walford to leave its custody even though "Walford

had visited the Springfield INS office a few days before the murder and had given an INS

employee a full report on his illegal status, his fraudulent possession of a U.S. passport and his

involvement in an illicit drug transaction."  <u>Id.</u>  In affirming the district court's decision granting

summary judgment in favor of the defendant on statute of limitations grounds, the Third Circuit

held that accrual of the plaintiffs' claim was not delayed until the plaintiffs discovered the role of

the INS in their son's death because "a claim accrues when the injured party learns of the injury

and its immediate cause."  <u>Id.</u> at 23.  "[T]he crucial question in determining the accrual date for

statute of limitations purposes," according to the court, "was whether the injured party had sufficient notice of the invasion of his legal rights to require that he investigate and make a timely claim or risk its loss." Id. From the court's perspective, "[a]n injured party with the knowledge of injury and its immediate cause is in no worse position than any other plaintiff who must determine whom to sue in an obscure factual context." Id.

The facts in Zeleznik are plainly distinguishable from the facts in this case. In Zeleznik, the plaintiffs were aware that the "immediate cause" of their son's death was his murder at the hands of Vernal Walford, which put them "in no worse position that any other plaintiff who must determine whom to sue." In contrast, the plaintiff in this case is not like "any other plaintiff" because, assuming arguendo that her allegations are true, she did not know who was the "immediate cause" of her daughter's death until May of 2003. Am. Compl. ¶ 36. Nor could the plaintiff in this case "investigate . . . the invasion of [her] legal rights" absent knowledge of who killed her daughter, for without such knowledge she could never have discovered through any amount of diligence whether there was any duty of care that could have been breached in the first place. It was only when the plaintiff became aware of this "essential fact[]," Kubrick, 444 U.S. at 121, that there were "others who c[ould] tell h[er] if [s]he ha[d] been wronged" had she "only ask[ed]." Id. at 122.

Norman v. United States, 467 F.3d 773 (D.C. Cir. 2006) (cited in Gov't Mem. at 11), is even less apropos than Zeleznik. In Norman, the plaintiff was struck by a rental car driven by Earnest Howe, an employee of the Environmental Protection Agency (the "EPA"). Id. at 774. Well after the statute of limitations had expired, the plaintiff discovered that Howe was an employee of the EPA and that he may have been acting within the scope of his employment at

the time of the collision.  Id.  On appeal to the District of Columbia Circuit, the plaintiff argued

that the statute of limitations should be equitably tolled because he filed his suit within the three-

year statute of limitations for personal injury actions, he filed a worker's compensation claim

with his employer and a liability claim with Howe's insurance carrier in a timely manner, and

because Howe's insurance carrier failed to notify the plaintiff that Howe was working for the

EPA in a timely manner.  Id. at 776-77.  The District of Columbia Circuit rejected these

arguments, reasoning that the plaintiff failed to demonstrate the due diligence necessary to justify

equitably tolling § 2401(b) because he did not make "reasonable efforts to learn the employment

status of [Howe]."  Id. at 776-78.[8]  It differed from the District Court's ruling only insofar as the

District Court had reasoned that the plaintiff's duty to investigate Howe's employment status was

heightened by the prevalence of federal employees in the Washington, D.C. metropolitan area, id.

at 778, holding that "due diligence must have the same meaning everywhere," id.  The Circuit

Court concluded that "at no time during the FTCA's two-year statute of limitations did [the

plaintiff] make any effort – diligent or otherwise – to identify Howe's employer," id., and

accordingly affirmed the dismissal of the plaintiff's complaint, id.

    The clear holding of Norman is that a plaintiff seeking to equitably toll a federal statute of

limitations in an action against the federal government based on actions committed by an

employee of the government must make a reasonable inquiry as to the status of the tortfeasor's

employment to satisfy the due diligence requirement.  See id. ("[b]ecause [the plaintiff] failed to

exercise due diligence he was not entitled to equitable tolling").  Read broadly, the decision

_____

[8]  The Circuit Court declined to decide "whether equitable tolling applies to the FTCA's statute of
limitations" in the first place because the plaintiff "failed to meet due diligence requirements for equitable tolling."
Id. at 776.

could perhaps be read to suggest that the plaintiff has an obligation to make a reasonable inquiry as to whether the tortfeasor has any connection to the federal government once the tortfeasor's identity is known.  See Skwira v. United States, 344 F.3d 64, 76-80 (1st Cir. 2003) ("outside the medical malpractice context, a claim accrues under the FTCA once a plaintiff knows, or in the exercise of reasonable diligence should know, (1) her injury and (2) sufficient facts to permit a reasonable person to believe that there is a causal connection between the government and her injury" (emphasis added)).  But nothing in Norman remotely suggests that a plaintiff's claim accrues even if the plaintiff does not know the identity of the tortfeasor in the first instance.

Finally, the Court finds unpersuasive the Ninth Circuit's decision in Dyniewicz v. United States, 742 F.2d 484 (9th Cir. 1984) (Kennedy, J.).  See Gov't Mem. at 10 (citing Dyniewicz).  The plaintiffs in that case were the estates and minor children of a married couple, Mark and Carol Dyniewicz, who "were killed when a flood swept their car off a highway on the island of Hawaii."  Id. at 485.  The plaintiffs sued the federal government under the FTCA based on the National Park Service's allegedly negligent failure to close off the highway.  Id.  The Dyniewiczs died on March 17, 1980, and the plaintiffs' administrative claim against the Department of Interior was filed on July 30, 1982.  Id.  The plaintiffs argued that "the first indication that United States' employees might have been involved was a dispatcher's tape-recording discovered on June 12, 1982."  Id.

In an opinion written by then-Judge Kennedy, the Ninth Circuit affirmed the district court's dismissal of the plaintiffs' complaint on statute of limitations grounds.  Id. at 486-87.  The court reasoned that because the plaintiffs "knew both the fact of injury and its immediate physical cause . . . when the bodies of Mr. and Mrs. Dyniewicz were found," id. at 487, "[t]he

22

cause of action accrued at that time," id.  The Ninth Circuit specifically rejected the notion that

knowledge of the identity of the person or entity causing the alleged harm was necessary.  See id.

at 486 ("Discovery of the cause of one's injury, however, does not mean knowing who is

responsible for it.").  Instead, the court held that "[t]he 'cause' is known when the immediate

physical cause of the injury is discovered."  Id.

　　At least one Circuit Court of Appeals has explicitly rejected the reasoning in Dyniewicz,

see Skwira, 344 F.3d at 79 (criticizing the Dyniewicz decision), and the Dyniewicz decision does

not accord with the decisions of several other circuits, as well.  See Drazan v. United States, 762

F.2d 56, 59 (7th Cir. 1985) ("When there are two causes of an injury, and only one is the

government, the knowledge that is required to set the statute of limitations running is knowledge

of the government cause, not just of the other cause."); accord Diaz v. United States, 165 F.3d

1337, 1340 (11th Cir. 1999); see also Ramming v. United States, 281 F.3d 158, 162 (5th Cir.

2001) ("causation" for purposes of determining when FTCA claim accrues refers to "the

connection between the injury and the defendant's actions").  But see New Castle County v.

Halliburton Nus Corp., 111 F.3d 1116, 1125 (3d Cir. 1997) (plaintiff's claim starts to accrue

when the plaintiff "was aware that its injury was caused in part by another person's conduct").

Even other members of the Ninth Circuit have recognized flaws in the reasoning of Dyniewicz.

In Gibson v. United States, 781 F.2d 1334 (9th Cir. 1986), a different panel from the Ninth

Circuit noted that "[l]anguage in Kubrick, emphasizing the strategic importance to the litigant of

knowing whom to sue, supports [the] plaintiffs' proposed construction" of Kubrick to the effect

that accrual of a federal tort claim does not begin "until [the] plaintiff knows or has reason to

know of the culpability of federal agents." Id. at 1344. Nonetheless, the Gibson court adhered to

the rule set forth in Dyniewicz only because that case was "binding circuit precedent." Id.

Indeed, the greatest failing of the Dyniewicz decision is that it does not reflect the

concerns expressed by the Supreme Court in Kubrick. The very premise of the Supreme Court's

ruling in that case was that a plaintiff's claim should accrue when the plaintiff has the

information necessary to determine, either on his own or with professional assistance, whether

his injury arose as a result of a breach of care by another party. See Kubrick, 444 U.S. at 123 ("A

plaintiff such as Kubrick, armed with the facts about the harm done to him, can protect himself

by seeking advice in the medical and legal community."). "It thus appeared to draw a distinction

between the facts about what happened to the plaintiff, on the one hand, and the facts and

standards by which those events were to be evaluated, on the other." Sexton, 832 F.2d at 633.

The identity of the person who harmed the plaintiff in an immediate sense falls into the former

category.

Consistent with the decisions of the First, Fifth, Seventh, and Eleventh Circuits, this

Court concludes that the plaintiff's cause of action did not accrue against the government until

she knew or should have known "sufficient facts to permit a reasonable person to believe that

there is a causal connection between the government and her injury." Skwira, 344 F.3d at 78.

The Amended Complaint states that the plaintiff first learned that Anthony Kelly murdered her

daughter in May of 2003, around the same time that Kelly was indicted. Am. Compl. ¶¶ 33, 36.

Assuming that the plaintiff could not have learned of Kelly's identity prior to that time, it stands

to reason that she could not have learned of the government's role in the death of her daughter,

either. Thus, the date on which the plaintiff's claim accrued – and the date on which the statute

of limitations began to run – turns on when the plaintiff first learned or should have learned that

Anthony Kelly was the man who killed her daughter and that his presence in the community was

connected to the government in some way.

2.    Claim accrual in this case

The government insists that the "[p]laintiff was informed of the killer's identity and his

status as a parolee by the homicide detective in just over one month from the murder."  Gov't

Mem. at 11.  It further argues that "the local media was able to gather and make public detailed

information regarding Anthony Kelly's parole history within a matter of weeks."  Id.  In both

instances, the government refers not to an allegation in the Amended Complaint, but rather to

extraneous exhibits attached to the government's motion.  See id. (citing Gov't Mot. Exs. 3, 8).

As the Court noted above, it cannot consider this evidence without converting the government's

motion into one for summary judgment.  See part II.A, supra.

Ordinarily, "[w]hen a district court converts a Rule 12(b)(6) motion to one for summary

judgment, it must allow all parties both a reasonable opportunity to present all material made

pertinent to such a motion by Rule 56 and a chance to pursue reasonable discovery."  Taylor v.

FDIC, 132 F.3d 753, 765 (D.C. Cir. 1997).  However, such notice need not be given where the

court "is satisfied that the parties are not taken by surprise or deprived of a reasonable

opportunity to contest facts averred outside the pleadings and the issues involved are discrete and

dispositive."  Access 4 All v. Trump Int'l Hotel and Tower Condo., 458 F. Supp. 2d 160, 165

(S.D.N.Y. 2006) (internal quotation and citation omitted); see also Kennedy v. Empire Blue

Cross and Blue Shield, 989 F.2d 588, 592 (2d Cir. 1993) (finding no error in district court's

conversion of motion to dismiss under Rule 12(b)(6) to motion for summary judgment without

prior notice to parties where both parties submitted evidence in support of their positions); cf.

Termorio S.A. E.S.P. v. Electranta S.P., 487 F.3d 928, 940 (D.C. Cir. 2007) (Court of Appeals

"has the authority to convert a motion to dismiss under Rule 12(b)(6) to a grant of summary

judgment under Federal Rule of Civil Procedure 56" where "both parties had sufficient

opportunity to present evidence beyond the pleadings"); Taylor, 132 F.3d at 765-66 (affirming

District Court's dismissal of case under Rule 12(b)(6) even though it considered evidence outside

the complaint and denied the plaintiffs' motion for a continuance to take discovery because

discovery would be superfluous and summary judgment in favor of the defendants was

appropriate).  "When a non-moving party is put on notice by the moving papers of its opponent

and submits its own exhibits and affidavits in its response papers, it cannot claim to be caught in

surprise."  Access 4 All, 458 F. Supp. 2d at 165.

    In this case, the government made what it believed to be a factual challenge to the Court's

subject-matter jurisdiction pursuant to Rule 12(b)(1).  The plaintiff, also under the mistaken

impression that the government's statute of limitations argument was properly before the Court

under a Rule 12(b)(1) motion, submitted affidavits and exhibits in response to the government's

evidence.  Under these circumstances, the plaintiff "cannot claim to be caught in surprise" by the

Court's consideration of the exhibits and affidavits submitted by the parties.  Access 4 All, 458

F. Supp. 2d at 165.  If anything, the Court's consideration of the evidence submitted by the

parties under Rule 56(c) requires less evidence from the plaintiff than would have been necessary

on a Rule 12(b)(1) motion because the Court can resolve disputed facts in adjudicating the latter

type of motion.  See Herbert v. Nat'l Acad. of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992) ("the

court may consider the complaint supplemented by undisputed facts evidenced in the record, or

26

the complaint supplemented by undisputed facts plus the court's resolution of disputed facts" in

deciding Rule 12(b)(1) motions).[9]

Even under the more generous standard afforded by Rule 56, the plaintiff cannot establish

the predicate facts necessary to delay accrual of her claim. By her own admission, the plaintiff

"was unable to process information, communicate with others, and operate in the world around

[her]" during the eight months following the death of her daughter. Pl. Opp'n, Ex. 1 ¶ 15

(Affidavit of Carol Smith) (the "Smith Aff."). Although she states in her affidavit that she

"do[es] not remember being told that the police had decided that it was Anthony Kelly who was

responsible for [the death of Erika Smith] until shortly before the indictment in May of 2003," id.

¶ 5, "[t]he truth is [that she] found it virtually impossible to process much of anything that they

told [her] up to and even after the indictment," id. The plaintiff further admits that she "do[es]

not remember specific incidents or conversations that took place during the months after the

incident," id. ¶ 7, because she was "too overwhelmed and disoriented to process" these

communications, id. ¶ 6. Moreover, according to the plaintiff, she "was even more incapable of

dealing with or exposing [her]self to information about the case from sources other than the

---

[9] The plaintiff made several oblique references to the need for discovery in her opposition to the United States' motion to dismiss. See Pl. Opp'n at 4 ("given the defendant's opportunity to present material outside the four corners of the complaint to support dismissal, this Circuit 'require[s] that plaintiff be given an opportunity for discovery of facts necessary to establish jurisdiction prior to a decision of a Rule 12(b)(1) motion'" (quoting Ignatiev v. United States, 238 F.3d 464, 467 (D.C. Cir. 2001))); id. at 8 ("Detective Buchan's statements raise more questions than they resolve – a circumstance that compels, at the very least, an opportunity for jurisdictional discovery before Mrs. Smith is deprived forever of the right to seek relief from the Government for her claims" (emphasis in original)). But the plaintiff never sought leave to conduct discovery as to the United States as permitted by Federal Rule of Civil Procedure 26. See Fed. R. Civ. P. 26(d) (permitting parties to take discovery "from any source" even before conferring as required by Rule 26(f) "by order or agreement of the parties"). Moreover, even if the plaintiff had properly requested leave to take such discovery, that request would have been moot in light of the plaintiff's admissions that she was incapable of diligently investigating the cause of her daughter's death during the eight-month period following her daughter's murder, which is the critical point relevant to the discovery rule question. See discussion, infra.

police" because she "was simply not strong enough to handle this and it was impossible for [her] to process information about <u>anything</u> at that time." <u>Id.</u> ¶ 8 (emphasis in original).

The plaintiff's affidavit paints a highly sympathetic figure, but it does not establish that the plaintiff acted with due diligence to find out who killed her daughter. To the contrary, it affirmatively establishes that the plaintiff did not – indeed, could not – engage in any kind of investigation into the facts surrounding her daughter's death. Given the plaintiff's "trouble remembering the content of conversations even minutes after they occurred," <u>id.</u> ¶ 11, it may well have been the case that the plaintiff was given the name of Anthony Kelly months before his indictment but "simply could not process or understand" that information. <u>Id.</u> ¶ 13. A reasonable jury simply could not conclude that the plaintiff knows when she first learned (as opposed to remembered) that Anthony Kelly was the person who shot her daughter or made "reasonable efforts," <u>Norman</u>, 467 F.3d at 776, to discover the shooter's identity prior to May of 2003.[10]

The plaintiff devotes the bulk of her argument on this point to criticizing the "speculative and inconclusive" evidence submitted by the government in support of its Motion. Pl. Opp'n at 7-10. But it is not the government's burden of proof to bear.[11] Rather, it is the plaintiff's

---

[10] Unlike the doctrine of equitable tolling, which places upon the Court the obligation of determining "whether equity requires extending a limitations period," <u>Smith-Haynie v. District of Columbia</u>, 155 F.3d 575, 579 (D.C. Cir. 1998), "[t]he discovery rule . . . is presumably for a jury to consider when issues of disputed fact surround the rule's application," <u>id.</u> Thus, the Court does not presume to resolve any factual disputes in ruling that the plaintiff cannot invoke the discovery rule in this case, but rather concludes that there is no dispute concerning any genuine issue of material fact as to whether the plaintiff could invoke the discovery rule as required by Rule 56(c).

[11] The plaintiff cites <u>Orlikow v. United States</u>, 682 F. Supp. 77 (D.D.C. 1988), for the proposition that it is the government's "'burden to show that [the plaintiff] could have discovered [the facts necessary to state a claim] if [she] had exercised due diligence.'" Pl. Opp'n at 9 (quoting <u>Orlikow</u>, 682 F. Supp. at 84). In <u>Orlikow</u>, the plaintiffs argued that their claims did not accrue when they were allegedly harmed by the Central Intelligence Agency (the "CIA") because the CIA fraudulently concealed predicate facts from the plaintiffs. <u>Orlikow</u>, 682 F. Supp. at 83.

<span style="float:right">(continued...)</span>

obligation to demonstrate that she neither knew of the identity of her daughter's assailant nor could have known his identity through the exercise of due diligence. The evidence submitted by this plaintiff establishes just the opposite: namely, by her own words she (1) is incapable of knowing when she first learned the name of her daughter's attacker and (2) could not have made any inquiry into this matter for many months after her daughter's death. Thus, the plaintiff's own words foreclose the need for any review of the government's evidence.

### 3.    Equitable tolling

The plaintiff argues in the alternative that she "lacked 'knowledge' sufficient to trigger the statute of limitations until May 2003[] because of her mental state during that time." Pl. Opp'n at 10. Citing Orlikow v. United States, 682 F. Supp. 77 (D.D.C. 1988), she contends that "a plaintiff's mental condition properly is considered 'when evaluating whether [she] exercised due diligence.'" Id. (quoting Orlikow, 682 F. Supp. at 84). The plaintiff asserts that she was "so substantially impaired during the first several months following the murder [of her daughter] that she was incapable of processing information sufficient to enable her to be 'fully aware' even if those facts [were] reasonably available to her at the time." Id. at 11.

---

[11](...continued)
"When . . . the defendants have concealed . . . their involvement in a cause of action about which the plaintiff might otherwise be aware, they have the burden of coming forward with any facts showing that the plaintiff could have discovered their involvement or the cause of action if he had exercised due diligence." Richards v. Mileski, 662 F.2d 65, 71 (D.C. Cir. 1981). In contrast, it is the plaintiff's "burden of establishing an exception to the statute [of limitations]" in the first instance where, as here, the plaintiff contends that the statute should not apply under the discovery rule. McCall ex rel. Estate of Bess v. United States, 310 F.3d 984, 987 (7th Cir. 2002); see also Gould, 905 F.2d at 745 ("Plaintiffs have failed to meet their burden and duty of exercising due diligence."); see generally Minebea Co. v. Papst, 444 F. Supp. 2d 68, 175 (D.D.C. 2006) ("Normally, a defendant asserting an affirmative defense such as the statute of limitations bears the burden of demonstrating that the plaintiff's claims are time-barred, but most jurisdictions hold that the burden shifts back to a plaintiff who invokes an exception to the statute of limitations.").

The plaintiff takes great pains not to describe this argument as a request for equitable tolling.  See Pl. Opp'n at 10 ("mental impairment does not 'toll,' per se, the FTCA statute of limitations").  Her caution is understandable, for "courts have uniformly held that mental incompetency, standing alone, will not toll the running of the statute of limitations under the FTCA."  Chomic v. United States, 377 F.3d 607, 615 (7th Cir. 2004); see also Casias v. United States, 532 F.2d 1339, 1342 (10th Cir. 1976) ("Insanity, such as constitutes a legal disability in most states, does not toll the statute of limitations under the Federal Tort Claims Act."); Jackson v. United States, 234 F. Supp. 586, 587 (E.D.S.C. 1964) ("The law is clearly established that insanity or mental incompetency does not suspend or toll a Federal Statute of Limitations such as the one involved in this action.").  The problem for the plaintiff, as the Seventh Circuit correctly noted in Chomic, is that unlike § 2401(a), which expressly provides that "[t]he action of any person under legal disability . . . at the time the claim accrues may be commenced within three years after the disability ceases," "the language of § 2401(b) contains no saving clauses for disabilities of any kind."  Chomic, 377 F.3d at 615.  "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."  TRW Inc. v. Andrews, 534 U.S. 19, 28 (2001) (quotation omitted).

TRW is directly on point.  There, the Supreme Court held that the two-year statute of limitations governing suits under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 (2000), was not subject to a general discovery rule in addition to the discovery rule expressed within the plain language of the statute itself.  See 15 U.S.C. § 1681p ("[a]n action to enforce any liability created under this subchapter may be brought in any appropriate United States district court . . . not later

30

than the earlier of . . . (1) 2 years after the date of discovery by the plaintiff of the violation that is

the basis for such liability").  "[R]eluctant to treat statutory terms as surplusage in any setting,"

TRW, 534 U.S. at 31 (quotation omitted), the Supreme Court rejected the respondent's proposed

construction of the statute as including both an implicit and an explicit discovery rule because

"the express exception would be rendered insignificant, if not wholly superfluous."  Id. (internal

quotation omitted).  Instead, the Supreme Court followed the "cardinal principle of statutory

construction that a statute ought, upon the whole, to be so construed that, if it can be prevented,

no clause, sentence, or word shall be superfluous, void, or insignificant," id., to conclude that

"[t]he most natural reading of § 1681p is that Congress implicitly excluded a general discovery

rule by explicitly including a more limited one," id. at 28.

Just as the Supreme Court would have "distort[ed] § 1681p's text by converting the

exception [in § 1681(p)(1)] into the rule," id. at 28-29, so too would it distort the text of § 2401

to infer that Congress intended to create an implicit exception for mental disability for all of

§ 2401 and an explicit exception for mental disability in § 2401(a).  Plainly, Congress thought it

necessary to state expressly when and under what circumstances it would permit a plaintiff's

disability to toll the statute of limitations, and § 2401(b) is not one of them.  It may well be the

case that the District of Columbia Circuit has "never squarely addressed whether equitable tolling

applies to the FTCA's statute of limitations," Norman, 467 F.3d at 776, but it is clear from the

text of § 2401 that mental disability, or disability in general, cannot serve as a basis for tolling of

any kind.

Orlikow, which serves as the plaintiff's primary authority on this issue, recognized the

impropriety in tolling § 2401(b) based on the mental disability of the plaintiffs in that case, but

avoided the issue by considering the subjective circumstances of the plaintiffs in that case under the rubric of "claim accrual" instead. See Orlikow, 682 F. Supp. at 84 ("[a]lthough insanity does not toll the running of the statute of limitations in FTCA cases[,] the conditions of the plaintiffs in this case can be considered when evaluating whether they exercised due diligence"). In Orlikow, a former member of this Court was faced with the question of whether a suit under the FTCA should be barred by the statute of limitations given the apparent concealment by the CIA of its alleged bad acts. Orlikow, 682 F. Supp. at 82-86. The plaintiffs alleged that they "innocently sought legitimate help for their varying degrees of mental disorders and were instead used as unwitting subjects in experiments funded by the CIA." Id. at 84. The "pivotal question" in the case was "when [the] plaintiffs' claims accrued against the CIA," id. at 83, for the plaintiffs' suit was brought outside the time period permitted by § 2401(b), id. at 82-83. The issue of accrual was complicated by the fact that the CIA actively concealed its role in these experiments until at least 1979, when a book chronicling the experiments was released. Id. at 83. Noting that "[c]oncealment can toll the limitations[,] but only as long as the plaintiff could not unearth the critical facts by exercising due diligence," id., the Court nevertheless found "[p]articularly troublesome . . . the task of ascertaining when [the plaintiffs] should or did know of the [previously concealed] facts when it [was] obvious these plaintiffs were diagnosed as suffering from various types of mental dysfunctions even before their 'treatment' and allegedly were in varying degrees of mental impairment thereafter." Id. at 84. Ultimately, the Court concluded that "[w]here the alleged negligence caused the mental harm which affects a plaintiff's ability to function normally in life, in fairness to that plaintiff, the question of due diligence or when the claim accrues differs from the case where the injury was not related to the plaintiff's

cognitive functioning," id., and accordingly refused to enforce the statute of limitations at the summary judgment phase with respect to all but one defendant, id. at 85-86.

Orlikow is not the only case in which a court construed Kubrick's due diligence rule in subjective terms. In Zeidler v. United States, 601 F.2d 527 (10th Cir. 1979), the plaintiff was subjected to multiple lobotomies while receiving treatment at a Veterans Administration ("VA") hospital in 1947 and 1948. Id. at 527-28. The government argued that the plaintiff's claims, brought in 1976 by a conservator appointed the year before, were time-barred by § 2401(b). Id. The Tenth Circuit disagreed, holding that the plaintiff's claims did not necessarily accrue when the lobotomies were performed because "the incapability of the plaintiff to comprehend the elements of possible malpractice, if such existed or exists, should indeed toll [§ 2401(b)] and should not bar the plaintiff from ever pursuing a remedy for violation of his rights." Id. at 531. Reasoning that "brain damage or destruction is not to be classified in the same way as ordinary mental disease or insanity for the purpose of barring such an action," id., the court remanded the case for a factual determination "concerning the plaintiff's mental capabilities and awareness at the time" of the plaintiff's injuries. Id.

In Clifford v. United States, 738 F.2d 977 (8th Cir. 1984), the plaintiff overdosed on medication allegedly prescribed to him in a negligent manner by doctors at VA hospitals in South Dakota in October of 1976, which left him in a permanent coma. Id. at 978. The plaintiff's father was appointed his conservator on January 23, 1979, and filed an administrative claim on the plaintiff's behalf on January 16, 1981. Id. The Eighth Circuit held that the plaintiff's cause of action accrued when the plaintiff's father was appointed his conservator, not when the plaintiff overdosed on his medication, because the plaintiff's prior "inability to act was the government's

own fault." Id. at 979.  Reasoning that, like Ziedler, this was the "rare situation where the alleged malpractice itself . . . has prevented the claimant from ever obtaining" knowledge of his injury, id. at 980, the court refused to apply prior Tenth Circuit precedent standing for the proposition that "mental incompetence generally does not toll the statute of limitations" because under such an approach "the government would profit from its own (alleged) wrong." Id.

Similarly, in Washington v. United States, 769 F.2d 1436 (9th Cir. 1985), the plaintiff lapsed into a coma after receiving allegedly negligent treatment from Air Force physicians at Plattsburgh Air Force Base in New York while delivering a child. Id. at 1437. The plaintiff's injury occurred in 1967, but she did not die until 1981. Id. The plaintiff's husband and children filed an administrative claim against the Air Force in 1982. Id. After reviewing both Zeidler and Clifford, the court held that the plaintiff's cause of action did not accrue until her death because "[s]he was never aware of her injury or its cause," id. at 1439, and, while "[a] guardian could have been appointed," id., "no one was appointed and no one had a legal duty to file an action on her behalf" until she died, id.

More recently, the Third Circuit held in  Miller v. Philadelphia Geriatric Center, 463 F.3d 266 (3d Cir. 2006), that the malpractice claim of the plaintiff, a sixty-four year-old mentally retarded man with the cognitive ability and emotional maturity of a four-year-old child, id. at 268, did not accrue until his death, id. at 272-75.  Citing Zeidler, Clifford, and Washington, the court held that "[t]he objective reasonable person inquiry annunciated by the Supreme Court in Kubrick does not apply here," id., because "[n]ot only was no guardian ever appointed for [the plaintiff], [but also] his profound mental retardation prevented him from any awareness of his injury or its cause," id. at 275.  The court thus sided with "those courts which have carved a

34

narrow equitable exception to <u>Kubrick</u>'s reasonable person standard for mentally incapacitated

persons who, for whatever reason, do not have a legally appointed guardian to act in their stead."

<u>Id.</u>[12]

---

[12]        Much of the <u>Miller</u> court's discussion was devoted to distinguishing the facts in that case from those before the Third Circuit in <u>Barren v. United States</u>, 839 F.2d 987 (3d Cir. 1988), where the court held that the "diminished mental condition" of the plaintiff in that case, who alleged malpractice by the VA in failing to admit him for inpatient psychiatric care, could not be considered in determining whether the plaintiff exercised due diligence in the discovery of his claims. <u>Id.</u> at 992 (cited in <u>Miller</u>, 463 F.3d at 273-74). The <u>Barren</u> court noted that "the VA's malpractice was a substantial factor in Barren's inability to recognize that very malpractice," <u>id.</u> at 991, but held that the discovery rule announced in <u>Kubrick</u> "cannot be subjectively applied" because "[a]llowing Barren to file later than an objectively reasonable person would be tantamount to ruling that a plaintiff's mental infirmity can extend the statute of limitations," and "[s]uch extensions have uniformly been rejected by this and other courts of appeals." <u>Id.</u> at 992. Instead, the <u>Barren</u> court held that "limitations periods must be strictly construed," <u>id.</u>, even when construing the statute of limitations so narrowly "visits a harsh result on the plaintiff," <u>id.</u>

Rather than reconsider the rationale behind <u>Barren</u>'s strict construction of § 2401(b) in light of <u>Irwin</u>, the <u>Miller</u> court distinguished <u>Barren</u> as follows:

> Our reluctance in <u>Barren</u> to allow the plaintiff an exception to the <u>Kubrick</u> objective standard stemmed from the concern that plaintiffs who were injured by the government could then attempt to take advantage of the "exception" by arguing about when they became incompetent. In other words, the court did not want disputes over when a plaintiff became incompetent to overtake or subsume the objective reasonable person standard in <u>Kubrick</u> – especially when the Government was the cause of the injury that led to the incompetency. <u>Barren</u>, 839 F.2d at 991. Additionally, we refused to address the effect of a lack of a guardian for fear that "[a] deliberate delay" in appointing one might also encourage extending the statute of limitations to the government's detriment.
>
>          However, on its facts, <u>Barren</u> addresses only the specific class of plaintiffs who were not only injured by the government, but were also prevented from recognizing their injuries by the government's malfeasance and we do not find its logic controlling here. Miller's incapacity was not caused by the Government's malfeasance. Instead, he was born totally incompetent and remained so his entire life. Consequently, the concerns suggested in <u>Barren</u> are simply not implicated here. The Government did not cause Miller's retardation, although they did injure him. Thus, because Miller's mental retardation predated the government's negligence, there can be no concern that finding <u>Kubrick</u> inapplicable here will encourage disputes over when a plaintiff was rendered incompetent. Nor might it facilitate the intentional delay in appointing a guardian because, again, plaintiffs in Miller's position are incompetent before the government's negligence occurs.

<u>Miller</u>, 463 F.3d at 274.

It is difficult to reconcile this reasoning with the reasoning that informed the <u>Clifford</u> and <u>Washington</u> decisions. In each of those cases (as with the <u>Orlikow</u> decision), the reviewing court justified its deviation from the <u>Kubrick</u> standard of due diligence largely if not exclusively due to the government's affirmative role in preventing the plaintiff from recognizing his or her injury. <u>See Washington</u>, 769 F.2d at 1438-39 (citing with approval <u>Clifford</u>'s reasoning that "[t]o find that the statute [of limitations] began to run when Clifford went into a coma would permit the government to profit from its own wrong"); <u>Clifford</u>, 738 F.2d at 979-80 ("The important point is

(continued...)

This Court is not so inclined.  The distinction drawn in Orlikow between tolling the

statute of limitations on equitable grounds (which the court believed to be impermissible) and

delaying the accrual of a plaintiff's claim based on the plaintiff's subjective circumstances

(which the court believed to be appropriate) is an ephemeral one.  As the District of Columbia

Circuit stated most recently in Chung, "equitable tolling . . . merely ensures that the plaintiff is

not, by dint of circumstances beyond his control, deprived of a 'reasonable time' in which to file

suit."  Chung, 333 F.3d at 278-79 (citation omitted).  That is the precise rationale behind the

plaintiff's request for a delay in the accrual of her claims.  See Pl. Opp'n at 13 ("[t]he question in

this case is whether, prior to March 2003[,] . . . Mrs. Smith was able to be 'fully aware' of the

facts surrounding Erika's murder sufficient to trigger the statute of limitations under the

FTCA.").

In contrast to the necessarily subjective nature of an equitable tolling analysis, "[t]he test

for whether a plaintiff should have discovered necessary facts" for purposes of the discovery rule

"is an objective one."  McIntyre, 367 F.3d at 52; accord Miller, 463 F.3d at 273; cf. Norman, 467

F.3d at 778 ("due diligence must have the same meaning everywhere").  This rule accords with

---

[12](...continued)

that the VA's actions in performing the lobotomies on Zeidler and in prescribing the Elavil for Allen are the very
conduct which allegedly destroyed those plaintiffs' capacities to realize the existence and cause of their injuries.");
Orlikow, 682 F. Supp. at 84 ("Where the alleged negligence caused the mental harm which affects a plaintiff's
ability to function normally in life, in fairness to that plaintiff, the question of due diligence or when the claim
accrues differs from the case where the injury was not related to the plaintiff's cognitive functioning.").  In contrast,
the Miller court claimed to have departed from Kubrick because the government did not cause the plaintiff's
incapacity.  See Miller, 463 F.3d at 274 ("To reiterate, we are not dealing with a person who, like in Barren, was
mentally ill but competent and then, because of the government's malpractice, progressed into total mental
incapacity.").  And in Zeidler, the court appears not to have cared about the government's role in damaging the
plaintiff's mental capacity at all, but rather distinguished the "brain damage or destruction" suffered by the plaintiff
in that case from "ordinary mental disease or insanity."  Zeidler, 601 F.2d at 531.  The implication is that there is no
single rule or principle for deviating from the normally objective due diligence inquiry required by Kubrick, but
rather, consistent with the Court's analysis above, that each of these specific cases presented "extraordinary
circumstances," Zeidler, 601 F.2d at 531, that warranted equitable relief from the tolling of the statute of limitations.

the original rationale for applying the discovery rule against the federal government, first

expressed by the Supreme Court in Urie v. Thompson, 337 U.S. 163 (1949), that Congress could

not have intended for "humane legislation" to have created causes of action that accrue when

those claims are "unknown and inherently unknowable." Id. at 169-70 (emphasis added). The

alternative to this approach – considering when each individual plaintiff should have known the

salient facts of his case based on his own specific circumstances (e.g., age, IQ, level of education,

work experience, etc.) – would be so convoluted and difficult that it would eviscerate the rule

altogether.

In short, the arguments advanced by the plaintiff are of the type that one would raise in

support of equitable tolling, not in deciding when a plaintiff's claim accrued under the discovery

rule of Kubrick. The Court cannot fathom why one would "carve[] a narrow equitable

exception" to what is already an equitable exception (i.e., the Kubrick discovery rule) unless it is

to try to evade the difficulties inherent in attempting to toll the statute of limitations itself.

Indeed, imposing such an exception on the objective due diligence requirement set forth in

Kubrick would itself arguably run afoul of TRW, for there would never be a need to toll the

statute of limitations for mentally disabled plaintiffs if those plaintiffs' claims never accrued in

the first place.[13]

Finally, even if the Court were to conclude that it could deviate from the objective

standard for due diligence set forth in Kubrick where there are "extraordinary circumstances,"

---

[13] One could argue that Congress intended to create an implicit claim accrual exception for plaintiffs who are both mentally disabled and present "extraordinary circumstances" to the reviewing court, Zeidler, 601 F.2d at 531, and further intended to create an explicit tolling provision for plaintiffs with non-tort claims who are mentally disabled but do not present such circumstances, but such a construction strikes the Court as unlikely because "the supporting scenario is [not] likely to occur outside the realm of theory." TRW Inc., 534 U.S. at 30.

Zeidler, 601 F.2d at 531, it would not do so in this case.  This is not to suggest that the plaintiff

has not suffered tremendously since the death of her daughter, for it is plain from her affidavit

and the declaration of her psychiatrist that she has.  See Smith Aff. ¶¶ 10-15 ("During the weeks

and months following the murders, I experienced severe mental, emotional, and physical

problems that affected every aspect of my life."); Pastor Decl. ¶¶ 4-5 ("Following Erika's death,

Carol Smith regressed to a primitive, survival-oriented mode of mental functioning.").  But the

facts alleged and proven in those cases that have delayed accrual of a plaintiff's claim based on

mental disability are some of the most extreme imaginable: plaintiffs who were unable to

recognize that they were the victims of malpractice because they had been lobotomized, Zeidler,

601 F.2d at 527-28; plaintiffs with pre-existing mental disabilities who were used as guinea pigs

by the CIA, Orlikow, 682 F. Supp. at 84; and plaintiffs who lived their entire lives at the mental

level of a pre-kindergartner, Miller, 463 F.3d at 268. When compared against this parade of

horribles, the "profound global and cognitive impairment" suffered by the plaintiff in the eight

months following the death of her daughter, Pastor Decl. ¶ 4, being both less severe and of a

much shorter duration, cannot be considered of the same piece.

## IV. Conclusion

"It goes without saying that statutes of limitations often make it impossible to enforce

what were otherwise perfectly valid claims."  Kubrick, 444 U.S. at 125.  Moreover, "any statute

of limitations that puts inquiry burdens on a plaintiff, as this one clearly does, . . . entails a degree

of ghoulish behavior," Sexton, 832 F.2d at 636 (internal citation omitted), for "[p]atients or

survivors, whose instinct may well be to shut off from their minds the grim experience through

which they have passed, are required instead to follow up on their leads," <u>id.</u>  As "difficult or even repugnant" as this process may be, <u>id.</u>, the Court is bound to enforce it, and does so here.

For the reasons set forth above, the Court concludes that the United States is entitled to summary judgment as a consequence of its statute of limitations defense.  The plaintiff's Amended Complaint therefore must be dismissed in its entirety with prejudice.

**SO ORDERED** this 9th day of October, 2007.


REGGIE B. WALTON
United States District Judge